UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                              Plaintiff,                    07-CV- 8123 (DC)

        - against —


CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                              Defendant.
------------------------------------------------------------------x


## PLAINTIFF OCEAN LINE HOLDINGS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SINOCHART'S MOTION TO VACATE THE ATTACHMENT, AND IN RESPONSE TO THE APPLICATION FOR COUNTER SECURITY


Of Counsel:

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
Ocean Line Holdings Limited
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................. i

PRELIMINARY STATEMENT ............................................................ 1

SUMMARY OF ARGUMENT IN RESPONSE TO MOTION TO VACATE ......................... 1

BACKGROUND FACTS .................................................................... 2

POINT I

THE OUTCOME OF THIS APPLICATION WILL TURN ON AN ANALYSIS
UNDER THE FSIA, AND WITH RESPECT TO THAT ANALYSIS, IT IS
SINOCHART WHO BEARS THE ULTIMATE BURDEN OF PROOF. ................... 3

POINT II

SINOCHART IS NOT ENTITLED TO FSIA IMMUNITY FROM PRE-
JUDGMENT ATTACHMENT BECAUSE IT IS NOT DIRECTLY OWNED BY A
FOREIGN STATE. ........................................................................ 6

    A.    Brief Overview of the FSIA ................................................. 6

    B.    The Criteria For Determining Majority Ownership for Agency and
    Instrumentality Status was Set by the Supreme Court in Dole, and Direct
    Ownership is Now Mandatory. ............................................ 8

    C.    Sinochart's True Ownership Structure is One of a Subsidiary with
    Ownership Held by its Parent Sinotran. ................................. 10

    D.    Sinochart's Argument in Support of FSIA Immunity Ignores Its Own
    Corporate Ownership Structure, and Should Be Rejected. Reliance on
    the EOWP label is Insufficient to Sustain its Burden of Showing
    Direct State Ownership ..................................................... 13

POINT III

SINOCHART'S APPLICATION FOR
COUNTERSECURITY IS OVERSTATED. .......................................... 18

CONCLUSION ........................................................................... 20

## TABLE OF AUTHORITIES

PAGE

### CASES

Arango v. Guzman Travel Advisors Corp.,
621 F2d 1371 (5th Cir. 1980) ...................................................................5

Banco de Seguros del Estado v. Mut. Marine Office,
344 F.3d. 255, 260 (2d Cir. 2003) .............................................................7

Bank of China v. NBM L.L.C., 01-0815 (DC),
2002 U.S. Dist. Lexis 9468 (S.D.N.Y. May 24, 2002).....................8, 12, 13

Cargill Int'l S.A. v. M/T PAVEL DYBANKO,
991 F.2d 1012 (2d Cir. 1993) ...................................................................4

City of N.Y. v. Permanent Mission of India to the UN,
446 F.3d 365, 369 (2d Cir. 2006) .............................................................4

Dole Food Co. v. Patrickson,
538 U.S. 468 (2003) ........................................................................1, passim

Edlow Int'l v. Nuklearna Elektrarna Krsko,
441 F.Supp. 827, 831 (D.D.C. 1977).......................................................14

First Md. Leasecorp v. M/V Golden Egret,
764 F.2d 749, 758 n.4 (11th Cir. 1985) ...................................................18

Folkstone Maritime, Ltd. v. CSX Corp.,
1988 U.S. Dist. LEXIS 10606 (D. Ill. 1988).............................................18

Forsythe v. Saudi Arabian Airlines Corp.,
885 F.2d 285, 289 n.6 (5th Cir. 1989) .....................................................5

Gould, Inc. v. Pechiney Ugine Kuhlmann,
853 F.2d 445 (6th Cir. 1988) ...................................................................5

Murphy v. Korea Asset Mgmt. Corp.,
421 F.Supp. 2d 627 (S.D.N.Y. 2005) .......................................................5

Nat'l Am. Corp. v. Fed. Rep. of Nigeria,
448 F. Supp. 622 (S.D.N.Y. 1978) ...........................................................6

Republic of Mexico v. Hoffman,
324 U.S. 30, 34-35 (1945) .......................................................................6

Result Shipping Co. Ltd. v. Ferruzzi Trading USA Inc.,
56 F.3d 394 (2d Cir. 1995) ................................................................................18

Starboard Venture Ship., Inc. v. Casinomar Transp., Inc.,
1994 AMC 1320 (S.D.N.Y. 1993) ......................................................................18

Titan Navigation, Inc. v. Timsco, Inc.,
808 F.2d 400, 404 (5th Cir. 1987) .....................................................................18

Trans Chemical Ltd. v. China National Machinery Import & Export Corp.,
978 F.Supp. 266 (S.D. Tex. 1997) ...............................................................16, 17

Trinidad Foundry v. M/V Kas Camilla,
776 F.Supp. 1555 (S.D. Fla. 1991) ....................................................................18

Verlinden B.V. v. Cent. Bank of Nigeria,
461 U.S. 480, 488 n.22 (1983) .............................................................................6

Virtual Countries, Inc. v. Republic of South Africa,
300 F.3d 230, 241 (2d Cir. 2002) ........................................................................5

## **STATUTES**

Fed. R. Civ. Proc. Supp. Rule E(4)......................................................................4

Foreign Sovereign Immunities Act, 28 USC §§1601 et seq. ...........................2, passim

## OTHER AUTHORITIES

H.R. Rep. No. 94-1487, at 45 (1976) ...................................................................6

Letter from Jack B. Tate to Philip B. Perlman (May 19, 1952),
reprinted in 26 Dep't of State Bull. 984 (1952)....................................................6

## PRELIMINARY STATEMENT

This Memorandum is submitted on behalf of the Plaintiff Ocean Line Holdings Limited (hereinafter "Plaintiff" and/or "Ocean Line") in opposition to the application by the Defendant China National Chartering Corp. (hereinafter "Defendant" and/or "Sinochart") to vacate the Rule B attachment, and in response to Sinochart's application for countersecurity. For the reasons set forth in greater detail below, the motion to vacate the attachment should be denied, and the application for countersecurity reduced.

