UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                                Plaintiff,

          - against –

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                             Defendant.
------------------------------------------------------------------x

**ECF CASE**

**07-CV- 8213 (DC)**

**DECLARATION OF
WEIDONG CHEN**

    I, <u>Weidong Chen</u>, affirm the following:

    1.    I am a Chinese national and a partner of Lee & Chen of Suite 703B, Building A, Jinying Mansion, 1518 Minsheng Road, Shanghai 200135, China. My practice areas include general commercial and shipping matters. I studied law at Shanghai Maritime University, and was qualified in 1999. My practice focuses heavily in the commercial and shipping area. I can read and speak English fluently.

    2.    I have been asked by Freehill Hogan & Mahar LLP, the attorneys representing the Plaintiff Ocean Line Holdings Limited in this action, to provide comment and an opinion on Chinese law as it relates to corporate entities. In particular, I have been asked to comment on and clarify the relationship between the defendant China National Chartering Corporation (commonly referred to as "Sinochart") and its parent entity, China National Foreign Trade Transportation (Group) Corporation (commonly referred to as "Sinotrans"), under the Chinese law and administrative system.



3.     I have also been asked to provide comment on the declarations submitted by the Defendant Sinochart in support of its claim that it is entitled to sovereign immunity.

## Materials Reviewed

4.     I understand that this Declaration is being submitted in response to a motion that has been filed by the Defendant Sinochart, in which it claims to be entitled to sovereign immunity as a Chinese State entity under the United States Foreign Sovereign Immunities Act of 1976.

5.     I have reviewed and considered the following:

    i.   Complaint filed in this action by Plaintiff Ocean Line Holding

    ii.   Answer and Counterclaim filed by Defendant Sinochart

    iii.   Rule 7.1 Statement filed by Sinochart

    iv.   Sinochart's Notice of Motion to Vacate Ocean Line Holdings' Order of Attachment

    v.   Declaration of Song Dihung submitted by Sinochart in support of Motion to Vacate (with exhibits)

    vi.   Declaration of Xing Nai Qun submitted by Sinochart in support of Motion to Vacate (with exhibits)

    vii.   Declaration of Patrick F. Lennon submitted by Sinochart in support of Motion to Vacate (with exhibits)

    viii.   Memorandum of Law in Support of Motion to Vacate Maritime Attachment filed by Sinochart

    ix.   Copy of the decision in Trans Chemical v. China National Machinery Import and Export Corporation from the U.S. District court for the Southern District of Texas

    x.   A copy of the U.S. Supreme Court decision in Dole Food Company v. Patrickson

2



xi.   Copy of relevant section from FSIA relied upon by Sinochart

xii.  Additional company search documents regarding Sinochart and its parent company Sinotrans obtained from the company Registry (SAIC)

xiii. Copy of pages from Website.

xiv.  Other reference materials, including cases and other authorities.

## Scope of Comments and Opinion.

6.      It has been explained to me that the current dispute will require the Court to determine whether Sinochart qualifies for immunity under the U.S. Foreign Sovereign Immunities Act.

7.      Obviously, I am not competent to render an opinion on that legal point and have not been asked to do so. Instead, I have been asked to provide comment and guidance to assist the Court in its evaluation by describing: (i) the nature of corporate entities in China; (ii) how these particular entities were formed and when; (iii) the relationship between the two; and, (iv) my opinion on the ownership relationship of the parent corporation ("Sinotrans") to the subsidiary (the Defendant "Sinochart").

8.      Based upon a review of all of the available materials, the applicable legislation, the corporate documentation and my knowledge and experience with Chinese law, I conclude that:

a.   Sinochart is an independent Chinese corporate legal entity, which would properly be considered a wholly owned subsidiary of Sinotrans;

b.   Sinotrans, which is itself a Chinese independent legal corporate entity, provided 100% of the investment capital in Sinochart for the overall benefit of Sinotrans; no evidence suggests that the investment was made

3



directly on behalf of the whole of the people or the Government of the People's Republic of China;

c.   Notwithstanding that both Sinochart and Sinotrans hold business licenses which describe them as "enterprises owned by the whole people", Sinochart, having been created and capitalized by its parent Sinotrans, and otherwise operating under the direct supervision and control of Sinotrans, would more properly be considered a subsidiary of Sinotrans with no direct state ownership.

d.   If an ownership analysis, similar to an analysis of stock ownership of a Western corporation, was to be applied in the context of these two companies, it is my opinion that the more appropriate characterization of their legal relationship is that Sinochart is a wholly owned subsidiary of Sinotrans, and Sinochart should not be considered as being a corporation with direct majority ownership by the PRC.

