# EXHIBIT B
# TO GUTOWSKI DECLARATION:

# DECLARATION OF DONALD CLARKE
# WITH EXHIBITS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                            Plaintiff,

        - against –

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                          Defendant.

-------------------------------------------------------------x

**ECF CASE**

**07-CV- 8213 (DC)**

**DECLARATION OF
DONALD CLARKE**

       I, DONALD CLARKE, declare as follows:

1.     I am a professor of law at the George Washington University Law School, where I have been employed since 2005. During the 2007-08 academic year, I am a visiting professor at New York University School of Law. My academic specialization is the law of the People's Republic of China (the "PRC" or "China") in general and the legal regime of economic reform in particular, and I speak and read Chinese fluently. I have published a number of articles, comments, and book reviews pertaining to Chinese law.

2.     I have been asked to provide my opinion on the corporate status of the Defendant China National Chartering Corporation ("Sinochart") and its relationship to China National Foreign Trade Transportation (Group) Corporation ("Sinotrans"). In particular, I have been asked to address the issue of whether Sinochart is directly and wholly owned by the government of China (*i.e.*, whether it is directly and wholly state-owned), or whether it is instead a subsidiary of a company (in this case, Sinotrans) that is itself directly or indirectly owned by the government of China.

*My Background*

3.     I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979.

4.      From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"). From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

5.      I spent the calendar year 2003 in China conducting research on corporate governance issues as a Fulbright Fellow and Visiting Scholar at Tsinghua University Faculty of Law ("Tsinghua"). I also spent the fall of 2004 as a Visiting Scholar at Tsinghua. I visit China frequently and, since 2004, have spent at least three months a year there.

6.      I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. I have been appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I am admitted to the practice of law in the state of New York and am a member of the Council on Foreign Relations.

7.      I have served as an expert witness on Chinese law matters in over a dozen cases, most of them involving issues of the Chinese legal system or Chinese commercial law. In *In the Matter of the Arbitration Between Trans Chemical Limited and China National Machinery Import and Export Corporation*, 978 F. Supp. 266 (S.D. Tex. 1997), for example, my testimony was cited extensively by the court in its decision.

8.      A more complete statement of my credentials, including a list of publications, is set forth in my curriculum vitae, attached as Exhibit A.

***Materials Reviewed and Summary of Opinion***

9.      In the course of researching this declaration, I have examined the following documents supplied to me by Plaintiff's attorney:

> i.    Complaint filed in this action by Plaintiff Ocean Line Holding
>
> ii.   Answer and Counterclaim filed by Defendant Sinochart
>
> iii.  Rule 7.1 Statement filed by Sinochart
>
> iv.   Sinochart's Notice of Motion to Vacate Ocean Line Holdings' Order of Attachment
>
> v.    Declaration of Song Dihuang submitted by Sinochart in support of Motion to Vacate (with exhibits)

2

vi.   Declaration of Xing Nai Qun submitted by Sinochart in support of Motion to Vacate (with exhibits)

vii.  Declaration of Patrick F. Lennon submitted by Sinochart in support of Motion to Vacate (with exhibits)

viii. Memorandum of Law in Support of Motion to Vacate Maritime Attachment filed by Sinochart

ix.   Copy of the decision in Trans Chemical v. China National Machinery Import and Export Corporation from the U.S. District court for the Southern District of Texas

x.    A copy of *Dole Food Company v. Patrickson*, 538 U.S. 468 (2003)

xi.   A copy of 28 USC §1602, the section of the Foreign Sovereign Immunities Act relied upon by Sinochart

xii.  Additional documents relating to Sinochart and Sinotrans that I understand have been obtained from the company registry at the State Administration of Industry and Commerce in China

xiii. Copy of pages from the Sinotrans Web site

xiv.  Other reference materials in their original Chinese versions as well as, in some cases, translated English versions.

10.   I have also conducted independent research and have cited the relevant sources in the text of my declaration.

11.   The conclusion I draw from an examination of the relevant documents and my own research is that Sinochart is not directly owned by the government of China. It is instead wholly owned by another company, Sinotrans. Sinotrans appears to be directly owned by a Chinese governmental entity. The Chinese government's beneficial interest in Sinochart makes it possible in some contexts to speak of it, as do some of the documents, as a "state-owned enterprise" ("SOE") (*guoyou qiye*) or "enterprise under the ownership of the whole people" ("EOWP") (*quanmin suoyouzhi qiye*) (the two terms are effectively synonymous). Being designated an SOE or EOWP, however, is not inconsistent with being a subsidiary of another SOE or EOWP, and does not necessarily mean that the enterprise in question is directly owned by a governmental entity.

### *Introduction*

12.   For purposes of the following discussion, it is important to clarify three points at the outset: first, that the concepts of "state ownership" and "ownership by the whole people" are for all practical purposes identical; second, that Sinochart's designation as "EOWP" on its business license does not bear on the question of whether it is directly owned by a

3

governmental entity; and third, that the holding of the *Trans Chemical* case is not relevant to the issues of this case.

13. **The concepts of "state ownership" and "ownership by the whole people" are for all practical purposes identical.** Article 9 of the Chinese Constitution equates ownership by the people with state ownership in speaking of "the state-owned economy, *i.e.*, the economy under the socialist system of ownership by the whole people . . . ." Article 5 of the 1994 PRC *Regulations Governing the Supervision and Management of State-Owned Enterprises' Property* states: "Enterprises' property is owned by the whole people, that is, owned by the state."[1] Article 41 of the 1992 PRC *Regulations on the Transformation of the Management System of Enterprises*[2] states: "The assets of the [state-owned] enterprise are under ownership by the whole people, *i.e.*, ownership by the state. The State Council exercises the right of ownership over enterprise assets on behalf of the state." Not only is the state here explicitly declared to be the owner, but the State Council, an identifiable government body, is declared to be the body that exercises the right of ownership on behalf of the state. (The State Council then delegates ownership functions to government agencies such as SASAC.) Finally, it is revealing that although until 1993 the State Statistical Yearbook, published annually by the State Statistical Bureau of China, used the term "ownership by the whole people" in presenting statistics for state-owned enterprises, from 1993 on it has ceased even paying lip service to this concept, using the term "state ownership" in presenting statistics for the same enterprises.[3]

14. **Sinochart's designation as "EOWP" on its business license does not bear on the question of whether it is directly owned by a governmental entity. SOE/EOWP status is not equivalent to direct ownership by a governmental entity and is not inconsistent with status as a subsidiary of another SOE/EOWP.** (1) A document issued in 2007 by the Beijing Administration of Industry and Commerce (the government agency in charge of registration of enterprises) makes it clear that the investor in a state-owned enterprise can itself be another state-owned enterprise.[4] (2) A document issued in 2003 by the State Statistical Bureau makes it clear that the term "state-owned" could apply not only to enterprises wholly and directly owned by a government agency, but also to enterprises wholly owned by an SOE/EOWP, and even in some cases to

---

[1] Regulations Governing the Supervision and Management of State-Owned Enterprises' Property, effective July 24, 1994, in British Broadcasting Corporation, *Summary of World Broadcasts* ("BBCSWB"), Part 3, at FE/2084/S1 (Aug. 25, 1994).

[2] Quanmin suoyouzhi gongye qiye zhuanhuan jingying jizhi tiaoli, July 23, 1992, available at <www.law-lib.com/law/law_view.asp?id=8840>. Here and elsewhere, World Wide Web addresses are signaled by the use of angle brackets.

[3] See, e.g., *Zhongguo Tongji Nianjian 1992* [Statistical Yearbook of China ("SYC") 1992] (Beijing: China Statistics Publishing House, 1992) at 97, SYC 1993 at 97; SYC 1994 at 84.

