# EXHIBIT C
# TO GUTOWSKI DECLARATION:

# DECLARATION OF
# JACQUES DELISLE
# WITH EXHIBITS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                              Plaintiff,

    - against -

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                              Defendant.
------------------------------------------------------------x

**ECF CASE**

**07-CV- 8213 (DC)**

**DECLARATION OF**
**<u>JACQUES DELISLE</u>**

I, Jacques deLisle, declare as follows:

**Qualifications and Scope of Opinion**

    1.    I am the Stephen A. Cozen Professor of Law at the University of Pennsylvania Law School and a member of the faculty of the Center for East Asian Studies at the University of Pennsylvania. I specialized in Chinese law and Chinese politics and policy while earning my J.D. at Harvard Law School and in the Ph.D. program in the Government Department at Harvard University. I also focused on Chinese politics and policy in my studies at the Woodrow Wilson School at Princeton University, where I received an A.B.

    2.    My research, writing and teaching for approximately twenty-five years have focused on Chinese law, Chinese politics and policy, and China's approach to international law. This work has addressed primarily contemporary developments and the period since the beginning of economic reforms in the People's Republic of China ("PRC" or "China") in the late 1970s. Much of this work has focused on Chinese policies of economic reform and deeper engagement with the outside world, related legal changes, and the political context of these policies and laws. My research has included work on remedies—and the limits imposed by sovereign immunity and other doctrines—in U.S. courts and under U.S. law for acts committed in China or by actors linked to the Chinese state.

    3.    I have published articles on these subjects in law journals, international affairs journals, edited volumes and other media. I regularly conduct research on law, politics and policy in contemporary China, and I monitor new laws and political and economic developments in China, and Chinese and foreign journalistic, official and scholarly commentaries on legal, political and economic developments in China.

4.  At the University of Pennsylvania, I teach courses each year focusing on legal, political and economic reform in contemporary China, and China's external legal relations. I regularly supervise law students' research work on Chinese legal topics, including theses and dissertations written on Chinese law topics by lawyers from the PRC studying in the LL.M. and S.J.D. programs at Penn. I also have taught several courses on contemporary Chinese politics, economics, policy and law and have advised graduate student theses and dissertations on Chinese law, Chinese politics, Chinese policy and contemporary China at other schools and universities, including Wharton (the business school at the University of Pennsylvania), the Graduate School of Arts and Sciences at the University of Pennsylvania, Harvard University, the National University of Singapore and the University of Aveiro (Portugal). I am a member of the faculty graduate group and have taught in the core curriculum of the Lauder Program at the Wharton School, a program that awards a joint M.B.A.-M.A. degree in regional studies, including in Chinese studies. I also conduct research and have published in the fields of international law and comparative law. I teach courses on torts, public international law and international relations and comparative law.

5.  I frequently give presentations on topics in contemporary Chinese law, politics, policy and related fields at major universities and law schools, and at international conferences in the United States, East Asia and Europe, attended by scholars, government officials and practitioners.

6.  I have served as a consultant, advisor or lecturer for programs on U.S. and international law for Chinese lawyers, and U.S. government-funded programs to provide legal advice to PRC legislation-drafters, primarily in the fields of civil and economic law (including torts, property, company law and intellectual property) and legal controls of government regulation (including the administrative procedure law). Projects that I have participated in during recent years have contributed to the drafting of major Chinese legislation in several of these areas. I also have conducted substantial research and scholarship on foreign legal advice and assistance programs (including those focusing on economic law and rule-of-law reforms) targeting China and other transitional post-socialist states.

7.  I am a member of the National Committee for United States-China Relations. I am a senior fellow and director of the Asia Program at the Foreign Policy Research Institute, where I oversee lecture series, conferences and publications on issues that include law, politics, economics and policy in the greater Chinese region. I am vice chair of the Pacific Rim Interest Group of the American Society of International Law. I am a member of the International Academy of Comparative Law. I contribute to scholarly and policy-related programs on contemporary Chinese law and politics for these organizations. I have served or do serve as a peer-reviewer for major U.S. and East Asian scholarly journals or presses in fields relevant to my scholarship, and for major U.S. and foreign providers of funding for academic research on the law and politics of the PRC.

8. Before joining the faculty at Penn, I did substantial work on issues of Chinese law and country conditions and aspects of China's external relations in my capacity as an attorney-advisor in the Office of Legal Counsel in the Department of Justice and in association with leading U.S.-based international law firms. At the Department of Justice, I also did substantial work on issues of U.S. foreign relations law.

