and that the parent/owner Chinese company cannot satisfy. Many of the same concerns of asset partitioning, limited liability and satisfying host country company registration and other legal requirements apply when a major Chinese enterprise establishes a wholly owned overseas arm.

60. Based on my review of documents from the website of Sinotrans, the Sinotrans enterprise group appears to include overseas listed or otherwise share-issuing subsidiaries and/or other overseas subsidiaries of the general types described that are described in the preceding paragraph.

**The "System of Ownership by the Whole People" in Chinese Law and Implications for Sinochart**

61. From my review of the Defendant's papers and the authorities on which they rely, it appears that the Defendant's bases for rejecting the conclusion that Sinochart is owned by Sinotrans in favor of a conclusion that Sinochart is "owned by the state" are two-fold. First, Sinochart is described on its business license as being "under the system of ownership by the whole people." Second, the assets with which Sinochart operates its business are characterized as "state assets." Neither of these is a basis for concluding that Sinochart is, in the relevant sense, owned not by Sinotrans but by "the state."

62. The term "system of ownership by the whole people" [*quanmin suoyou zhi*] is to a significant degree vestigial and thus potentially misleading. It is certainly too slender a reed upon which to rest an argument that requires rejecting the vast body of enterprise and company law and practice in China that regards enterprises such as Sinochart as distinct legal persons that are owned by their company owners, such as Sinotrans.

63. The concept of "ownership by the whole people" dates to the pre-reform days of planning and a broadly Soviet-style economy in China. It was meant to distinguish those entities and assets that were under the leadership principally of central government organs in Beijing (such as ministries) from "collectively [*jiti*] owned" entities and assets that were under the control of more local state organs (or local political entities that were formally not part of the state but were functionally part of the party-state apparatus).

64. As China's moves toward a market economy with diverse forms of ownership has proceeded over the last nearly thirty years, additional forms of ownership have been added to the mix, including foreign ownership and private ownership. (In recent years, these new forms of ownership have even won recognition in China's constitution.) A vast number of business enterprises in China that take the corporate form are no longer characterized—or amenable to characterization—as falling into any of these categories. They have mixed ownership forms that can include shares owned by "the state," shares owned by other "legal persons" that can and do include enterprises that are, in some cases, themselves "state-owned," and shares owned by Chinese or foreign individuals or institutional investors.

15

65. In this rapidly evolving and now profoundly transformed context, the meaning of "ownership by the whole people" (like "collective ownership") has been fundamentally altered. Gone are the days when the subsidiary enterprise units of a state-owned enterprise were merely bureaucratic divisions within an entity that was itself so entangled with and subordinate to a state organ as not to be meaningfully distinguishable. That Soviet-style structure initially gave way to one of state "departments in charge" that often combined regulatory, some asset ownership, enterprise ownership and sometimes management functions over "their" enterprises. (The shadow of that interim world still hangs—in my view excessively, given the relatively recent, though still more-than-a-decade-old events at issue—over the analysis of "ownership" of a directly "state-owned," non-subsidiary enterprise in *Trans Chemical, Ltd. v. China National Machinery Import and Export Co.*, 978 F. Supp. 266 (S.D. Tex. 1997).)

66. An enterprise's formal classification as under the system of "ownership by the whole people" simply does not retain the robust notion of "state ownership" that it once may have had now that China has undertaken decades of legal reforms that, first, moved to separate ownership from management and, second, moved to separate the state-as-regulator from the state-as-owner and, third, have since moved on to restructure the state's exercise of its "ownership" role with respect to the enterprises of which it is the sole or partial owner.

67. A signature development in this area in recent years has been the creation of SASAC, a governmental body of the PRC. SASAC holds a vast and varied portfolio of state-owned stakes in numerous enterprises. It was established with a mandate to have the state-as-owner act as a value-maximizing shareholder rather than as a set of local government or central ministry bureaucratic organs seeking to protect or control "their" enterprises. When those enterprises in which SASAC holds shares themselves own part or all of other enterprises, including "second-tier" subsidiaries, this structure and the broader framework of Chinese enterprise and company law dictate that those "first-tier" enterprises hold and exercise the relevant full or partial "owner" rights with respect to the second-tier companies.

68. SASAC functions as the state "owner" for Sinotrans. SASAC's official website lists Sinotrans (but not Sinochart) as one of the enterprises for which SASAC holds the role of "owner" or "investor." Sinotrans's Articles of Association provide that SASAC is its "investor" and exerciser of rights and powers ordinarily associated with ownership.

