UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

OCEAN LINE HOLDINGS LIMITED :

Plaintiff, : 07 Civ. 8123 (DC)

- against - :

CHINA NATIONAL CHARTERING CORP. a/k/a SINOCHART, :

Defendant. :

---------------------------------------------------X

**SECOND DECLARATION OF SONG DIHUANG**
**IN SUPPORT OF DEFENDANT'S**
**MOTION TO VACATE MARITIME ATTACHMENT**

I, Song Dihuang, declare under penalty of perjury of the laws of the United States of America as follows:-

1. I am a partner of Commerce & Finance Law Offices, of 6th Floor, A12 Jianguomenwai Avenue, Beijing 100022, the People's Republic of China, the Chinese Counsel to the Defendant in this action, China National Chartering Corp ("**Sinochart**") and I make this declaration based upon my own personal knowledge and upon documents that I believe to be true and accurate.

2. I submitted my first Declaration on the subject case on October 12, 2007. I now submit my 2nd Declaration on the subject case.

3. I have read and considered copies of the following documents which were provided to me:

(1) Declaration of Weidong Chen, as submitted by the Plaintiff, together with its exhibits;

(2) Declaration of Donald Clarke with exhibits;

(3) Declaration of Jacques Delisle with exhibits

4. I have also read and considered the following documents, among others, obtained by my colleague from the State Administration for Industry and Commerce of the People's Republic of China ("**SAIC**") and Administration for Industry and Commerce of Beijing City ("Beijing **AIC**") and/or from Sinochart:

(1) a copy of the Registration Form of Sinochart ("**Exhibit 1**");

(2) a copy of the Business License of Sinochart issued in 1964 ("**Exhibit 2**");

(3) a copy of the Report of SAIC dated June 5th, 1984 ("**Exhibit 3**");

(4) copies of the Business License of Sinotrans Chartering Corporation and the Administrative Sanction Decision dated November 10th, 1998 ("**Exhibit 4**");

(5) a copy of the SAIC's Letter to the State Council dated June 19th, 1995 ("**Exhibit 5**");

(6) a copy of the correspondence among Chinese Government Authorities ("**Exhibit 6**");

(7) a copy of the MOFTEC's Letter to SAIC dated December 23rd, 1983 and its letter dated December 1st, 1983 ("**Exhibit 7**");

(8) a copy of the Certificate of Registration of the Property Rights of the State Assets of Sinochart ("**Exhibit 8**");

5. With due respect to Ocean Line's expert, Mr. Chen, it appears that he was not reading carefully the documents when he prepared his Declaration and/or his opinion was based upon a mistaken understanding and/or wrong application of laws/regulations. I cannot agree with some of his interpretations of PRC Company Law. My law firm, Commerce & Finance Law Office, is one of the leading PRC law firms in the capital market, and though I am also best

known as a shipping lawyer, I have frequently advised clients on PRC company laws based upon my own knowledge as well as the knowledge and experiences of my colleagues where necessary. I will deal with this in more details below.

***<u>About the history and the formation of Sinochart</u>***

6. The descriptions within Mr. Chen's Declaration on the history and the formation of Sinochart are incorrect and/or inaccurate.

6.1 Within his Declaration, Mr. Chen describes the history and the formation of Sinochart, inter alia, as follows:

> "34. In the exercise of its right to make investment, Sinotrans established, **in or around 1993**, a separate subsidiary corporation which it first called "Sinotrans Chartering Corporation". *(emphasis added);*
>
> 36. In 1996, Sinotrans decided to begin using the name "Sinochart" for the chartering business being performed by this subsidiary entity, instead of the name "Sinotrans Chartering Corporation". It did so because it felt that the name "Sinochart" had some commercial recognition (going back to the period pre-1988 when Sinotrans had been operating as one entity, under two names, one of which was commonly known as "Sinochart");
>
> 38. **Sinochart essentially took over the legal position of the former "Sinotrans Chartering Corporation" subsidiary**, and Sinotrans Chartering Corporation was de-registered. The subsidiary has since operated under the name Sinochart. *(emphasis added);*
>
> 39. The Defendant **Sinochart is** thus a direct subsidiary entity **formed by Sinotrans in or around 1993 first as Sinotrans Chartering Corporation and**

