UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
OCEAN LINE HOLDINGS LIMITED :
:
Plaintiff, : 07 Civ. 8123 (DC)
:
- against - :
:
CHINA NATIONAL CHARTERING :
CORP. a/k/a SINOCHART, :
:
Defendant, :
----------------------------------------------------------X

## DECLARATION OF SI YUZHUO
## IN SUPPORT OF DEFENDANT'S
## MOTION TO VACATE MARITIME ATTACHMENT

I, Si Yuzhuo declare under penalty of perjury under the laws of the United States of America as follows:-

1. I am 70 years old. I am a professor in maritime law at the Law School of Dalian Maritime University ("DMU"), Dalian, People's Republic of China ("PRC"). I graduated from DMU in 1964 and have been working at DMU since then. I attended the Norwegian Shipping Academy, Oslo, Norway for study in shipping business and maritime law for one year from June 1980 to May 1981.

2. I was appointed as a maritime arbitrator at the China Maritime Arbitration Commission ("CMAC") in 1972 and have been an arbitrator on the panel of CMAC Arbitrators since then. I was admitted as a practicing lawyer in 1984 at the time when the PRC first began issuing practicing certificates.

3. DMU is a leading maritime university in China. It is currently the only maritime university in China which is funded by the Central Government of the People's Republic China. It has 16 schools and institutes including navigation, marine engineering, management, and law schools. It has currently about 16,000 students, including approximately 2,000 masters and PhD candidates. Many DMU graduates are now serving in important positions in the shipping industries, maritime courts, ship agencies, chartering companies and the legal profession in China.

4. In 1984, I was appointed as an associate professor in Maritime Law and as the head of the Faculty of Maritime Law at DMU. I was the supervisor of the LLM course in maritime law from 1984. I was appointed as a professor in

maritime law in 1991. I became vice president of DMU in 1989. From 1991 to 1998, I served as President of Dalian Maritime University. In 1998, I became the first supervising professor of Ph.D. in maritime law in China and have been the supervising professor of PhD students since then. At the end of 1998, I retired from the position as President of DMU.

5. I am Vice-Chairman of CMAC. I am also Vice Chairman of China Maritime Law Association. I am a visiting professor to various distinguished Japanese and Chinese universities including Auyama-Gakuin (Tokyo), Beijing, Wuhan, Jilin, Liaoning, University of International Business and Economics in Beijing, Southwest Political Science and Law University. I served as a governor of the World Maritime Law University, Sweden which is sponsored by the International Maritime Organisation ("IMO") from 1991 to 1998.

6. I am the editor in chief of the Annual of China Maritime Law. I was one of the draftsmen of the Chinese Maritime Code which came into force in 1993. I have been appointed as the head for the project which is considering revisions to the Chinese Maritime Code. I have attended many international meetings of international organisations including IMO and CMI as the delegate of the PRC. I am at present the head of the Chinese Government's delegation to the United Nations Commission on International Trade Law in relation to issues of transport law.

7. I have published over 60 academic theses and over 20 academic books such as Maritime Law, The Law of Ship's Collision, Maritime Law Monograph, Dissertation on Maritime Law by Si Yuzhuo, Maritime Law Dictionary, also I take charge of academic research in the field of maritime law for 20 items including 15 items of state and province/ministry rank and 6 of which won the prize of state and province/ministry rank.

8. I have been sitting as an arbitrator in CMAC and International Chamber of Commence arbitration proceedings. I have also been giving expert opinions on Chinese law to Chinese and foreign courts and arbitration tribunals.

9. I have been asked by Lennon, Murphy & Lennon via the Hong Kong lawyers, Richards Butler, for the Defendant in this case, i.e., China National Chartering Corporation ("Sinochart") to give an opinion on whether Sinochart is owned by the People's Republic of China. I have also been requested to comment on the opinions in respect of the above issue given by the experts appointed by the Plaintiff, Ocean Lines.

