UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OCEAN LINE HOLDINGS LIMITED,

Plaintiff,

- against -

CHINA NATIONAL CHARTERING CORPORATION,

Defendant.

07 Civ. 8123 (DC)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE MARITIME ATTACHMENT OR IN THE ALTERNATIVE FOR COUNTERSECURITY**

*Of counsel:*

Patrick F. Lennon, Esq.
Kevin J. Lennon, Esq.
Lennon, Murphy & Lennon, LLC
Attorneys for Defendant
CHINA NATIONAL CHARTERING CORPORATION
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone: (212) 490-6050
Facsimile: (212) 490-6070

# TABLE OF CONTENTS


| Topic | | | Page |
|---|---|---|---|
| Summary of Argument | | | 1 |
| Point I | | SINOCHART IS AN INSTRUMENTALITY OF THE PRC | 1 |
| | A. | The PRC owns all of Sinochart's ownership interests | 4 |
| | B. | Sinochart is an instrumentality under the "organ" prong of § 1603(b) | 9 |
| Point II | | FSIA SECTION 1609 BARS PREJUDGMENT ATTACHMENT OF SINOCHART'S PROPERTY | 11 |
| Point III | | SINOCHART IS ENTITLED TO COUNTERSECURITY | 14 |
| Conclusion | | | 15 |

## SUMMARY OF ARGUMENT

Section 1609 of the FSIA provides in pertinent part: ". . . the property in the United States of a foreign state shall be immune from attachment arrest and execution . . . ." 28 U.S.C. § 1609 (emphasis added). In the context of Chinese law and the undisputed facts of this case, section 1609 raises two distinct issues:

1. Is Sinochart a "foreign state?" In other words, are a majority of Sinochart's shares or other ownership interest owned by a foreign state, as required by § 1603(b)(2) of the FSIA?

2. Irrespective of and independently from whether Sinochart itself is owned by a foreign state, are the assets that Sinochart possesses and manages owned by a foreign state?

As to the first issue, Sinochart is entitled to immunity under the FSIA either because it is an agency or instrumentality a majority of whose "ownership interests" are owned by the government of the People's Republic of China ("PRC") or because it qualifies as an agency or instrumentality under the "organ prong" of section 1603(b) despite its alleged ownership by non-party Sinotrans. *See Points I(A) and (B), infra.* As to the second issue, the attached funds belong to the PRC government despite that they are managed, administered and utilized by Sinochart. An entity may possess assets that it does not own, but merely holds in trust for the sovereign who does own it. *See Karaha Bodas Company, LLC v. Perusahaan Perambangan Minyak Dan Gas Bumi Negara,* 313 F. 3d 70, 92 (2d Cir. 2002) (discussed further at Point II, *infra*). If that is the case, such property is immune. *Id.*

## POINT I

## SINOCHART IS AN INSTRUMENTALITY OF THE PRC

Plaintiff concedes, as it must, that both Sinotrans and Sinochart are "entities owned by the whole people ("EOWP")." *See Plaintiff's Memo of Law at 13-18; Clarke Decl. ¶ 13-14;*

*deLisle Decl.* ¶ *27; Chen Decl.* ¶ *8(c).* It recognizes that, by statute, the assets of an EOWP are owned by the state. *Clarke Decl.* ¶ *13.* The assets Sinotrans manages are owned by the state because Sinotrans is an EOWP. Sinochart is no more than an asset that is managed by Sinotrans but owned by the state.