## SUMMARY OF ARGUMENT IN RESPONSE TO MOTION TO VACATE

Defendant Sinochart moves to vacate the attachment on the basis that it enjoys immunity under the Foreign Sovereign Immunities Act ("FSIA") as an instrumentality of a foreign state. Sinochart seeks to support its claim to instrumentality status on the basis that it is a Chinese corporate entity which is directly owned by the People's Republic of China ("PRC").

In its submission, however, Sinochart neglects to address the one critical factor which deprives it of immunity -- this being that it is, in reality, a wholly-owned subsidiary of yet another Chinese corporate entity (a corporation called Sinotrans). Such intermediate ownership nullifies any claim to FSIA immunity, under *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), in which the "tiering" of intermediate layers of corporate ownership to establish foreign state ownership was expressly rejected by the Supreme Court. When the true ownership structure of Defendant Sinochart is explored, and its relationship to its parent entity (Sinotrans) fully examined under applicable Chinese law, it becomes evident that there is no direct state ownership by the PRC in Sinochart, and hence no entitlement to immunity. Since this is the only basis upon which Sinochart seeks vacatur, the application should be summarily denied.[1]

---

[1] These points are addressed more fully below beginning with a brief overview of the facts, a review of the applicable law and an examination of the ownership structure under which Sinotrans, as parent, owns

## BACKGROUND FACTS

The facts relevant to the underlying casualty giving rise to this claim are not germane to the motion to vacate, and as such, only a very brief overview is provided so the Court has some idea of the background to the claim.

In August 2006, Plaintiff Ocean Line, in the capacity as owner of the M/V OCEAN VICTORY, entered into a contract of charter party with Defendant Sinochart.  (Verified Complaint ¶4).  The charter party provided that Defendant Sinochart, as charterer, would only employ the vessel via safe berths and safe ports. (Verified Complaint ¶5).  While performing on a voyage pursuant to orders issued by Sinochart, the vessel grounded while trying to depart from the port of Kashima, Japan, and eventually broke up, becoming a total loss.  Damages in the approximate amount of $147 million have been sustained. (*See, generally*, Verified Complaint ¶¶ 6-15).

The merits of the claim are subject to arbitration in London pursuant to the charter party. This action was commenced in aid of those proceedings, and an attachment was issued pursuant to Supplemental Admiralty Rule B.  Funds of Defendant Sinochart have been restrained at various banking institutions, but equal to only about 15% of the amount set forth in the order of attachment.  Defendant Sinochart has moved to vacate the attachment and for countersecurity.

Insofar as this motion is concerned, the only facts which will bear on this Court's review and eventual decision involve Sinochart's status as a subsidiary of Sinotrans – a point which was not addressed to any significant degree, or mentioned for any practical purpose, in Sinochart's motion papers.  Indeed, the only reference to its parent corporation is a very hazy discussion contained in ¶8 of the Declaration of Mr. Song wherein he confirms that Sinotrans was the entity

---

its subsidiary, Sinochart.  The application for countersecurity is also addressed at the conclusion of this memorandum.

which provided 100% of the capital infusion in the creation of Sinochart. No other mention of the parent Sinotrans features anywhere in the motion to vacate.

The role of Sinotrans (the parent entity) and its relationship to Sinochart (the subsidiary) are fully described in the accompanying Declarations of Weidong Chen, Donald Clarke and Jacques deLisle (Exhibits A, B & C, respectively).[2] This relationship is critical to the FSIA analysis because, as discussed more fully below, "tiering" of ownership through corporate intermediaries to satisfy state ownership is no longer allowed. While Sinochart may have been formed under a legislative scheme which describes the economic nature of the entity as being owned by the people, that label does not control the outcome under the FSIA, nor does it reflect the reality of the ownership structure in this case. Here, the direct ownership interest of Sinochart rests with its parent Sinotrans. Sinochart reports to Sinotrans in all material respects, the profit generated by Sinochart flows only to Sinotrans and the capital used to create Sinochart came from Sinotrans. Therefore, and under *Dole*, the direct ownership interest by the intermediate parent (Sinotrans) foreclose immunity under the FSIA.

## POINT I

### THE OUTCOME OF THIS APPLICATION WILL TURN ON AN ANALYSIS UNDER THE FSIA, AND WITH RESPECT TO THAT ANALYSIS, IT IS SINOCHART WHO BEARS THE ULTIMATE BURDEN OF PROOF.