9.     The following is a summary of the basis upon which I have reached these conclusions.

**General Background and Development of PRC Corporate Law**

10.     I think it would be useful to begin with a brief overview of the historical development of PRC corporate law, and the attendant concepts of ownership under Chinese law.

11.     This analysis should properly start after 1949 when the PRC was formed, because almost all prior laws were repealed at that point in time.

12.     Subsequent to the formation of the PRC in 1949, most enterprises were considered State-owned entities because it was generally considered under our communist

4



regime that all such property was property of the people, and under the general supervision of the Government.

13. In the 1980's, however, and in an effort to invigorate the economy, the Government enacted certain legislation which initiated a decentralization of the prior connection between the State and the industrial enterprises.

14. Chinese law, like other civil countries from which it draws, identifies the fundamental rights that comprise ownership, which are: (a) possession; (b) use; (c) benefit; and (d) disposition of the asset.

15. As the Chinese economy grew and as the Government recognized that decentralization and enterprise independence would foster economic growth, these basic rights of ownership were allocated to the enterprises themselves to provide more autonomy and greater efficiency.

16. Specifically, under the Law of Industrial Enterprise Owned by the Whole People, 1988 ("1988 Industrial Enterprise Law" – *Exhibit 1*), corporations which had previously been considered wholly state-owned and operated, were granted the majority of the ownership rights, including the right of possession, use and disposition, with only the single right of benefit being retained by the State.

17. This change and delegation of ownership rights is reflected in Article 2 of the 1988 Industrial Enterprise Law (*Exhibit 1*).

18. It would be fair to state, therefore, that as of the enactment and implementation of this Law in 1988, or indeed about two years earlier in the General Principles of Civil Law, 1986 (Article 82 – *Exhibit 2*), the commercial entities were themselves now allocated three of the four basic ownership rights, with the right of benefit still vested in the State (the people).

**Development of the EOWP Entity.**

19.    Under the 1988 Industrial Enterprise Law, a corporation is formed under a legislative framework in which the beneficial ownership is considered to rest with the Whole of the People.

20.    In the 1990's, regulations were promulgated to further reform the industrial enterprises which exist under the 1988 Industrial Enterprise Law.

21.    The 1992 Regulations on Transformation of the Business System of Industrial Enterprises Owned by the Whole People, 1992 ("1992 Regulations" – *Exhibit 3*) provide some insight into the Government's rationale for the creation, in effect, of more autonomous corporate entities.  Article 2 provides that:

> "The aim of transforming the business system of an enterprise is to adapt an enterprise to market demand, to make the enterprise to be an entity for commodity production and merchandise, which shall, in accordance with law, make its own business decisions, take full responsibility for its profits and losses, promote its own development and control its own activities, and to make the enterprise to be a legal person which independently enjoys civil rights and assumes civil obligations."

22.    In Sinochart's motion papers, they refer to this type of entity as an "EOWP" corporation and for purposes of this Declaration, I will use the same abbreviation.

23.    Generally speaking, entities governed by this legislation have the following characteristics:

6

i. Capital is infused by action of the Government, which authorizes and arranges for the direct capital contribution from the State into the enterprise;

ii. The Government exercises supervisory control over the enterprise including, for example, the supervision and approval of capital and major technical projects, promotion or removal of directors and managers, and the exercise of general administrative and supervisory control. (1988 Industrial Enterprise Law Arts. 55 & 56 – *Exhibit 1*);

iii. The profits of the enterprise are utilized at the direction of the State. (1988 Industrial Enterprise Law Art. 6 – *Exhibit 1*; Article 42 of the 1992 Regulations – *Exhibit 3*); and,

iv. The Government makes decisions regarding mergers, termination of the enterprise, etc. (Article 42 of the 1992 Regulations - *Exhibit 3*).