[4] See Beijing Shi Gong-Shang Xingzheng Guanli Ju [Beijing Municipal Administration of Industry and Commerce], Ruhe banli quanmin suoyouzhi qiye jiti suoyouzhi qiye dengji zhuce [How to Handle Registration of Enterprises Owned by the Whole People and Collectively-Owned Enterprises], June 2007, available at <www.baic.gov.cn/qideng/wszc/2004b/009/04.doc>.

enterprises in which the state holds a minority, non-controlling stake.[5]  (3) This view is confirmed by a SASAC official, who has written, "If the parent corporation is a state-owned enterprise, then its subsidiaries should also be [considered] state-owned enterprises."[6]

15.     **The Trans Chemical case is not relevant.**  The case of *Trans Chemical Ltd. v. China National Machinery Import and Export Corp.*, 978 F. Supp. 266 (S.D. Tex. 1997), quoted in Sinochart's Memorandum of Law in Support of Motion to Vacate Maritime Attachment or in the Alternative for Countersecurity, is not relevant to the particular issue posed in this case.  In that case, China National Machinery Import and Export Corp. ("China National") was claiming *not* to be a state-owned enterprise.  I appeared as an expert witness and testified to the contrary.  In *Trans Chemical*, the factual issue was whether China National's own public statements (it called itself a state-owned enterprise on its Web site and in other published materials) and the specific facts of its ownership structure warranted the conclusion that it was state-owned.  Unlike in the present case, there was no issue of tiering as addressed in *Dole Food Company v. Patrickson*, 538 U.S. 468 (2003).  Neither side suggested that China National was indirectly owned; China National simply denied that it was state-owned in *any* sense of the term, even beneficially.  Thus, the court in *Trans Chemical* addressed neither the factual issue in this case—what kind of relationship between Sinochart and Sinotrans would constitute a parent-subsidiary relationship—nor the legal issue (addressed and resolved in the negative by *Dole*) of whether a subsidiary of a state-owned parent is itself "state-owned" for purposes of the Foreign Sovereign Immunities Act.

### *Documentary Evidence Shows that Sinochart Is a Subsidiary of Sinotrans*

16.     **Sinotrans's Web site shows that Sinochart is a subsidiary.**  That Web site carries a list of "specialized subsidiaries" of Sinotrans, among which is named "China National Chartering Corp.", *i.e.*, Sinochart.[7]

17.     I have reviewed the Chinese original and the English translation of a document entitled "Subject Matters of the Application for Establishment and Registration" and the attached "List of subsidiaries of Sinotrans Group".[8]  Row 38 of the latter document lists Sinochart as a subsidiary of Sinotrans.

---

[5] See Guojia Tongji Ju [State Statistical Bureau], Guanyu dui guoyou gongsi qiye rending yijian de han [Letter Concerning How to Recognize State-Owned Companies and Enterprises], April 18, 2003, available at <www.wzstats.gov.cn/infoshow.asp?id=5980>.

[6] See Xie Jun [Deputy Director, Property Rights Bureau, State Asset Supervision and Administration Commission], Guquan duoyuanhua de guoyou qiye chanquan yingdang ruhe jieding [How the Property Rights in State-Owned Enterprises Should Be Delimited Under Conditions of Diversified Equity Ownership], March 1, 2005, available at <finance.sina.com.cn/review/20050301/14321393638.shtml>.

[7] The Web page in question can be found at <tinyurl.com/2uw4kh>.

[8] Both documents—the Chinese original and the English translation—were supplied to me by Plaintiff's attorneys.

18.  **Sinochart's own Articles of Association show that it is a subsidiary of Sinotrans.**
Article 1 plainly states that Sinochart "is a subsidiary belonging to" Sinotrans.[9]  Article 7
states that its capital comes from Sinotrans.  Article 12 states that its general manager and
deputy general managers shall be appointed and removed by Sinotrans (its sole equity-
holder).  Article 16 states that profits not retained by Sinochart should be remitted to
Sinotrans.  Article 17 states that financial statements and other reports should be
submitted to Sinotrans.  Article 24 states that any amendment to the Articles of
Association must be approved by Sinotrans.  Finally, the Articles of Association are
themselves sealed by Sinotrans.  All these provisions are standard hallmarks of a parent-
subsidiary relationship.  There is no mention here of any governmental agency to which
Sinochart has a duty to remit profits or report operations.  I believe the only possible
conclusion to draw from the Articles of Association is that Sinochart is a subsidiary of
Sinotrans.

19.  Exhibit 2 to the Song Dihuang Declaration ("Dihuang Declaration"[10]) contains an
untranslated document at page 4 of 10 of Document No. 10-3 on the Court's ECF Docket
(hereinafter "Document 10-3").  This document is entitled "Circumstances of State-
Owned Assets Held by Enterprise".  Assuming it describes Sinochart, the clear import is
that Sinochart is wholly owned by Sinotrans, and not directly owned by a governmental
entity.

    a.  The first six rows list the sources of capitalization.[11]  **The first row, "state
capital", is empty**, meaning there was no capital contribution directly from the
state.  The second row shows the amount contributed by "legal persons", *i.e.*,
corporate entities.  (Government agencies are not considered "legal persons" in
the Chinese legal system.)  This shows a capital injection of 23.163 million *yuan*,
an amount identical to the amount said in another document to have been
contributed by Sinotrans.[12]  The third row shows how much of the amount in the
second row was contributed by state-owned entities; in this case, as Sinotrans is a
state-owned entity, the number is the same.  In short, this section of the document
clearly shows that no capital was contributed directly by the state; instead, it all
came from Sinotrans.  In view of the general principle of Chinese law that
ownership follows investment, as well as the specific indications in other
documents that Sinotrans holds 100% of the equity in Sinochart, I believe it is
clear that Sinochart is a wholly-owned subsidiary of Sinotrans.

---

[9] In the translation supplied to me by the plaintiff's attorneys, Sinochart is described as "affiliated to" Sinotrans.
This is a mistranslation.  The Chinese text uses the term "zi gongsi", which as noted in Paragraph 20 simply means
"subsidiary".

[10] Although the declarant's surname is Song (Dihuang is the given name), Defendant refers to his declaration as the
"Dihuang Declaration" in its submissions; I will do likewise to avoid confusion.

[11] The columns, not relevant for the purposes of this discussion, show amounts as they appeared in various records.

[12] See the table at the bottom of page 9 of 10, Document 10-3; Chinese original at page 5 of 10, Document 10-3.

    b. This conclusion is reinforced by rows 12 and 13 of this document. Row 12 is labeled "Equity interest that should be enjoyed by [*i.e.*, because attributable to] state-owned capital". The amount shown is zero. Row 13, by contrast, shows "Equity interest that should be enjoyed by capital from state-owned legal persons [*i.e.*, corporate entities]". The amount shown is over 34 million *yuan*.[13] In short, there is **no equity interest accruing directly to the state**; it all accrues to a corporate entity owned by the state (an entity that we know from other sources to be Sinotrans.)

20. Further evidence of Sinochart's status as a subsidiary of Sinotrans is contained in a document dated November 26, 1996 and bearing the seal of Sinotrans.[14] This document declares plainly that Sinochart is a subsidiary of Sinotrans. The translation with which I was supplied is incorrect in stating that Sinochart is "affiliated to" Sinotrans. The Chinese text states that Sinotrans is a subsidiary (*zi gongsi*) of Sinotrans. "Subsidiary" is the standard and universally accepted translation of "zi gongsi".

21. Finally, the *absence* of a key piece of documentary evidence is telling: Sinochart does not appear on a list of centrally-owned SOEs. If Sinochart is indeed owned by a Chinese governmental entity, then the question arises: which one? SOEs in China are not simply owned by some vague entity known as "the state"; instead, a specific governmental entity exercises the functions of ownership. For non-financial enterprises owned at the central level of government, this entity is typically the State Asset Supervision and Administration Commission ("SASAC"). A list of enterprises directly owned by the central government appears on SASAC's web site.[15] It shows, for example, that Sinotrans (no. 105 on the list) is indeed directly owned by the Chinese state. Sinochart does not appear on this list, indicating that it is not directly owned by the central government. Sinochart has not to my knowledge suggested that it is owned by a unit of local government (for example, a provincial or municipal government) in China. It follows, therefore, that Sinochart is not directly owned by any governmental entity.