9. I have served as an expert witness and consultant on matters of the law of China in litigation in federal and state courts, arbitration proceedings and proceedings before federal agencies. Several affidavits and expert opinions that I have provided have been introduced and accepted in litigation in courts and arbitral proceedings. These expert opinions and affidavits have addressed issues of Chinese law that include: Chinese enterprise and company law (including the legal status of enterprises and their relationships with parent and investor enterprises and the state), civil law, civil procedure law, contract law, intellectual property law, the regulation of foreign trade with and investment in China (including the law of Sino-foreign joint ventures and related aspects of contract law), financial law, torts, and issues concerning the powers and quality of Chinese courts and judicial process.

10. I have conducted extensive research in residence in China. Since 1986, I have traveled regularly to China and on several occasions been a visiting scholar or visiting researcher at major research universities in the region. I have frequent, extended discussions with PRC lawyers, judges, legal academics, social scientists, government officials and ordinary Chinese citizens in China and elsewhere. I read Chinese and speak Mandarin, the standard national dialect of Chinese in the PRC. Much of my research is conducted in that language. I speak frequently, in Chinese, with Chinese lawyers, academics, students and officials. I have given presentations in Chinese to groups of lawyers and scholars, in the United States and in China.

11. I also have conducted extensive research outside of the PRC on matters relating to Chinese law, politics and economics. I have reviewed documentary evidence and have conducted many interviews with: lawyers who advise and represent non-PRC clients who invest or otherwise do business or have business interests in the PRC, non-PRC business people who invest or otherwise do business or have business interests in the PRC, and government officials and foundation, industry organization, and other non-profit officers who have been involved in promoting or monitoring economic and legal reform in China and China's compliance with economic-related international agreements and obligations.

12. A *curriculum vitae* is attached as Exhibit A.

13. For the purposes of rendering this opinion, I have reviewed the documents set forth in Exhibit B, which were provided to my by counsel for Plaintiff, and on other materials cited in this declaration. Where documents originally written in Chinese have been provided or are available to me in English translation as well as in the original Chinese, my opinions are based on review of the original Chinese texts. In formulating

my opinion, I have also relied upon my academic and professional experience and knowledge Chinese law, policy and practices.

14. I also reviewed a declaration prepared for Plaintiff by Chen Weidong. I first reviewed the Chen declaration after I had reached all of the conclusions and formulated the supporting analyses that are set forth in this declaration and after I had completed a full draft of this declaration. In revising the draft version of this declaration, I have added some references to the Chen declaration. I have not revised any of my conclusions or the analysis that I offer to support those conclusions.

15. I have been asked by counsel for Plaintiff to offer an opinion on the "ownership" of Defendant China National Chartering Company ("Sinochart") and related matters under Chinese law. It is my opinion that, under Chinese law and based on the case-specific materials that have been provided to me, Sinochart is properly considered to be owned by the China National Foreign Trade Transportation (Group) Company ("Sinotrans"), which is an enterprise owned by the state (that is, the People's Republic of China). The most that could plausibly be claimed is that Sinochart is, in a sense, indirectly owned by the state. Sinochart's status as an enterprise under the system of ownership by the whole people and Sinochart's operation with assets or capital that are, in some respects, property of the state do not alter these conclusions.

**Independent Legal Personality and the Distinction between Enterprises and Owners in Chinese Law**

16. Under Chinese law, an enterprise legal person such as Sinochart is a legally distinct entity separate from its owner, Sinotrans. Absent exceptional circumstances that, based on the materials I have seen, do not apply here, Chinese law would not "pierce the corporate veil" or apply any similar doctrine that would treat Sinochart and Sinotrans as not distinct companies. The fact that both are enterprises under the "system of ownership by the whole people" or that Sinochart is a wholly owned subsidiary within the Sinotrans enterprise group does not change this analysis.

17. Chinese law requires that an enterprise legal person have legal and practical capacity to act on its own and in its own interests. Before an entity can be established as an enterprise legal person, it must satisfy several criteria that relate to its substantiality and its capacity for autonomy. It must be "an organization that possesses civil legal capacity and capacity for civil acts and that, according to the law, independently enjoys civil rights and assumes civil liabilities." It must "be established in accordance with the law . . . possess necessary property or funds . . . have its own name, organizational structure and premises and be capable of bearing civil liability." These requirements are set forth in the General Principles of Civil Law ("General Principles"), which provide the framework for all civil law in China, including the law governing enterprises such as Sinochart or Sinotrans. The General Principles further provide that enterprises under the system of ownership by the whole people, such as Sinochart or Sinotrans can be legal persons, but only if they have appropriate articles of association, organizational structure, premises, funds in conformity with state regulations and the

4

capacity independently to assume civil liability. *General Principles of Civil Law*, arts. 36, 37, 41.