69. Such an ownership arrangement is fully consistent with the legal and policy regime I have described in the preceding paragraphs. It is consistent with the way state ownership ordinarily is structured for a large, wholly state-owned, national-level enterprise such as Sinotrans. It also is consistent with the practices I have observed in documentation concerning other Chinese enterprises and enterprise groups with ownership structures similar to what I understand Sinochart's and Sinotrans's to be.

70. SASAC's role as owner of Sinotrans and Sinotrans's role as owner of Sinochart are similar and different in ways that make clearer still how being an enterprise under the system of ownership by the whole people is consistent with an enterprise—such as Sinochart—not being, in any traditional or direct sense, "owned" by the state.

71. While Sinochart's Articles of Association (and the Asset Registration Form) provide that its capital is allocated or appropriated by Sinotrans (*art.* 7), Sinotrans's

72. Articles of Association provide that SASAC has the "investor" role for Sinotrans, and that Sinotrans's capital is "state invested capital" (*art.* 1). Powers that Sinotrans holds under Sinochart's Articles of Association (such as appointment and removal of top officers, fiscal oversight, approval of the Articles of Association, and amendment to those articles, and termination of Sinochart, *arts.* 10-13, 24-27) are similar to the powers that SASAC holds under Sinotrans's Articles of Association (such as appointment and removal of directors and recommending to the board appointments of top officers, oversight or approval of major financial decisions, approval of the articles of association, and approval of the termination of the enterprise, *arts.* 10, 39, 42).[10]

73. Relevant regulations further spell out powers that SASAC has over Sinotrans, but not Sinochart. They provide that the state (initially the State Council, but with relevant powers that are assigned to the central-level SASAC for enterprises such as Sinotrans) has the rights and responsibilities of investor in its "investee enterprise" (that is, a directly state-invested enterprise such as Sinotrans, but not Sinochart) and to appoint and remove directors and officers of the investee enterprise, approve decisions with major financial or structural consequences (including assignment of equity, merger, acquisition or termination) for the investee enterprise, and supervise the financial affairs and systems of the investee enterprise. *Provisional Regulations on the Supervision and Administration of State-Owned Assets of Enterprises* ("State-Owned Assets Regulations") (2003), arts. 4, 13, 17, 20-23, 35-36.

74. Notably, these same regulations do not extend the same powers of SASAC to those entities (such as Sinochart) in which a SASAC state-invested enterprise (such as Sinotrans) itself invests. With respect to such second-tier enterprises, the regulations provide that the decision by a first-tier enterprise to invest in a second-tier enterprise must be reported to, and approved by, the first-tier enterprise's investor (SASAC in the case of Sinotrans). But that is the limit of SASAC's lawful role as the first-tier enterprise's investor / owner toward the second-tier enterprise. Another provision of the same regulations states that both SASAC's investee enterprises (such as Sinotrans) *and* the enterprises in which those enterprises invest (such as Sinochart) enjoy their *respective* "rights of autonomous operation as specified in relevant laws." SASAC must "support the autonomous operation of enterprises in accordance with the law and may not intervene in the production and operational activities of an enterprise except in

---

[10] Some of the other powers that Sinotrans exercises for Sinochart are exercised by Sinotrans's Board of Directors (rather than SASAC) over Sinotrans. These include appointment of top officers and approval of amendments to the Articles of Association, and decisions over the use of profits, for example. *State-Owned Assets Regulations,* arts. 16, 41.

performing its role as investor." As described above, those rights to autonomous operation are robust. They still include a significant role for an owner (SASAC vis-à-vis Sinotrans and Sinotrans vis-à-vis Sinochart) but they do not include interference or intervention by an enterprise's owner's owner (SASAC vis-à-vis Sinochart). SASAC has no role as an "investor" in Sinochart because Sinotrans, not SASAC, is the investor in Sinochart. *State-Owned Assets Regulations*, arts. 10, 24.