**later re-named as "Sinochart"** (China National Chartering Corporation) **in 1996**." *(emphasis added);*

"48. These documents [found within the company search on Sinochart] were issued in connection with the nationwide restructuring of State-owned enterprises starting in 1988, conducted under the direction and supervision of the Government of PRC, one purpose of which was to address the type of a situation where there was a single entity which had been trading under more than one name;

49. These documents reflect that at the time of establishment in the 1950's, there was only one entity, Sinotrans, which also used the name Sinochart to trade. It was, in effect, "one institution bearing two names";

50. In my view therefore, it is incorrect to state that the documents reflecting formation in the 1950's evidence creation of the current Defendant Sinochart entity by State action in 1955. That is not true. **The current Sinochart entity did not exist in 1955**. *(emphasis added);*.

51. What happened in the 1950's was the creation of the current Sinotrans entity but at that time they utilized two names to reflect different aspects of the business being conducted by the one entity, essentially what is known as **"trade names"**. *(emphasis added);* and.

52. These documents further confirm the point because they make clear that when Sinotrans underwent the State supervised reformation, its previously used alternative name was not preserved, and it went forward simply as Sinotrans. During this transformation, Sinotrans did not make any request or application for the

continued use of the trade name Sinochart and **that name was considered "deregistered"**." *(emphasis added).*

6.2 It was true that Sinochart used to be part of the same institution (Sinotrans) with two name boards before the restructuring in 1990's. However, this should be read and understood against the historic background and under the then existing laws. Certainly, one would find it difficult to interpret or would give a wrong interpretation if one attempts to make such interpretation under Company Law (let alone any ownership analysis which is similar to "an analysis of stock ownership of a Western corporation" as Mr. Chen did in paragraph 8(d) of his Declaration) which does not apply to Sinochart or Sinotrans at all. Unfortunately, it appears that the approach taken by Mr. Chen was often based upon the PRC Company Law which first came into force on 1 July 1994, and latest was revised in 2005.

6.3 Thus, Mr. Chen suggested that Sinochart did not exist in 1955 at all, and the name "Sinochart" was only a "trade name" instead of a real entity. He declares that either the previous Sinochart was NOT a legal entity at all as from 1955 to 1993, and/or that the current "Sinochart" was not the same Sinochart which was set up in 1955 and ceased to exist since 1993, and that it was the successor of "Sinotrans Chartering Corporation" which was incorporated in or around 1993. Obviously, if Mr. Chen had read the documents obtained from Administration for Industry and Commerce (the "SAIC"), he would have easily realized his mistakes.

6.4 Within the documents on file with the SAIC, I refer to a copy of the official registration documents of SAIC, which clearly indicates that based upon the letter of approval by the then Ministry of Foreign Trade (under reference number (55)Yunmidaizi 79) which was dated 17th March 1955, Sinochart was formally set up to deal with foreign chartering business and booking business. The registered capital was RMB 20,000,000.00, and the grand opening

date of Sinochart was 1 April 1955 (**See Exhibit 1**). This was further confirmed by a number of government documents. I believe that Sinochart was firstly registered with local Beijing company registrar ("Beijing AIC") in 1964 as a state-run enterprise and obtained its first business license in accordance with the Administrative Measures on Registration of Industrial and Commercial Enterprises (for Trial Implementation) promulgated by the State Council on 30 December 1962. I now attach to my Declaration a copy of this first business license issued in 1964 (**See Exhibit 2**) and it clearly indicated that Sinochart was a "state-run" economic entity, and its scope of production or operation was chartering and booking business for import and export of cargo. This shows that Sinochart began its independent operation of business, at least since 1964. Such information is easily accessible at SAIC and I believe Mr. Chen probably reviewed these documents.