10. I have read and considered the following documents provided to me:-

   (1) the Declaration of Mr. Chen Weidong with exhibits;

(2) the Declaration of Mr. Peter Gutowski;
(3) the Declaration of Mr. Donald Clarke with exhibits;
(4) the Declaration of Mr. Jacques Delisle with exhibits;
(5) the Declaration of Mr. Luke Parsons with exhibits;
(6) the Declaration of Mr. Song Dihuang with exhibits;
(7) the Declaration of Ms. Xing Naiqun with exhibits;
(8) the Declaration of Prof. Jiang Ping with exhibits;
(9) the Certificate of Registry of Ownership of State-owned Assets of Enterprises of Sinochart issued by the State-owned Assets Supervision and Administration Commission ("SASAC") (Exhibit 1);
(10) the Business License of Sinochart of 1964 (Exhibit 2); and
(11) the Business License of Sinochart of 2001 (Exhibit 3).

11. I have carefully read the declarations made by Professor Jiang Ping and Mr Song Dihuang. I can confirm that I fully agree with their opinions on the legal status of Sinochart. In this Declaration, I refer to the same legal text or the same title of Chinese laws and regulations for those referred to in the Declaration of Professor Jiang. I will not exhibit the law texts which have been exhibited to the Professor Jiang's declaration.

12. I can confirm that as a matter of the laws of the People's Republic of China ("PRC"), Sinochart is 100% owned by the PRC and all the assets of Sinochart belong to the PRC.

13. In addition to the above, I would like to comment on Mr. Chen Weidong's declaration submitted in support of the Plaintiff, Ocean Line, as follows:

14. With all respect to Mr. Chen, my general comment on his declaration is that his reasoning and conclusion are misleading because he did not interpret the applicable Chinese laws properly.

15. Mr. Chen Weidong in paragraph 8 of his Declaration stated:

> "Sinochart is an independent Chinese corporate legal entity. . . . No evidence suggests that the investment was made directly on behalf of the whole of the people or the Government of the People's Republic of China."
> . . . . Notwithstanding that both Sinochart and Sinotrans hold business licenses which describe them as "enterprises owned by the whole people", Sinochart, having been created and capitalized by its parent Sinotrans and otherwise operating under the direct supervision and control of Sinotrans, would more properly be considered a subsidiary of Sinotrans with no direct state ownership.

16. In paragraphs 14 to 18 of his Declaration, Mr Chen states that Chinese law has granted most of property rights of an enterprise wholly owned by the people ("EOWP") to the EOWP. As commented by Professor Jiang Ping, Mr. Chen is incorrect because his contention is not in compliance with the principles of Chinese law. I would like to make a further comment in this regard. In fact, the Law of Industrial Enterprises Owned by Whole People ("the Law of IEOWP") only gives an EOWP an authorisation to manage the state assets. In order to exercise such authorisation, the enterprise will be entitled to possess, use or dispose of the state assets according to law. However, this should not be interpreted as ownership of such assets by an EOWP.

17. In paragraph 19 of his Declaration, Mr Chen said that the whole people of the PRC only enjoy beneficial ownership of an EOWP. This is again wrong under Chinese law. The whole people of the PRC or the Chinese Government have full ownership on an EOWP. Article 7 of the Constitution of the People's Republic of China states, inter alia, that the state owned economy is the socialist economy of ownership by the whole people of the People's Republic of China. This means that "ownership by whole people of the PRC" is the equivalent of "state-owned".

18. In paragraph 23 of his Declaration, Mr. Chen summarises that an EOWP would have four elements: (1) direct investment by the government; (2) direct supervision by the government; (3) profit to be used by the state; and (4) any merger and acquisition to be decided by the government. Mr. Chen's statement is not completely right under Chinese law. The Chinese Government may authorise or ask an EOWP to put any capital into another EOWP. The EOWP so established will be required to be registered as an EOWP which is subject to the relevant laws on EOWPs. The Government may also authorise an EOWP to supervise another EOWP but this can be changed from time to time. It should be noted that the names in the list of so called "central enterprises of the State-owned Assets Supervision and Administration Commission" ("SASAC") have been changing. However, the economic nature and the government control over an EOWP remain the same under Chinese law and practice. In other words, an EOWP is owned by the People's Republic of China even if it is not in the list of SASAC. Any person who has disposed of the assets of an EOWP without the Government's authorisation and/or compliance with Chinese laws will be subject to criminal liability under Chinese law.