The thrust of Plaintiff's experts' declarations is to persuade the Court about their personal interpretations of the Chinese statutes, based on their personal views of the statutes' intent. However, the statutes are clear on their face, and "[i]t is axiomatic that the plain meaning of a statute controls its interpretation, . . . and that judicial review must end at the statute's unambiguous terms. . . . Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." *Lee v. Bankers Trust Company*, 166 F. 3d 540, 544 (2d Cir. 1999)(citation omitted); *see also Pitway Corp. v. U.S.*, 88 F. 3d 501, 505 (7th Cir. 1996):

> Nonetheless, we may not ignore the structure set up in the French legislation just because some think it might not be having its desired effect. There can be no dispute that French law clearly and consciously requires shareholder approval of dividends before the board of directors action is legally binding. Indeed, the law specifies that 'any dividend distributed in violation of these rules is an unlawful dividend.' Pittway's invitation to look beyond the formalities of French law fails to take into account the subtle but important differences that exist between corporate governance arrangements in France (and other countries) and those typically found in the United States. . . ."

The fundamental governing principle of Chinese law on EOWPs was succinctly laid out in *Trans Chemical Ltd. v China National Machinery Imp. and Exp. Corp.* 978 F. Supp. 266, 284-85 (S.D. Tex. 1997) based largely on the testimony of Ocean Lines' own expert witness, Donald Clarke:

> The Civil Law also embodies the reform principle of separating state ownership of industrial enterprise assets from enterprise operation and management rights. A state-owned industrial enterprise the right to "operate according to law *state*

> *property* that has been given to it to operate and manage." (Civil Law, Art. 82 (emphasis added [by the Court]).
>
> * * *
>
> The Industrial Enterprises Law seeks to encourage management autonomy, while at the same time maintaining state ownership of enterprise assets. It does so by separating ownership rights from operation and management rights.
>
> The property of an enterprise shall belong to the whole people and shall be operated and managed by the enterprise with the authorization of the State, in accordance with the principal of separating ownership rights and management rights. An enterprise shall enjoy the right to possess, use and legally dispose of property which the State has authorized it to operate and manage. Industrial Enterprises Law, Art. 2.

Plaintiff's witnesses suggest that three out of four indicia of ownership were assigned to the EOWP, so that the EOWP in some sense (legal or extra-legal is not clear) owns the property. But those indicia of ownership were assigned in the sentence that immediately follows the sentence that says the property <u>belongs to the State</u>, and that <u>ownership</u> is <u>separate</u> from management of property. Assigning some "indicia" of ownership is not assigning ownership. There is nothing unclear about that in the Chinese statutes. Notably, one of the common indices of ownership of one business entity by another that Prof. Clarke opined upon in *Transchemical* was "who gets paid if a state-owned enterprise is sold, merged, or liquidated." 978 F. Supp. at 281 (quoting Clarke). As shown by Sinochart's PRC counsel, Mr. Song Dihuang in his Second Declaration, the PRC could transfer Sinochart to a different entity (or to the supervision of a different entity), and Sinotrans would be paid nothing. *See 2d Song Decl.* ¶ *19.*

Plaintiff's witnesses further suggest that the clear words of the law governing EOWPs do not apply to "second tier" EOWPs that are managed by "first tier" EOWPs. But they have not referred to any statutory language that says that, only their own interpretation of the intent of the law, which is inadmissible under *Lee*, *Pitway*, and similar cases.

As is set forth below, Sinochart is an agency or instrumentality of the PRC government.

### A. The PRC owns all of Sinochart's ownership interests

Plaintiff concedes that Sinochart meets the first and third requirements of FSIA section 1603(b). *See Plaintiff's Memo of Law at 7.* Plaintiff further concedes that the only question is whether Sinochart can prove "majority ownership by a foreign state." *Plaintiff's Memo of Law at 7.* That being the sole issue on which Plaintiff opposes Sinochart's motion to vacate, Sinochart respectfully submits that its motion to vacate must be granted because as a matter of the laws of the PRC, Sinochart is owned by the PRC government. In addition to Sinochart's original moving papers and supporting declarations, it now submits: the Second Declaration of Dihuang Song, and the Declarations of: Professor Wang Baoushu ("*Wang Decl.*"), Professor Jiang Ping ("*Jiang Decl.*") and Professor Si Yuzho ("*Si Decl.*"), all of which conclusively demonstrate that regardless of the factual contentions Plaintiff raises in its opposition papers, as an EOWP Sinochart is, as a matter of PRC law, owned by the PRC government, notwithstanding its relationship with non-party Sinotrans.