Sinochart begins its legal analysis with a discussion of the burden of proof generally applicable when a defendant challenges a Rule B attachment. (*See* Sinochart Br. at 3-4). Sinochart notes that in such a context, it is the plaintiff who bears the burden of showing why the

---

[2]    To the extent the relationship between these two corporate entities is outlined in greater detail in the argument section of this brief and the accompanying declarations, no further comment on the actual corporate structure, formation or ownership relationship between Sinotrans and Sinochart is necessary here.

attachment should not be vacated. *See* Fed. R. Civ. Proc. Supp. Rule E(4). Plaintiff Ocean Line

has no quarrel with Sinochart's recitation of the law insofar as the Rule B analysis is concerned,

and for the reasons outlined in the balance of this memorandum, Plaintiff submits that it amply

meets that burden.

At bottom, however, this motion does not raise a challenge to any of the fundamental

requirements for the maintenance of a Rule B attachment.[3] Instead, Defendant Sinochart moves

for vacatur under the Foreign Sovereign Immunities Act, 28 USC §§1601 *et seq.,* (the "FSIA" or

"Act") which has a separate set of burdens which thus needs to be considered.

Under the FSIA, there is a three-step burden-shifting framework which places the

ultimate burden of proof on the one seeking immunity. In its brief, Sinochart outlines only two

of the three steps. Sinochart suggests that once it, as the party seeking immunity, presents a

*prima facie* showing of agency or instrumentality status, the burden then shifts to the opposition

to demonstrate why the FSIA should not apply -- period. (Sinochart Br. at 5). In so doing,

Sinochart leaves one with the impression that the ultimate burden in this case lies with the

Plaintiff. (*See* Sinochart's Br. at 5 (citing *Cargill Int'l S.A. v. M/T PAVEL DYBANKO,* 991 F.2d

1012 (2d Cir. 1993)). This is inaccurate.

Indeed, in the very case cited by Sinotrans (*Cargill*), the Second Circuit made clear that

the analysis does not end there. There is yet a third step in the burden of proof framework which

places the "ultimate burden of persuasion" back on the one seeking FSIA immunity. *See Cargill,*

991 F.2d at 1016. Similar support for this burden of proof framework is found in numerous

other decisions. *See, e.g., City of N.Y. v. Permanent Mission of India to the UN,* 446 F.3d 365,

---

[3]    Sinochart does not contest that the underlying requirements of Rule B have been met, *i.e.* that the
plaintiff has a maritime claim, that the defendant is not "found" in the district, and that property of the
defendant has been restrained.

369 (2d Cir. 2006); *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989); *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988); *Arango v. Guzman Travel Advisors Corp.*, 621 F2d 1371 (5th Cir. 1980).

In *Murphy v. Korea Asset Mgmt. Corp.*, 421 F.Supp. 2d 627 (S.D.N.Y. 2005), *aff'd*, 190 Fed. Appx. 43 (2d Cir. 2006), District Judge Holwell thoroughly described the applicable shifting burdens of proof in a case in which the defendant claimed it was an agent or instrumentality of a foreign state[4]:

> [A] party claiming immunity need not initially establish by a preponderance of the evidence that it is an "agent or instrumentality of a foreign state" under Section 1603(b); rather, the entity need initially only make a prima facie showing. Once that showing is made, the opposing party then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Determining whether the opposing party has met this burden "involves a 'review [of] the allegations in the complaint, the undisputed facts, if any, placed before [the court] by the parties, and -- if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue -- [resolution of] disputed issues of fact.'" Finally, if that burden is met, the "ultimate burden of persuasion" shifts back to the party claiming immunity. This final burden must be met by a preponderance of the evidence.

*Id.* at 640-41.

Based upon the foregoing, therefore, the correct recitation of the burden of proof must necessarily include a reference to the fact that the ultimate burden rests with Sinochart in demonstrating its alleged sovereign status. For the reasons discussed more fully below, that burden cannot be carried because of Sinochart's corporate ownership structure.

---

[4] The defendant in that case argued that it was an agent or instrumentality under 28 U.S.C. §1603(b), because it was an "organ" of a foreign state, whereas Sinochart here argues that it is an instrumentality under §1603(b) because it is an entity the majority of whose ownership interest is owned by a foreign state. Nonetheless, the shifting burdens of proof applicable under the FSIA are equally applicable.

## POINT II

### SINOCHART IS NOT ENTITLED TO FSIA IMMUNITY FROM PRE-JUDGMENT ATTACHMENT BECAUSE IT IS NOT DIRECTLY OWNED BY A FOREIGN STATE.

As outlined above, the sole basis upon which Sinochart seeks vacatur of the attachment is grounded on its position that it is entitled to immunity from pre-judgment seizure as an instrumentality of a foreign state under the FSIA. As a starting point in this analysis, therefore, a brief overview of the FSIA is appropriate.

### A.    Brief Overview of the FSIA.

The FSIA provides comprehensive rules for suits involving foreign governments and their agents and instrumentalities. These rules govern the availability of foreign sovereign immunity, jurisdiction over suits involving foreign governments and their entities, as well as the procedures for such suits. *See, e.g., Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 n.22 (1983).

The FSIA was designed to "facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation." Letter from Robert S. Ingersoll & Harold R. Tyler to Carol O. Albert, October 31, 1976, reprinted in H.R. Rep. No. 94-1487, at 45 (1976). Prior to the enactment of the Act, the U.S. State Department had adopted the so-called "restrictive theory" of sovereign immunity, under which "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis)." Letter from Jack B. Tate to Philip B. Perlman (May 19, 1952), reprinted in 26 Dep't of State Bull. 984 (1952); *see also Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-35 (1945). In enacting the FSIA, therefore, Congress codified and refined the restrictive theory of sovereign immunity. *See Nat'l Am. Corp. v. Fed. Rep. of*

*Nigeria*, 448 F. Supp. 622 (S.D.N.Y. 1978), *aff'd,* 597 F.2d 314 (2d Cir. 1979).