24.    Further, under the 1988 Industrial Enterprise Law, an EOWP corporation has the full status of a legal person and bears civil liability in relation to the property that it uses, manages and can dispose of. Article 2 of the 1988 Industrial Enterprise Law (*Exhibit 1*) states:

> "An enterprise shall enjoy the right to possess, utilize and dispose of, according to law the property which the State has authorized it to operate and manage."

25.    For the sake of completeness, a "legal person" is defined in Article 36 of the General Principles of Civil Law, 1986 (*Exhibit 2*) as "an organization that has capacity for civil



rights and capacity for civil conduct and independently enjoys civil rights and assumes civil obligations in accordance with law."

## Analysis of the Corporations in this Case

26.     With respect to the nature of the corporations that we are dealing with here, I will begin with a review of the parent entity, Sinotrans, and then discuss the subsidiary, Sinochart.

### (i)     History of the Formation of Sinotrans.

27.     Sinotrans is the trade name for a large Chinese corporate entity whose formal name is China National Foreign Trade Transportation (Group) Corporation.

28.     Sinotrans, as confirmed by its own website (***Exhibit 4*** – printout of Sinotrans website), was originally formed in 1950.

29.     At that point in time (which was long before the enactment of the 1988 Industrial Enterprise Law I mentioned above), there was no clear separation between the State and the business enterprises and no distinct allocation of ownership rights to the enterprises.

30.     Sinotrans' "economic nature" is that of an EOWP (***Exhibit 5*** – Business License of Sinotrans).

31.     The capital for the formation of Sinotrans was provided directly by the State. This is confirmed by a review of the "Information Sheet of Shareholders" for Sinotrans (***Exhibit 6***), which was obtained through a company records search and which verifies that the State Council is the investor of Sinotrans.  Also, Article 1 of the Articles of Association of Sinotrans (***Exhibit 7***) provides that Sinotrans is invested by the State, and the SASAC (under

8



the State Council) takes the investor's responsibility.  (I will explain in greater detail below the meaning of the "State Council" and the "SASAC".)

32.    As an EOWP type corporate entity, Sinotrans is a legal person that independently enjoys civil rights and assumes civil obligations.

33.    Under Article 13 of the 1992 Regulations (*Exhibit 3*), Sinotrans, as an EOWP, had the right to make its own decisions regarding investment:

> "An enterprise has the decision-making right of investment.
>
> According to the relevant laws and regulations of the State Council, an enterprise shall be entitled to use its remaining capitals, materials, land use right, industrial property right and non-patented technology to make investment in other enterprises and institutions of all kinds of industries and in all areas within the country."

### (ii)    Formation of Sinochart as a Subsidiary of Sinotrans

34.    In the exercise of its right to make investment, Sinotrans established, in or around 1993, a separate subsidiary corporation which it first called "Sinotrans Chartering Corporation".

35.    Sinotrans Chartering Corporation was funded by an infusion of RMB5,000,000 of capital which was provided directly by Sinotrans.

36.    In 1996, Sinotrans decided to begin using the name "Sinochart" for the chartering business being performed by this subsidiary entity, instead of the name "Sinotrans Chartering Corporation".  It did so because it felt that the name "Sinochart" had some commercial recognition (going back to the period pre-1988 when Sinotrans had been operating as one entity, under two names, one of which was commonly known as "Sinochart").



37.    Thus, Sinotrans felt that if it re-cast its new subsidiary as "Sinochart", it could capitalize on that previous commercial value and reputation, and so it decided to revert to this name as the name under which it would operate its new subsidiary entity.   (This point is covered in greater detail below when I discuss the inaccuracy in the Defendant's discussion about when the current corporate entity Sinochart was actually formed.)

38.    Sinochart essentially took over the legal position of the former "Sinotrans Chartering Corporation" subsidiary, and Sinotrans Chartering Corporation was de-registered. The subsidiary has since operated under the name Sinochart.

39.    The Defendant Sinochart is thus a direct subsidiary entity formed by Sinotrans in or around 1993 first as Sinotrans Chartering Corporation and later re-named as "Sinochart" (China National Chartering Corporation) in 1996.

40.    Unlike Sinotrans, whose capital was directly infused from the State, 100% of the capital for Sinochart came from Sinotrans.