***The Documents Cited by Sinochart in Support of Its Case Do Not in Fact Support It***

22. **None of the claims of the Xing Nai Qun declaration ("Xing Declaration"), even if accurate, bears on the issue in this case.** The issue in this case is whether Sinochart is directly owned by the government of China or is instead a subsidiary of Sinotrans. None of the claims of the Xing Declaration is inconsistent with Sinochart's being a subsidiary of Sinotrans.

---

[13] The exact number is illegible. For accounting reasons not germane to the issue here, the number is larger than the capital injection amount.

[14] In the translation supplied to me by the plaintiff's attorneys, the document is headed "China Foreign Trade Transportation Corporation" and entitled "Reply RE Permitting to Reuse the Name of China National Chartering Corporation". My analysis here is based on the Chinese original.

[15] See <www.sasac.gov.cn/zyqy/qyml/default.htm>.

a. Paragraph 3 of the Xing Declaration (Document 11) states that Sinochart was formed in 1955 by "Chinese Government" and refers to the attached business license in support of that statement. First, as I show in Paragraph 24 of this Declaration, **the "Sinochart" formed in 1955 is not the same "Sinochart" that is the defendant in this case.** Second, "Chinese Government" is too vague a term to warrant a conclusion as to whether or not Sinochart is a subsidiary of Sinotrans. It is within the realm of regular linguistic practice to say that "the government" did something when technically it was a company wholly owned by the government. Third, the business license attached as Exhibit 1 to the Xing Declaration (Document No. 11-2 on the Court's ECF Docket) does not in fact support the statement in Paragraph 3. The business license states that Sinochart was initially established in 1984; it does not state anywhere the identity of the party forming the company.

b. Paragraph 4 of the Xing Declaration states that the business license shows Sinochart to be an enterprise under "ownership of the whole people." This much is accurate, but the conclusion that follows is not. The Xing Declaration states that "under Chinese law, ['ownership by the whole people'] means the company is owned by the People's Republic of China." If we add the words "directly or indirectly" before "owned", this statement is by and large (although not completely) accurate. If the Xing Declaration is stating that "ownership by the whole people" always and everywhere means *direct* ownership by a government entity, then it is simply incorrect. As explained in Para. 14 of this Declaration, subsidiaries of SOEs/EOWPs can also be considered SOEs/EOWPs.

c. Paragraph 5 of the Xing Declaration states that Sinochart is a separate legal corporation created under the laws of the People's Republic of China. None of this is inconsistent with Sinochart's being a subsidiary of Sinotrans. Separateness is part of the very definition of a subsidiary.

23. The documents attached to the Dihuang Declaration do not support the argument that Sinochart is directly owned by the Chinese state.

a. Exhibit 1 (the business license) is irrelevant to the issue. As noted above in Paragraphs 14 and 22.b of this Declaration, ownership by the whole people is consistent both with direct state ownership and with subsidiary status.

b. The "Registration Form on Possession of State-Owned Assets by Enterprise" attached as part of Exhibit 2 (Document 10-3, page 2 of 10, English translation at page 8 of 10) is not probative. That Sinochart is said to possess state-owned assets does not resolve the issue of whether or not it is a subsidiary of Sinotrans. Subsidiaries of SOEs/EOWPs are also said to possess state-owned assets. In any case, calling these assets "state-owned" is more a figure of speech than a legal reality. As in an American corporation, the assets themselves belong, in a

realistic sense, to the enterprise.[16] They could, for example, be seized by creditors in satisfaction of a corporate debt. When such a subsidiary liquidates, its assets go to the corporate parent, not to the state treasury. In addition, Exhibit 2 has been mistranslated. The English version of this document attached to the Dihuang Declaration shows only Sinochart's seal. The Chinese version, however, shows clearly the seals of both Sinochart *and* Sinotrans. If Sinotrans is unrelated, what is its seal doing there?

    c.   I am not sure of the significance of the document attached at page 3 of 10 of Document 10-3 (translated at the top of page 9 of 10 of Document 10-3). This document purports to be about an entity called "China National Foreign Trade Transportation (Group) **Chartering** Corporation" (emphasis added). This is the official name neither of Sinochart nor of Sinotrans; I do not see, nor have Defendant or its declarants explained, its relevance to this case.

    d.   I am not sure of the significance of the document attached at page 7 of 10 of Document 10-3 (translated at page 10 of 10 of Document 10-3). The document is not mentioned, nor its significance explained, in the Dihuang Declaration. Certainly it shows some kind of involvement of Sinotrans, presumably in the affairs of Sinochart (absent which I assume it would not have been attached to the Dihuang Declaration).

24.    One document attached to the Dihuang Declaration[17] might appear to support the argument that Sinochart was at some point directly owned by a governmental entity—in this case, the Ministry of Foreign Economic Relations and Trade ("MOFERT"). This document recites that Sinochart was established in 1955 and was, as of the time the document is dated (Dec. 23, 1983), directly owned by MOFERT. For the reasons explained below, this document, even if genuine, has no bearing on the defendant's current status.

    a.   **First, and most important, the "Sinochart" referred to in that document is not the same Sinochart that is the defendant in this case.** It shares only the same name. The basic facts appear to be that a company named Sinochart was established in 1955 and terminated around 1988. In 1993, a company named "Sino-Foreign Transportation Ship Chartering Corporation" (*Zhong-Wai Yun Zu Chuan Gongsi*) ("SFTSCC") was established as a subsidiary of Sinotrans to engage in the ship-chartering business. In 1996, essentially nothing more than a

---

[16] See, for example, Article 2 of the Law of the People's Republic of China on Industrial Enterprises Owned by the Whole People (Exhibit 4 to the Dihuang Declaration, Document 10-5, page 10 of 20). While faithfully reciting the political formula that the property of the enterprise shall be owned by the whole people, the text then specifically says that "[t]he enterprise shall enjoy the rights to possess, utilize and dispose of, according to law, the property which the state has authorized it to operate and manage." Furthermore, the enterprise "shall bear civil liability with the property which the state has authorized it to operate and manage." By any realistic definition, this amounts to ownership.

[17] This is the "Application for Business License and Business Certificate" that appears at page 2 of 5 of Document 10-4 (English version at page 4 of 5 of Document 10-4).

name change took place: the company formerly known as SFTSCC adopted the name of Sinochart.  Today's Sinochart is not the Sinochart that was established in 1955, and the statements of the Xing Declaration and the Dihuang Declaration that Sinochart was established in 1955, assuming they refer to the defendant in this case, are not correct.

b.  A Sinotrans document entitled "Explanation Concerning the Restoration of the Use of the Name 'China National Chartering Corporation'", dated Nov. 26, 1996,[18] sets out the relevant history.  A company called China National Chartering Corporation ("Sinochart") was established in 1955.  It was in effect the same company as China National Foreign Trade and Transportation General Company (*Zhongguo Duiwai Maoyi Yunshu Zong Gongsi*), but the name of Sinochart was used in foreign dealings.  During a period of government-mandated enterprise reorganizations in 1988, the name "Sinochart" was not preserved and was deemed cancelled.  In 1993, the Ministry of Foreign Economic Relations and Trade approved the establishment **by Sinotrans** of a company called SFTSCC.

c.  The document, addressed to the government agency in charge of corporate names, argues that the name "China National Chartering Corporation" is, because of its history, a valuable intangible asset that should not be allowed to go to waste.  It asks that the name be restored and that it be recognized as a subsidiary (*zi gongsi*) of Sinotrans.  At the same time, SFTSCC (as a corporate name) is to be cancelled.

d.  Another Sinotrans document of the same date[19] adds more detail.  This document is addressed by Sinotrans to SFTSCC.  It begins by stating that SFTSCC's application to restore the name "China National Chartering Corporation" has been received.  It states that that the company (*i.e.*, China National Chartering Corporation) shall belong to Sinotrans, and shall inherit the legal status of SFTSCC.  SFTSCC shall subsequently be cancelled.

e.  In summary, "Sinochart" was originally simply a name used by Sinotrans when conducting business abroad.  By 1988, it had ceased using that name.  In 1993, Sinotrans established SFTSCC to engage in the chartering business.  SFTSCC later changed its name to Sinochart.  That is the Sinochart that is the defendant in these proceedings.

f.  **Second, even if the Sinochart of 1955 were indeed in some sense the same company as the Sinochart of today, the document is still not probative of Sinochart's current status.**  It speaks to Sinochart's status twenty-four years ago, at the very outset of the current period of economic reform.  Since that time, the state-owned enterprise sector has undergone major reorganization, ministries no longer generally own SOEs, and MOFERT does not even exist any more (its

---

[18] The document's Sinotrans designation is "(1996) Yun Qi Zi No. 2503/474".