18.   The Law on Industrial Enterprises Owned by the Whole People ("Enterprise Law") is a framework statute that applies to enterprises under the system of ownership of the whole people that have not been reorganized as enterprises under the Company Law, which appears, from all the materials I have reviewed, to include Sinochart and Sinotrans. That law, which is a foundational law for the restructuring of traditional state-owned enterprises in the era of market-oriented economic reform that began a quarter-century ago, extends to a much wider array of enterprises—including those that are not "industrial" in the ordinary sense—than its title suggests. This law provides that enterprises under the system of ownership by the whole people can be independent enterprise legal persons, but only if they have their own requisite name, premises, organizational structure, funds, resources and other criteria imposed by laws and regulations. It also demands that such enterprises have the capacity independently to bear civil responsibility and liability for their civil acts. *Law on Industrial Enterprise Owned by the Whole People* (1988), art. 2, 17.

19.   Chinese law provides a variety of primarily administrative and government supervisory means for ensuring that business organizations holding themselves forth as enterprise legal persons satisfy the relevant legal requirements of substantiality and autonomy. An enterprise "receives" legal person status only after it demonstrates to a designated government "registration organ" (usually the State Administration of Industry and Commerce ("SAIC")[1] at the relevant level) that it meets the substantive criteria for legal person status. Under the General Principles of Civil Law, an enterprise under the system of ownership by the whole people "receives the status of an enterprise legal person following examination, approval and registration" by its supervisory government unit (often referred to as its "department in charge"). *General Principles* (1986), arts. 41, 50.

20.   The Enterprise Law similarly provides that an enterprise "receives the status of a legal person" only after it applies to its supervisory government unit or other authorized government unit, and SAIC approves the registration application and issues the enterprise a business license. *Enterprise Law*, art. 16. Materials that I have reviewed (and that are discussed in more detail below) indicate that these procedures have been followed for Sinochart and Sinotrans.

21.   The same sets of laws also provide that substantive autonomy, including autonomy from owners, accompanies separate legal status. Enterprise legal persons such as Sinochart or Sinotrans enjoy autonomy of management and operations, including control over how to operate their businesses, and when and with whom to enter into contracts or undertake other acts with legal consequences. The General Principles of Civil Law grant authority for enterprise legal persons to operate on their own,

---

[1] "State Administration for Industry and Commerce" is the conventional, if not literal or completely accurate, translation into English of the *Gongshang xingzheng guanli ju*. To avoid confusion, I will use the standard translation and its abbreviation in this declaration.

undertaking or refusing to undertake contracts or other civil legal acts, within their approved and registered scopes of business. *General Principles*, arts. 41-42.

22. The Enterprise Law contains additional provisions detailing extensive autonomy of enterprises under the system of ownership by the whole people in management and business operations. These include the rights to possess, use and legally dispose of property (including property that is placed under the enterprise's management and operation by the state), to make investments in other enterprises, to issue bonds to make autonomous production decisions, to choose whether and with whom to enter into dealings as supplier or customer, and to determine what prices to charge—all unless there are specific legal provisions to the contrary. (Examples of these narrow limitations include specific State Council regulations that restrict enterprise autonomy, or obligations imposed by the State Economic Plan—which has reached an ever-shrinking share of the economy—that require the enterprise to act in specified ways.) This set of rights also includes the right of an enterprise to be free from appropriation of its material or financial resources, and to reject any "production assignment," by any other unit, including another enterprise (except where the State Economic Plan requires otherwise). It also includes the right to be free from encroachment by any other unit (including another enterprise) upon the enterprise's "right to enjoy operational autonomy and administrative autonomy in accordance with the law." *Enterprise Law*, arts. 2-4, 7, 22-34, 58.

23. The Enterprise Law also provides that the functions and powers of the enterprise manager, the legal rights and interests of the enterprise and the property that the enterprise operates and manages all receive protection by law. *Enterprise Law*, arts. 7, 14, 15; see also *General Principles*, art. 82.

24. The same sets of laws also impose responsibilities that are the corollaries of the autonomy and authority those laws grant to enterprise legal persons. Among other things and in one of their principle effects, these provisions legally direct and require enterprises to bear the adverse consequences of choices that prove to ill serve the enterprise's economic interests. They provide that an enterprise legal person such as Sinochart or Sinotrans must bear legal responsibility independently for its civil acts.