75. The crucial difference in all this is, again, that SASAC is an organ of the Chinese state while Sinotrans is a company—an independent enterprise legal person. Thus, the state holds key rights, powers and attributes as "owner" of Sinotrans, but not of Sinochart; for Sinochart, similar rights, powers and attributes are held by Sinotrans. This is the case even though both Sinotrans and Sinochart are enterprises under the system of ownership by the whole people. Although that label is the same, they are significantly and relevantly different enterprises, including in the nature of their "ownership" relations with the state. In ordinary Chinese descriptions, the term "state-owned" (*guoying*) that once would have applied to both enterprises would no longer be applied to Sinochart, though it might to Sinotrans, even though both are enterprises "under the system of ownership by the whole people."

76. Under the circumstances of enterprise ownership and enterprise structure in contemporary China described above, "ownership by the whole people" thus does not mean what it might appear to suggest. It does not show traditional or direct ownership of an enterprise by the state, especially where records indicate that an enterprise is owned by another enterprise (or other owners that are not the state or organs of the state). It is generally best understood as a historical statement about the origins of the enterprise (as an entity that, during the era of planning and ubiquitous direct state ownership, was under a central government body) and, to a limited extent, the original source of its capital or assets (that is, allocation from the central state).

77. Even the latter proposition is somewhat misleading. The "assets" or "capital" of enterprises under the system of "ownership by the whole people" typically include a good deal more than resources that may initially have been allocated by the state fisc. They often include substantial retained earnings of the enterprise—something which is explicitly provided in detail in Sinochart's Articles of Association (article 16). They often include borrowing from banks (usually state-owned banks). They also may include infusions from more local state and quasi-state sources, especially for the period following the 1980s wave of decentralization to provincial and subprovincial levels of the state's authority over many "ownership by the whole people" enterprises. For more recently created or restructured enterprises under the system of ownership by the whole people (a category that, based on the enterprise history described above, would include Sinochart), capital and assets may also come primarily or exclusively from a parent enterprise under the system of ownership by the whole people (such as Sinotrans).

78. As this indicates, an enterprise's being "under the system of ownership by the whole people" is consistent with its capital or assets being allocated or otherwise provided by sources other than the state or an an organ of the state. And documents

18

concerning Sinochart and Sinotrans (discussed more extensively elsewhere in this Declaration) indicate that this is the case for Sinochart, which has received its capital and assets from Sinotrans.

79. An enterprise's being "under the system of ownership by the whole people" is consistent with an enterprise having extensive rights to use, derive economic benefit, and dispose of property and assets that are allocated to or acquired by the enterprise, including "state assets" or "state property." Nothing in the materials that I have reviewed suggests that Sinochart does not enjoy these ordinary rights.

80. An enterprise's being "under the system of ownership by the whole people" is consistent with the enterprise's profits being remitted to a parent enterprise owner, with the state receiving not profit remissions but only tax payments from the enterprise. The materials that I have reviewed, including but not limited to Sinochart's Articles of Association, indicate that this arrangement—now a standard one in China—applies to Sinochart.

81. Thus, the fact that Sinochart is listed as being "under the system of ownership by the whole people" may add relatively little, if anything to what appears to be the Defendant's other principal claim: that Sinochart should be considered to be owned by the Chinese state to the extent that the assets with which it operates are "owned" by the state and merely "allocated" to Sinochart for its use.

**Operation of an Enterprise with "State Owned" Assets or Capital under Chinese Law and Implications for Sinochart**

82. That the assets with which Sinochart operates its business are in some sense "state owned" (or, in the terms of the *Enterprise Law*, "owned by the whole people" (*art.* 2) also is not an adequate grounds for concluding that Sinochart is "owned by the state" and rejecting the conclusion that Sinochart is owned by Sinotrans.

83. Chinese Law does provide that enterprises under the system of ownership by the whole people operate at least partly with assets that are "state assets." The same is true of many other enterprises, including many that now take the form of corporations that are subject to the Company Law—a law that applies to firms with a wide diversity of ownership forms, including predominantly private ownership.

84. Chinese law does impose a variety of obligations on enterprises, including enterprises under the system of ownership by the whole people, in how they handle "state owned" assets assigned to them. These include obligations to make effective use of those assets, increase returns, and avoid heavy losses. *Enterprise Law*, arts. 6, 63; *cf. State-Owned Asset Regulations*, arts. 11 (obligation of directly state-invested organization to maintain and increase the value of state-owned assets that it uses and manages).

19

85. A myriad of substantive, subject-matter specific laws, criminal laws and the like impose additional restrictions on how an enterprise may use its state assets, but in most cases those apply generally to all types of assets, not just state-owned ones.