It was true that the employees (which were all called "state cadres" or "*guo jia gan bu*" at the time) were the same as those of Sinotrans, and that Sinochart and Sinotrans were actually one institution with two name boards. Obviously, this has to be read and understood under the then economic structures and regulations, and in particular the express approval by the government together with the SAIC in 1983/1984 when Sinochart was re-registered with SAIC and issued business license (see paragraph below). Further, the fact that Sinochart was allowed to operate under its own name and under a separate business license with separate registered capital (RMB20,000,00) is conclusive to demonstrate that Sinochart came into existence and was operating as a State-run enterprise since 1955.

6.5 The State Council repealed the aforesaid administrative measures on company registration and formulated and promulgated the Administrative Regulations on Registration of Industrial and Commercial Enterprises on 9 August 1982 ("Registration Regulation 1982").

According to the Registration Regulation 1982 which mainly dealt with state-owned enterprises and collectively-owned enterprises, all industrial and commercial enterprises were required to formally re-register with the administration authority on industry and commerce. Enterprises directly under the then Ministry of Foreign Trade like Sinotrans and Sinochart which has the title of "China" were required to register with SAIC. Under the Registration Regulation 1982, each enterprise could only have one name. However, given the special status and long history of independent operation of different businesses, with special approval by the Ministry of Foreign Trade dated 23 December 1983 and/or its letter dated 1 December 1983, the SAIC agreed to issue separate business licenses to both Sinotrans and Sinochart (See Exhibit 7). This was due to the then regulation that any company beginning with the title of "China" should be registered with SAIC rather than any local AICs and this explains why some documents including the business license issued by SAIC all indicated that Sinochart was set up in 1984, rather than 1955. In particular, I draw attention to the remark by SAIC in its report dated 5th June 1984, which indicated that "in consideration of the fact that the ***capital of these two companies [Sinochart and Sinotrans] have been separated***" (emphasis added. **See Exhibit 3**). Thus, as a matter of then laws and regulations, Sinochart was registered as an independent legal entity despite the fact that they were still operating "two name boards for one institution".

6.6 In 1988, the State Council again repealed the Registration Regulations 1982, and formulated and promulgated the Administrative Regulations on Registration of Legal Corporation ("Registration Regulations 1988"). According to the Registration Regulations 1988, it is the first time that "private enterprise" was allowed for registration. Further, based upon this Registration Regulation 1988, the so-called nation-wide campaign of "checking up and rectifying companies" was carried out in China. Obviously, the regulations again emphasize that one entity

could only have one name. In 1989 till 1991, Sinochart requested three times for extension of its business license, since the previous business license issued would expire on 8th June 1989, and all the requests were granted by SAIC. Since then, no further request was made, and therefore, the business license of Sinochart expired on 30 June 1991.

Also due to the reasons mentioned above, Sinochart did not conduct any annual inspections with SAIC from 1988 till 1993. This coincided with the move to set up group companies by large state-owned enterprises in the early 1990's. Thus, in order to avoid the "two name boards for one institution", Sinotrans set up a Group company with Sinotrans as the "core company" and all its related companies as its "subsidiaries". These were required by the then regulations and again, there was a gap between the Law on EOWP and the Company law. Indeed, "subsidiary" is a concept under the Company Law which did not exist until 1993 and there is no such concept or definition at all under the Law on EOWP.

6.7 It is true that Sinotrans set up a company called "Sinotrans Chartering Corporation" in or around 1994, also as its "subsidiary" to replace "Sinochart". However, it only existed for about three years, and it was de-registered. So it is not accurate for Mr. Chen to say that Sinochart was first established in or around 1993. *Indeed, if Mr. Chen simply made a company search against Sinotrans Chartering Corporation, he would have realized that it was an entirely different file with Beijing AIC (and NOT SAIC).* For easy reference, I attach a copy of the business license of Sinotrans Chartering Corporation and a copy of the Administrative Sanction Decision dated 10 November 1998 (see Exhibit 4). As a matter of PRC laws, this clearly indicates that Sinotrans Chartering Corporation was duly registered with Beijing AIC in 1994, and was revoked in 1998 (due to its failure to conduct annual inspection for the year of 1997), ie not succeeded by any company at all. Thus, the "Sinochart" in the present case refers

to the "original" Sinochart, and not Sinotrans Chartering Corporation and any other conclusion is absolutely wrong.