19. In Paragraphs 27 to 52 of his Declaration, Mr. Chen states his observation of the establishment of Sinochart and Sinotrans. He disagrees with what Mr. Song has described in his first Declaration in respect of the establishment of Sinochart in his Declaration.

20. In Paragraphs 53 to 62 of his Declaration, Mr. Chen also emphasises that according to the Articles of Association of Sinochart, Sinochart is operated under the direct supervision and control of Sinotrans. In essence, Sinochart was invested by Sinotrans, under the supervision of Sinotrans and therefore he concludes Sinochart is an enterprise under Sinotrans (in Chinese 下屬企業).

21. As I mentioned above, the legal conclusion of Mr. Chen is wrong under Chinese law in any event. From the documents available to me including the Business License of Sinochart of 1964 (Exhibit 2) and Business License of Sinochart of 2001 (Exhibit 3), it can be seen that the descriptions as to the establishment of Sinochart by Mr. Chen do no correspond with the documentary evidence.

22. Mr. Chen says that Sinochart is only a "trade name" of Sinotrans and is not a real entity. However, this is belied by the fact that in 1964 Sinochart was granted a business license by the Government of Beijing Municipal City. This shows that Sinochart was already an entity in 1964. This is not a trade name.

23. Mr. Chen also takes the view that the current Sinochart was established in or about 1993 and it was not the original Sinochart. However, his opinion is contradicted by the contents of the 1964 business license of Sinochart which show clearly that Sinochart was at least granted a business licence in 1964. Further, Mr. Chen must have noted from the 2001 business licence of Sinochart, it clearly states that Sinochart was originally established in 1984. I believe that the original date in this certificate refers to the Sinochart's registration with the State Administration of Industry and Commerce ('the SAIC"). I understand that since 1980s, China began to re-register the legal persons. The SAIC is in charge of the registration of national enterprises. Local enterprises would be registered with the local administration of industry and commerce. Each province or city has its local registration for its local enterprises. Because Sinochart is a national company, it should be re-registered at the State's registry, i.e., the SAIC. Therefore Sinochart's Business Licence of 2001 refers to the initial establishment of Sinochart as recorded at SAIC on 9th June 1984 given that the Beijing Municipal City's Administration for Industry and Commence is not the same organisation of the SAIC.

24. Hence, from the documentary evidence, Sinochart was clearly not established after 1993 as Mr. Chen wrongly suggests. In summary, the descriptions of Mr. Chen on the establishment of Sinochart do not correspond with the facts plainly evident from Sinochart's historical business documents. I can see from the document of the Ministry of Foreign Economy and Trade of the PRC dated

23rd December 1983 attached to Mr Song's Declaration that both Sinochart and Sinotrans were initially established by the PRC in 1955.

25. In Paragraphs 63 – 81 of his Declaration, Mr. Chen discusses the SASAC. He says that Sinochart does not belong to any levels of SASAC. But, he does not produce any documentary evidence from any SASAC or local SASAC to exclude Sinochart as an EOWP. In other words, his view that Sinochart is not an EOWP is not supported by any evidence. As commented by Professor Jiang, the deciding factor as to whether an enterprise is an EOWP is the registration at the SAIC or a local administration. I will mention below that SASAC does have a certificate certifying that Sinochart is an EOWP.