Large swaths of the Plaintiff's expert Declarations are devoted to a misconstrued discussion of the alleged management and control of Sinochart by non-party Sinotrans, itself an instrumentality of the PRC. *See 2d Song Decl. ¶¶ 5, 6.7, 6.9, 16-19; Si Decl. ¶¶ 14 et seq.; Wang Decl. ¶ 20.* Trying to shoehorn the facts of this case within the fact pattern presented in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), Plaintiff wrongly poses the key issue relevant to this motion "whether a corporate subsidiary can claim instrumentality status where the foreign state [does] not own a majority of the subsidiary's shares directly but rather a majority of the shares[1] of a corporate parent positioned one or more "tiers" above that subsidiary." *Plaintiff's Memo of Law at 8, quoting Dole,* 538 U.S. at 471.

---

1 The PRC's "ownership by the whole people" form of ownership comes squarely within the FSIA language addressed in *Dole* and cannot be so easily set aside by Plaintiff's efforts to bootstrap Western corporate methods into

Plaintiff misses the mark, however, because Sinochart does not, and never has, conceded that it is "owned" by Sinotrans and Plaintiff has failed to prove otherwise.[2] Rather, as is set forth in detail in the supporting declarations of Sinochart's experts, Sinochart has at all relevant times been a state owned enterprise. Sinochart is not a corporation (despite its name). Rather, it is a "non-incorporated enterprise legal person," and an "enterprise owned by the whole people" that is not subject the PRC Company Law as Plaintiff contends. *See Jiang Decl. ¶ 33; Wang Decl. ¶ 9.* As such, its property is by law owned by the PRC, *i.e.* the Chinese state. Any inference drawn from other documents or evidence is inconsistent with the provisions of Chinese law. *Id.* ¶ 32. In *Dole*, the Court discussed the statutory language of section 1603(b), in particular the phrase "other ownership interest" The Court explained "[t]he statute had to be written for the contingency of ownership forms in other countries . . . that depart from conventional corporate structures. The statutory phrase 'other ownership interest' is best understood to accomplish this objective." *Dole,* 538 U.S. at 476. Notwithstanding Plaintiff's efforts to cast the PRC system of ownership in Western legal terms, it is obvious as set forth herein that the PRC government owns Sinochart's "other ownership interests."

The focus of Plaintiff and its experts on the operational relationship between Sinochart and Sinotrans is irrelevant to the question of whether Sinochart is an agency of instrumentality of the PRC. The Supreme Court in *Dole* made clear that: "[c]ontrol and ownership . . . are distinct concepts . . . . Majority ownership by a foreign state, not control, is the benchmark of

---

the FSIA analysis. Plaintiff's attempt to equate "ownership by the whole people" with the Western corporate legal concept of stock ownership utterly fails because it is completely at odds with the system of social ownership inherent in the PRC Enterprise Law under which Sinochart was created.

[2] Such ownership status was a key concession necessarily made by the Israeli defendants in *Dole*. See *Patrickson v. Dole Food Co.,* 251 F.3d 795 (9th Cir 2001). It is noteworthy also that when before the Supreme Court the Israeli defendants apparently argued that "other ownership interest" should include a state's interest in its instrumentality's subsidiary. See *Dole v. Patrickson*, 538 U.S. at 476. Thus, to be clear, the argument presented by the Israel defendants to the Supreme Court in Dole is not at all the argument presented by Sinochart to this Court. In Israel, there is no concept of an entity "owned by the whole people."