The FSIA sets forth the "**sole and exclusive standards** to be used in resolving questions of sovereign immunity raised by foreign states before federal and state courts in the U.S." *See Banco de Seguros del Estado v. Mut. Marine Office*, 344 F.3d. 255, 260 (2d Cir. 2003) (quoting H.R. Rep. No. 94-1487) (emphasis added). The Act identifies the entities eligible to invoke the doctrine of sovereign immunity and defines the circumstances under which suit can be maintained against a foreign state or its instrumentalities and when immunity will or will not be available. 28 U.S.C. §§ 1604, 1609.

Under the FSIA, a "foreign state" is defined to include both (1) a political subdivision of a foreign state or (2) an "agency or instrumentality" of a foreign state. Here, Sinochart does not suggest that it is a political subdivision of a foreign state, instead seeking immunity as an "instrumentality." (*See* Sinochart Br. at 8). An "agency or instrumentality" of a foreign state is defined by §1603(b) of the FSIA as consisting of an entity meeting the following three criteria:

> (1)    Which is a separate legal person, corporate or otherwise, and
>
> (2)    Which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interests is owned by a foreign state or a political subdivision thereof, and
>
> (3)    Which is neither a citizen of a state of the United States as defined in §1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

In this case, there is no dispute that Sinochart meets the first and third prongs of the §1603(b) test – being a separate legal person that was created under the laws of the PRC. The sole issue in dispute, consequently, focuses on whether Sinochart meets its burden of proof with respect to the second prong of the test – majority ownership by a foreign state. *See* §1603(b)(2).

Sinochart alleges that it meets instrumentality status because it is "100% owned by the PRC." (*See* Sinochart Br. at 6). The position is unsupportable.

**B.    The Criteria For Determining Majority Ownership for Agency and Instrumentality Status was Set by the Supreme Court in *Dole*, and Direct Ownership is Now Mandatory.**

Prior to the Supreme Court's decision in *Dole*, 538 U.S. 468, the circuit courts struggled with the issue of whether the FSIA requirement of majority ownership by a foreign state could be satisfied in a situation involving corporate intermediaries. *See, e.g., Bank of China v. NBM L.L.C.*, 01-0815 (DC), 2002 U.S. Dist. Lexis 9468 (S.D.N.Y. May 24, 2002) (noting the split in the circuits and holding tiering is not allowed under FSIA). That issue was squarely addressed, however, and resolved in 2003 with the *Dole* Court's pronouncement that tiered ownership would not suffice.

In *Dole*, the state ownership in the corporate entities claiming agent or instrumentality status was not direct. Instead, there were one or more layers of intermediate corporate entities between the State of Israel and the subsidiary entities who claimed immunity. The issue, therefore, framed to the Supreme Court was whether a corporate subsidiary can claim instrumentality status where the foreign state did not own a majority of the subsidiary's shares directly but rather a majority of the shares of a corporate parent positioned one or more "tiers" above that subsidiary. 538 U.S. at 471. In other words, was direct ownership a prerequisite, or would beneficial ownership through corporate tiering suffice?

The Supreme Court answered the question unequivocally: "[O]nly direct ownership of a majority of shares by the foreign state satisfies the statutory requirement" and provides a basis for immunity. *Id.* at 474. Importantly, the Court noted that it was corporate structure that should drive the analysis and ultimately control the outcome as to whether state ownership is direct.

The hazy concept of ultimate or beneficial ownership, as was urged by the entities seeking immunity in *Dole,* was determined to be insufficient. The Supreme Court stated:

> §1603(b)(2) speaks in terms of ownership. The Dead Sea Companies [i.e. the parties seeking immunity in *Dole*] urge us to ignore corporate formalities and use the colloquial sense of that term. They ask whether, in common parlance, Israel would be said to own the Dead Sea Companies. We reject this analysis. In issues of corporate law structure often matters.

*Id.* at 474. Applying this rationale, the Court rejected agency or instrumentality status in *Dole* because there was no direct state ownership by Israel.

Sinochart recognizes the existence of *Dole*'s requirement of direct ownership (Sinochart Br. at 6), but in a presentation which is, at best, cursory, neglects to provide any substantive disclosure of its true corporate structure.[5]  Boiled down to its basics, Sinochart argues that because it is a corporation created under a legislative scheme which labels it "an enterprise owned by the whole people" (an "EOWP"), the Court's inquiry need go no further and, *presto,* Sinochart is entitled to immunity. This effort, however, falls far short of the mark. It ignores the true ownership structure which exists between Sinochart and its parent Sinotrans and the *Dole* requirement that the outcome be determined by corporate structure.

Under *Dole,* it is clear that an examination of the actual corporate structure is mandatory, and cannot be satisfied with mere conclusory statements of direct state ownership. In the context of this situation, when Sinochart's *actual corporate ownership structure* is examined, and Sinotrans 100% ownership considered, the fallacy in Sinochart's position is laid bare. There is no direct state ownership, Sinochart is a wholly owned subsidiary of yet another Chinese corporate entity, and as a consequence, the application for immunity should be denied.