41.    This is reflected on Sinochart's Registration Form for Ownership Change of State-owned Assets of Enterprises (***Exhibit 8***) which reflects a typical parent-subsidiary relationship in which Sinotrans, the investor, contributed 100% of the share percentage in Sinochart.

42.    A   review   of   Sinochart's   Articles   of   Association   similarly   supports characterizing Sinochart as a subsidiary of Sinotrans (***Exhibit 9***).  Articles 1 and 7 provide:

> "[Sinochart] is a subsidiary of [Sinotrans]" and "the capital
> of [Sinochart] is invested by [Sinotrans]."

10



43.     As outlined above, this type of relationship would best be described as a subsidiary-parent relationship since Sinochart's very creation was initiated by Sinotrans with funds provided by Sinotrans, not by the State.

44.     Therefore, I conclude that Sinochart is a wholly owned subsidiary of Sinotrans, and in fact, Sinotrans lists Sinochart as a subsidiary in its website (***Exhibit 10*** – printout of Sinotrans website).

### (iii)   *Mr. Song's Description of the Formation of Sinochart is Inaccurate*

45.     In paragraph 7 of Mr. Song's Declaration, he suggests that both Sinotrans and Sinochart (the current corporate defendant) were formed in 1955.  Mr. Song does not refer to any document from 1955 to support his statement but refers to a Document of the Ministry of Foreign Economic & Trade issued on 23 December 1983 (which is at Exhibit 3 to his Declaration).

46.     I do not agree with Mr. Song's assessment regarding formation, his exhibit does not support his position, and I believe that he is incorrect.

47.     Within the company search documents that I reviewed, there are two more recent documents relating to Sinotrans, both issued on 26 November 1996 (***Exhibit 11*** and ***Exhibit 12***) providing more detail of Sinochart's history.

48.     These documents were issued in connection with the nationwide restructuring of State-owned enterprises starting in 1988, conducted under the direction and supervision of the Government of PRC, one purpose of which was to address the type of a situation where there was a single entity which had been trading under more than one name.

11



49.     These documents reflect that at the time of establishment in the 1950's, there was only one entity, Sinotrans, which also used the name Sinochart to trade.  It was, in effect, "one institution bearing two names".

50.     In my view therefore, it is incorrect to state that the documents reflecting formation in the 1950's evidence creation of the current Defendant Sinochart entity by State action in 1955.  That is not true.  The current Sinochart entity did not exist in 1955.

51.     What happened in the 1950's was the creation of the current Sinotrans entity but at that time they utilized two names to reflect different aspects of the business being conducted by the one entity, essentially what is known as "trade names".

52.     These documents further confirm the point because they make clear that when Sinotrans underwent the State supervised reformation, its previously used alternative name was not preserved, and it went forward simply as Sinotrans.  During this reformation, Sinotrans did not make any request or application for the continued use of the trade name Sinochart and that name was considered "deregistered" (*Exhibit 12*).


*(iv)*     ***Operation & Supervision of Sinochart by Sinotrans.***

53.     In so far as the operation and management is concerned, Sinochart is directly controlled and supervised by Sinotrans.

54.     Article 12 of the Articles of Association of Sinochart (*Exhibit 9*) provides that

> *"the general manager and deputy general manager shall be appointed and dismissed by [Sinotrans]"*.

12



55.    Article 17 provides that Sinochart shall regularly submit the relevant materials including its accounting and statistics reports etc. to Sinotrans according to the latter's requirement (*Exhibit 9*).

56.    Similarly, Article 24 and Article 27, respectively, provide that any amendment to and effectiveness of the Articles of Association of Sinochart shall be approved by Sinotrans (*Exhibit 9*).

57.    These Articles reflect the fundamental rights of an investor (Sinotrans) in an enterprise (Sinochart) in which they have the complete investment and the complete managerial control.

58.    The same direct relationship is revealed in the manner in which the Sinochart profit is allocated.

59.    Pursuant to Article 16 of the Sinochart Articles of Association (*Exhibit 9*), Sinochart (like any Chinese corporation) must first pay its taxes out of its profits, but after taxation, Sinochart is to pay all its dividends to Sinotrans in accordance with a pre-set percentage. After the payment of tax and its dividends to Sinotrans, the balance of any profit shall remain with Sinochart, of which 50% is to be used as the enterprise's development fund, 30% is to be used as staff bonus fund and 20% is to be used as the staff's welfare fund.