[19] The document is entitled "Reply Agreeing to the Restoration of the Use of the Name 'China National Chartering Corporation' and is dated Nov. 26, 1996.  Its Sinotrans designation is "(1996) Yun Qi Zi No. 2503/475".

successor ministry is the Ministry of Commerce). The document simply does not tell us what we need to know about Sinochart today. By contrast, documents that appear to be more recent do tell a consistent story: that Sinochart is a subsidiary of Sinotrans.

### Summary and Conclusion

25.    The documentary evidence overwhelmingly supports the conclusion that Sinochart is a wholly-owned subsidiary of Sinotrans and is not directly owned by the Chinese state. The statements of the Xing Declaration and the Dihuang Declaration that Sinochart is owned by the Chinese state are insufficient to overturn the weight of this evidence; indeed, they do not address it at all. They may be using the term "ownership" loosely to mean ultimate beneficial ownership, but such ownership is not by itself enough, under *Dole*, to qualify for the protections of the FSIA. Alternatively, they may be relying on the incorrect premise that the status of "ownership by the whole people" means direct ownership by the Chinese state and precludes ownership through a subsidiary. As I have shown, this premise is not supported in Chinese law. In sum, an examination of the specific features of the relationship between Sinotrans and Sinochart reveals a fairly standard parent-subsidiary pattern. Thus, in my opinion the facts of this case fit squarely within the holding of *Dole*.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.

*Donald C. Clarke*

_____

DONALD CLARKE

Dated: November 1, 2007

11

**Exhibit A**

# DONALD C. CLARKE

George Washington University Law School
2000 H Street
Washington, DC 20052
Tel. (202) 994-2830
Fax (202) 318-4479
E-mail: dclarke@law.gwu.edu
World Wide Web: http://donaldclarke.net

*Sept. 2007-May 2008:*
Office tel.: 212-992-8839

## CURRENT POSITION

- Professor, George Washington University Law School, Washington, DC (from Jan. 2005)

    Courses taught:    • Chinese Law
                       • Chinese Business Law
                       • Business Organizations

- Visiting Professor, New York University School of Law, New York, NY (2007-08)

## PREVIOUS POSITIONS

- Professor, University of Washington School of Law, Seattle, Washington (1988-2004)

- Attorney, Paul Weiss Rifkind Wharton & Garrison, New York, New York (Sept. 1995-Aug. 1998)
    (on leave from University of Washington)
    Areas of practice: Corporate, East Asia (focusing on China)

- Lecturer in Commercial Law of the Far East, Department of Law, School of Oriental and African
    Studies, University of London, UK (Sept. 1985-July 1988)

## EDUCATION

- *Harvard Law School*, Cambridge, Mass., USA (1983-85, 1986-87)—JD cum laude 1987
    Activities:    Editorial Board, *Harvard Law Review*
                   *Harvard International Law Journal*

- *School of Oriental and African Studies*, University of London, UK (1981-83)—MSc 1983
    in Government and Politics of China
    Honors: Award of Distinction for thesis

- *Beijing University and Nanjing University*, People's Republic of China (1977-79)— Non-degree
    academic exchange program
    Major area of study: Chinese history

- *Princeton University*, Princeton, New Jersey, USA (1973-77)—BA cum laude 1977
  Major areas of study: International affairs (Woodrow Wilson School of Public
  and International Affairs); Certificate of Proficiency in East Asian Studies

SCHOLARSHIPS AND FELLOWSHIPS

- Rowdget Young Visiting Fellow, Faculty of Law, University of Hong Kong, June 2005
- Fulbright Research Fellowship, 2003 (Tsinghua University Faculty of Law, Beijing)
- Visiting Fellow, China Law Center, Yale Law School, Fall 2001
- Research Fellowship, National Program, Committee on Scholarly Communication with the
  People's Republic of China, 1991-92
- Foreign Language and Area Studies Fellowship, 1986-87 (Harvard Law School)
- Foreign Language and Area Studies Fellowship, 1984-85 (Harvard Law School)
- Commonwealth Scholarship, 1981-83 (University of London)
- Canada-China Exchange Scholarship, 1977-79 (Peking University, Nanking University)

PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS

- Member, Council on Foreign Relations
- Member, New York Bar
- Member, Academic Advisory Group, US-China Working Group, United States Congress
- Affiliate Professor, University of Washington School of Law
- Member, American Bar Association
- Member, Association for Asian Studies
- Director, U.S. China Law Society
- Director, Pacific Rim Law and Policy Association (publisher of *Pacific Rim Law and Policy Journal*)
- Member, Advisory Board, Center for Real Estate Law, Peking University Law School

CONSULTANCIES (SELECTED)

- Financial Sector Reform and Strengthening (FIRST) Initiative, *Amendments to the Securities Law of the People's Republic of China*, 2004-2005
- Asian Development Bank, *Economic Law in the People's Republic of China: Retrospect and Prospect*, 2004-2005
- Asian Development Bank, *Amendments to the Company Law of the People's Republic of China*, 2001-2005
- Agency for International Development, *Commercial Law Reform in the Former Soviet Republics*, 2002
- Asian Development Bank, *China's Legal and Administrative System*, 2001

OTHER TEACHING

- *Chinese Business Law* (intensive Executive MBA course), October-November 2004, Hong Kong University of Science and Technology, Shenzhen Campus, Shenzhen, China
- *Chinese Business Law* (intensive Executive MBA course), March 2004, Shanghai Jiaotong University, Shanghai, China

LANGUAGES

- Chinese (Mandarin) (fluent)
- French, Japanese (reading: excellent; spoken: good)
- Spanish, Latin (fair)

COMMUNITY SERVICE

- Member, Editorial Board, *Journal of Comparative Law*
- Co-editor (with Prof. Veronica Taylor) of *Asian Law Abstracts*, a journal of the Social Science Research Network (www. ssrn.com)
- Establishment and maintenance of Chinese Law Prof Blog (chineselawblog.net), a member of the Law Professor Blogs Network
- Establishment and maintenance of the Chinalaw listserv (formerly the Chinese Law Net), an Internet discussion group on issues of Chinese law (web site address: chinalawlist.org)
- Refereeing of grant applications to various bodies, including the Committee on Scholarly Communication with China and the Social Sciences and Humanities Research Council of Canada
- Refereeing articles and book manuscripts for various journals and publishers including the China Quarterly, Oxford University Press, and Stanford University Press

PUBLICATIONS

### Articles and Monographs

"The Chines e Legal System Since 1995: Steady Development, Striking Continuities," *China Quarterly*, no. 191 (Sept. 2007): 555-566

"Legislating for a Market Economy in China," *China Quarterly*, no. 191 (Sept. 2007): 567-585