25. The General Principles of Civil Law mandate that an enterprise legal person under the system of ownership by the whole people assume civil liability for its business activities with the property and assets that have been assigned to it, and that such an enterprise must bear liability for other unlawful acts, and that its officers may face administrative or criminal sanctions for malfeasance. *General Principles*, arts. 43, 48, 49.

26. The Enterprise Law provides that covered enterprises under the system of ownership by the whole people are responsible for their own profits and losses and bear civil liability with assets they are authorized to manage or operate. Such enterprises and their managers individually also face sanctions for failure to fulfill a variety of legal obligations, and they also face the prospect of bankruptcy and punishment for managers responsible for the enterprise's insolvency. *Enterprise Law*, arts. 2, 63 & passim; *cf. Enterprise Bankruptcy Law of the PRC*.

27. That Sinochart is a wholly owned subsidiary of Sinotrans within the Sinotrans "group" does not change this analysis. This ownership structure is fully consistent under Chinese law with Sinochart's meeting the criteria for and bearing the rights and responsibilities of independent enterprise legal person status. For at least a decade and a half, Chinese law has permitted the establishment of "enterprise groups," generally with a parent and some (but usually not all) of the subsidiary enterprises being under the system of ownership by the whole people. The relevant regulations (some of which are discussed more fully in the Chen Declaration) clearly provide that parent and subsidiary enterprises that stand in such a relationship are separate enterprise legal persons, with the parent being the "investor" or "owner" enterprise and the subsidiary being the "investee" or "owned" enterprise.

28. For enterprises that fail to satisfy the substantiality and capacity for autonomy requirements for legal personhood, Chinese law and practice provide administrative and related judicial means for "canceling" legal person status, and for punishing owners and state regulators responsible for the shortcomings or improper approvals.

29. The registration authority (SAIC) may revoke the business license of an enterprise that is found to lack the qualifications for enterprise legal person status, to have made a fraudulent application for registration as an enterprise legal person, to have concealed its true circumstances from the registration authority, or to have engaged in business activities beyond its authorized scope. *Enterprise Law*, art. 59; *General Principles*, arts. 45, 49. Moreover, an enterprise legal person that fails to meet the basic requirements for legal person status may be "terminated" administratively upon the determination of its supervisory government unit, or if the enterprise's legal person status is "ordered" (by its registration organ) revoked on the basis of the enterprise's violations of statutes and regulations. *Enterprise Law* art. 19; *cf. General Principles*, arts. 36, 45. The General Principles of Civil Law provide for formal termination—whether by dissolution on such grounds or because of bankruptcy, legal annulment or termination for other reasons—that brings to an end an enterprise's capacity to act as a legal person. There is no indication that any of these enterprise legal person status-terminating events has occurred with respect to Sinochart or Sinotrans.

30. In addition, Chinese law provides for administrative and even criminal sanctions to be imposed on natural persons whose responsibilities include making sure that an enterprise legal person meets relevant legal requirements. An enterprise legal person's "representative legal person" can be subject to such sanctions under many of the same circumstances that can trigger revocation of the enterprise's business license (or imposition of other sanctions against the enterprise). *General Principles*, art. 49. Chinese laws also authorize administrative or criminal sanctions against personnel of an enterprise legal person's registration organ or supervisory government unit where such personnel have neglected their duties to investigate and oversee the enterprise.

31. In contrast to the legal mechanisms for regulating enterprise legal persons described above, Chinese law has not generally permitted judicial "veil-piercing" to ignore a an enterprise's corporate form and to hold it legally indistinct from its owner (and thus to hold the owner liable for the actions of the subsidiary). Until very recently, the concept of "veil-piercing" was alien to Chinese law. Although known to Chinese legal scholars, it was nowhere to be found in statutes, regulations, rules or in an articulated judicial doctrine. Observers generally agree that something akin to judicial veil-piercing clearly entered Chinese law only with revisions to the Company Law that became effective in 2006. Still uncertain are the precise meanings of those provisions and their application to the circumstances of enterprises that remain under the system of ownership of the whole people and that have not been formally reorganized as companies under the Company Law—again, a characterization that appears to apply to Sinochart and Sinotrans.

32. In sum, under Chinese law, an enterprise legal person such as Sinochart is regarded in Chinese law as a separate legal entity that is distinct from its "owner" or "owners," including where there is one owner, where that one owner is itself an enterprise legal person (and thus the parent enterprise of the wholly owned subsidiary), and where the parent enterprise / owner is itself owned by "the state."