86. The rights of enterprises under the system of ownership of the whole people with respect to the "state-owned" assets they possess are extensive and include a vast portion of what would ordinarily be described as "ownership" rights over those "state" assets. These include rights legally to acquire and dispose of assets, including those provided by the state, and to bear civil liability fully with those assets. The Enterprise Law also recognizes the right of such enterprises to receive some of the "benefits" from the property owned and operated by the enterprise. It recognizes the rights of enterprises to retain earning after taxes, fees, and profit distributions (to owners) are paid, and provides that enterprises are free to allocate and use those benefits, as they decide, in ways consistent with applicable laws, regulations and rules, and the enterprise's articles of association. *Enterprise Law*, art. 2, 6, 28; *General Principles*, art. 48, 71; *Enterprise Regulations*, art. 42.

87. As described earlier, some powers of supervision or approval with respect to some major or important moves to dispose of, or acquire, state-owned assets (as well as other assets) may rest with an enterprise's owner, much as they would rest with a shareholder's meeting in a corporation with multiple equity owners. But they generally rest with the owner or investor, not with any other party, including the state—unless the state is the enterprise's owner / investor. Again, the State-Owned Assets Regulations are illustrative. While, under that legal regime, SASAC exercises such powers with respect to assets of an entity's in Sinotrans's position, SASAC does not do so with respect to second-tier entities such as Sinochart. For them, similar functions with respect to the state-owned assets with which they operate are held by the first-tier entity. *State-Owned Assets Regulations*, arts. 10, 28. For enterprises under the system of ownership by the whole people, the Enterprise Law requires approval by the relevant government department for merger, acquisition or dissolution. It does not so provide with respect to other transactions involving property possessed, operated and managed by the enterprise. *Enterprise Law*, art. 18.

88. More importantly and more to the point, there is no contradiction in Chinese law between an enterprise (including an enterprise under the system of ownership by the whole people) operating with assets or capital that are "state owned" and nonetheless itself being owned by an entity other than the "state"—an entity that can be another enterprise under the system of ownership by the whole people that itself may (or may not) be owned directly by "the state."

89. In contemporary Chinese conditions, an enterprise's operating with "state assets" or "state capital" that it "possesses" can and often does mean only that the assets or capital is, somewhere up a sometimes rather long chain, owned by the state. It does not mean that the owner of the enterprise is the state or even that the state directly invests or entrusts the assets or capital to the enterprise.

90. Indeed, the investment or entrustment of "state assets" or "state capital" to Sinochart here was made by Sinotrans and quite explicitly not by a state organ or entity. As noted earlier, both Sinochart's Articles of Association and the Registration Form for Enterprise's Possession of State-Owned Assets indicate that all of Sinochart's assets or capital are "allocated" or "appropriated" [*bokuan*] by Sinotrans, not by a state entity.

91. Here, the incompleteness of the translation of a document provided to me risks giving an incorrect impression. The Registration Form for Enterprise's Possession of State-Owned Assets contains two relevant tables. The first table, which is largely translated, sets forth that the "state owned capital" of Sinochart is "allocated" or "appropriated" entirely by a type of entity that is best translated as "allocated / appropriated by responsible unit" [*zhuguan danwei*], which is rendered in the English translation that I have seen as "responsible department."[11] This clearly is here a reference to Sinotrans. Notably, the line on the form above the line for "responsible department" is a line for "allocated / appropriated by department or ministry."[12] The line for "department" and "ministry"—which are organs of the state and are not enterprises—is left blank and, given the information elsewhere on the form, this blankness is clearly meant to indicate "zero."

92. In addition, there is a second, untranslated table in the same document that is headed "Conditions / Circumstances of State-Owned Assets / Capital Possessed by the Enterprise." This table breaks down the source of such capital or assets for Sinochart. The table indicates that all of this is capital / assets from "a legal person" and specifically from a "state owned legal person." A secondary table on the following page, which is translated, indicates that this legal person that is this 100% contributor for Sinochart is Sinotrans (that is, Sinotrans (group) general / head company). The principal table further indicates that none of the asset / capital is "state capital" (and that none of it is foreign capital or private capital).