6.8 I should also draw your attention to the document which indicates that the then Ministry of Foreign Trade and Economic Cooperation (i.e. "MOFTEC", currently the Ministry of Commerce, PRC) and/or Sinotrans and/or other government authority merely thought "[original] Sinochart was considered as being de-registered", but SAIC clearly in its letter confirmed that it was NOT, and therefore, it was treated as unresolved and left issue in the so-called "checking up and rectifying companies" action (**See Exhibit 5**). Indeed, it was finally resolved by restoring the [original] Sinochart and de-registering the Sinotrans Chartering Corporation.

In fact, as reflected by the correspondence dated 24 May 1995 between MOFTEC and the State Council (**See Exhibit 6**), Sinochart was to be "restored" and subsequently "registered" with SAIC and the former "Sinotrans Chartering Corporation" which was registered with Beijing AIC, was deregistered. Indeed, despite the application by Sinotrans and/or some documents to suggest otherwise, the intention to simply change the name from Sinotrans Chartering Corporation back to Sinochart was turned down by SAIC (**See Exhibit 5**), since Sinochart was still in existence at all time. Thus, it was later decided that Sinochart should be "restored", and the SAIC further exempted from the annual inspections of Sinochart for the period when Sinochart "ceased operation" and Sinotrans Chartering Corporation was in operation. This again clearly shows that "Sinochart" was, as a matter of law, in existence since 1955, and after a mere interruption of a few years, it was restored, instead of succeeding "Sinotrans Chartering Corporation".

6.9 As a result, I submit it is irrefutable that the current Sinochart was first set up in 1955, operating as a separate business from Sinotrans. Mr. Chen's suggestion that Sinochart was

merely a trade name or that Sinochart was the successor of Sinotrans Chartering Corporation is therefore incorrect and misleading.

***<u>Sinotrans' Investment in Sinochart IS on behalf of the Whole People</u>***

7. As discussed above, from the documents (**See Exhibit 7**) of MOFTEC, it shows that Sinochart and Sinotrans were parts of the same company ("the company") when first established in 1955. However the registered capital of the "company" was RMB80 million, all of which came from the State. Among the registered capital, RMB60 million was allocated to Sinotrans and RMB 20 million was allocated to Sinochart. This clearly shows that the original capital to establish Sinochart did not come from Sinotrans at all. It could only come from the investor, i.e. the Chinese Government.

8. When Sinochart was restored, although documents, including Sinochart's Articles of Association ("AOA"), evidenced that the registered capital came from Sinotrans, legally it was the capital from the State, and Sinotrans contributed it on behalf of the State. To interpret otherwise would come to an absurd conclusion or it would perhaps be an illegal conversion of State assets by Sinotrans, since there was never any evidence what had become of the original invested capital of RMB20 million into Sinochart by the State.

9. In light of the facts above, although Sinochart's AOA and other documents state that the registered capital of Sinochart is appropriated from Sinotrans, it was clearly the Chinese Government that made the investment through Sinotrans. In other words, when establishing Sinochart, Sinotrans was acting on behalf the Chinese Government, i.e. the whole people of the PRC. This is entirely consistent with Sinochart's legal form, i.e. an "enterprise owned by the whole people ("EOWP"), as discussed in my first declaration, whose property is at all times owned 100% by the State. Furthermore, as an EOWP itself, Sinotrans does not "own" its own

property. This further illustrates as a matter of law why Sinochart does not, never has, and may not in the future own the property it manages and administers because under the Law on EOWP, all such property is property owned by the PRC, i.e. the State.

***Wrong or Misleading Interpretation of PRC Laws by Mr. Chen***

10. In my opinion, as I have mentioned in my first Declaration, both Sinochart's Business License (**See Exhibit 1 of my fist Declaration**) and other documents filed at the SAIC unequivocally indicate that the "economic nature" of Sinochart is an enterprise with "ownership by the whole people (**"EOWP"**)". As a matter of PRC law, this means Sinochart is duly registered under the "Law of PRC on Industrial Enterprises Owned by the Whole People". Also as I have mentioned in my first Declaration, the fact that Sinochart is an EOWP is sufficient, per se, to show that Sinochart is an enterprise owned by the People's Republic of China.