26. Further, I believe that Mr. Chen did not consider Article 28 of Provisional Regulations on Supervision and Administration of State-owned Assets of Enterprises (Exhibit 4), which reads:

> "State-owned assets supervision and administration authorities may authorize the wholly State-owned enterprises and companies among their Funded Enterprises that are qualified to operate State-owned assets. Wholly State-owned enterprises and companies so authorized shall operate, administer and supervise, in accordance with the law, State-owned assets created by State investment in the enterprises that they wholly own, have a controlling interest, or have an equity participation."

27. Under the above Regulations, an EOWP can be authorised to operate, supervise and manage another EOWP. As I mentioned above, this does not mean that the managed or supervised EOWP is not owned by the State. All the properties of such EOWP are owned by the State under relevant PRC law on IEOWP.

28. In Paragraphs 76 – 83 of his Declaration, Mr. Chen quotes Guidelines for Provisionally Implementing Operational Budget of State-owned Capitals, 2007 and states that Sinochart was not taken into the national planning. In other words, Mr. Chen takes the view that Sinochart is not state-owned and operated by the State. Again, this is wrong. Some EOWPs may have been taken into account and some may not be taken into account. With respect, Mr. Chen's statement is misleading.

29. In Paragraphs 91 – 93 of his Declaration, Mr. Chen tries to say that there was no evidence to show that Sinotrans' investment in Sinochart was made on behalf of the State. As Professor Jiang has pointed out in his Declaration and I also mentioned herein, even though the capital of Sinochart was invested by Sinotrans, as long as Sinochart is registered as an EOWP, Sinochart is owned by the State. In other words, all the properties of Sinochart belong to the State.

There is no doubt about this under Chinese law. I should mention that the Law of IEWOP is a national law adopted by National People's Congress of the PRC. Its effect will prevail over any other administration regulations if there is any difference or contradiction.

30. Exhibit 1 attached hereto is a copy of the Certificate of Registry of Ownership of State-owned Assets of Enterprises of Sinochart issued by the SASAC. This document clearly shows that Sinochart is registered as a State Owned Assets Enterprise. In this document, the SASAC imposes Sinochart a responsibility with respect to the value maintenance and increment of the state-owned assets.

31. Article 5 of the Rules on the Management of Property Right Registration of the State-owned Assets of Enterprises (Exhibit 5 attached hereto) provides that the "Certificate(s) of Registry of Ownership of State-owned Assets of Enterprises of the People's Republic of China" issued by all the levels property registration administrations ("the Certificate of Registration") is the legal evidence confirming the status of the enterprise property and it is also the evidence of the financial ability of an enterprise. Therefore, there is no doubt that Sinochart's assets belong to the State. I should mention that this Certificate indicates that the capital contributor is Sinotrans. As mentioned in the above, this only means that Sinotrans acted on behalf of the Government in making the capital contribution in accordance with the Regulations mentioned above.

32  I should also comment that Sinotrans may sometimes describe Sinochart as its "subsidiary". I believe that this is only for the matter of convenience or a misuse in a legal sense. As mentioned in Professor Jiang's Declaration, legally, one EOWP cannot own another EOWP under Chinese law given EOWP is under the system of the Law of IEOWP. Naturally, Sinochart does not issue any share certificates.

33. The "subsidiary" concept is a concept under the PRC Company Law. People sometimes do misuse this term in EOWPs. A document shows that Sinochart was willing to participate in the Group headed by Sinotrans. In my view, this does mean that Sinotrans might have exercised the Government function over Sinochart on behalf of the PRC. Of course, the Government can order another EOWP to replace Sinotrans and exercise the Government function over Sinochart on behalf of the PRC. In such case, Sinotrans is not entitled to be paid by either another EOWP or the Government for their contribution of the capital to Sinochart because the capital contribution (if any) was made by Sinotrans on behalf of the PRC. As mentioned above, the National Law governing EOWPs is the Law of IEOWP which prevails. I firmly believe that under Chinese law, Sinochart is not owned by Sinotrans but it is owned by the PRC.

34. I make this declaration based upon my own personal knowledge and upon documents available to me.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on 29 November, 2007 in Dalian, China.

_____
Si Yuzhuo