instrumentality status."[3] *Dole*, 538 U.S. at 477. Thus, whether Sinotrans oversees or controls Sinochart (a point Sinochart does not dispute), is irrelevant to its status as an agency of instrumentality under 28 U.S.C. § 1603(b). *See Dole*, 477 U.S. at 477. However, Sinotrans oversight or control over Sinochart must not be taken to mean that it is, as Ocean Line would have this Court find, the "corporate intermediary" between Sinochart and the Chinese government. As an EOWP itself, Sinotrans is simply incapable, under Chinese law, of owning Sinochart. *See Jiang Decl.* ¶¶ *32-33; 2d Song Decl.* ¶¶ *9, 24; Si Decl.* ¶¶ *18, 26-27, 32.*

In unsuccessfully arguing that Sinochart is directly owned only by Sinotrans, Plaintiff relies heavily on the Declarations of Professors Clarke, deLisle and Chen. Plaintiff and its experts pay lip service to Sinochart's form of ownership under the PRC law on enterprises "owned by the whole people." In an effort to prove Sinochart is not "directly" owned by the PRC, Plaintiff and its experts provide a discourse on "direct" versus "indirect" ownership, which is not a concept known to the Chinese legal system, nor are they terms used in any of the relevant PRC laws. Unlike the opinions given by Sinochart's experts which make clear that under PRC law Sinochart and its property are entirely owned by the State,[4] *i.e.* the PRC, Plaintiff's experts depart from the plain language of PRC law and provide conjecture based on comparisons of the Chinese legal system to Western corporate legal concepts which have little, if any, relevance.[5]

---

3 Plaintiff's reliance on *Edlow Int'l Co. v. Nuklearna Elektrarna Krsko*, 441 F. Supp. 827 (D.D.C. 1977) clouds the issues. Using *Edlow's* dicta, Plaintiff frames Sinochart's position as one based on titles or labels rather actual ownership. Were this actually the case Plaintiff would be right to cite *Edlow*. However, this the attempt is futile since Sinochart has carried its burden under the FSIA analysis showing it is entirely owned by the PRC.

4 *See 2d Song Decl.* ¶¶ *15-16, 22.*

5 In seeking to recast the plain meaning of "owned by the whole people" under the PRC Enterprise Law, Plaintiff coyly uses nomenclature such as "beneficial ownership," "corporate intermediaries," "corporate ladder," "shareholding", and "indirect versus direct ownership" in an effort to graft Western corporate legal concepts onto Chinese entities originally created (*see 2d Song Decl.* ¶¶ *6.2 – 6.9)* in the 1950's during the midst of the then nascent Cold War. Such legalistic mischief is understandable given Ocean Line's lack of evidence showing Sinochart to be other than wholly owned by the PRC. Yet, it should be noted for what it clearly is: an end run from the evidence showing Sinochart to be wholly owned by the PRC.

Stripped of their rhetoric, the opinions of Plaintiff's experts are in accord with the position Sinochart and its experts advance. In particular, this Court needs look no further than the testimony of Plaintiff's expert, Professor Clarke, in the case of *Trans Chemical Ltd. v. China National Machinery Import and Export Corp.*, 978 F.Supp. 266 (S.D. Tx. 1997), which that court *accepted* in finding the defendant was an agency of instrumentality under the FSIA. In *Trans Chemical,* the court summarized Professor Clarke's opinions, in part, as follows:

> the argument that "ownership by the whole people" is somehow different from "state ownership'" after 1988 has no basis in fact or in Chinese law or legal theory and lies in the realm of abstract political theory. Article 7 of the Chinese Constitution equates "ownership by the whole people" with "state ownership" when it speaks of "the state-owned economy, i.e., the economy under the socialist system of ownership by the whole people . . . ." Article 5 of the 1994 PRC Regulations Governing the Supervision and Management of State-Owned Enterprises' Property provides: "Enterprise property is owned by the whole people, that is, owned by the state." Finally, Article 41 of the 1992 PRC Regulations on the Transformation of the Management System of Enterprises states: ***"The assets of the enterprise are under ownership by the whole people, i.e., ownership by the state. The State Council exercises the right of ownership over enterprise assets on behalf of the state." The state is, therefore, declared to be the owner of industrial enterprises like CNMC; and the State Council, an identifiable government body, is declared to be the body that exercises the right of ownership on behalf of the state.***
>
> The Chinese state has broad ownership rights. Under Article 41 of the 1992 Regulations state-owned industrial enterprise assets include assets invested in the enterprise by the state in various forms and the return on those assets. Enterprise profits thus belong to the government, not to the enterprise itself. That the government allows some profits to remain in the enterprise in no way negates its claim to receive them at will. Article 42 of the 1992 Regulations makes it clear that governmental departments in charge of an enterprise have the right to decide how enterprise profits shall be allocated between the government and the enterprise.