---

[5]   Indeed, virtually no mention of Sinotrans, the parent, is contained in Sinochart's presentation with the exception of a brief mention in one paragraph of the Song Declaration.

**C.**    *Sinochart's True Ownership Structure is One of a Subsidiary with Ownership Held by its Parent Sinotrans.*

Sinochart's actual ownership structure and its relationship to Sinotrans are set forth in detail in the accompanying declarations of Mr. Weidong Chen ("Chen Decl."), Professor Donald Clarke ("Clarke Decl.") and Professor Jacques deLisle ("deLisle Decl.")[6]. These declarations incorporate a very detailed and careful analysis of the formation, capitalization and ownership structure of Sinochart and its relationship with its parent (Sinotrans). They also address the ramifications that relationship has to the question of direct state ownership under Chinese law and the applicable regulations.

Instead of simply regurgitating those points here, Plaintiff respectfully refers the Court to the declarations themselves, which speak volumes on both: (i) the utter deficiency in the scope of Sinochart's factual presentation; and, (ii) the basis upon which, Plaintiff submits, there is no direct state ownership by the PRC of Sinochart and thus no entitlement to immunity. The declarations illustrate the following about the actual owning structure of Sinochart:

- It was Sinotrans (the parent) that provided 100% of the capital for the formation of Sinochart. No capital was directly provided by the state. (*See* Chen Decl. at ¶40-41; Clarke Decl. at ¶ 18-19; deLisle Decl. at ¶39).

- Defendant Sinochart was not formed in the 1950's but was created by Sinotrans in the 1990's. (*See* Chen Decl. at ¶45-52; Clarke Decl. at ¶22-24; deLisle Decl. at ¶33-39).

- Sinotrans describes Sinochart in its own website as a subsidiary. (*See* Chen Decl. at ¶44; Clarke Decl. at ¶16; deLisle Decl. at ¶43, 47).

- The corporate documentation of Sinochart describes Sinotrans' shareholding percentage as being 100%. (*See* Chen Decl. at ¶41; Clarke Decl. at ¶19(a)).

---

[6]    These declarations are submitted as an attachment to the Gutowski Declaration as Exhibits A, B, C, respectively.

- Sinochart's own documents describe Sinotrans as holding 100% of its equity interest and further confirms that the state holds *no equity interest.* (*See* Clarke Decl. at ¶19(a-b); deLisle Decl. at ¶91-92).

- None of Sinochart's profit goes directly to the state. Its profit is divided, after corporate taxes, between itself and its parent Sinotrans. (*See* Chen Decl. at ¶58-60; Clarke Decl. at ¶18; deLisle Decl. at ¶45, 54, 71).

- Under Sinochart's Articles of Association, it is described as a subsidiary of Sinotrans. (*See* Chen Decl at ¶42; Clarke Decl. at ¶18; deLisle Decl. at ¶38).

- Sinochart's parent, Sinotrans, has managerial control over all major aspects and decisions of Sinochart. (*See* Chen Decl. at ¶53-57; Clarke Decl. at ¶18; deLisle Decl. at ¶45, 75).

- The state's (PRC's) corporate governing body - the SASAC - which is charged with the supervision and management of all direct state-owned entities in China, has no supervisory role over Sinochart. (*See* Chen Decl. at ¶63-75; Clarke Decl. at ¶18; deLisle Decl. at ¶54, 65-70, 72-75, 87).

- The PRC publishes a list of the "Central Enterprises" which comprise the entities considered to be directly owned/invested by the PRC. Sinotrans is on the list, but Sinochart is not. (*See* Chen Decl. at ¶71-73; Clarke Decl. at ¶21; deLisle Decl. at ¶67-68).

- The applicable Chinese regulations and guidelines equate the relationship of the head company in a group (*i.e.* like Sinotrans) to its subsidiary members of the group (like Sinochart) as one where the parent company exercises "shareholders rights as per its proportion of investment in its subsidiaries." (*See* Chen Decl. at ¶82-87; *see also* deLisle Decl. at ¶40-42).

- Sinochart is fully invested by Sinotrans, meaning that Sinotrans exercises 100% of the shareholders rights of Sinochart. (*See* Chen Decl. at ¶40, 84; deLisle Decl. at ¶91-92).[7]

---

[7]    The references above to the various sections in the declarations which support the true factual structure are by no means intended to be a complete citation to the exhaustive analysis conducted by these

Contrary to the superficial presentation submitted by Sinochart, the above-referenced facts overwhelmingly demonstrate the absence of any direct ownership interest by the PRC in Sinochart. To the contrary, the ownership structure is, simply stated, that of a subsidiary to its parent, with the parent Sinotrans having the direct ownership interest. This case thus falls squarely within *Dole*, and Sinochart's effort to re-cast itself as an instrumentality of a foreign state entitled to FSIA immunity fails.[8] There is simply no evidence in the record of any direct state ownership as required by *Dole*.

Interestingly, this Court has already had occasion to consider a similar situation and reached the same conclusion in a case that pre-dated *Dole*. *See Bank of China*, 2002 U.S. Dist.

---

three individuals. They are merely intended to highlight where these major points are covered, and the Court is otherwise respectfully referred to those declarations for an even more complete review.