60.    Article 16 again confirms that Sinotrans, in its position as the investor of Sinochart, is therefore entitled to receive the profits earned by Sinochart.

61.    The discussion above further demonstrates that the Government of the People's Republic of China does not have direct managerial control over Sinochart, nor does it reap profit/benefit directly from Sinochart.



62.     As a further illustration, a comparison may be made with the operation and management of Sinotrans, an EOWP directly under the State's control.   Article 10 of Sinotrans' Articles of Association provides that the investor (i.e. the State Council) enjoys the rights such as the approval of the Articles of Association, the appointment and change of president and directors, the approval of increase or decrease of registered capital, and the determination of merger, dissolution and liquidation of Sinotrans etc (*Exhibit 7*).

### *(v)     Analysis under the Recent Regulations Further Reinforces the Lack of Any Direct State Involvement or Control over Sinochart.*

63.     To further show that there is a separation between the State and Sinochart, it is worthwhile to look at the Provisional Regulations on Supervision and Administration of State-owned Assets of Enterprises, promulgated by the State Council in 2003 ("2003 Regulations" – *Exhibit 13*), and the Guidelines for Provisionally Implementing Operational Budget of State-owned Capitals issued by the State Council in 2007 ("2007 Guidelines" – *Exhibit 14*).

64.     I should roughly explain how the administration of state-owned assets and profits is supervised in China.

65.     When I refer to the "State Council", I am referring to the Central Government of PRC which, together with the local governments at various levels, administer the state-owned assets on behalf of the State (Article 4 of the 2003 Regulations – *Exhibit 13*).

66.     The actual body that is responsible for the administration is SASAC, which stands for the State-owned Assets Supervision and Administration Commission.

67.     According to Article 3 of the 2003 Regulations (*Exhibit 13*), "State-owned assets of enterprises" refers to all forms of State investments in enterprises and the equities

14



generated therefrom, as well as other equities which are legally determined to be owned by the State.

68.     There are various SASAC offices established by the State Council and local governments to perform the responsibilities of the investor (i.e. the State) (Article 6 of the 2003 Regulations – *Exhibit 13*).

69.     The responsibilities performed by the SASACs include the appointment and dismissal of the top management (Article 17), the approval of reform and restructuring plans (Article 20), the approval of the merger, bankruptcy, and dissolution etc. (Article 21), the dispatch of shareholder's representatives and directors to companies in which the State holds majority or part of the shares (Article 22), and the approval of transfer of state shares (Article 23), etc (*Exhibit 13*).

70.     It is to be noted that the SASACs do not perform the responsibilities of the investor for every single state enterprise which is licensed as an EOWP type corporation, but in principle they only play this role for those enterprises which are directly invested by the State (Central or local governments).

71.     There are currently 155 enterprises in China for which the SASAC of the State Council takes the investor responsibility role, which enterprises are the ones which are directly invested by the Central Government (State Council).   These 155 enterprises are called the Central Enterprises.

72.     Sinotrans is one of them, and is numbered 105 on the list of Central Enterprises published on the website of SASAC of the State Council as of 31 October 2007.   The list is attached as *Exhibit 15*.



73.     Significantly, Sinochart is not so identified on the list of Central Enterprises over which SASAC of the State Council maintains supervision.

74.     Similarly, and as far as I know, Sinochart is not on any list of enterprises of any local SASAC either (such as the SASAC of Beijing where Sinochart is domiciled, which is the only SASAC that could be relevant).

75.     This accords with the status of Sinochart as I have described it, which is not an enterprise directly invested by or controlled by the State, but rather as a subsidiary, whose investment came from Sinotrans and which is controlled by Sinotrans.

76.     Similar support is found in the 2007 Guidelines, which deal with the budget system based on profits made by the State in the capacity as the owner of enterprises which were funded directly by state-owned capital.

77.     According to paragraph (3) under Section II of the 2007 Guidelines (*Exhibit 14*), the projection of revenue (for the purpose of establishing the State's budgets) is comprised of the profit/benefit anticipated to be earned by those enterprises over which the various SASACs perform the responsibilities of investor.