"Three Concepts of the Independent Director," *Delaware Journal of Corporate Law*, vol. 32, no. 1 (2007): 73-111 (available at http://ssrn.com/abstract=975111)

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China," *Columbia Journal of Asian Law*, vol. 19, no. 1 (2005 [2006]): 50-71

"The Independent Director in Chinese Corporate Governance," *Delaware Journal of Corporate Law*, vol. 31, no. 1 (2006): 125-228 (available at http://ssrn.com/abstract=895588)

"Zhengfu chigu yu Zhongguo gongsi zhili" (Government Shareholding and Chinese Corporate Governance), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 2 (Sept. 2005): 230-248

"Yige bing buyuan de waiguo yueliang: Meiguo fan neimu jiaoyi falü zhidu" (A Foreign Moon That Is not Round: America's Anti-Insider Trading Legal Regime), *Hongfan Pinglun* (Hongfan Review [Journal of Legal and Economic Studies]), vol. 2, no. 1 (March 2005): 225-238

"Zhongguo xiuding 'Xing Fa' pingjia" (An Assessment of China's Revisions to the "Criminal Law"), in Xu Chuanxi (ed.), *Zhongguo Shehui Zhuanxing Shiqi de Falü Fazhan* (The Development of Law in China's Transitional Society) (Beijing: Falü Chubanshe [Law Press], 2004): 448-492

"Corporate Governance in China: An Overview," *China Economic Review*, vol. 14, no. 4 (2003): 494-507

"Empirical Research in Chinese Law," in Erik Jensen & Thomas Heller (eds.), *Beyond Common Knowledge: Empirical Approaches to the Rule of Law* (Stanford: Stanford University Press, 2003): 164-192

"Duli dongshi yu Zhongguo gongsi zhili" (The Independent Director and Chinese Corporate Governance), in Fang Liufang (ed.), *Fa Da Pinglun* (China University of Politics and Law Review), vol. 2 (Beijing: Zhongguo Zheng-Fa Daxue Chubanshe [China University of Politics and Law Press], 2003): 99-122

"The Independent Director in Chinese Corporate Governance and the 'Guidance Opinion on the Establishment of an Independent Director System in Listed Companies'," in Wang Baoshu (ed.), *Touzizhe Liyi Baohu* (The Protection of Investors' Interests) (Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 142-165

"Economic Development and the Rights Hypothesis: The China Problem," *American Journal of Comparative Law*, vol. 51 (2003): 89-111

"China's Legal System and the WTO: Prospects for Compliance," *Washington University Global Studies Law Review*, vol. 2, no. 1 (2003): 97-118

"Puzzling Observations in Chinese Law: When Is a Riddle Just a Mistake?" in C. Stephen Hsu (ed.), *Understanding China's Legal System* (New York: New York University Press, 2003): 93-121

"Zhongguo de jiufen jiejue" (Dispute Resolution in China), in Jiang Shigong (ed.), *Tiaojie, Fazhi yu Xiandaixing: Zhongguo Tiaojie Zhidu Yanjiu* (Mediation, Legality, and Modernity: Studies in the Chinese Mediation System) (Beijing: Zhongguo Fazhi Chubanshe [China Legal System Press], 2001)

"Zhongguo tudi shiyong guanli zi xia er shang de celüe" (A Bottom-Up Strategy for Land Use Regulation in China), in Chi Fulin (ed.), *Zouru 21 Shiji de Zhongguo Nongcun Tudi Zhidu Gaige* (China's Rural Land System Reform Going Into the 21st Century) (Beijing: Zhongguo Jingji Chubanshe [China Economics Press], 2000): 299-303

"Chûgokuhô kenkyû no apurôchi: 'hô no shihai' paradaimu wo koete" (Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm), *Hikaku Hôgaku* (Studies in Comparative Law), vol. 34, no. 1 (2000): 73-91

"Alternative Approaches to Chinese Law: Beyond the 'Rule of Law' Paradigm," *Waseda Proceedings of Comparative Law*, vol. 2 (1998-1999): 49-62

"China and the World Trade Organization," in Freshfields (ed.), *Doing Business in China* (Yonkers, N.Y.: Juris Publishing, 1999): I-11.1 to I-11.30

"Private Enforcement of Intellectual Property Rights in China," *NBR Analysis*, vol. 10, no. 2 (April 1999): 29-41

*Wrongs and Rights: A Human Rights Analysis of China's Revised Criminal Code* (New York: Lawyers Committee for Human Rights, December 1998)

"Power and Politics in the Chinese Court System: The Execution of Civil Judgments," *Columbia Journal of Asian Law*, vol. 10, no. 1 (Spring 1996): 1-125

"The Creation of a Legal Structure for Market Institutions in China," in John McMillan & Barry Naughton (eds.), *Reforming Asian Socialism: The Growth of Market Institutions* (Ann Arbor: University of Michigan Press, 1996): 39-59

"The Execution of Civil Judgments in China," *China Quarterly*, no. 141 (March 1995): 65-81; translated into Japanese as "Chûgoku ni okeru minji hanketsu no kyôsei shikkô," in Hikota Koguchi (ed.), *Chûgoku no Keizai Hatten to Hô* (Tokyo: Waseda University Institute of Comparative Law, 1998): 343-367

"Antagonistic Contradictions: Criminal Law and Human Rights in China" (with James V. Feinerman), *China Quarterly*, no. 141 (March 1995): 135-154

"Justice and the Legal System," in Robert Benewick & Paul Wingrove (eds.), *China in the 1990s* (London: Macmillan, 1995): 83-93

"GATT Membership for China?," *University of Puget Sound Law Review*, vol. 17, no. 3 (Spring 1994): 517-531

"Regulation and Its Discontents: Understanding Economic Law in China," *Stanford Journal of International Law*, vol. 28, no. 2 (Spring 1992): 283-322

"Dispute Resolution in China," *Journal of Chinese Law*, vol. 5, no. 2 (Fall 1991): 245-296

"What's Law Got to Do with It? Legal Institutions and Economic Reform in China," *UCLA Pacific Basin Law Journal*, vol. 10, no. 1 (Fall 1991): 1-76

"Law, the State and Economic Reform in China," in Gordon White (ed.), *The Chinese State in the Era of Economic Reform: The Road to Crisis* (London: Macmillan, 1991): 190-211

"Political Power and Authority in Recent Chinese Literature," *China Quarterly*, no. 102 (June 1985): 234-252

"Concepts of Law in the Chinese Anti-Crime Campaign," *Harvard Law Review*, vol. 98, no. 8 (June 1985): 1890-1908

### Unpublished Working Papers

"Lost in Translation? Corporate Legal Transplants in China" (July 3, 2006), GWU Law School Public Law Research Paper No. 213 (available at http://ssrn.com/abstract=913784)

"The Role of Law in China's Economic Development" (with Peter Murrell and Susan H. Whiting) (January 27, 2006), GWU Law School Public Law Research Paper No. 187 (available at http://ssrn.com/abstract=878672)

"The Enforcement of United States Court Judgments in China: A Research Note" (May 27, 2004) (available at http://ssrn.com/abstract=943922)

### Translations

"The Management Liability of Directors," *Law in Japan*, vol. 20 (1987): 150-172 (translation from Japanese of M. Kondô, "Torishimariyaku no keiei sekinin")

### Short Articles, Comments, and Book Reviews

"Law, Institutions, and Property Rights in China" (with Peter Murrell and Susan Whiting), Woodrow *Wilson International Center for Scholars Asia Program Special Report*, No. 129, 2005: 42-47

"Xintuo zeren de zhenzheng yiyi -- yu Lang Xianping jiaoshou shangque" (The True Meaning of Fiduciary Liability: A Discussion with Professor Lang Xianping), *Zhongguo Zhengquan Bao* (China Securities News), Dec. 5, 2003