**Ownership of Sinochart by Sinotrans**

33. The materials that I have reviewed are consistent with the foregoing characterizations of enterprises and their relationships' applying to Sinochart and Sinotrans. These materials uniformly indicate that Sinochart is an independent enterprise legal person that is owned by, but legally distinct from, Sinotrans, which is itself an independent enterprise legal person, owned by, but distinct from, what is apparently a state owner.

34. A document dated 2001, titled "Enterprise Legal Person Business License" and issued by the national level SAIC, indicates that Sinochart is an independent enterprise legal person under Chinese law. As indicated above, such a business license would not be properly issued to an enterprise that was not a separate legal person, and the SAIC (here, at the national level) is the appropriate organ for issuing such a license.

35. A document dated 1988, titled "Application for Business License and Business Certificate" and issued by the Ministry of Foreign Economic Relations and Trade ("MOFERT")[2] and addressed to SAIC indicates MOFERT's approval of Sinochart (here with the same Chinese name that is used for the company in other documents) and

---

[2] "Ministry of Foreign Economic Relations and Trade" is the conventional translation for the *Duiwai jingji maoyi bu*. The translation provided to me uses the slightly different, and unconventional, "Ministry of Foreign Economy and Trade." MOFERT was renamed the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") after the issuance of this document. It has since been absorbed into a larger Ministry of Commerce ("MOFCOM").

8

Sinotrans (here listed as a *zonggongsi* or "general" or "head" company, in contrast to Sinochart's listing as a *gongsi* or company) for registration as enterprises with the SAIC.

36. At that time, MOFERT almost certainly was the governmental "department in charge" for Sinotrans and Sinochart. The MOFERT document indicates that the two enterprises are, at that time, part of the same set of "state-owned [or state operated] enterprises [*guoying qiye*] under the system of ownership by the whole people" [*quanmin suoyouzhi*]. At this point (and as the following paragraph explains further), it appears, and surely was the case, that Sinotrans was not yet the "group" (*jituan*) enterprise that owned other enterprises such as Sinochart. The difference in categorization (with Sinotrans as a *zonggongsi* and Sinochart as a mere *gongsi*) suggests the inequality of status that would be reformulated later into a parent-subsidiary relationship for Sinochart as a subsidiary of Sinotrans and as a subsidiary enterprise within in the Sinotrans group.

37. A document dated 1996, titled "Reply Concerning Agreement to the Reuse of the Name 'China National Chartering Company'[3] [Sinochart]" and issued by Sinotrans head / general company [*zonggongsi*] to Sinochart approves a restructuring that makes Sinochart fully a subsidiary of Sinotrans, but one that still has its own independent legal person status. The document states that the name Sinochart is to continue to be used for Sinochart as a company that is subordinate to [*lishu*][4] Sinotrans head / general company (*zongongsi*). The document also directs the "deregistration" of the former Sinochart. It also calls for a report to SAIC and securing of approval and proper registration of the new Sinochart with SAIC as a "branch" or "affiliate" [*fenzhi jigou*][5] with "independent legal person status" [*duli faren diwei*].[6]

38. Articles of Association for Sinochart, also dated 1996, state that, with the approval of the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC," the successor ministry to MOFERT), Sinochart was re-formed along the lines described in the "Reply" described in the preceding paragraph. The Articles of Association describe Sinochart as a company [*gongsi*] that is an entity with "independent legal person status" [*duli faren diwei*] and that is subordinate [*lishu*] the "head" or "general" company [*zonggonsi*], Sinotrans company [*zonggongsi*].

---

[3] This translation deviates somewhat from the translation I was provided. I have used here what I consider to be a more accurate rendering into English of the Chinese title.
[4] I use the term "subordinate" where the translation with which I have been provided uses "affiliated" to render the Chinese term, *lishu*, characterizing the relationship between Sinochart and Sinotrans. I would not say that "affiliated" is incorrect, but the Chinese term does have a meaning of subordination or inequality of relationship that is not captured by the English term "affiliated." Other, related Chinese terms such as *lianshu* (the same second character with a different first character) are often translated as "affiliated" and in Chinese do not suggest inequality between the two affiliates.
[5] The translation with which I have been provided uses the term "branch." That is an appropriate translation unless it is taken to suggest that Sinochart therefore might lack status as a separate enterprise or legal person. It does not. As noted above, Sinochart continues to possess a 2001-dated business license that indicates independent enterprise legal person status.
[6] Again, this translation differs slightly from that used in the translation with which I was provided. The translation used here is somewhat more literal.