93. Further, under relevant Chinese law, Sinotrans as an enterprise under the system of ownership by the whole people, had the authority to make the decision on its own (and not only at the behest of its state owner or the state) to make the investment of capital and assets in Sinochart. The Enterprise Law and the Regulations on Transforming the Management System of Industrial Enterprises Owned by the Whole People ("Enterprise Regulations") provide that an entity such as Sinotrans has the "right to make [its own] investment decisions" and to use its "capital [and other assets] to invest in other enterprises." *Regulations on Transforming the Management System of Industrial Enterprises Owned by the Whole People* (1992), art. 13; *Enterprise Law*, art. 34; see also Sinotrans Articles of Association, *arts.* 10, 16, 24 (detailing powers of investor, board of directors and general manager); *cf. State-Owned Assets Regulations*, art. 28.

---

[11] The term *danwei* is a very complicated term in Chinese. It can refer to an enterprise or to a government department.

[12] I am relying on the translation provided for the last term; the characters on the Chinese version that I have received are too blurred to read. The phrase "department or ministry" is consistent with what I would expect to find at this place in a form of this type.

21

94. Moreover and more broadly, an argument that a Chinese enterprise should be deemed to be owned by the state on the basis of its operating with assets or capital that is "owned" by the state is implausible because it "proves too much." It would extend the notion of "ownership by the state" and—therefore, under U.S. foreign sovereign immunity law—extend benefits of sovereign immunity (subject, of course to applicable exceptions) to a vast range of Chinese companies that, first, clearly cannot be plausibly characterized as "state owned" enterprises under Chinese law and, second, could be considered as owned by the Chinese state under U.S. foreign sovereign immunity law only if that category is extraordinarily capacious.

95. Two examples may help to illustrate the point. First, Chinese law permits the creation of Chinese-foreign joint venture enterprises. These enterprises usually do, and for some types of joint ventures must, have independent enterprise legal person status (specifically, as Chinese enterprise legal persons). It is permissible, and is often the practice, for the Chinese partner to a Chinese-foreign joint venture to contribute more than half—sometimes much more than half—of the assets of the joint venture enterprise. In some cases, the Chinese partner to a Chinese-foreign joint venture is an enterprise that is "owned by the state," including in the way that Sinotrans is owned by the state.

96. In such circumstances, the joint venture enterprise legal person would be majority owned (but not necessarily controlled) by an entity that is owned by the Chinese state.[13] Chinese law does not regard such an entity as "state owned" or as a "state-owned enterprise" or as an "enterprise under the system of ownership by the whole people" (although the Chinese party to the joint venture would be so regarded under Chinese law if it were fully "owned by the state," including in the way that Sinotrans is owned by the state).

97. Nonetheless, the joint venture enterprise would be deemed "owned by the state" and thus within the reach of sovereign immunity *if* one applies the standard dictated by the apparent logic of the plaintiff's position: that an entity is "owned by the state" if its majority owner is owned by the state.

98. Second, some Chinese enterprises can and do hold real estate as principal assets. Some of these companies clearly are not "state owned" under any ordinary Chinese legal analysis. They may be Chinese-foreign joint ventures, or privately owned companies. Their principal assets, however, would be, in an important and here relevant sense, owned by the state and not the enterprise. Land in Chinese cities is legally owned by the state and only by the state. Use rights can be, and are, "unbundled" and sold to a

---

[13] Such an ownership arrangement need not give the Chinese party to the joint venture control over the enterprise. Under laws applicable to some types of Chinese-foreign joint ventures, control and management rights need not follow ownership or equity stakes. Such arrangements are adopted for a number of reasons, including where the Chinese side's contributions—often in the form of land or equipment—are overvalued in the documents setting up the joint venture, and the foreign partner's contributions—often in the form of technology or know-how—are undervalued. Such problems were particularly likely to arise before recent legal changes made clear that capital could be contributed to company in a wide range of forms, including intangible assets.

variety of buyers, including non-state-owned companies that principally buy and sell land use rights.

99. Although there are some differences from the "allocation" or "appropriation" of state assets to enterprises in the mold of Sinochart or Sinotrans, the situation concerning real estate assets and companies described in the preceding paragraph is relatively closely analogous, and, indeed, more closely analogous than it might at first seem. In both cases, an underlying claim to ownership of the key assets (and possibly the only assets) of an enterprise remains with "the state" and the enterprise (or layers of enterprises) enjoys extensive control over the use of those assets, including the power to transfer many of the ownership or ownership-like rights to third parties. In both cases, laws and regulations impose restrictions and duties that seek to prevent waste and to protect various state policy interests.