11. I also refer to a copy of the Certificate of Registration of the Property Rights of the State Assets of Enterprise of People's Republic of China (See **Exhibit 8**). This clearly shows that Sinochart is authorized by the State-owned Assets Supervision and Administration Commission ("SASAC") to lawfully possess and utilize the state assets of RMB23,163,000, and Sinochart shall undertake to ensure safe-guarding and appreciation of the state assets under its possession and utilization.

12. According to Art. 2 of the Measures on Administration of Property Right Registration of State Assets of Enterprises 1996 by the State Council (the "Property Right Registration Measures", see **Exhibit 9**), "The registration of the property rights of the State assets of enterprises (hereinafter referred to as property right registration) as mentioned in these Measures is a behaviour of registering by State assets management departments on behalf of the Government, the assets, liabilities, proprietary rights and interests, and other matters concerning

the property rights of various enterprises occupying State assets and confirming the relationship of imputation of these property rights in accordance with law." Property right registration includes registration of possession of property rights, registration of alteration of property rights, and registration of cancellation of property rights, and are subject to annual inspection by the state assets administration authority within 90 days after end of each year. I can confirm that up to the time of my colleague's independent search at SAIC on 22 October 2007, there is no indication whatsoever that the ownership of Sinochart has been changed from the State to Sinotrans or anyone else.

13. It should be noted that all state assets were formerly to be registered with the Ministry of Finance. Therefore, the Ministry of Finance formulated and promulgated the Implementing Regulations on the Property Right Registration Measures ("IRPRM"), firstly in 1996, and then revised in 2000 (see **Exhibit 10**). According to Art. 4, the Certificate of Registration of the Property Rights of the State Assets of Enterprise of People's Republic of China is the legal proof affirming the ownership of the enterprise property right and the fundamental basis of the authorization to the enterprise to operate/manage the state assets by the Government. Further, it is aimed to implement the fundamental principle of "Ownership by the State, Management through Different Levels, Operation by Authorization and Supervision via Division of Work"

14. In 2003, the State-owned Assets Supervision and Administration Commission ("SASAC") was set up under the direct leadership of the State Council of PRC to take over the administration and supervision of state-owned assets of all those enterprises except for the financial institutions. Thus, on 30 October 2004, the SASAC promulgated the Business

Registration Rules on State-owned Property Rights of Enterprises and it has an identical provision in its Art. 5 **(see Exhibit 11)**.

15. Further, I refer to Exhibit 3 to Mr. Chen's Declaration. According to the Transformation of the Business System of Industrial Enterprises Owned by the Whole People, 1992 (for sake of convenience, I will still adopt Mr. Chen's translation though I believe a more accurate translation would be "Regulations on Transformation of Operation Mechanism of Industrial Enterprise Owned by the Whole People" or "Regs. IEOWP"), it was clearly and unambiguously provided in Art. 3 that "The transformation of operation mechanism of enterprise must observe the following principles:

....

(2) .... To ensure the ownership of the State to the assets of the enterprise, and safe-guarding and appreciation of the State assets..."

Art. 41 further clearly provides that "Assets of enterprises are owned by the whole people, ***namely, owned by the State***....

Assets of enterprises include any assets as may be invested by the State in various forms and assets as constituted from profits of such investment, and any other assets which are deemed to have been owned by the whole people by the laws and administrative regulations on administration of state-owned assets, and which are operated/managed by the enterprises" (emphasis added).

16. Therefore, it was entirely incorrect or misleading for Mr. Chen to rely upon Art. 2 and Art. 13 on the Regs. IEOWP without consideration of the fundamental basis for the regulations, which first confirms that assets owned by the whole people equate to assets owned by the State, and that any transformation should ensure the ownership of the State to the assets of

those enterprises. Further, this Regulation was promulgated on 23 July 1992 whereas the first Company Law of PRC was promulgated in December 1993, and came into force on 1 July 1994, and therefore, it would be inappropriate to analyze or interpret the Regulation from a Company Law perspective since it was not in effect at that time.