*Trans Chemical*, 978 F. Supp. at 280-81.

Despite his unsupported opinion that Sinotrans "owns" Sinochart and that the PRC is merely an "indirect" owner of Sinochart, a proposition, as aforesaid, not supported by relevant Chinese laws, Professor Clarke apparently still holds true to his *Trans Chemical* opinion

regarding the meaning of "ownership by the whole people" under Chinese law. Specifically, at paragraphs 12 and 13 of his Declaration submitted in this case he reiterates verbatim most of the quoted language above from *Trans Chemical.*

Ultimately, the *Trans Chemical* court held:

> the court concludes that Chinese industrial enterprises "owned by the whole people" . . . are "state-owned," with proprietary rights exercised by the State Council on behalf of the state. Because CNMC is state-owned the court also concludes that CNMC is an agency or instrumentality of the People's Republic of China within the meaning of 28 U.S.C. § 1603(b)(2) (an "entity a majority of whose shares *or other ownership interest* is owned by a foreign state or political subdivision thereof" is an agency or instrumentality of a foreign state).

*Trans Chemical,* 978 F.Supp. at 290. The First and Second Declarations of Mr. Dihuang, and those of Ms. Xing, and Professors Jiang, Wang and Si, make it abundantly clear that, pursuant to the PRC laws under which Sinochart was created and exists, the ownership of Sinochart (and of its assets) is identical to that of the defendant in *Trans Chemical*, *supra.* Because the concept of indirect ownership is not found in Chinese law, the attempt by the Plaintiff and its experts to inject it into this case is nothing more than an attempt to put a square peg in a round hole.[6] The key consideration, as *Dole* mandates, is majority ownership, not control. "[c]ontrol and ownership . . . are distinct concepts . . . . Majority ownership by a foreign state, not control, is the benchmark of instrumentality status. *Dole*, 538 U.S. at 477.

---

6 Plaintiff cites to *Bank of China, New York Branch v. NBM, L.L.C.*, 2002 U.S. Dist. LEXIS 9468 (S.D.N.Y. 2002) for the principle that a subsidiary of a parent instrumentality under the FSIA will not itself be protected. However, the facts of *Bank of China*, of which this Court is well aware, are not squarely on point with this case. Although not set out within the reported decision, it appears that Bank of China itself was easily found to be a "foreign state" since it was "wholly owned by the People's Republic of China." *Bank of China*, 2002 U.S. Dist. LEXIS 9468, *12. The "wholly owned" finding is entirely consistent with China's constitutionally based "enterprise owned by the whole people" form of ownership.

In Bank of China, the sole defendant found lacking FSIA immunity was the Bank of China, Hong Kong branch. The opinion makes clear that this defendant was, unlike the other unincorporated branches of Bank of China, Head Office, admittedly wholly owned by Bank of China, Head Office. This is unlike the situation here where Sinotrans and Sinochart are both EOWPs albeit one, Sinotrans, has been vested with authority to control the other, Sinochart. It is likely, given the time periods involved in the case, that Bank of China, Hong Kong, was created as a wholly owned subsidiary of Bank of China, Head Office while Hong Kong was still governed by the United Kingdom which transferred sovereignty of Hong Kong to the Chinese government on July 1, 1997.