[8]    Although not discussed at any length in its submission, Sinochart hints that it may rely on the "other ownership interest" language used in §1603(b)(2), which refers to an "entity a majority of whose shares or other ownership interest is owned by a foreign state." (*See* Sinochart Br. at 7). Once again, the Supreme Court's decision in *Dole* forecloses any such reliance. In *Dole*, the Supreme Court explained exactly how the "other ownership interest" language is to be construed:

> The words "other ownership interest," when following the word "shares," should be interpreted to refer to a type of interest other than the ownership of stock. The statute had to be written for the contingency of ownership forms in other countries, or even in this country, that depart from conventional corporate structures. The statutory phrase "other ownership interest" is best understood to accomplish this objective. Reading the term to refer to a state's interest in entities lower on the corporate ladder would make the specific reference to "shares" redundant.

538 U.S. at 476.

Consequently, even if the relationship between Sinotrans and Sinochart may not include the issuance of actual share certificates, the relationship nonetheless forecloses Sinochart's argument because the nature of the ownership is identical. As described above and in the declarations, Sinotrans' role and rights vis-à-vis Sinochart are the same as shareholder rights and Sinochart is considered directly owned by Sinotrans under the applicable Chinese laws and regulations. Indeed, under the more recent guidelines, the parent's rights are described in terms "shareholders' rights" and the extent of those rights is the equivalent to the percentage invested – a situation identical to a stock ownership analysis. *See*, generally, Chen Decl. at ¶82-85. Thus, the interest of Sinotrans in Sinochart constitutes either "shares" or "other ownership interest" as those terms are used in §1603(b)(2) and construed by the Supreme Court in *Dole*, and the fact that no share certificates may have been issued is of no moment.

Lexis 9468. In that case, this Court addressed the question of whether the Bank of China (Hong Kong) Ltd. was entitled to agent or instrumentally status under the FSIA where the bank was a wholly-owned subsidiary of another entity (the Bank of China) which in turn was "wholly owned by the PRC". The Court rejected the application for FSIA status because the Hong Kong bank was, the Court noted, "one step removed" from the state due to the fact that it was "wholly owned" by the Bank of China. It was thus not entitled to agency or instrumentality status.

That conclusion is even more compelling here when one considers that the Supreme Court later confirmed in *Dole* that tiering is not allowed under the FSIA, and as such, implicitly affirmed the rationale underlying the decision in *Bank of China*. Based upon the complete record which is now before the Court, and the absence of any direct state ownership interest, *Dole* precludes immunity.

**D.**      ***Sinochart's Argument in Support of FSIA Immunity Ignores Its Own Corporate Ownership Structure and Should Be Rejected. Reliance on the EOWP Label is Insufficient to Sustain Sinochart's Burden of Showing Direct State Ownership.***

As outlined above, it is Sinotrans who bears the ultimate burden of showing instrumentality status, and to do so, it must demonstrate that it is majority owned directly by the PRC. As is evident from the accompanying Chen, Clarke and deLisle Declarations, Sinochart's discussion of its *own* corporate structure was a bit thin, to say the least, on details, and all but omitted any mention of its parent Sinotrans.[9] It obviously did so because its relationship to Sinotrans is fatal to its claim of immunity.

In an effort to provide some basis for its position, however, Sinochart resorts to the argument that the EOWP label should be enough. Here, and relying primarily on the fact that its corporate license describes its economic nature as being an enterprise of the whole people (an

---

[9]    In the one place where Sinotrans is mentioned, Mr. Song tries in a somewhat opaque discussion to dilute the import of Sinotrans' 100% shareholding in Sinochart.

EOWP entity), Sinotrans then asks the Court to ignore its structure and simply conclude that as such an entity, it satisfies the direct state ownership requirement. The argument is flawed for several reasons.

First, *Dole* makes clear that structure, not labels, control the analysis. *See also Edlow Int'l v. Nuklearna Elektrarna Krsko*, 441 F.Supp. 827, 831 (D.D.C. 1977) (suggesting that labels such as "socialist system" are not dispositive in an instrumentality evaluation). Next, formation under the EOWP legislative scheme does not carry with it automatic direct state ownership of every EOWP entity. Instead, the legislative scheme sanctions subsidiary ownership by a corporate EOWP parent, in which the parent is an intermediary between the state and the subsidiary. Finally, all indicia of ownership under the Chinese concept of civil law place ownership with the parent insofar as the subsidiary is concerned. Each point is discussed below.

With respect to the first point, the *Dole* requirement necessitating a factual analysis of the actual ownership structure has already been addressed above and thus need not be repeated. (*See* Point II(C) above).

Next, Sinotrans' suggestion that its mere status as an EOWP entity means 100% direct state ownership is debunked by all three declarants. By way of illustration, Professor Clarke completely rejects Mr. Xing Nai Qun's conclusion on this point:

> Paragraph 4 of the Xing Declaration states that the business license shows Sinochart to be an enterprise under "ownership of the whole people." This much is accurate, but the conclusion that follows is not. The Xing Declaration states that "under Chinese law, ['ownership by the whole people'] means the company is owned by the People's Republic of China." If we add the words "directly or indirectly" before "owned", this statement is by and large (although not completely) accurate. If the Xing Declaration is stating that "ownership by the whole people" always and everywhere means direct ownership by a government entity, then it is simply incorrect. As explained in Para. 14 of this Declaration, subsidiaries of SOEs/EOWPs can also be considered SOEs/EOWPs.

(Clarke Decl. at ¶22(b)).