78.     These enterprises are referred to as the "first tier enterprises" under the 2007 Guidelines.

79.     Only the projected profits of these "first tier" enterprises are taken into account in assessing the projected budget, which reinforces the view that enterprises like Sinochart do not turn over profits directly to the State.  It is only the profit of the "first tier enterprises (or parent entities) whose profit is computed in the budget projections prepared by the SASACs.

80.     The anticipated profit/benefit of other EOWP enterprises, such as a subsidiary of a first tier enterprise, will not directly form a part of the revenue for the budget.

16



81.     In the present case, it is clear that the profit/benefit earned by Sinochart will not be directly included in the budget system for the operation of the state-owned enterprises, which indicates that the State does not reap profit/benefit directly from Sinochart.   This analysis is in line with the provision of Article 16 of the Articles of Association of Sinochart mentioned above.

### (vi)     *Other Factors Showing Subsidiary Relationship*

82.     It is also noteworthy that, within the company search documents of Sinotrans, there is a (i) "Notice of Approval" (***Exhibit 16***) issued by the State Administration of Industry and Commerce approving the establishment of the Sinotrans Group; (ii) an "Application Report for the Registration of Enterprise Group" (***Exhibit 17***) submitted by Sinotrans as the parent company for the registration of the Sinotrans Group; and (iii) a letter from Sinochart issued on 12 July 2001 (***Exhibit 18***) showing that Sinochart joined the Sinotrans Group and became a group subsidiary member.

83.     It is noted that the Sinotrans Group was established in 1993 and in 2001, Sinotrans, the parent company, applied for the formal registration according to requirements of the Provisional Regulations for Registration Management of Enterprise Groups, 1998.   The more relevant aspect of these documents is Sinochart's acknowledgement as becoming a subsidiary of this Sinotrans Group.

84.     These documents are also significant because according to Article 6(4) of the Guidelines on the Authorized Operation of State-owned Assets of Enterprise Groups, 1996 ("1996 Guidelines" - ***Exhibit 19***) promulgated by the National State-owned Assets Administration Bureau (now the SASAC of the State Council):

17



**"the parent company exercises share-holders' rights as per its proportion of investment in its subsidiaries within which it has the majority of shares or companies within which it has part of the shares"**.   (emphasis supplied).

85.   Consequently, as the parent company, Sinotrans exercises share-holders' rights in Sinochart which is wholly-owned by Sinotrans.

86.   The nature of this subsidiary relationship is also reflected in the Provisional Regulations for Management of State Capital of the State Pilot Enterprise Groups, 1998 jointly promulgated by the Ministry of Finance and the National Economic and Trade Commission ("1998 Regulations" – *Exhibit 20*).

87.   Article 3 of the 1998 Regulations (*Exhibit 20*) provides that the subsidiary-parent ownership relationship among an enterprise group means the relationship of "the investor" and "the invested" between enterprises.  The parent is the investor who bears limited liability to the extent of its investment amount in the subsidiary, enjoys the investors' rights of selecting operators, making major decisions and taking profits of assets etc., and bears the corresponding liabilities.

88.   It is to be noted that Sinotrans, as indicated in its Application Report for the Registration of Enterprise Group mentioned above in paragraph 82 (*Exhibit 17*), is one of the state pilot enterprise groups as referred to in the 1998 Regulations.

89.   By way of further illustration, I should also mention that there are basically two types of group members under the "enterprise group" mentioned in the preceding paragraphs, namely

(a) an enterprise that becomes a subsidiary of the group parent enterprise as a consequence of state authorization according to the 1996 Guidelines mentioned above. Article 1(1) of the 1996 Guidelines (*Exhibit 19*) provides that in relation to a member

18



enterprise which is invested by the state directly (i.e. not directly invested by the parent enterprise), the government authorizes the parent enterprise to hold the shares of it so as to establish the subsidiary-parent relationship; and

(b) an enterprise that is directly invested by the group parent enterprise, hence a subsidiary, and no state authorisation is required.

90. Clearly the Sinochart-Sinotrans relationship falls within the second category because Sinochart was directly invested by Sinotrans. According to Article 7 (3) of the 1996 Guidelines, "*the ownership relationship between a group parent enterprise and its directly invested subsidiary is a natural consequence of law and does not need to be confirmed by any authorization of the government*" (*Exhibit 19*).