"Ruhe quezhi yijia gongsi de cunzai: Zhongguo fa shang de kunhuo he falü duoyuan zhuyi," in Wang Baoshu (ed.), *Quanqiu Jingzheng Tizhi Xia de Gongsi Fa Gaige* (Company Law Reform in a System of Global Competition)(Beijing: Shehui Kexue Wenxian Chubanshe [Social Sciences Documentation Press], 2003): 74-76

"Corporatisation, Not Privatisation", *China Economic Quarterly*, vol. 7, no. 3 (2003): 27-30

Review of Peter Murrell (ed.), *Assessing the Value of Law in Transition Economies* (Ann Arbor: Univ. of Michigan Press, 2001), in *Journal of Economic Literature*, vol. 41 (June 2003): 624-625

"China" (with Nicholas Howson and Lester Ross), in *Insolvency & Restructuring 2003* (London: Law Business Research, 2003): Chapter 9

Statement Before the Congressional-Executive Commission on China (June 6, 2002), in "WTO: Will China Keep Its Promises? Can It?", *Hearing Before the Congressional-Executive Commission on China*, 107th Congress, Second Session (Washington, D.C.: U.S. Government Printing Office, 2002): 66-78

Statement Before the United States-China Security Review Commission (Jan. 18, 2002) [on China's accession to the World Trade Organization], in *Compilation of Hearings Held Before the U.S.-China Security Review Commission*, 107th Congress, First and Second Sessions (Washington, D.C.: U.S. Government Printing Office, 2002): 1171-1181

"China" (with Lester Ross), in *Insolvency & Restructuring 2002* (London: Law Business Research, 2002): 57-63 (Chapter 9)

"Dispute Resolution in China: The Arbitration Option" (with Angela H. Davis), in Asia Law and Practice (ed.), *China 2000: Emerging Investment, Funding and Advisory Opportunities for a New China* (Hong Kong: Euromoney Publications (Jersey) Limited, 1999): 151-162

"State Council Notice Nullifies Statutory Rights of Creditors," *East Asian Executive Reports*, vol. 19, no. 4 (April 15, 1997): 9-15

"China's New Partnership Law" (with Nicholas Howson and Gangliang Qiao), *The China Business Review*, July-August 1997: 30-33

"Shanghai Measures on Land Use by FIEs: An Indication of Coming Changes in the National System?" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 11 (November 15, 1996): 9-13

"Bill Jones: An Appreciation," *Washington University Law Quarterly*, vol. 74 (Fall 1996): 545-546

"Methodologies for Research in Chinese Law," *University of British Columbia Law Review*, vol. 30, no. 1 (1996): 201-209

"One Step Back Permits Two Steps Forward," *China Rights Forum*, Fall 1996: 8-11

"Developing P.R.C. Property and Real Estate Law: Revised Land Registration Rules" (with Nicholas C. Howson), *East Asian Executive Reports*, vol. 18, no. 4 (April 15, 1996): 9, 13-17

"Implementation of Central Policy and the Law in China," *European Association for Chinese Law Information Bulletin* (1991)

"Foreign Economic Laws and Bureaucracy in China," *European Association for Chinese Law Information Bulletin*, vol. 5, no. 4 (December 1989): 3-7

Review of Frank K. Upham, *Law and Social Change in Postwar Japan* (1987), in *Bulletin of the School of Oriental and African Studies* (1989)

Contribution on the People's Republic of China for "Crime and Punishment" section of the *Encyclopaedia Britannica* (1989)

Review of Michael J. Moser (ed.), *Foreign Trade, Investment, and the Law in the People's Republic of China* (2nd ed. 1987), in *Lloyd's Maritime and Commercial Law Quarterly*, 1989, Part 1: 129-130 (February 1989)

"Relief on the Way for Foreign Investors," *South* (June 1987): 32

Review of J. Oldham, ed., *China's Legal Development* (1986), in *China Quarterly*, no. 109 (March 1987): 122-123

Review of D.T.C. Wang, *Les sources du droit de la République populaire de Chine* (1982), in *China Quarterly*, no. 108 (December 1986): 727-728

Review of M.D. Pendleton, *Intellectual Property Law in the People's Republic of China* (1986), in *European Intellectual Property Review*, vol. 8, no. 10 (October 1986): 323-324

Review of D. Solinger, *Chinese Business Under Socialism. The Politics of Domestic Commerce, 1949-1980* (1984), in *China Quarterly*, no. 106 (June 1986): 348-350

Review of P. Gladwin & A. Hameed, *Guide to the Patent Law of the People's Republic of China* (1985), in *European Intellectual Property Review*, vol. 8, no. 5 (May 1986): 160

"China's New Rule of Law," *Britain-China*, no. 31 (Spring 1986): 11-14

"Proposed Consent Agreement Between General Motors Corporation and Toyota Motor Corporation," *Harvard International Law Journal*, vol. 25, no. 2 (Spring 1984): 421-427

LECTURES, INTERVIEWS, AND CONFERENCE APPEARANCES

Commentator, conference on *China's Financial System Reforms and Governance*, School of Advanced International Studies, Johns Hopkins University, Washington DC, 16 April 2007

"Is Chinese Law Different?", public lecture sponsored by East Asian Studies Program, Princeton University, Princeton, New Jersey, 10 April 2007

"The Role of Law in China's Economic Development," public lecture sponsored by Department of Economics, Middlebury College, Middlebury, Vermont, 5 April 2007

Panelist, "The Academic Perspective and Recent Research," *OECD-China Policy Dialogue on Corporate Governance*, sponsored by the OECD, Shanghai Stock Exchange, State Assets Supervision and Administration Commission, Chinese Securities Regulatory Commission, Development Research Center, Government of Japan, Global Corporate Governance Forum, and Millstein Center for Corporate Governance and Performance at Yale School of Management, 29-30 March 2007

Public lecture, "The Ecology of Chinese Corporate Governance," sponsored by Asian Institute of International Financial Law, Faculty of Law, University of Hong Kong, 2 March 2007

"The Rule of Law in China," roundtable discussion (with Jerome A. Cohen), MITRE Corporation, Washington, DC, 2 February 2007

Guest lecturer, National Taiwan University Faculty of Law, "The Institutional Environment of Corporate Governance in China" (in Chinese), 22 December 2006

Guest lecturer, New York University Law School, "Chinese Constitutional Law", 14 November 2006

"The Institutional Environment of Corporate Governance in China", lecture presented as part of Clarke Program Colloquium Series, Cornell Law School, 3 November 2006

"The Role of Non-Legal Institutions in Chinese Corporate Governance", paper presented at authors' workshop on *A Decade After Crisis: The Transformation of Corporate Governance in East Asia* sponsored by the Center of Excellence Program in Soft Law at the University of Tokyo, the Center on Financial Law at Seoul National University, and the Center for Japanese Legal Studies at Columbia Law School, Tokyo, 1 October 2006

"The Institutional Environment of Chinese Corporate Governance", paper presented at panel on *Legal Aspects of the Economic Transformation in China*, annual conference of the International Society for New Institutional Economics, Boulder, Colorado, 23 September 2006

"Law and the Economy in China: The Past Decade", paper presented at authors' workshop on *Developments in Chinese Law: The Last Ten Years*, sponsored by *The China Quarterly* and All Souls College, Oxford University, Oxford, UK, 15 September 2006

"The Institutional Environment of Corporate Governance in China and Its Policy Implications", paper presented at conference on *Corporate Governance in East Asia: Culture, Psychology, Economics and Law*, Berkeley Center for Law, Business and the Economy, Boalt Hall School of Law, 5 May 2006

Guest lecturer, Yale Law School, "Recent Revisions to China's Securities Law", 4 April 2006

Commentator, Roundtable on "China's Emerging Financial Markets: Opportunities and Obstacles," Transactional Studies Program, Columbia Law School, New York, 19 January 2006

Speaker at Timothy A. Gelatt Memorial Dialog on Law and Development in Asia, New York University Law School, New York, 18 January 2006