9

39.  The legal effect of these actions approved and apparently undertaken in 1996—the deregistration of the former Sinochart, the adoption of articles of association for a new Sinochart with capital provided by Sinotrans (later reflected in the form for registration of possession of state owned assets)—is somewhat ambiguous in Chinese law and practice. Such measures sometimes are viewed as unquestionably terminating the existence of the former enterprise legal person and creating an entirely new one with the same name. In other cases, where the actions are not viewed as creating quite so sharp a discontinuity, there is still no doubt that the legal character of the enterprise has changed—or, at the very least, been clarified—here, with the result that Sinochart (whatever its former status) became a wholly owned subsidiary of Sinotrans.

40.  Other documents reflect the creation of the Sinotrans group and Sinochart's position as a subsidiary enterprise of Sinotrans (group) general / head company [(jituan) zonggongsi]. A document dated 1993, titled "Notice of Approval" and issued by the SAIC to Sinotrans (which, as addressee, is still referred to as a "head" or "general" company [zonggongsi]), grants permission for the establishment of the Sinotrans group [jituan] with Sinotrans general / head company to be the "core enterprise" of Sinotrans (group [jituan]). A document dated 2001, titled "Application" and issued by Sinochart states that Sinochart is joining Sinotrans (group) [jituan] as a member enterprise of that group [jituan chengyuan qiye].[7]

41.  Another document, also dated 2001, titled "Application for Registration of Formation of an Enterprise Group" submitted to SAIC seeks approval of the formation of the actual formation of Sinotrans (group) and lists Sinotrans (group) head / general company [(jituan) zonggongsi] as the "parent company" [mugongsi]. Sinochart is among the many companies listed as "group members (subsidiaries)" [jituan chengyuan (zigongsi)].

42.  The addition of the parenthetical "(group)" in the name of Sinotrans head / general company does not change its legal status or structure beyond reflecting that it is to become the parent enterprise in the Sinotrans group, the foundation of which is the object of the application. These are the types of document that ordinarily would be issued—and SAIC (at the national level) would be the proper issuer (for the Approval) or recipient (for the Application) of such documents—when the creation of an enterprise group such as Sinotrans is being undertaken.

43.  I have also reviewed documents available in Chinese and English on the Sinotrans website. These are fully consistent with the conclusion that Sinochart is a subsidiary of the Sinotrans group and is owned by Sinotrans. I have also reviewed the Chen Declaration in relevant part and agree with its conclusions that Sinochart is owned by Sinotrans, not the Chinese state.

44.  Other documents provide other indications that Sinotrans is the owner of Sinochart and exercises rights and powers ordinarily associated with ownership of an

---

[7] Once again, this translation differs slightly from that used in the translation with which I was provided. The translation used here is somewhat more literal.

enterprise in Chinese law. Most of these are discussed more fully below in connection with Defendant's apparent arguments against the conclusions offered here. Briefly, the relevant contents of these documents include the following. According to Sinochart's Articles of Association (*arts.* 1, 7) and a "Registration Form for Enterprise's Possession of State-Owned Assets," Sinochart's capital / assets are provided entirely by Sinotrans and not by a state organ.

45. According to Sinochart's Articles of Association, Sinotrans receives a portion of Sinochart's after-tax profits—essentially dividends. The remainder of the after-tax profits are retained by Sinochart; they are not paid to any state actor (*art.* 16). Sinotrans also receives accounting reports and other information about Sinochart's operations (*art.* 17), approves Sinochart's Articles of Association, amendments to them and any termination[8] (including dissolution or sale) of Sinochart (*arts.* 24, 25, 27), and appoints and removes Sinochart's general manager and deputy general manager (the top two officers of an enterprise of this type, with the general manager ordinarily being the enterprise's "legal representative person" who bears an extraordinary range of rights and obligations on behalf of and with respect to the enterprise) (*arts.* 10, 12, 13).

46. The materials that I have reviewed also indicate that Sinotrans is an enterprise legal person with an identity separate and distinct from its owner. A document dated 2006, titled "Enterprise Legal Person Business License" and issued by the national level State Administration of Industry and Commerce ("SAIC"),[9] indicates that Sinotrans (group) head / general company [(*jituan*) *zongongsi*] is an independent enterprise legal person under Chinese law. As indicated above, such a business license would not be properly issued to an enterprise that was not a separate legal person and the SAIC (here, at the national level) is the appropriate organ for issuing such a license. The 1988 "Application for Business License and Business Certificate" indicates MOFERT's approval of Sinotrans for registration as an enterprise legal person with the SAIC.