100. Again, while Chinese law would not regard such a real estate enterprise as "state-owned" solely on the basis of "state-owned" real estate being the dominant—or even sole—valuable asset of the enterprise.[14] Yet, such an enterprise seemingly should be considered to be "owned by the state" and thus within the reach of sovereign immunity *if* one takes ownership by the state of the enterprise's assets (in a relatively thin sense—which is all that can be asserted plausibly in the case of Sinochart's assets) as a basis for finding an enterprise to be "owned by the state" in the relevant sense.

101. Tellingly, the notions that some form or degree of "state ownership" of the assets of an enterprise appears to have become a significant issue in this case (and in U.S. foreign sovereign immunities law analyses of the "owned by the state" status of Chinese enterprises) by virtue of a case in which the question arose in a significantly different context. In *Trans Chemical*, there simply was no entity equivalent to Sinotrans that stood between the enterprise at issue in the case and the state. There was no entity that "owned" the enterprise in the conventional sense of share ownership of a corporation, or in the sense in which Sinotrans owns its subsidiary Sinochart (or in which many a parent company owns its wholly owned subsidiaries).

102. The sources that seem to have been available to the court and the experts in the *Trans Chemical* case do not seem to have established clearly that the Chinese state was the "owner" of the enterprise in any sense similar to Sinotrans's ownership of Sinochart or the state's—in the form of SASAC's—apparent ownership of Sinotrans. This is not surprising, given the state of Chinese law, practices, institutions of state

---

[14] Even the most extreme case is only somewhat far-fetched. That is, it is conceivable that an enterprise's assets might consist almost exclusively of as-yet-unused development rights to land—again, land that is ultimately "owned" by the state. The Chinese urban real estate and real estate development sector is notorious for what one might call "vertical fragmentation"—many layers of owners between the underlying land use right and an occupied apartment in a high rise, for example. The initial holder thus often holds and sells as-yet-unused land use / development rights. Moreover, a major concern in recent years in booming real estate markets such as Shanghai has been "land banking"—acquiring use and development rights to property, sometimes cleared to vacant land, and simply leaving the land fallow in the expectation that market prices will rise and the rights can be sold to another at a considerable profit.

23

ownership and availability of relevant documentation as they existed in China at the relevant times.

103. Indeed, the defendant in *Trans Chemical*—the China National Machinery Import and Export Corporation—appears to have been in a position closely analogous to that of the state-owned enterprise that the plaintiffs in *Lehman Bros. v. Minmetals* (discussed later in this declaration) sought, and failed, to reach when they argued for piercing the corporate veil of the defendant subsidiary Chinese enterprise that was immediately before the court. The parent of the subsidiary in the *Lehman Bros.* case— the China National Minerals and Metals Export Corporation—was, as its name suggests, a very similar entity to the defendant immediately before the court in *Trans Chemical*. Both were among the large state trading companies that, in the pre-reform era, were monopolists in their respective import and export sectors and were very closely tied to the state.

104. Thus, the court seemed to face the seemingly bizarre possibility that no one "owned" the enterprise in any conventional or familiar sense. In such a context, the resort to analyzing asset ownership may well have made sense. That type of departure from the more ordinary inquiry into ownership does not seem necessary or warranted in the circumstances of this case.

**Chinese Law, Chinese State and Enterprise Positions (and U.S. Law) on Questions of Ownership and Sovereign Immunity**

105. A conclusion that the Chinese state is not, in a relevant sense, the owner of Sinochart and that Sinochart is not within the scope of instrumentalities of the Chinese state that enjoy sovereign immunity in U.S. courts is consistent with the ways Chinese law, official Chinese sources, Chinese enterprises similar to Sinochart and decisions by U.S. courts regarding entities similar to Sinochart have approached issues of ownership and sovereign immunity and similar questions. To conclude that Sinochart is owned by Sinotrans rather than by the Chinese state and that Sinochart is not a state-owned entity within the scope of U.S. foreign sovereign immunity law would be to reach a result that would be unsurprising and/or generally acceptable for the Chinese state, relevant principles and doctrines of Chinese law, and Chinese enterprises with relevant characteristics similar to Sinochart (and Sinotrans as well).

106. First, in litigation in federal courts, including the Southern District of New York, a subsidiary (including where it is a wholly owned subsidiary) of a parent enterprise owned by the Chinese state has been treated as distinct and separate from with the subsidiary's parent, and therefore not as potentially "owned" (in effect, directly) by the Chinese state, which is the owner of the parent enterprise.