17. It is true that Sinotrans, under the current Company Law and/or other regulations including Mr. Chen's Exhibit 14, may invest as the sole investor into other entities, and the relationship between them is subject to the Company Law. It is also true that those EOWPs are also undergoing structure reform to meet with the requirement of socialist market economy. However, the reality is that Sinochart was set up as an EOWP and it is manifestly wrong for Ocean Line's experts to assert that Sinochart was owned by Sinotrans.

18. Mr. Chen also relied upon Sinochart's Articles of Association and/or other documents and asserted that Sinochart was controlled by Sinotrans under its free will. This is again an incorrect interpretation of the laws and regulations.

19. I refer to Exhibit 19 of Mr. Chen's Declaration (the "1996 Guidelines"), which was repealed. But, Art. 3 clearly shows that it was authorized by the State that a Group company like Sinotrans shall hold the ownership (shares) of its member enterprises, and that it can appoint the directors, chairman of BOD (or manager) according to the procedures. These authorizations are obviously subject to the Law on EOWP. The concept of shares under the PRC Company Law does not exist in the Law of EOWP. Sinochart does not issue any shares. If the Government decides that Sinochart is transferred to the Group of another EOWP, it can do so by way of administrative order according to law. Sinotrans is not entitled to request such EOWP to pay Sinotrans. This is also the reason why all assets of Sinochart must be registered with the State-owned Assets Supervision and Administration Commission.

20. Indeed, it is provided in Art. 4 of the 1996 Guidelines ("Chen Exhibit 19) that the total assets of the Group shall be the aggregate of the assets of the previous assets of the group company and the assets of its members held as authorized by the State, and the previous "State capital" of the subsidiary company shall be changed to "state-owned corporate capital". This is the reason why in the registration form of State-owned assets, the assets of Sinochart is recorded as State-owned corporate capital instead of State capital.

21. In light of the above, although Sinochart is described in some documents as a "subsidiary company", it is incorrect to say that Sinochart is owned by Sinotrans. In my opinion, Sinotrans, acting on behalf of the State, is exercising its powers as authorized by the State on supervision and administration over Sinochart.

22. Based upon the aforementioned opinions, I conclude that as a matter of PRC law, Sinochart, as an EOWP, is 100% state-owned and all the assets and property of Sinochart are also 100% owned by the PRC, i.e. the State. In fact, the same is true for Sinotrans. The fact that Sinochart is described as a "subsidiary company" of Sinotrans does not affect Sinochart's nature as an EOWP, and cannot change the fact that all the assets and property of Sinochart are owned by the PRC, i.e. the State.

**Some further comments on Mr. Chen's Declaration**

23. Paragraph 39 of Mr. Chen's Declaration is incorrect, since Sinochart as an EOWP established under the Law on EOWP cannot be set up as a subsidiary of Sinotrans. As mentioned before, there is a gap between the Law on EOWP and the Company Law, and the former does not have the concept of "subsidiary" at all. It would either be an enterprise owned by the whole people, i.e. by the State, or it would not be an EOWP at all.

24. Paragraph 41 of Mr. Chen's Declaration is also misleading, since two EOWP entities cannot be in a typical "parent-subsidiary" relationship such as the one Mr. Chen describes. It is true that it was intended that a "group" like the Sinotrans Group should be managed and administered as if there were such relationship, but in any event there cannot be such relationship under the PRC Company Law where two EOWP's are involved.

25. Mr. Chen in paragraphs 45-52 of his Declaration again tries to analyze the nature and structure of Sinochart from the prospective of corporate law. However, the fact that at the relevant time there was no Company Law in existence, as well as the indisputable fact that Sinochart was operating under a separate business license, at least from 1964, clearly proves Mr. Chen is mistaken as a matter of fact and law and that Sinochart was not just a "trade name" under the then PRC laws and regulations since legally it has been a legal entity separate and distinct from Sinotrans, at least from 1964. ..

26. In paragraphs 71-74 of his Declaration, Mr. Chen discusses "Central Enterprises". It is only correct to say that these 155 enterprises which were under direct investment and control by different government agencies, have been chosen to be under direct control of SASAC, hence, they no longer have any administrative relationship with those government agencies which exercise respective administrative powers in their respective field. However, it is incorrect to say that only these 155 enterprises are directly invested by and/or under the control of SASAC. The SASAC may authorize certain enterprises to act on its behalf to invest and/or control state-owned enterprises.