The *Trans Chemical* court in its conclusions further described state ownership under the PRC Enterprise Law as follows:

> Under this separation of ownership rights and operation and management rights, state-owned assets are entrusted to industrial enterprises to operate and mange," not own. . . . The state retains ownership of enterprise assets, and there is no suggestion in the Industrial Enterprises Law or its implementing regulations that the state is giving up its ownership rights in the enterprise property.

*Trans Chemical*, 978 F.Supp. at 288. This basic principle refutes Plaintiff's self-serving declaration that "… formation under the EOWP legislative scheme does not carry with it direct state ownership of every EOWP entity." *Plaintiff's Memorandum of Law at 14*. Contrary to Professor Clarke's mincing in this case of his straightforward testimony in *Trans Chemical* this is exactly the effect of the creation of an entity under the Law of the IEOWP. The *Trans Chemical* court's description of enterprise ownership under the PRC Enterprise Law is totally consistent with the ownership of Sinochart. Thus, for the same reasons stated by the *Trans Chemical* court and based on the evidence provided by Sinochart's experts, as conceded by Plaintiff's experts, Sinochart is owned not by Sinotrans, but entirely by the PRC government.

**B. Sinochart is an instrumentality under the "organ" prong of § 1603(b)**

Alternatively to Sinochart's proof that the PRC government is the majority owner of its "ownership interests" (*see Point I(A), supra*), Sinochart alternatively contends that it is an instrumentality under the "organ" prong of section 1603(b). The court in *RSM Production Corp. v. Petroleos de Veneuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208 (D. Co. 2004) described the analysis as follows:

> Several factors are relevant to an assessment of organ status under the FSIA. These factors include (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; (6) the entity's obligations and privileges under

> the foreign state's laws; and (7) the ownership structure of the entity. *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3rd Cir. 2003). No one factor is determinative. *Id.*

*Id.* at 1215. The *PDVSA* court concluded that the defendant entity was, in fact, an agency or instrumentality of the Venezuelan government even though it was entirely owned by the main defendant, PDVSA, which in turn itself was owned by the Venezuelan government. The court determined that despite the indirect ownership by the Venezuelan government, the involved entity was closely involved with the government and discharged functions of a public nature. *Id.* As was further explained by the court in *Vivas v. Boeing Co.*, 2007 U.S. Dist. LEXIS 61625 (N.D. Ill. August 21, 2007):

> There is no clear test for determining agency or instrumentality status under the organ prong of section 1603(b)(2). . . . This flexible approach is supported by the legislative history of the FSIA, as reflected in the following statement: "As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name." H.R. Rep. No. 94-1847, at 15-16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614.

*Vivas*, 2007 U.S. Dist. LEXIS at *15-16. The court continued, reasoning:

> "The federal courts have recognized as organs such quasi-public entities as national banks, state universities and public television networks." *EOTT*, 257 F.3d at 997. Regarding state-owned airlines in particular, the court in *Shirobokova* v. *CSA Czech Airlines, Inc.*, 335 F. Supp. 2d 989, 990-91 (D. Minn. 2004), found that an airline, which had been continuously owned and operated by the government of the Czech Republic or its predecessors, served as the state carrier of the former Czechoslovokia, and was 91 per cent owned (albeit indirectly) by the government of the Czech Republic, qualified as an organ.

In this case, the flexible "organ" factors support a finding that Sinochart is entitled to agency or instrumentality status under the organ prong of section 1603(b). In particular, it is important to note that there appears to be no disagreement among any of the experts in this case

that Sinotrans is directly and wholly owned by the PRC government. For example, Mr. Chen, provides evidence that Sinotrans is a "central enterprise" created by the PRC. He also goes on to point out that Sinochart was created by Sinotrans for the purpose of carrying out its chartering business. *See Chen Decl. ¶¶ 36, 62, 71.* In his Second Declaration, Mr. Song provides documentary proof that Sinochart was created together with Sinotrans in 1955. *See 2d Song Decl. ¶¶ 6.2 – 6.9, 7.* He also shows that they were operated by common employees and were really "one institution with two boards." *Id. ¶ 6.4, 7.* He also provides proof that all of the initial capital for both companies came from the PRC government. *Id. ¶ 7.* Further, its business scope is to charter ships and perform related activities in relation to Sinotrans' activities. *See Chen Decl. ¶ 11.* Finally, as Mr. Song makes clear, Sinotrans exercises oversight over Sinochart on behalf of the PRC government pursuant to executing its own business purpose under the auspices of the PRC government. *See 2d Song Decl. ¶ 21.*