Professor Clarke goes on to explain:

> The documentary evidence overwhelmingly supports the conclusion that Sinochart is a wholly-owned subsidiary of Sinotrans and is not directly owned by the Chinese state. The statements of the Xing Declaration and the Dihuang Declaration that Sinochart is owned by the Chinese state are insufficient to overturn the weight of this evidence; indeed, they do not address it at all. They may be using the term "ownership" loosely to mean ultimate beneficial ownership, but such ownership is not by itself enough, under Dole, to qualify for the protections of the FSIA. Alternatively, they may be relying on the incorrect premise that the status of "ownership by the whole people" means direct ownership by the Chinese state and precludes ownership through a subsidiary. As I have shown, this premise is not supported in Chinese law. In sum, an examination of the specific features of the relationship between Sinotrans and Sinochart reveals a fairly standard parent-subsidiary pattern. Thus, in my opinion the facts of this case fit squarely within the holding of Dole.

(Clarke Decl. at ¶25).

The same conclusions are reached by Professor deLisle, commencing at ¶33 of his Declaration. At the conclusion of this initial discussion, he explains:

> It appears that the Defendant does not dispute that Sinochart's, and Sinotrans's, ownership structure fits the pattern described above, at least as a formal or legal matter. It appears that Defendant's argument is, instead, that this formal or legal structure of ownership does not matter because Sinochart is, nonetheless, "owned by the state" [EOWP entity] in a relevant sense because of other factors such as its being an enterprise under the "system of ownership by the whole people" or because it operates with "state-owned" assets. As addressed more fully below, these arguments, and what is offered to support them, do not warrant the conclusion that Sinochart is, in a relevant sense, "owned by the state."

(deLisle Decl. at ¶48).

In the ensuing paragraphs, Professor deLisle describes the background to and the development of China's modern day corporate environment where the creation of subsidiaries is commonplace. Based upon his review of the entire record and the relevant Chinese law and system of ownership, he concludes that the mere fact that a corporate subsidiary in China holds a

business license which describes it as an EOWP does not necessitate a finding that such an entity is directly state owned. (See deLisle Decl. at ¶49-81):

> Under the circumstances of enterprise ownership and enterprise structure in contemporary China described above, "ownership by the whole people" thus does not mean what it might appear to suggest. It does not show traditional or direct ownership of an enterprise by the state, especially where records indicate that an enterprise is owned by another enterprise (or other owners that are not the state or organs of the state). It is generally best understood as a historical statement about the origins of the enterprise (as an entity that, during the era of planning and ubiquitous direct state ownership, was under a central government body) and, to a limited extent, the original source of its capital or assets (that is, allocation from the central state).
>
> *        *        *        *
>
> For the reasons set forth above, Sinochart is properly considered to be owned by the China National Foreign Trade Transportation (Group) Company ("Sinotrans"), which is an enterprise owned by the state (that is, the People's Republic of China). The most that could plausibly be claimed is that Sinochart is indirectly owned by the state. Sinochart's status as an enterprise under the system of ownership by the whole people and Sinochart's operation with assets or capital that are, in some senses, "property of the state" or "owned by the whole people" do not alter these conclusions.

(*See* deLisle Decl. at ¶76 & 116). (*See also* Chen Decl. at ¶101-102).

On this same point, Sinochart's reliance on *Trans Chemical Ltd. v. China National Machinery Import & Export Corp.*, 978 F.Supp. 266 (S.D. Tex. 1997), for the proposition that EOWP status equates to direct state ownership is completely misplaced, and Sinochart's suggestion that the ownership structure there is identical to here is wrong.[10] (Sinochart Br. at 7) Professor Clarke, the expert who testified for the plaintiffs in that case and upon whom the

---

[10] In *Trans Chemical*, the party asserting the application of the FSIA was the plaintiff who sought to use the Act as a basis to support subject matter jurisdiction. The foreign entity disputed its status as an instrumentality. After an extensive record was developed through discovery and the district court's consideration of all the factors of ownership including infusion of capital, control and management, the court held that that particular EOWP entity (China National Machinery Import and Export Corp.) was in fact an instrumentality under the FSIA.

district court heavily relied in its opinion, rejects Sinochart's position based the difference in the fact pattern here. As explained in his declaration, the issue of tiering was simply not in play. The *Trans Chemical* court thus did not even address the factual issue in this case -- the lack of any direct ownership by the state -- or the legal issue (addressed and resolved in *Dole*) of whether a subsidiary of a state-owned parent is itself state-owned under the FSIA. (*See* Clarke Decl. at ¶15). These factors preclude reliance on *Trans Chemical*, which in any event does not stand for the proposition that every EWOP is, *ipso facto*, directly owned by the state.

Finally, there is an interesting issue not considered in *Trans Chemical* which bears mention. Under Chinese law (like many civil law jurisdictions), total ownership is comprised of four "ownership rights" including (1) use, (2) possession, (3) disposition and (4) benefit. (*See* Chen Decl. at ¶14). With respect to Sinochart, three of those rights rest with Sinochart itself and the fourth (*i.e.* the right of benefit) is split between Sinochart and Sinotrans. (*See* Chen Decl. at ¶103). Therefore, if one were to consider ownership under Civil Law concepts, one could not fairly say that the state holds a majority interest in Sinochart as the state holds none of those four ownership rights.