### (vii)   *Sinotrans' Investment in Sinochart is Not on behalf of the Whole People*

91. I note Mr. Song stated in paragraph 8 of his declaration that "*the description of Sinotrans as the investor/contributor in this form merely means that the registered capital was put in by Sinotrans on behalf of the whole people after the approval by Chinese Government under the Law of PRC on EOWP*".

92. I do not think this statement is correct. I do not find any documents, either provided by the Defendant or within the company search documents, that demonstrate that the registered capital of Sinochart was provided by Sinotrans on behalf of the whole people or the government of the People's Republic of China. Nor am I aware of any law or regulation providing that, when an EOWP makes investment in another legal entity, it is doing so on behalf of the whole people or the government of the People's Republic of China.



93.    The shareholding relationship between Sinotrans and Sinochart discussed above supports my conclusion that Sinochart is a subsidiary of Sinotrans, was not invested or capitalized by the State directly (but by Sinotrans) and thus was not invested on behalf of the whole people or the government of the People's Republic of China.

**Distinguishing Trans Chemical.**

94.    In connection with the preparation of this opinion, I have reviewed the decision issued by U.S. District Court in Trans Chemical Limited v. China National Machinery Import and Export Corporation, and the Court's discussion of Chinese law leading up to its eventual determination that the defendant in that case was an agency or instrumentality of the PRC under the Foreign Sovereign Immunities Act since it was an EOWP.

95.    In this situation, we are presented with a different ownership structure.

96.    The corporation which is the focus of this inquiry is, properly stated, a subsidiary of a first tier EOWP corporation.  Thus, while it may have been formed under the same legislation describing its economic nature, it does not in my view operate within the same framework as a first tier EOWP corporation.

97.    As explained above, there are fundamental distinctions between the manner in which Sinochart, the subsidiary, was formed and operates which distances it significantly from the State.

98.    The manner in which Sinotrans operates Sinochart is indicative of a relationship once removed from the typical State to EOWP situation.

99.    As outlined above, the State exercises managerial control only on a first tier EOWP corporation, with those enterprise reporting to the State and the State controlling the profit.



100.   Such is not the case in the context of this subsidiary.  Most notably, the profit generated by Sinochart is not paid to the State as is the case in a first tier EOWP corporation, but rather its profit is controlled internally by Sinotrans.

101.   While Sinochart may bear the label of an EOWP corporation because in enterprise registration and particularly in the contents of the Business Licenses no difference will be made as to first tier EOWPs or subsidiaries, that does not mean that it was infused with capital by the State, or operated with direct State supervision (as provided for in the 1988 Industrial Enterprise Law).

102.   For these reasons, and drawing from my experience and knowledge of Chinese law, and my understanding of the issue which is before the Court, it is my opinion that one could not in practical terms consider that a majority ownership of Sinochart rests directly with the State, but it would be more appropriate to consider that Sinochart is wholly and directly owned by Sinotrans, the parent.

103.   This same analysis is even more evident when one turns back to the concepts of ownership under Chinese Law, because in this case the right of benefit belongs to the parent (Sinotrans) with the remaining three rights of ownership resting with Sinochart itself.

104.   If I was asked the specific question as to whether, under the manner in which Sinochart was formed and operated, the majority ownership rested with the State, I would say no because it is an entity operated with virtually no or negligible influence by the State, was not formed by the State, was not capitalized by the State, and does not answer to the State with its profits.  Instead, it essentially conducts its own affairs, subject to its answering to its principal Sinotrans.

21



105.    Further, and with the utmost respect, I do not share the views expressed by Sinochart's legal commentators that the mere fact that Sinochart was formed as an EOWP corporation settles the issue.

106.    I would respectfully submit that it is necessary to look below the surface and examine the actual nature of the corporation formation, the infusion of capital, and the management and distribution of profits to make a more informed decision, and on that basis, I would disagree with their conclusion as to ownership.

107.    I hope the above comments are of assistance to the Court in its determination. I would be more than happy to provide further comment or amplification on any of the discussion above should the Court wish, and I am honored to have been able to submit this to the Court.


I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.


Executed on November 2, 2007 at Shanghai, PRC

Weidong Chen