Speaker and participant in workshop on administrative rule-making under China's new Securities Law, sponsored by the FIRST Initiative, the Finance and Economics Committee of the National People's Congress, and the World Bank, Beijing, 14-15 January 2006

Panelist, "The Globalization of American Law? Comparative Law and the New Legal Transplants", Section on Comparative Law, American Association of Law Schools annual meeting, Washington, DC, 5 January 2006

Panelist, "Improving the Fairness and Transparency of Judicial Decisions", conference on *Rule of Law Developments in China*, sponsored by the Bureau of Democracy, Human Rights, and Labor, Department of State, Washington, DC, 7 November 2005

Interviewed on BBC World Service on recent developments in death penalty procedures in China, 26 October 2005

"Lost in Translation: Legal Transplants in Chinese Corporate Law", Rowdget Young Visiting Fellow Lecture, University of Hong Kong Faculty of Law, Hong Kong, 4 June 2005

"The Independent Director in Chinese Corporate Governance", invited paper presented at 4th Asian Corporate Governance Conference, co-hosted by Asian Institute of Corporate Governance, Korea University and Center for Financial Law, Seoul National University, sponsored by World Bank Global Corporate Governance Forum, Seoul, 19-20 May 2005

"The Legacy of History in China's Legal System", paper presented at conference on *The Rule of Law: Chinese Law and Business*, Centre for Socio-Legal Studies, Oxford University, May 11-13, 2005

"The Emerging Private Sector and China's Legal System", paper presented at conference on *China's Economic and Sociopolitical Transformation: Measuring China's Emerging Private Sector and Its Impact*, Washington, DC, 22 April 2005

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *New Scholarship in Chinese Law: A Celebration in Honor of Stanley Lubman*, Center for Chinese Legal Studies, Columbia Law School, New York, 15 April 2005

"Lost in Translation? Corporate Law in China", paper presented at conference on *Asia in a Globalizing World*, Center for East Asian and Pacific Studies, University of Illinois at Urbana-Champaign, 9 April 2005

Guest lecturer in course on "China and Globalization", Prof. Reuven Avi-Yonah, University of Michigan Law School, Ann Arbor, 1 April 2005

"Law, Institutions, and Property Rights", paper presented at conference on *China's Economy: Retrospect and Prospect,* Woodrow Wilson International Center for Scholars, Washington, DC, 2 March 2005

"Insider Trading Law in the United States and China", lecture presented in Chinese at East China University of Politics and Law, Shanghai, 25 November 2004

"Law, Property Rights, and Institutions" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part II), University of Pittsburgh, 5-7 November 2004

"The Independent Director in Chinese Corporate Governance", opening paper presented at conference on *Amendment of the Company Law* organized by the Legislative Affairs Office of the State Council, the China Securities Regulatory Commission, and the Shanghai Stock Exchange, 10 October 2004

"Insider Trading Law in the United States and China", talk presented to Shanghai Institute of Law and Economics, Beijing, 28 September 2004

"China's Proposed Bankruptcy Law", commentator at conference on *Legal and Financial Infrastructure Requirements for Residential Mortgage Securitization in China* organized by Beijing University School of Law, Center for Real Estate Law and Financial Law Institute, Beijing, 17 July 2004

"Does Law Matter in China?", talk presented at Global Business Center, University of Washington School of Business, 15 January 2004

"Why China Should Not Adopt United States Insider Trading Law", paper presented at conference on *Corporate Fraud and Governance: American and Chinese Perspectives* organized by Shanghai Jiaotong University and New York University School of Law, Shanghai, 16 December 2003

"Human Rights and Culture", paper presented at conference on *Sino-U.S. Human Rights Conference* organized by Georgetown University Law Center, Beijing, 14 December 2003

"The History of Corporate Governance in China", commentator at conference organized by Shanghai Institute of Law and Economics, Beijing, 15 November 2003

"Professional Ethics of Defense Lawyers", commentator at conference on *The Defense Functions of Lawyers and Judicial Justice* organized by the All-China Lawyers Association, the American Bar Association, Renmin University of China, and New York University School of Law, Beijing, 21 September 2003

"The Independent Director in Chinese Corporate Governance", lecture presented at Tsinghua University Faculty of Law, Beijing, 10 April 2003

"The Independent Director in Chinese Corporate Governance", paper presented to the School of Business and Management, Hong Kong University of Science and Technology, 7 March 2003

"Assessing the Value of Law in China's Economy" (with Peter Murrell and Susan Whiting), paper presented at conference on *China's Economic Transition: Origins, Mechanisms, and Consequences* (Part I), University of Toronto, 15-17 November 2002

"China's Entry into the WTO: Prospects for Compliance", paper presented at conference on *China's Accession to the World Trade Organization*, Georgetown University Law Center, 10 Oct. 2002

"How Do We Know When an Enterprise Exists? Unanswerable Questions and Legal Polycentricity in China", paper presented at conference on *The Reform of Corporate Law Under Global Competition*, Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 15 Sept. 2002

"Zhongguo youdai fazhan duoyuanhua de jiandu jizhi" (China Has Yet to Develop a Multidimensional Monitoring Mechanism), *21 Shiji Jingji Baodao* (21st Century Economic Report), 19 Aug. 2002, p. 39, col. 1 (interview)

Testified before the Congressional-Executive Commission on China, Washington, D.C., on issues relating to China's compliance with its WTO commitments, 6 June 2002

"Business Regulation in the Bureaucratic State: Enterprise Law in China", paper presented at panel on *The Rule of Law and Enterprise Reform in China*, Association for Asian Studies annual meeting, 5 April 2002

"What WTO Accession Does *Not* Mean for China", paper presented at panel on *WTO and the International Rule of Law*, American Society of International Law annual meeting, 15 March 2002

Testified before United States-China Security Review Commission, Washington, DC, on issues relating to China's WTO accession, 18 Jan. 2002

"The Independent Director in Chinese Corporate Governance", paper presented at conference on "Protection of Investors' Interests: International Experience and Chinese Practice", Commercial Law Research Center of the Faculty of Law, Tsinghua University, Beijing, China, 18-19 November 2001

"Economic Development and the Rights Hypothesis: The China Problem", paper presented at conference on *Law Reform in Developing and Transitional Economies*, Ulaanbaatar, Mongolia, 2-3 July 2001

Interviewed for feature entitled "Detained in China", broadcast on PBS, *The News Hour with Jim Lehrer*, 18 May 2001 <http://www.pbs.org/newshour/bb/asia/jan-june01/detained_05-18.html>

"Empirical Research in Chinese Law," paper presented to Rule of Law Workshop, Stanford Law School, 18 April 2001

"Transparency in China's Regulation of International Trade," presentation made to audiences from Chinese government, business, and academia in Beijing and Shanghai as part of 5-member United States government mission, 13-25 March 2000

"Courts and Markets in Post-Socialist Transition: China," paper presented at workshop on *Courts and Markets in Post-Socialist Transition*, University of Wisconsin School of Law, 3 March 2000

"Incentives and the Top-Down Model of Regulation in Chinese Land Law," paper presented (in Chinese) at *International Conference on the Legal Framework for Rural Land Use Rights in China*, China Institute for Reform and Development, Haikou, Hainan Province, China, 12-14 January 2000

"Corporate Governance in China," paper presented to members of Project on Corporate Governance in China, Stanford University, Stanford, California, 29 October 1999

"Alternative Approaches to Chinese Law," lecture delivered at UCLA School of Law, Los Angeles, 28 October 1999

Panelist on "Rule of Law in China – Recent Developments and Prospects," Inaugural Session of Global Business Briefing Series, Pacific Council on International Relations, Los Angeles, 28 October 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, City University of Hong Kong, 27 September1999

Guest lecturer, Chinese administrative law class of Prof. Wang Xixin, Beijing University Faculty of Law, Beijing, China, 23 September 1999