47. The various documents cited above concerning Sinochart's establishment as a subsidiary of Sinotrans and the creation of the Sinotrans group all assume that Sinotrans is an independent enterprise legal person. Those documents would not be properly issued or approved if Sinotrans were not an independent enterprise legal person. The documents available on the Sinotrans website are also fully consistent with this conclusion. I have also reviewed the Chen Declaration and agree with its conclusion that Sinotrans is an independent enterprise legal person, distinct from its state "owner."

48. It appears that the Defendant does not dispute that Sinochart's, and Sinotrans's, ownership structure fits the pattern described above, at least as a formal or legal matter. It appears that Defendant's argument is, instead, that this formal or legal structure of ownership does not matter because Sinochart is, nonetheless, "owned by the

---

[8] For termination, approval is also required from the relevant supervisory and regulatory ministry—then MOFTEC, now a department within MOFCOM.

[9] "State Administration for Industry and Commerce" is the conventional, if not literal or completely accurate, translation into English of the *Gongshang xingzheng guanli ju*. To avoid confusion, I will use the standard translation and its abbreviation in this declaration.

11

state" in a relevant sense because of other factors such as its being an enterprise under the "system of ownership by the whole people" or because it operates with "state-owned" assets. As addressed more fully below, these arguments, and what is offered to support them, do not warrant the conclusion that Sinochart is, in a relevant sense, "owned by the state."

**Purposes and Importance of the Chinese Legal Regime's Distinction between Owner and Enterprise**

49. To the extent that the Defendant's arguments may rely, or gain persuasive force, from a possible impression that one should not take seriously the Chinese legal rules concerning the separateness of enterprise legal persons from their owners, it is important to understand some of the broader roles these legal rules play and the functions they perform.

50. The Chinese laws that take the enterprise or company form seriously are important means for implementing core policy goals that the government of the PRC has viewed as of the utmost importance for many years. The legal separation between enterprise legal persons and their owners and the efforts to build and sustain enterprises with autonomous powers and responsibilities of management and operation and control over property and assets, was to contribute to the most fundamental policy goal of the PRC throughout the last three decades: rapid economic growth and development through the creation and strengthening of an increasingly market-based economy in which economic functions are performed by enterprises that have strong reasons to respond to market signals and related economic incentives.

51. This pursuit has been reflected in and supported by the adoption and implementation of many of the legal changes, described above, to give enterprises under the system of ownership by the whole people the management autonomy and independent authority and responsibility to make their own decisions and pursue their own economic interests. Under the pre-reform regime, many of the entities that have now become enterprise legal persons (including those under the system of ownership by the whole people) suffered from the problem that a state "owner" (typically in the form of a central ministry or provincial-level subordinate of the central state) did not allow, much less demand, that "its" subordinate production entities behave—individually or collectively—in a market-regarding fashion, seeking economic efficiency, profits, or the maximization of the enterprise's value. By separating such entities from the state, setting them up as full enterprise legal persons and allowing them to establish or own other independent enterprise legal persons, these reform-era legal changes undertook to remove the state from the management and, often (as in the case of a subsidiary such as Sinochart), from direct ownership of enterprises. This was to make firm-level entities responsible for their own successes and failures, and free to respond to market incentives and thereby become engines of efficient growth.

52. Even though drafted relatively early in the reform era, the Enterprise Law reflects and seeks to advance this agenda. It states that its purposes include "increasing

the vitality" of enterprises under the system of ownership by the whole people and "accelerating China's socialist modernization." It defines the "primary tasks" of such enterprises as including "to develop commodity production, create wealth . . . [and] satisfy the growing material and cultural needs of society" in accordance with "market demands" (as well as state plans). *Enterprise Law*, arts. 1, 3. The same law orders enterprises to "make effective use" of the property they "operate and manage" to "attain increased returns." *Enterprise Law*, art. 6.