107. In the *Lehman Brothers v. Minmetals* litigation, the enterprise structure appears to have been, in relevant part, indistinguishable from the structure that links Sinochart and Sinotrans. In that case as well, the immediate defendant was an enterprise legal person that was wholly owned by another enterprise legal person that was properly

24

described as "state owned." Both were under the system of ownership by the whole people and part of an industrial enterprise "group." The court rejected plaintiff's argument that the court should pierce the corporate veil, or take other actions that would disregard the legal distinction and separation between the subsidiary and the parent. By thus accepting that the subsidiary should be regarded as a separate entity in an enterprise legal person ownership structure closely analogous to that linking Sinochart and Sinotrans, the court's decision necessarily rejected the conclusion that the entity equivalent to Sinochart should be regarded as directly owned by the Chinese state (as it arguably would be if the veil had been pierced and the subsidiary and parent enterprises were held to be legally indistinct).[15]

108. This court reached a similar conclusion in the *Bank of China* v. *NBM* litigation. The court's analysis accepted that a wholly owned subsidiary of an entity owned by the Chinese state was, again, a separate entity not to be assimilated to its state-owned owner. Again, the ownership structure appears to have been fundamentally similar to the structure that links Sinochart and Sinotrans. The Bank of China (Hong Kong) Ltd. is described as wholly owned by the Bank of China, which is described as wholly owned by the Chinese state. But, unlike *unincorporated* branches of the Bank of China operating in various jurisdictions, the Bank of China (Hong Kong) was "one step removed" from ownership by the Chinese state because it was owned by the Bank of China. (In contrast, the unincorporated branches were part of the Bank of China and therefore owned by the Chinese state because the Bank of China was owned by the Chinese state). *Bank of China* v. *NBM*, 2002 WL 1072235 (S.D.N.Y. 2002).

109. Both the *Lehman Bros.* v. *Minmetals* court and the *Bank of China* v. *NBM* court faced the question of whether *indirect* ownership of an enterprise by "the state"—specifically in the form of ownership of an enterprise by another, parent enterprise that is owned by / is an instrumentality of the Chinese state—is sufficient to make the wholly owned subsidiary enterprise "owned by the state" in the sense that would bring it within the scope of sovereign immunity under U.S. law. In *Lehman*, Judge Keenan concluded that this indirect ownership was sufficient. In *Bank of China*, Judge Chin noted divisions among courts over the issue, rejected the *Lehman* court's approach, and held that indirect ownership in the form of an enterprise being owned by an enterprise that is an instrumentality of, and owned by, a foreign state is not enough. Since the decisions in these two cases, the United State Supreme Court appears to have definitively resolved the question in favor of the *Bank of China* court's approach. *Dole Food Co.* v. *Patrickson*, 538 U.S. 468 (2003).

---

[15] I was the Chinese law expert for the defendants and provided opinions that were submitted to and accepted by the court at several points during the litigation. This included reports on "veil piercing" and related issues. Although none of the reported opinions in the litigation explicitly address the veil-piercing question, it is my understanding that the court did squarely reject that argument. Plaintiffs did make that argument. Defendants responded. And the case could not have proceeded as it did, including in the way reflected in published opinions, if the court had accepted the veil-piercing argument. See *Lehman Bros.* v. *Minmetals International Non-Ferrous Trading Co.*, 169 F.Supp.2d 186 (S.D.N.Y. 2001).
  I did not participate in the phase of the case when foreign sovereign immunity questions were addressed.

110. Second, and as the cases discussed in the preceding paragraphs suggest, Chinese enterprises with links to the Chinese state (of both the Sinochart and Sinotrans types) and the Chinese government itself have become accustomed to and accepting of the ordinary application of U.S. foreign sovereign immunity law in cases brought by or against Chinese enterprises and entities in U.S. courts. Since the normalization of U.S.-China relations and the beginning of the post-Mao reform era in China, Chinese parties routinely have appeared in U.S. courts and made their arguments within the framework of U.S. foreign sovereign immunity law. See, e.g., *Lehman Bros.* v. *Minmetals*; *Bank of China* v. *NBM*; *BP Chemicals* v. *Jiangsu SOPO Corp.*, 420 F.3d 810 (8th Cir. 2005) and 285 F.3d 677 (8th Cir. 2002); *Voest-Alpine Trading* v. *Bank of China*, 142 F.3d 887 (5th Cir. 1998).