27. Further, I should perhaps mention that the list of Central Enterprises can vary from time to time. For instance, it has just recently been adjusted to 153 enterprises.

28. In paragraphs 77-81 of his Declaration, Mr. Chen refers to the 2007 Guidelines (his Exhibit 14). First of all, this will only apply and will be implemented in the year 2008 and therefore is irrelevant. Secondly, the term of "first tier" is NOT a legal term under Company Law or the Law on EOWP. Thirdly, his understandings that only first-tier enterprise should turn over profits and/or Sinochart is not obligated to turn over profits directly to the State are inaccurate.

29. As I discuss in paragraph 20, above, total assets of the Sinotrans Group shall be the aggregate of the assets of the previous assets of the group company and the assets of its members held as authorized by the State, and naturally, the annual total profits/loss reported by Sinotrans to SASAC shall include those of second tier enterprises and even third tier enterprises under Sinotrans. In fact, as discussed in paragraph 11 above, the Certificate of Registration of the Property Rights of the State Assets of Sinochart clearly indicates that Sinochart has an obligation to ensure the safe-guarding and appreciation of the state-owned assets under its possession and utilization. Thus, I believe in making and/or approving any such budget or profits, if any, the Sinotrans and/or SASAC have to take into account the state-owned assets that have been possessed and utilized by each and every stat-owned enterprises, including Sinotrans itself and all second-tier and third-tier enterprises. It is therefore entirely incorrect for Mr. Chen to rely upon the 2007 Guidelines and assert that Sinochart has no obligation towards the State of PRC in terms of profits or otherwise.

29. In fact, Sinotrans has the obligation to file with SASAC every year a consolidated budget report and accounting report, which are accompanied by independent reports from its "subsidiaries". I can confirm that unless it has prior approval on the use of the profits of Sinochart, Sinotrans is not allowed to use at its free will such profits, otherwise, it may constitute a conversion of state-owed assets which is a criminal offence under PRC law.

30. Paragraph 90 of Mr. Chen's Declaration is again incorrect. The Sinochart-Sinotrans relationship falls within the first category set out in his paragraph 89(a), i.e. as is set forth in paragraphs 6.4 and 7, above, the investment in Sinochart did, in fact, come from the State via Sinotrans. Obviously, the registered capital of Sinochart originally came from the State, and not from Sinotrans. The indication in various documents that Sinotrans was the sole investor merely means that they did so on behalf of the State. Indeed, the creation of the Sinochart-Sinotrans relationship was subject to the approval by the government, and was not a natural consequence of law as Mr. Chen wrongly concludes.

31. For all of the foregoing reasons, I respectfully conclude that it is irrefutable that:

a. Sinochart as an EOWP is 100% owned by the PRC; and

b. All of Sinochart's assets and property are owned by the PRC, and not Sinochart itself or Sinotrans.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on 30th November, 2007 in Beijing, China.

SONG DIHUANG

# Table of Contents


| | |
|---|---|
| Exhibit 1 | Registration Form of Sinochart |
| Exhibit 2 | Business License of Sinochart issued in 1964 |
| Exhibit 3 | Report of SAIC dated June 5th, 1984 |
| Exhibit 4 | Business License of Sinotrans Chartering Corporation and the Administrative Sanction Decision dated 10th, November 1998 |
| Exhibit 5 | SAIC's Letter to the State Council dated June 19th, 1995 |
| Exhibit 6 | Correspondences Among Relevant Chinese Government Authorities |
| Exhibit 7 | MOFTEC's Letter to SAIC dated December 1st, 1983 and December 23rd, 1983 |
| Exhibit 8 | Certificate of Registration of the Property Rights of the State Assets of Sinochart |
| Exhibit 9 | Measures on Administration of Property Right Registration of State Assets of Enterprises |
| Exhibit 10 | Implementing Regulations on the Property Right Registration Measures |
| Exhibit 11 | Business Registration Rules on State-owned Property Rights of Enterprises |