Thus, applying the foregoing "flexible" factors, Sinochart is an instrumentality of the PRC government under the "organ prong" of FSIA section 1603(b), despite its relationship with Sinotrans and regardless of whether Sinotrans "owns" Sinochart, which is in any event denied.

**POINT II**

**FSIA SECTION 1609**
**BARS PREJUDGMENT ATTACHMENT OF SINOCHART'S PROPERTY**

Additionally, Sinochart's assets, such as the funds that are currently restrained in this action, are merely managed by Sinochart, but owned by the state. Such funds are "property in the United States of a foreign state" (*i.e.* owned by the whole people, which means owned by the state) and immune from attachment.

The *Dole* decision, upon which Plaintiff heavily relies, states:

> A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. . . . A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary . . . . A holding corporation does not own the subsidiary's property.

*Dole*, 538 U.S. at 474-475. Thus, whether or not Sinotrans "owns" Sinochart as a subsidiary (which, as set forth above, Sinochart submits is inaccurate), Plaintiff and all of its expert witnesses are in agreement that under the Chinese system of "ownership by the whole people" *all* of the property of Sinochart (and Sinotrans for that matter, which if Plaintiff is to be believed would include Sinochart and all of its property in any event) is undeniably owned by the "whole people" or the State, *i.e.* the PRC. *See, e.g. Clarke Decl. ¶ 13; deLisle Decl. ¶¶ 75-84, 116; Chen Decl. ¶¶ 62, 68-70, 77-79, 99.*

For example, the concluding paragraph of Plaintiff's expert, Professor deLisle states: "The most that could be plausibly claimed is that Sinochart is indirectly owned by the state. Sinochart's status as an enterprise under the system of ownership by the whole people and Sinochart's operation with assets or capital that are, . . . .<u>'property of the state' or 'owned by the whole people'</u> do not alter these conclusions." *See deLisle Declaration ¶ 116.* There is, however, no basis in any of the Chinese laws for Prof. deLisle's insertion of the word "indirectly." Professor deLisle also admits that:

> "Chinese Law does provide that enterprises under the system of ownership by the whole people operate at least partly with assets that are "state assets" . . . and " Chinese law does impose a variety of obligations on enterprises, including enterprises under the system of ownership by the whole people, in how they handle "state owned" assets assigned to them."

*See deLisle Decl. ¶¶ 82-83.* He further makes clear that the "claim to ownership of the key assets of an enterprise remains with "the state." *Id. at ¶ 99.* That ownership of an EOWP's property and assets at all times remains with the State is made clear by Professor deLisle's

reference to Articles 2 and 63 of the PRC Enterprise law providing for punishment of the EOWP's managers if the enterprise goes into bankruptcy:

> enterprises under the system of ownership by the whole people are responsible for their own profits and losses and bear civil liability with assets they are authorized to manage or operate. Such enterprises and their managers individually also face sanctions for failure to fulfill a variety of legal obligations and they also face the prospect of bankruptcy and punishment for mangers responsible for the enterprises insolvency.