In the final analysis, this is a case which is on all fours with *Dole*. Contrary to the suggestion by Sinochart that the Court need only look to its label, the Supreme Court mandates otherwise and commands a review of the actual ownership structure. Such a review leaves no room for debate: the PRC holds no direct ownership of Sinochart. Concepts of beneficial ownership play no part in this analysis. The application for immunity should be denied.[11]

---

[11]    Plaintiff maintains that on the current record, there is no basis upon which Sinochart should be entitled to FSIA instrumentality status. Sinochart, as the entity claiming immunity, has the ultimate burden of proof on this point, and as outlined above, the record refutes any notion that there is majority ownership directly by the PRC. To the extent Sinochart submits any new evidence on reply, Plaintiff submits that it should be given an opportunity to respond and/or conduct discovery on that evidence, particularly given the paucity of the initial factual presentation made by Sinochart.

## POINT III

## SINOCHART'S APPLICATION FOR
## COUNTERSECURITY IS OVERSTATED.

Sinochart has cross-moved for an order compelling the posting of countersecurity to cover its counterclaims. To the extent counter security is determined to be appropriate, the sum demanded should be reduced.

In *Result Shipping Co. Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995), the Second Circuit made clear that despite the seemingly mandatory language of Rule E, a court has broad discretion on whether to order the posting of counter-security, and if so, in what amount. *Id.* at 399-400 (citations omitted) (emphasis added); *see also First Md. Leasecorp v. M/V Golden Egret*, 764 F.2d 749, 758 n.4 (11th Cir. 1985).[12] Although the court is not charged with the obligation of resolving the merits of the dispute in the context of a countersecurity application, the court does have the power to examine the defendant's claims to determine whether the counterclaim or the amount sought may be frivolous or not warranted. *See Trinidad Foundry v. M/V Kas Camilla*, 776 F.Supp. 1555 (S.D. Fla. 1991) (counterclaim for unsatisfactory services was frivolous when there was notice executed by a representative of defendants explicitly confirming that the services were satisfactorily completed). The court's finding in this regard is not *res judicata* on the ultimate issue of whether a claim or element of damage is recoverable, but rather a preliminary assessment relating to the request for countersecurity only. *Id.*

---

[12]    By way of example, it is well established that "the court should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant." *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 404 (5th Cir. 1987); *Starboard Venture Ship., Inc. v. Casinomar Transp., Inc.*, 1994 AMC 1320 (S.D.N.Y. 1993). The courts have also made clear that a request that is primarily tactical rather than of substance is not proper. *See Folkstone Maritime, Ltd. v. CSX Corp.*, 1988 U.S. Dist. LEXIS 10606 (D. Ill. 1988).

As outlined more fully in the accompanying Declaration of Luke Parsons QC (Ex. D to Gutowski Decl.), several components of the Sinochart "counterclaim" are not viable under English law and thus do not provide a legitimate basis for countersecurity.

In Sinochart's counterclaim, it includes a claim for the alleged loss of the use of the vessel in the sum of $2,150,000. Here, Sinochart claims that this item is recoverable due to the Plaintiff's supposed "breach of the charter party contract and/or its negligence or gross negligence in the operation or management of the vessel". (*See* Verified Answer and Counterclaim outlining basis for loss of use claim). The claim however is not sustainable under English law because, as Mr. Parsons points out, the incorporation of the Hague or Hague-Visby Rules and that legislation's exoneration for any liability with respect to the purported negligent navigation of the vessel nullifies the ability to seek recovery under this theory of liability. (*See*, generally, Parsons Decl. at ¶8-9).

The same holds true with respect to Sinochart's counterclaim for $2 million for "recoverable legal fees and costs incurred by Daiichi Chuo in the arbitration proceeding under the sub-charter party". (*See* Verified Answer and Counterclaim). This claim is equally unsustainable under English law, particularly under the English decision the *VAKIS T*, which addressed recovery of similar costs and legal fees. As outlined in the Parsons Declaration, no such recovery is possible because liability for Daiichi's costs will have arisen from Sinochart's independent decision to commence proceedings against Daiichi and not from any alleged breach by Ocean Line. (*See* Parsons Decl. at ¶19-20).

Based upon the foregoing, and to the extent the Court determines that an order directing countersecurity is appropriate, the total sum should be reduced by those aspects of the claim which are not recoverable under English law, and due consideration should be given to the issue

of whether the application should be further reduced to reflect the amount of security actually "given" by Sinochart.[13]

## CONCLUSION

Sinochart's motion to vacate the attachment on FSIA grounds should be denied, and the application for countersecurity (should it become ripe) significantly reduced.

Dated: November 1, 2007

Respectfully submitted,

Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)
FREEHILL HOGAN & MAHAR LLP
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax
*Attorneys for Plaintiff*
*Ocean Line Holdings Limited*

TO:     Patrick F. Lennon
        LENNON MURPHY & LENNON, LLC
        420 Lexington Avenue, Suite 300
        New York, NY  10170
        Tel: (212) 490-6050
        Fax: (212) 490-6070
        Attorneys for Defendant Sinochart

---

[13]  It goes without saying that, at present, Sinochart is not entitled to any security. Under the Rules, countersecurity can only be required when the defendant has "given" security.  Here, Sinochart has given nothing and challenges the Plaintiff's right to security.  Assuming, *arguendo*, this application to vacate is denied, and security in a form acceptable to the Court is posted (*i.e.* "given") by Sinochart, the issue of countersecurity may then become ripe, at which point the extent of security "given" by Sinochart should play a role in the amount of any countersecurity to be provided.