"Bankruptcy in Capitalist and Reforming Socialist Economies," brief course taught to delegation of North Korean legal officials and academics at Beijing University, Beijing, China, 20-23 September 1999

"Misunderstanding Chinese Law: The Lure of the 'Rule of Law' Paradigm," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 23 June 1999

"The Enforcement of Civil Judgments in China," lecture delivered at Faculty of Law, Waseda University, Tokyo, Japan, 19 June 1999

"China's Revised Criminal Law," paper presented at conference on *Contemporary Chinese Legal Development*, sponsored by Chinese Law Society of America, Harvard Law School, Cambridge, Mass., 26-27 March 1999

"Alternative Approaches to Chinese Law," lecture delivered at Yale Law School, 25 March 1999

Commentator, conference on *Administrative Law Reform in China*, sponsored by UCLA Center for Chinese Studies, International Studies & Overseas Programs, UCLA School of Law and Southern California China Colloquium, Los Angeles, 6 March 1999

Participant, *U.S.-China Symposium on the Legal Protection of Human Rights*, The Aspen Institute, 11-13 December 1998

"Private Enforcement of Intellectual Property Rights," paper presented at *Sino-U.S. Conference on Intellectual Property Rights and Economic Development: 1998 Chongqing*, sponsored by the National Bureau of Asian Research, Chongqing, China, 16-18 September 1998

Commentator, conference on *Law and Development in Asia*, co-sponsored by Asian Development Bank and Harvard University, Council on Foreign Relations, New York, 21 May 1998

"Introduction to U.S. Capital Markets for Chinese Enterprises," speech (in Chinese) presented at Investment Promotion Forum sponsored by United Nations Industrial Development Organization, Beijing, 31 March 1998

"Legal Order as a Prerequisite for Cooperation: The China Problem," paper presented at *Inaugural University of California at San Diego Social Sciences Research Conference on Cooperation Under Difficult Conditions*, Graduate School of International Relations and Pacific Studies, 18 October 1997

"Recent Developments in Criminal and Administrative Punishments in China," paper presented at University of Washington School of Law Conference on Asian Law, Seattle, Washington, 3 August 1996

"Enforcement of International Awards Involving China and Hong Kong," paper presented at EuroForum conference on *Dispute Resolution in China and Hong Kong*, London, 31 May 1996

"China and the WTO," paper presented at American Conference Institute conference on *Doing Business in China and Hong Kong*, New York, 10 May 1996

"Recent Developments in Chinese Foreign Investment Law," talk presented at conference on *Trade and Investment in Emerging Markets: China and India*, New York University School of Law, 17 November 1995

Commentator on China at *Timothy A. Gelatt Dialogue on Law and Development in Asia*, New York University School of Law, 14 September 1995

"Round Pegs and Square Holes: China and the GATT," paper presented at panel on *China in the World Economic Order* at the annual meeting of the Association for Asian Studies, Washington, DC, April 1995

"Civil Rights in China," talk delivered to Civil Rights Committee of the Seattle-King County Bar Association, Seattle, March 1995

"Foreign Business Law and China's Application to the GATT/WTO," paper presented at 1990 Institute Conference on Chinese Foreign Trade and Investment Law, San Francisco, March 1995

"China and the GATT/WTO," talk delivered to the World Affairs Club, Juneau, Alaska, March 1995

"The Clines e Court System," paper presented at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, January 1995

"Enforcement of Civil Judgments in a Changing Society: A Chinese Example," paper presented at annual meeting of the Law and Society Association, Phoenix, Arizona, 17 June 1994

"The Enforcement of Civil and Economic Judgments in China," paper presented at symposium on *The Chinese Legal System*, sponsored by the China Quarterly and the School of Oriental and African Studies, University of London, London, U.K., 10-12 May 1994

"GATT Membership for China?," paper presented at symposium on *Pacific Rim Trade*, University of Puget Sound School of Law, Washington, 5 November 1993

"The Creation of a Legal Structure for Market Institutions in China," paper presented at conference on *The Evolution of Market Institutions in Transition Economies*, Graduate School of International Relations and Pacific Studies, University of California, San Diego, 14-15 May 1993

Chair/discussant at panel on "Theoretical Perspectives in China's Legal Reform," conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law,* Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Research Methodologies in Chinese Law," paper presented at conference on *Chinese Law -- A Re-Examination of the Field: Theoretical and Methodological Approaches to the Study of Chinese Law,* Faculty of Law, University of British Columbia, Vancouver, 22 March 1993

"Enforcement of Civil Judgments in China," talk delivered at *China Studies Seminar*, University of British Columbia, October 1992

Discussant at conference on *The Modernization of Chinese Law on Both Sides of the Taiwan Straits*, National Taiwan University College of Law, September 1992

"Enforcement of Civil Judgments in the People's Republic of China: Notes from the Field," talk delivered at Attorney-General's Chambers, Hong Kong, August 1992

"Dispute Resolution in China," talk delivered at Chinese University of Hong Kong, November 1991

Interviewed on modern Chinese law for program on East Asian legal systems broadcast by BBC World Service (London), September 1991

Discussant at panel on *New Perspectives on Chinese Economic Development*, Western Economic Association Annual Conference, Seattle, 30 June-3 July 1991

"The Trials of the June 4th Defendants," talk delivered at *East Asian Legal Studies Lunchtime Colloquium*, Harvard Law School, 22 March 1991

"What's Law Got to Do with It?  Legal Institutions and Economic Reform in China," talk delivered at *East Asian Legal Studies Workshop*, Harvard Law School, 21 March 1991

Guest lecturer, Chinese law class of Prof. William C. Jones, Washington University School of Law, St. Louis, Missouri, 30 January 1991

"Legal Problems of Industrial Economic Reform in China," talk delivered to *Faculty Forum,* Washington University School of Law, St. Louis, Missouri, 30 January 1991

Speaker and panel chairman, "Chinese Business Law," at *China Trade Update: Doing Business with China in the 1990s*, conference sponsored by the Washington State China Relations Council, Seattle, Washington, 5 November 1990

"The Future of Democracy in China," panel discussion sponsored by the Council of International Organizations, Citizens International Center, Seattle, Washington, 21 April 1990

"Why Laws Fail: Central Legislation and the Structure of the Chinese Polity," paper delivered at *Winter Workshop on East Asian Law*, Center for Pacific Rim Studies, University of California at Los Angeles, 20 January 1990

"The Legal Background to the Behavior of State-Owned Enterprises," paper delivered at conference on *Ownership Reforms and Efficiency of State-Owned Enterprises* sponsored by the Institute of Economics of the Chinese Academy of Social Sciences and the Ford Foundation, Shenzhen, China, 6 January 1990

"Implications of Recent Events in China for Sino-U.S. Relations," panel discussion sponsored by U.S.-China People's Friendship Association and the East Asian Resource Centre, University of Washington, 11 July 1989

"Law and Economic Reform in China," *London China Seminar*, School of Oriental and African Studies, University of London, 19 May 1988

"Urban Enterprises and the Role of Law in China's Economic Reforms," Conference on *The Chinese Developmental State: Change and Continuum*, Institute of Development Studies, University of Sussex, 7-9 April 1988

Interviewed for feature entitled "How is China Run?", broadcast on BBC World Service, *The World Today*, 25 March 1988

"The 13th Congress of the Chinese Communist Party and China's Legal Reforms," Asian Studies Centre, St. Antony's College, Oxford University, 8 March 1988

"Chinese Economic and Legal Reforms," John F. Kennedy School of Government, Harvard University, 24 March 1987

Co-organizer and discussant, Conference on *China: Law and Trade 1986*, School of Oriental & African Studies, University of London, 30 June 1986

"The Role of Law in Modern China," Great Britain China Centre, London, 17 April 1986

"The Foreign Economic Contract Law," Law-China Society Seminar on China's Economic Laws, London, 17 April 1986