53.  A related dimension of the reform-era economic agenda has been to rewrite the fiscal relationship between enterprises and the state into a more "arm's length" and market-consistent format. Partly, this was a matter of giving such enterprises incentives to behave in efficient, market regarding ways. Before reform, enterprises or production units (many of which were not even constituted formally as separate enterprises) simply remitted their "profits" to the state and had their deficits covered by the state. They operated in a world that created no effective incentives to seek efficiency gains or profits. A series of fiscal reforms allowed enterprises that were owned by the state to retain and use a substantial portion of their profits (in essence and increasingly, after-tax profits). Adopting and taking seriously the enterprise legal person form was an essential part of this arrangement for relations between the state and the enterprises that the state directly owned. Adopting the structure that is used for Sinochart—an enterprise legal person that is a subsidiary of an enterprise legal person that is owned by the state—advances this fiscal reform a step further.

54.  This is partly a matter of adding an additional layer of legal personhood. But it is also partly a matter of the character of the relationship created by means of that additional layer. This aspect is reflected in the Articles of Association of Sinochart, which provide for a conventional corporate arrangement of paying taxes to the state, retaining some profit for company use, and paying some profit to the owner, Sinotrans. Tellingly, the Articles of Association of Sinotrans—which is more directly linked to the state—do not appear to include any parallel provisions. Those articles, and the regulatory framework (discussed below) applicable to entities that, like Sinotrans, have the State-Owned Assets Supervision and Administration Commission ("SASAC") as an immediate state "investor," do not have this kind of crisp and conventionally corporation-like arrangement, are a good deal murkier about the issue, and thus presumably provide weaker incentives.

55.  The legal separation between enterprise legal persons and their owners also has been seen as vital to addressing the second side of the Janus-faced problems of insufficient autonomy and insufficient accountability in the operation of PRC enterprises, especially those which began life as traditional "state-owned" enterprises. The lack of clear separation between enterprise and owner, especially a state owner, contributed to the problem of managers of enterprises who faced no meaningful oversight by an owner or investor and who did not worry about running up losses. Simply "the state" was too large and its aims and responsibilities too varied to undertake effective owner-like or investor-like supervision over an enterprise. And state-owned enterprises also had

become accustomed to "soft budget constraints" and expectations of state-funded or state-directed bailouts.

56. Legal reforms of the type that helped give rise to Sinochart and Sinotrans in their current forms addressed these goals as well. For enterprises in Sinotrans's position, the shift to SASAC as investor from earlier forms of state ownership (as is discussed more fully below) sought to create a state owner that would behave more like an ordinary capitalist corporate investor—focused on economic returns and with a sufficiently specialized and narrow agenda that it could undertake effective monitoring and press enterprises to pursue economic interests. Creating an additional layer of enterprises in Sinochart's position took matters an important step further, creating a situation in which a still smaller and more focused entity (Sinotrans) had an immediate stake (reinforced by its right to profits) in monitoring Sinochart's performance, while the state (in the narrowed and specialized form of SASAC) also retained an indirect interest by virtue of its claims on the profits of Sinochart's parent.

57. More simply, the system of enterprise accountability for losses as well as profits—and the responsibility to bear the civil legal consequences of losses with the property operated and managed by the enterprise—that the Enterprise Law and kindred reforms introduced, and that apply to Sinotrans and Sinochart, was an important part of hardening the budget constraint for enterprises. The Enterprise Law notably backs up such legally mandated market-based and civil-law sanctions with more penal ones. Among the behavior for which an enterprise's leading officer faces potentially severe sanctions are "errors" that "cause relatively heavy losses to the enterprise." *Enterprise Law*, art. 63.

58. The foregoing analyses apply in full to enterprises, such as Sinotrans and Sinochart, which are parts of an enterprise group, including where one enterprise (such as Sinotrans) is the parent of another, subsidiary enterprise (such as Sinochart). Indeed, many such enterprise groups—including, it appears from the materials I have reviewed, the Sinotrans group—are created and structured in significant part to create legal and operational separation between entities that were seen as too entwined and insufficiently separate to achieve either the autonomy or the accountability aims described above.

59. Relatively recently, enterprise group structures of the type that—based on the materials I have reviewed—includes Sinotrans and Sinochart have been especially prominent in another context. The legal separation between enterprise legal persons and their owners (often in the context of an enterprise group) has been seen as vital to an important type of asset partitioning (and reaping the related benefits of limited liability). Increasingly, many of China's largest companies—many of them state-owned—have sought to issue stock and secure listings on stock exchanges abroad, including in New York, Hong Kong and elsewhere. Overwhelmingly, this has taken the form of establishing a subsidiary. The subsidiary, initially wholly owned (that is, before stock is sold to foreign investors) is structured, first, to include a bundle of assets that will make shares saleable at desirable prices abroad and, second, to satisfy the structural, operational, financial and disclosure requirements that foreign stock exchanges impose