111. Third, Chinese positions on relevant doctrines of international law are consistent with concluding that, in the Chinese view, Sinochart does not enjoy sovereign immunity. As noted in the preceding paragraph, at least for purposes of litigation in the United States, China accepts the structure of U.S. foreign sovereign immunity law (including what international law calls the "restrictive theory" of sovereign immunity) which, in turn, largely accords with the customary international law of sovereign immunity.

112. Moreover, even when the PRC was much less open to this U.S. and customary international law of sovereign immunity, China generally did not view entities such as Sinochart (or Sinotrans, for that matter) as entities that could enjoy sovereign immunity. Before the normalization of U.S.-PRC relations and the reform-era revival of interest in "general" or "Western" international law, the PRC had rejected the applicability and the substance (including especially the "restrictive theory" of sovereign immunity) of U.S. law and, along with it, much of relevant customary international law. See *Russell Jackson* v. *People's Republic of China*, 794 F.2d. 1490 (11th Cir. 1986). In the PRC version of "absolute sovereign immunity," however, the articulated position was that commercial enterprises that were owned (whether directly or indirectly) by the Chinese state did not enjoy sovereign immunity in international law. See, e.g., Wang Houli, "Sovereign Immunity: Chinese Views and Practices," 1 *J. Chinese L.* 22 (1987).

113. In addition, contemporary mainstream PRC sources accept another international law doctrine that respects the corporate form and the separation between an enterprise and its owners. Orthodox PRC analyses of international law endorse the international legal principles set forth in the *Barcelona Traction* case, in which the International Court of Justice held that Spain, not the United Kingdom, was the state that could claim to have suffered an international legal wrong and to seek protection for the victims' interests when a third state allegedly expropriated the assets of a Spanish-registered corporation the sole owners of which were U.K. nationals. See, e.g., Chen Qiang, "Chinese Practice in Public International Law," 1 *Chinese J. Int'l L.* 319 (2003)

114. Fourth, and similarly, PRC domestic law regards as "Chinese" a wholly owned foreign enterprise that is registered in China as an enterprise legal person. Chinese law provides for the creation of subsidiaries in China that are wholly owned by a

foreign investor, often a parent enterprise. Such subsidiary enterprises must be approved and registered as Chinese enterprise legal persons. Unlike the parent or owner, these enterprises are not regarded as of foreign nationality. The existence and applicability of a number of laws governing foreign investment and foreign-invested enterprises mean that such enterprises do have rights and duties that are not always the same as those of purely domestic enterprises. Nonetheless, for many purposes (including the ability to bear civil rights and obligations independently, susceptibility to veil-piercing, and so on), such a wholly foreign-owned Chinese enterprise legal person is not legally significantly different from a domestic enterprise. It does not matter that the enterprise's owner has what Chinese law regards as an importantly "different" legal character. (It is fair to characterize Chinese law as regarding the difference between a Chinese legal person and a foreign legal person as being no less fundamental than the difference between a state-owned enterprise and an enterprise under a different form of ownership.)

115.    Fifth, in domestic litigation in the PRC, enterprises under the system of ownership by the whole people (including enterprises that are wholly owned subsidiaries of an enterprise that is "owned" by the state) do not enjoy immunity from suit based on their ownership status. Such enterprises are routinely and ordinarily amenable to suit and are sued in civil actions. Chinese law does not treat them as significantly or relevantly different for these purposes from enterprises under other ownership forms, including private, foreign or mixed ownership. In contrast, organs of the Chinese state generally are not subject to civil suit. Legal remedies against them are available, if at all, through administrative lawsuits. Also, as noted earlier, enterprise legal persons in litigation before Chinese courts have not faced the prospect of having the court pierce their corporate veils until very recently.

Conclusion

116.    For the reasons set forth above, Sinochart is properly considered to be owned by the China National Foreign Trade Transportation (Group) Company ("Sinotrans"), which is an enterprise owned by the state (that is, the People's Republic of China). The most that could plausibly be claimed is that Sinochart is indirectly owned by the state. Sinochart's status as an enterprise under the system of ownership by the whole people and Sinochart's operation with assets or capital that are, in some senses, "property of the state" or "owned by the whole people" do not alter these conclusions.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.

Dated: November 1, 2007

_____
Jacques deLisle

27