The manager of a private company that owns private assets would not be punished by the State if the company went into bankruptcy. Obviously, any punishment is meted out in China because of the mismanagement of <u>state-owned</u> assets. *deLisle Decl.* ¶ *26.* In this respect, Professor deLisle's opinions are entirely consistent with those of Sinochart's experts. *See Jiang Decl.* ¶ *21-25, 32.*

In *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002), the Court analyzed a foreign state's ownership rights in assets possessed by its instrumentality under circumstances where the instrumentality had waived its immunity. In determining whether the foreign state (Indonesia) owned the funds in question, in which case they would be immune under the FSIA, or the instrumentality owned the funds, in which case immunity had been waived, the court (quoting the district court) reasoned: "'Under absolute Hornbook law, the Court must look past that and must recognize any property rights in that money which belong to any other parties . . . such as the right of a beneficiary to a trust or some similar kind of property right.'" *Id.* at 86 fn. 16.

The *Karaha* court held that the funds were owned by the Indonesian government despite the fact that they were possessed by the instrumentality, reasoning, "[l]ike a trustee, [the instrumentality] possesses the remaining funds but has no ownership interest in them. *Cf. Wulff v. Roseville Trust Co., 164 A.D. 399, 404-05, 149 N.Y.S. 683, 687* (1st Dept. 1914) ("Property

which a debtor holds in trust for others . . . is not subject to an attachment issued against his property."). *Id.* at 92. *Karaha* is directly analogous to this case because here, ownership of all of the funds that Plaintiff has attached indisputably remains with the State, i.e. the PRC government. On the question of ownership of the property that Sinochart possesses as an EOWP, all of the experts for both parties are in agreement that ownership remains with the PRC.

As set forth in Sinochart's main brief, section 1609 of the FSIA provides, "the property in the United States of a foreign state shall be immune from attachment arrest and execution." As set forth at point I, above, Sinochart is entitled to immunity under section 1603. However, even if Plaintiff were correct that Sinochart is *not* an agency or instrumentality because of alleged "tiered" ownership, which is denied, the attachment must nevertheless be vacated because the funds in question are absolutely immune from prejudgment attachment because there is no dispute that they are owned by the PRC. In its opposition Memorandum of Law Plaintiff failed entirely to address this issue, despite the discussion of the asset ownership issue by all of its experts in their respective declarations.

**POINT III**

**<u>SINOCHART IS ENTITLED TO COUNTERSECURITY</u>**

In the alternative, Sinochart is entitled to countersecurity in the sum of $9,640,457.89. In its opposition Plaintiff merely claims that Sinochart's counterclaim is "overstated." However, it is not the province of this Court to address the merits of Sinochart's counterclaim, as Plaintiff readily concedes. As Judge Sullivan recently recognized in *Front Carriers Ltd. v. Transfield ER Cape Ltd.*, 2007 U.S. Dist. LEXIS 85177 (S.D.N.Y. November 19, 2007). "The overwhelming weight of authority among courts in this Circuit, and in other circuits, favors the view that, with regard to the merits of the movant's counterclaim, the court should do no more than screen out

'totally frivolous claims' by the counterclaimant upon review of a motion under Rule E(7))." *Id.* at *6. The opinion of Plaintiff's expert barrister that Sinochart is not entitled to recover on its counterclaim goes right to the very heart of the merits of the counterclaim itself but does not prove that Sinochart's counterclaim is "totally frivolous." Thus, because Sinochart's counterclaim is *prima facie* valid the Court should not engage in an analysis of the merits and when the Plaintiff has succeeded in attaching the Defendant's property, countersecurity must be ordered to put the parties in a position of equality on security.

## CONCLUSION

For all of the foregoing reasons the attachment of Sinochart's funds must be vacated. In the alternative, Plaintiff should be ordered to post countersecurity in the sum of $9,640,457.89, with the further condition that if Plaintiff does not post such countersecurity within 10 business days the September 20, 2007 Ex Parte Order should be vacated.

Dated: November 30, 2007
New York, New York

The Defendant,
CHINA NATIONAL CHARTERING CORPORATION

By: ______________________

Patrick F. Lennon (PL 2162)
Kevin J. Lennon (KL 5072)
LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 (phone)
(212) 490-6070 (fax)

**AFFIRMATION OF SERVICE**

I hereby certify that on November 30, 2007, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Patrick F. Lennon