UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                                    Plaintiff,                    07-CV- 8123 (DC)

           - against –


CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                                    Defendant.
------------------------------------------------------------------x


## PLAINTIFF OCEAN LINE HOLDINGS' *SUR-REPLY* MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SINOCHART'S MOTION TO VACATE


Of Counsel:

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Ocean Line Holdings Limited
80 Pine Street
New York, NY 10005
(212) 425-1900  (212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)

NYDOCS1/297983.1

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................. i

PRELIMINARY STATEMENT ........................................................................ 1

SUMMARY OF ARGUMENT ON SUR-REPLY.......................................... 1

REPLY ON THE FACTS.................................................................................. 2

POINT I

SINOCHART IS NOT AN INSTRUMENTALITY AND THUS NOT ENTITLED
TO IMMUNITY UNDER THE DOLE DIRECT OWNERSHIP STANDARD AND
DOES NOT HAVE "ORGAN" STATUS UNDER THE CONTROLLING
CRITERIA. ........................................................................................................ 3

    A.    The Structure of Current Day Sinochart Demonstrates that it is a
    Subsidiary of Sinotrans. Under Dole, it is this Structure which
    Controls the Determination of Immunity, Not Formation under the
    EOWP Label. .............................................................................................. 3

        (i)    A brief review of the development of Sinochart's arguments is
        helpful to put the new arguments it raises in reply into
        perspective. ........................................................................................ 4

        (ii)    Sinochart is very much a subsidiary of Sinotrans, and a
        creation of recent vintage. ............................................................... 5

        (iii)    Sinochart's "EOWPs cannot own anything" argument is
        wrong and would make a mockery of Dole............................................ 9

    B.    Similarly, Sinochart Does Not Qualify as an Organ under the FSIA. .................. 12

POINT II

SINOCHART'S ASSET-BASED IMMUNITY ARGUMENT FINDS NO SUPPORT
IN THE LAW ......................................................................................................... 16

    A.    Sinochart's Asset-Based Immunity Argument is Not Supportable. ..................... 16

    B.    Plaintiff is Entitled to a Declaratory Judgment that Enforcement Can be
    Had Against the Assets of Any EOWP................................................................. 19

POINT III

VACATUR OF THE ATTACHMENT IS NOT WARRANTED UNDER ANY CIRCUMTANCES, BUT IN THE ALTERNATIVE, AND IF VACATUR IS CONSIDERED, DISCOVERY AND A HEARING ARE WARRANTED. ................................ 20

POINT IV

SINOCHART'S APPLICATION FOR COUNTERSECURITY IS OVERSTATED................. 20

CONCLUSION.................................................................................................................... 21

CERTIFICATE OF SERVICE .......................................................................................... 22

## TABLE OF AUTHORITIES

PAGE

## CASES

*Beacon Const. Co., Inc. v. Matco Electric Co., Inc.,*
521 F.2d 392 (2d Cir. 1975)......................................................................... 19

*Burnett v. Al Baraka Inv. & Dev. Copr. (In re Terrorist Attacks),* 349 F.Supp.2d 765, 792
(S.D.N.Y. 2005) ............................................................................................ 20

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
991 F.2d 1012, 1016 (2d Cir. 1993)............................................................. 5

*Dole Food Co. v. Patrickson,*
538 U.S. 468, 481 (2003) ........................................................... 6, *passim*

*Filler v. Hanvit Bank,*
378 F.3d 213, 218 (2d Cir. 2004).............................................. 9, *passim*

*In re Magnetic Audiotape Antitrust Litig.,*
334 F.3d 204, 208 (2d Cir. 2003)................................................................ 20

*In re Terrorist Attacks on September 11, 2001,*
392 F. Supp. 2d 539, 546 (S.D.N.Y. 2005)........................................... 13, 20

*Karaha Bodas Co. LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
313 F.3d 70 (2d Cir. 2002)...................................................................... 16, 17

*Murphy v. Korea Asset Mgmt. Corp. (KAMCO),*
421 F.Supp. 627, 641 (S.D.N.Y. 2005)..................................................... 5, 14

*Peninsula Asset Mgt. (Caymen) v. Hankook Tire Co.,*
476 F.3d 140 (2d Cir. 2007)......................................................................... 13

*RSM Prod Corp. v. Petroleos de Venezuela Societa Ananima (PDVSA),*
338 F. Supp. 2d 1208 (D. Co. 2004) ........................................................... 15

*Virtual Countries, Inc. v. Republic of South Africa,*
300 F.3d 230, 241-42 (2d Cir. 2002) ........................................................... 5

*Vivas v. Boeing Co.,*
2007 U.S. Dist. LEXIS 61625 (D. Ill. 2007) .............................................. 15

**STATUTES**

28 U.S.C. §1603(b) ................................................................................................ 12

28 U.S.C. §2201(a) ............................................................................................... 19

NYDOCS1/298214.1

**PRELIMINARY STATEMENT**

Plaintiff Ocean Line submits this sur-reply memorandum in response to the reply submissions filed by Defendant Sinochart in respect to its motion to vacate. For the reasons outlined below and in the accompanying Declarations, the new materials and arguments raised by Sinochart in its reply papers do not support a finding of direct PRC ownership or organ status and thus do not support vacatur of the attachment under the FSIA.[1]

**SUMMARY OF ARGUMENT ON SUR-REPLY**

Despite the girth of the submissions now before the Court on the issue of FSIA immunity, the fundamental issue which will drive the outcome in this case remains relatively straightforward by virtue of the Supreme Court's holding in *Dole*. In the wake of *Dole*, there can be no debate that the governmental interest in the company seeking immunity must be immediate and direct. Under *Dole*, once you move away from such a direct one-on-one relationship between the entity and the foreign state, there is no immunity. It matters not that ownership can be *traced* through some other entity to the foreign government, be it via shareholding interests or some other form of ownership.

In this case, the reality is that Sinochart is a subsidiary of Sinotrans. They describe themselves as such; the documentary evidence of formation, capitalization and structure confirms this relationship; and the law of the PRC acknowledges such a tiered relationship even within the EOWP framework of legal entities. Sinochart, through its experts, asks the Court to ignore that reality and instead focus solely on the EOWP "label" as evidence of the requisite

---

[1] This memorandum also supplements Plaintiff Ocean Line's response to Sinochart's application for counter-security and incorporates a request for alternative declarative relief in the wake of Sinochart's new argument that it is the *asset*, as opposed to the *entity*, that should be the focus of inquiry for immunity under the FSIA. These two issues are addressed, respectively, in Points IV and II(B), *infra*.

direct relationship. But under *Dole*, it is the structure which dictates the outcome, and having Sinotrans (the parent) as the intermediary deprives Sinochart of immunity as an "instrumentality" of the PRC. (*See* Point I(A)).

Sinochart's new "organ" status argument, raised for the first time in its reply papers, is equally without merit. The record is devoid of any evidence which would even remotely satisfy the criteria for immunity on this basis, and this new argument should be summarily rejected. (*See* Point I(B)).

Finally, Sinochart's "asset" immunity argument – another argument raised for the first time on reply – should similarly be rejected. Here, Sinochart asserts that the Court's inquiry should focus on the asset itself, not the entity, in the examination of the application for immunity. Such an argument finds no support in the law, or the facts of this case, and indeed presents the Court with an extraordinary judicial admission (*i.e.* that EOWPs actually own nothing) with far reaching ramifications which (if accepted) would trigger an interesting and concomitant right to declaratory relief regarding ultimate enforcement of any arbitration award. (*See* Point II).

## **REPLY ON THE FACTS**

To the extent the facts are relevant to the arguments raised in the sur-reply, and they are, they are incorporated into the argument sections of this brief and are thus not repeated here. The Court, however, is respectfully referred to the very detailed, comprehensive and thoughtful reply submissions (i) by Mr. Weidong Chen in his Second Declaration, which provides a summary of the true historical development and formation of the Sinochart entity now before the Court, as well as its structure and relationship with its parent entity Sinotrans ("Second Chen Decl"); and (ii) by Mr. Donald Clarke in his Second Declaration, which succinctly demonstrates that parent

and subsidiary relationships exist in the context of EOWPs, EOWPs do indeed own their assets, and the new position asserted by Sinochart is wholly inconsistent with its own documentation, its prior presentation, and official filings from the PRC.[2]  (*See* "Second Clarke Decl." and Second deLisle Decl.).

**POINT I**

**SINOCHART IS NOT AN INSTRUMENTALITY AND THUS NOT ENTITLED TO IMMUNITY UNDER THE *DOLE* DIRECT OWNERSHIP STANDARD AND DOES NOT HAVE "ORGAN" STATUS UNDER THE CONTROLLING CRITERIA.**

In its reply submissions, Sinochart re-asserts its supposed direct PRC ownership argument, albeit now from a slightly different factual angle.  While paying lip-service to the *Dole* decision, Sinochart essentially retreats to the argument that the Court should apply the pre-*Dole* holding in *Trans Chemical* because as an EOWP, Sinotrans' existence as the parent should be ignored by the Court.  (*See* Sinochart Reply Br. at Point I(A)).  Sinochart next advances a new argument that it qualifies as an "organ" of the PRC.  (Sinochart Reply Br. at Point I(B)).  Neither argument carries the day.  Each is addressed below.

**A.    The Structure of Current Day Sinochart Demonstrates that it is a Subsidiary of Sinotrans.  Under *Dole*, it is this Structure which Controls the Determination of Immunity, Not Formation under the EOWP Label.**

Sinochart's relationship with its parent Sinotrans is the principle reason why it is not entitled to immunity under the FSIA.  Sinochart recognizes this impediment, so in its reply, it embarks on a somewhat Herculean effort (*i.e.* it utilizes multiple new "experts") to try to diminish the role played by its parent Sinotrans and, in effect, portray Sinochart as a stand alone

---

[2] By way of immediate example, a document issued by the PRC State Tax Administration lists Sinochart as a wholly-owned subsidiary (*quanzi zigongsi*) of Sinotrans.  (*See* Clarke Second Decl. ¶15).  Obviously, the concept of EOWP subsidiaries is not quite as foreign to the PRC, as Sinochart would want this Court to believe.  (*See also* Second deLisle Decl. at 2-3.)

entity with the requisite direct relationship with the PRC. But it is hard to re-write history and Sinotrans' role as parent cannot be diminished and certainly should not be ignored. In fact, it is Sinotrans' position as parent that brings this case squarely within the *Dole* holding. Try as it might, this is not *Trans Chemical* revisited, and Sinochart's latest effort to demonstrate the requisite direct governmental relationship with reference merely to the EOWP "label" will not suffice to side-step *Dole*.

> (i)    *A brief review of the development of Sinochart's arguments is helpful to put the new arguments it raises in reply into perspective.*

At this stage of the proceeding, it would be helpful to step back for a brief moment and review the progression of arguments in Sinochart's motion papers. Initially, Sinochart stood before the Court in a relatively simple presentation claiming to be a "corporation" that was directly owned by the PRC. (Xing Nai Qun Decl. ¶5; Dihuang Orig. Decl. ¶4 and Sinochart Orig. Br. at 6). In that presentation, Sinotrans (*i.e.* the parent) barely featured and was quickly discarded in favor of this simple and supposed direct governmental ownership argument in what Sinochart had, no doubt, hoped would be a quick order of vacatur.

As outlined in Plaintiff's original opposition papers, the actual structure was not nearly as simple, or direct, as Sinochart suggested it was. Instead, Plaintiff Ocean Line demonstrated that there was an intermediary (*i.e.* Sinotrans) between the PRC and Sinochart, and the true relationship between Sinotrans and Sinochart was that of parent and subsidiary. As previously outlined, *Dole* makes plain that if the structure of the entity seeking immunity leaves it once removed from the state - be it through intermediate stock ownership or some "other ownership interest" - immunity will not lie. That intermediary layer thus deprived Sinochart of immunity under *Dole*. (*See, e.g.* Plaintiff's Orig. Br. and accompanying Declarations).

In its reply submissions, Sinochart is dancing a bit faster, having now been forced to fess up (so to speak) and deal with the role of Sinotrans in this relationship. As a consequence, Sinochart has tried to re-shape the basis upon which it claims to have a direct governmental relationship with the PRC. It does this in two ways.

First, and from a factual standpoint, Sinochart tries to circumvent the reality by arguing, through multiple "expert" declarations, that it really is not a subsidiary at all. (*See, e.g.,* Song Second Decl. 24; Si Decl. 32). Here, Sinochart wheels in all sorts of new experts proclaiming they have divined Sinochart's genealogy, and if the Court would oblige them by looking at what they say the documents mean -- as opposed to what the documents say -- they will be able to re-cast the current Sinochart as a stand alone entity which dates back to 1955. (*See* Point I (A)(ii) below). As a fall-back position, Sinochart argues, in its reply memorandum, that as an EOWP, Sinotrans cannot own anything, and thus, it cannot be the parent of Sinochart. With this argument, Sinochart asks the Court to literally jump right over Sinotrans and allow it to create the one-on-one relationship it knows it needs to secure immunity. (*See* Point I (A)(iii) below). Each point is addressed below.[3]

### (ii)   *Sinochart is very much a subsidiary of Sinotrans, and a creation of recent vintage.*

In its reply, Sinochart tries to diminish the role of Sinotrans and convince the Court that there really is no subsidiary/parent relationship at all. Sinochart submits declaration testimony from multiple new "experts" who claim to have gone back through the records and have

---

[3] Sinochart, as the party seeking immunity, bears the ultimate burden of persuasion of establishing its right to immunity, and this burden must be satisfied by a preponderance of the evidence. *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241-42 (2d Cir. 2002); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993); *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 640-641 (S.D.N.Y. 2005). The evidence overwhelmingly supports a finding of a subsidiary relationship and thus no entitlement to immunity, but even if the Court was to find the evidence related to Sinochart's status to be in equipoise, Sinochart's motion to vacate must be denied.

deciphered the various machinations through which Sinochart has gone, arriving at the conclusion that the current-day Sinochart is in fact the same entity formed in 1955. With this, Sinochart hints that its relationship with Sinotrans is more one of parallel entities as opposed to a parent/subsidiary.

To accomplish this genealogical sleight of hand, Sinochart's experts, in essence, ask the Court to ignore the content of Sinochart's/Sinotrans' own internal documents and public filings,[4] which illustrate the nature and character of the relationship between the two as parent and subsidiary. The plain and simple fact of the matter is that Sinochart is very much a subsidiary of Sinotrans, and any other conclusion flies in the face of the documentary evidence before the Court.[5]

The alleged formation or lack of formation of Defendant Sinochart in 1955 is, in any event, a bit of a red herring, as the proper focus is its status *today*,[6] and on that critical issue, there can be no real dispute. (*See* Second Clarke Decl. ¶¶4-7). Nevertheless, it is important to note that the new description of its historical development being offered by Sinochart's recently retained experts is almost as misleading as was the initial discussion offered in Sinochart's

---

[4] By way of example, another entity within the Sinotrans Group, Sinotrans Shipping Ltd., recently issued a legal document in connection with an initial Global Offering, which lists Sinochart as one of the "major subsidiaries of Sinotrans Group Company related to shipping business." (*See* Second Gutowski Decl. Ex. 1: attached excerpts from Global Offering p. 122).

Other internal document and public filings which demonstrate the true parent/subsidiary relationship of Sinotrans/Sinochart include: (i) Sinotrans description of Sinochart in its own website is as a subsidiary (*see* Chen Orig. Decl. ¶44; Clarke Orig. Decl. ¶16; deLisle Orig. Decl. ¶43, 47; (ii) Sinochart's corporate documentation which describes Sinotrans' shareholding percentage as being 100% (*see* Chen Orig. Decl. ¶41; Clarke Orig. Decl. ¶19(a)); and (iii) Sinochart's Articles of Association which describe it as a subsidiary of Sinotrans (*see* Chen Orig. Decl ¶42; Clarke Orig. Decl. ¶18; deLisle Decl. Orig. ¶38 and Second deLisle Decl. at ¶2-18).

[5] Indeed, this whole exercise brings to mind the old adage about a duck - if it walks like a duck, quacks like a duck and looks like a duck, it's likely a duck - or in this scenario, a subsidiary.

[6] *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 481 (2003) (status is to be evaluated at the time of suit).

original motion papers. This new description is designed, Plaintiff submits, to give the false impression that there is no subsidiary relationship here and Sinochart was essentially a stand alone entity as far back as 1955, and that same entity is here today. This is inaccurate.

In this respect, the Court is referred to the accompanying Second Chen Declaration wherein, in a very careful documentary-based analysis, Attorney Chen dissects and then lays out the actual historical development of the current entity now before the Court, the evidence which supports creation in the 1990s, and the mistaken conclusions drawn by Sinochart's new experts. The Second Chen Declaration speaks for itself on these issues, but several of the salient points include:

1. Sinochart describes itself as a subsidiary of Sinotrans, and Sinotrans describes itself as the parent. (Second Chen Decl. ¶¶ 32-33).

2. Present day Sinochart was not originally created in 1955, as Sinochart asserts, but was formed by Sinotrans in the 1990's. (*Id.* at ¶¶ 3-15).

3. While the name Sinochart may have been utilized, that was in reality no more than a "trade name" for the chartering business performed by Sinotrans following the latter's formation in 1955. (*Id.* at ¶4).

4. Present day Sinochart was an outgrowth of the Sinotrans created entity "Sinotrans Chartering Corp." which was originally formed and capitalized by Sinotrans in the early 1990's. (*Id.* at ¶¶ 5-15).

5. The present day Sinochart was not formed by any direct governmental act or decree but rather by Sinotrans. (*Id.* at ¶¶ 5-15, 48).

6. The capital for the formation of Sinochart came from Sinotrans. (*Id.* at ¶¶ 16-23).

7. The capital consisted of the RMB5 million originally placed into Sinotrans Chartering (the predecessor) and the balance of RMB18.16 from the Sinotrans' Marine Department. (*Id.* at ¶¶ 18-20).

8. The top management of Sinochart is appointed by Sinotrans. (*Id.* at ¶53).

9. Sinochart's operations are supervised by Sinotrans. (*Id.* at ¶55).

10. Sinotrans also controls the hiring and firing of Sinochart's employees and sets their salaries as well. (*Id.* at ¶54.)

11. Sinochart does not report to the PRC Governmental Supervisory Agency (SASAC), only Sinotrans does. (*Id.* at ¶ 55.)

12. Sinochart functions both for the purpose of facilitating Sinotrans' commercial activities, as well as its own. (*Id.* at ¶¶ 49-50; *see also* contract in question involving trade between Plaintiff and Sinochart, and Sinochart with Daiichi).

13. Sinotrans controls the distribution of profit earned by Sinochart. (*See, e.g.,* Chen Orig. Decl. ¶¶ 58-60; Clarke Orig. Decl. ¶18; deLisle Orig. Decl. ¶¶ 45, 54, 71).

Based upon the evidence in this record, there can be no other conclusion than that Sinochart is a subsidiary of Sinotrans, and is not some outgrowth of the entity formed in 1955.

Contrary to the position asserted by Sinochart, this case is not *Trans Chemical* revisited. In *Trans Chemical*, there was a direct ownership relationship between the PRC and China National Machinery. In determining that China National Machinery enjoyed FSIA status, the court found significant that the state's ownership rights were exercised over the enterprise through the State Council. *See Trans Chemical*, 978 F.Supp. at 280-81 (quoting from Professor Clarke's original opinion). A direct governmental relationship was found there because it actually existed. *Trans Chemical* does not, however, stand for the proposition that such a relationship exists in every EOWP situation and Sinochart's reliance on *Trans Chemical* for the proposition that mere EOWP status establishes a direct governmental relationship is unfounded.

Indeed, when the PRC decides to exercise ownership rights over an entity, it does so through a specific, identifiable state institution; there is no abstract ownership by "the Chinese government" as Sinochart repeatedly describes in its hazy discussion of this point. (Second Clarke Decl. ¶ 20). As succinctly explained by Professor Clarke,

I note that none of the New Defense Declarations answers a key question that I posed in my original declaration: if Sinochart is really directly owned by the state and not by Sinotrans, which state entity owns it? As I stated in my original declaration, EOWPs are not abstractly owned by "the Chinese government." *There is always a specific, identifiable state institution that exercises ownership power.* In the case of Sinotrans, it is the State Asset Supervision and Administration Commission ("SASAC"). But SASAC does not assert ownership over Sinochart. If Sinochart is indeed directly owned by some other Chinese government institution, surely it is fair to ask Sinochart and its experts to identify that institution. And yet despite the specific question in my original declaration, which all the authors of the New Defense Declarations have seen, *no answer has been forthcoming.* The reason, I believe, is simple: Sinochart is owned by Sinotrans, and its status as "EOWP" is in no way inconsistent with that fact.

(*See* Second Clarke Decl. ¶¶ 20, 22) (internal citations omitted).

It is clear why Sinochart went to the lengths that it did to recast its historical development – subsidiaries do not enjoy immunity under *Dole. See also Filler v. Hanvit Bank*, 378 F.3d 213, 218 (2d Cir. 2004) (reiterating that "'a subsidiary of an instrumentality is not itself entitled to instrumentality status"). But despite the number of experts retained, it is hard to run away from one's own characterizations of oneself and its own evidence. Sinochart simply cannot disassociate itself from its parent Sinotrans, or erase that structure with a parade of experts. Sinochart is a subsidiary of Sinotrans, and its effort to rewrite history to jump over Sinotrans and restructure itself as having a direct governmental relationship where one does not exist should be rejected.

    **(iii)**    ***Sinochart's "EOWPs cannot own anything" argument is wrong and would make a mockery of Dole.***

Recognizing the weakness in its factual argument discussed above (*i.e.* that it should not be considered a subsidiary), Sinochart advances a fall-back argument regarding an EOWP's supposed inability to own anything – a position which is nothing short of extraordinary. Here, Sinochart argues (for the first time) that an EOWP (like Sinotrans) cannot own anything, and as such, Sinotrans cannot stand in the position as a parent entity. Sinochart argues that this is so

because Sinotrans "is simply incapable, under Chinese Law, of owning Sinochart". (*See* Sinochart Reply Br. at 6). The position is so remarkable both for its inaccuracy and for the ramifications this juridical admission carries with it that it is hard to know where to begin a response.

At the outset, the notion that an EOWP can own nothing is wrong and runs contra to modern day operations of these entities. Professor Clarke, in his Second Declaration, illustrates the utter fallacy in this position:

6. We are told [by Sinochart's New Defense Declarations] that anything labeled an EOWP is for that very reason incapable of being a subsidiary of another enterprise. This assertion, as I shall show below, is incorrect because it relies on abstract formalisms instead of a practical understanding of what it means to "own" something or to be in a parent-subsidiary relationship. It is also contradicted by numerous real-life examples where Chinese law specifically contemplates parent-subsidiary relationships among EOWPs and the parties to such relationships describe themselves in those terms. As is shown in my first declaration, the two declarations by Weidong Chen, and the DeLisle Declaration, it is also contradicted by the substance of the relationship between Sinochart and Sinotrans. The New Defense Declarations fail to address the specific arguments made in these declarations, instead simply repeating that something labeled "state-owned" or "EOWP" is for that reason alone incapable of being a subsidiary.

7. The New Defense Declarations assert that Sinochart cannot be a subsidiary because all its *assets* are owned directly by the Chinese state. This argument fails for two reasons. **First, it relies on a formalistic definition of "ownership."** The Wang Declaration concedes that EOWPs have the "right to possess, utilize, and dispose of according to law" the assets that are in their name. The Wang Declaration calls these rights "limited"; I do not agree. These are extensive rights that look very much like ownership. The Si Declaration concedes that EOWPs are entitled to "possess, use or dispose of" their assets according to law. It then states that "this should not be interpreted as ownership of such assets by an EOWP." Why not? It certainly looks like ownership.

8. **Second, it proves too much.** Sinochart's expert witnesses assert that Sinochart's status as an EOWP means that the assets it operates are all owned directly by the Chinese state and not by Sinochart itself. The implications of this argument, if accepted, are profound and in my opinion unacceptable. *If the physical and financial assets in question are in a realistic sense directly owned by the Chinese state, such assets would not be available to creditors—*

not for reasons of sovereign immunity, but simply because creditors cannot take what a debtor does not own. To accept this argument means accepting that one could never collect on a judgment against a Chinese EOWP, even in China, *regardless of its status under the Foreign Sovereign Immunities Act*, because it owns no assets of its own. This is not an argument that Chinese law or courts have found compelling – as Defendant's experts concede, the assets operated by EOWPs in their name are routinely available to creditors.

(*See* Clarke Second Decl. ¶¶ 6-8; *see also* Second Chen Decl. ¶¶ 34-37 (debunking Sinochart's proffered rigid notion of "ownership" by pointing out that the rights conferred under Chinese law to an EOWP with respect to property are tantamount to ***full ownership*** in the conventional sense of those words) and Second deLisle Decl. at ¶ 41-48).

Apart from the factual inaccuracy of the position, Sinochart's "EOWPs own nothing" argument would eviscerate *Dole*. *Dole* instructs that where there is an intermediate layer, immunity will not lie. This was a policy decision designed to avoid situations where immunity was sought by entities far removed from the ultimate governmental interest, and the Supreme Court drew the line at one. To sanction Sinochart's position on this point would allow entities two, five, ten times removed from the PRC to enjoy sovereign immunity as long as they wear the EOWP label.

A somewhat similar effort was tried and rejected in *Filler*, 378 F.3d 213, where immunity was sought by two banks which were separated from the Republic of Korea by an intermediate entity that qualified as an organ under the FSIA. The banks argued that since the intermediary was an organ, *Dole* did not preclude their request for immunity. The Second Circuit rejected this argument holding that *Dole* applies regardless of the status of the intermediary, noting that to adopt the defendants' position would "permit an infinite number of subsidiaries to enjoy sovereign immunity, ...would be incompatible with the purpose of the FSIA, which is to grant governmental, not private corporate immunity, and ...would reflect infidelity to the Supreme Court's reasoning in *Dole*." *Id.* at 218.

Sinochart's effort here is analogous to the argument raised in *Filler* to the extent Sinochart also seeks to circumvent the ramifications of the existence of its intermediate layer. While the nature of the intermediaries in *Filler* and here may differ, the result sought is the same and would run afoul of *Dole*. Clearly, if immunity was denied in *Filler* where the intermediary had organ status, a similar result is compelled here. Plaintiff submits that in the circumstances of this case, granting agency or instrumentality status to Sinochart (particularly when it describes itself as a "subsidiary" of Sinotrans) would permit an infinite number of subsidiaries to enjoy sovereign immunity, would be incompatible with the FSIA's purpose, and would reflect infidelity to *Dole*. Sinochart is simply not an entity, the majority of whose ownership interests are directly owned by the PRC, and Sinochart is thus not entitled to immunity under the "ownership" prong of the FSIA.

**B.**     **Similarly, Sinochart Does Not Qualify as an Organ under the FSIA.**

In another argument raised for the first time in its reply, Sinochart now asserts that it is entitled to FSIA immunity under §1603(b) as an "organ" of the PRC. (Sinochart Reply pp. 9-11). Curiously, with this argument, Sinochart fails to point this Court to controlling Second Circuit authority which describes the relevant factors and the appropriate analysis for determining whether an entity is an organ for purposes of the FSIA. Plaintiff submits that this omission is purposeful because when the cases from the Second Circuit and district courts within this Circuit are examined, it is clear that Sinochart's claim of organ status does not pass muster.

In *Filler*, 378 F.3d 213, the Second Circuit explained that the following factors are relevant when determining whether an entity is an organ of a foreign state under the FSIA:

1.     Whether the foreign state created the entity for a national purpose;

2.     Whether the foreign state actively supervises the entity;

3.    Whether the foreign state requires the hiring of public employees and pays their salaries;

4.    Whether the entity holds exclusive rights to some right in the foreign country; and

5.    How the entity is treated under foreign law.

*Id.* at 217. An examination of the cases within this Circuit which have applied these factors illustrates the types of entities which qualify and why Sinochart does not meet the test.[7]

In *Filler,* the Second Circuit agreed that the Korean Deposit Insurance Corporation ("KDIC") was an organ of Korea. The Second Circuit found the following factors significant: (i) the KDIC was formed by statute and presidential decree; (ii) the KDIC performed traditional governmental functions (*i.e.* protecting depositors and promoting financial stability); (iii) its directors were appointed by the Ministry of Finance and Economy; (iv) its president was appointed by the President of the Republic of Korea; and (v) many of its operations were overseen by the Ministry of Finance and Economy.

In *Peninsula Asset Mgt. (Caymen) v. Hankook Tire Co.,* 476 F.3d 140 (2d Cir. 2007), the Second Circuit examined whether the Financial Supervisory Service of the Republic of Korea ("FSS") was an organ. In determining that FSS was an organ, the Second Circuit first reaffirmed the *Filler* factors. The court then noted that the FSS was created by a special act and presidential decree and acted as Korea's financial oversight agency with duties similar to the U.S. Securities and Exchange Commission. The Korean government also actively supervised FSS by, *inter alia,* appointing its governor and auditors. Finally, the Korean government informed the State Department and the district court that it treats FSS as a government entity. *See* 476 F.3d at 143.

A similar result was reached in *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539, 546 (S.D.N.Y. 2005), which involved a claim against the Saudi High Commission

---

[7]    Additional case authority on this point is found in Second deLisle Decl. at ¶¶39-40.

("SHC"). SHC argued, *inter alia*, that it was an immune organ of Saudi Arabia and submitted the affidavits of a Minister of State on the Council of Ministers in the Kingdom of Saudi Arabia and an individual who had been the Director of the Executive Office of SHC since its inception. SHC also offered undisputed evidence that it was created by the Kingdom's Council of Ministers to centralize all charitable giving from the Kingdom to Bosnia-Herzegovina and was vested with the sole authority to collect and distribute charitable funds in Bosnia. The salaries of SHC employees were paid by either the Kingdom of Saudi Arabia or out of the SHC budget. Like other Saudi Arabian government agencies, SHC could be sued in the administrative court of the Kingdom. With these facts, the court concluded that the SHC qualified as an organ.

Finally, in *Murphy v. Korea Asset Mgmt. Corp. (KAMCO),* 421 F.Supp. 627, 641 (S.D.N.Y. 2005), the district court, using the *Filler* factors, concluded that KAMCO was an organ. The court found significant the facts that KAMCO was created by statute and was largely funded by and financially dependant on the government of Korea. The court also found that KAMCO had exclusive control over the Resolution Fund which was funded by government-backed bonds, was exempt from paying certain taxes, and had a management committee composed of officials from Korea's Ministry of Finance and Economy, Ministry of Planning and Budgeting, the Korea Development Bank, and the Financial Supervisory Service. Perhaps most significantly, KAMCO had a quintessentially "public" mission, to service and stabilize the Korean economy by efficiently disposing of non-performing loans and restructuring failing corporations.

These cases demonstrate the proper analysis for examining whether Sinochart here is an organ under the FSIA, and when the factors are applied, it is clear that Sinochart cannot sustain its burden of proving its entitlement to organ status.

- Sinochart was not formed by statute or presidential decree or the like.

- Sinochart was not formed to perform governmental functions.

- The top management of Sinochart is appointed by Sinotrans.

- The employees of Sinochart are hired and fired by Sinotrans.

- The salaries of Sinochart's employees are paid by Sinotrans and not from the State Treasury.

- The operations of Sinochart are subject to the supervision of Sinotrans, not SASAC.

- Under Chinese law, Sinochart bears civil obligation and assumes civil liability as a private commercial entity does. Its assets are subject to attachment like those of any other private entities. It can sue and be sued like any other entity in China before any court.

(*See, e.g.,* Chen Second Decl. ¶¶ 46-56).

Ignoring the clear import of the Second Circuit cases discussing organ status, Sinochart instead seeks to rely primarily on two district court cases, one from Colorado and one from Illinois, which, in addition to not being controlling, are clearly distinguishable. *See, e.g., RSM Prod Corp. v. Petroleos de Venezuela Societa Ananima (PDVSA),* 338 F. Supp. 2d 1208 (D. Co. 2004); *Vivas v. Boeing Co.*, 2007 U.S. Dist. LEXIS 61625 (D. Ill. 2007).

In *PDVSA*, the district court determined that PDVSA Petroleo (a wholly-owned subsidiary of PDVSA) was an "organ". PDVSA Petroleo was, however, in contrast to Sinochart here, created under a resolution issued by the Venezuelan Ministry of Energy and Mines, was subject to detailed policies, guidelines and direction of the Venezuelan government, and was governed by public law in Venezuela.

In *Vivas v. Boeing Co.*, 2007 U.S. Dist. LEXIS 61625 (D. Ill. 2007), the court determined that Transporte Aereo Nacional de Selva ("TANS"), a Peruvian entity, was an organ. Again, unlike Sinochart here, TANS was created by a specific governmental decree and it served a

similar role to the U.S. Air Force One. It transported military personnel and provided general access to remote areas of the country. Finally, Peru required that all TANS pilots be members of the Peruvian Air Force, which meant that they were state employees and were paid from the state treasury.

Based upon the foregoing, Sinochart has not and cannot demonstrate the requisite *Filler* elements entitling it to organ status.

## POINT II

### SINOCHART'S ASSET-BASED IMMUNITY ARGUMENT FINDS NO SUPPORT IN THE LAW

**A.    Sinochart's Asset-Based Immunity Argument is Not Supportable.**

In yet another argument raised for the first time in its reply, Sinochart maintains that even if *it* is not entitled to immunity, the funds themselves should nonetheless be immune under the FSIA because they are owned by the PRC, not Sinochart. Not only is this wrong, it directly contradicts Sinochart's earlier statements to this Court.[8]

According to Sinochart, the FSIA provides an alternative asset-based immunity, distinct from the evaluation of whether the entity qualifies as an instrumentality. Sinochart argues that since it owns nothing, even if it does not qualify for immunity, the assets under restraint should. In support of this novel concept, Sinochart relies upon a single case, which does not stand for any such proposition. *See Karaha Bodas Co. LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002).

---

[8] Sinochart has repeatedly referred to the funds under attachment as being "the Defendant's property", not "the PRC's property", as it now contends. *See* ECF Doc. No. 7: Sinochart's Answer at 19th Defense; ECF Doc No. 8: Sinochart's Notice of Motion p. 1; and ECF Doc. No. 12: Sinochart's Orig. Memo. pp. 1, 2. This underscores the somewhat frenetic nature of Sinochart's motion, where previous positions are abandoned in favor of new arguments raised in reply.

In *Karaha,* the plaintiff had obtained an arbitration award against Pertamina, an oil and gas company owned and controlled by the Republic of Indonesia. The award was confirmed as a judgment against Pertamina, and a writ of execution was then served on the Bank of America in New York where trust accounts were maintained with funds generated from the sale of gas extracted in Indonesia, which were governed by Indonesian laws. Pertamina and the Ministry of Finance of the Republic of Indonesia (which filed its own memorandum) argued that none of the funds were Pertamina's property. The district court held that the plaintiff could execute against that portion which represented the retention of Pertamina

On appeal, the Second Circuit did not, as Sinochart suggests, address an asset-based immunity under the FSIA. In fact, the only FSIA issue addressed by the court was whether Pertamina (which was an agency or instrumentality of a foreign state) had waived its sovereign immunity from attachment. Finding that it had, the Second Circuit moved on to an analysis of whether the attachment had reached property of the judgment debtor, an issue governed by New York state law, under which ownership is demonstrated by the ability to "assign or transfer" an asset.

It was in this context that the court examined the ownership interests of Indonesia and Pertamina in the funds. Based upon the particular facts of that case, specifically, a regulation which allocated to Pertamina 5% of the funds generated by the production sharing contracts, execution was permitted against only that portion. *Karaha* simply does not support Sinochart's FSIA asset immunity argument, as the case simply examined what type of property could be executed against in accordance with New York state law. This case does not in any manner support a new FSIA asset-based analysis, which would supplant the statutory language which focuses on the status of the entity.

In any event, there can be no real debate that Sinochart has a sufficient interest in the funds so as to allow them to be restrained. The transfers represent payment of charter hire and freight under charter parties which identify Sinochart as the performing party, and reflect either the satisfaction of debt owed to or by Sinochart for the performance of ocean carriage. That's what Sinochart does.

Similarly, there is no dispute that EOWPs enjoy the rights to posses, transfer, retain and use the funds generated in their operation, and they alone are responsible for the satisfaction of their own profits and losses, and cannot look to the PRC to make up for any shortfall. (*See* Second Chen Decl. ¶¶ 35-37). The Chinese legal system thus "treats the assets of EOWPs for all practical purposes as if they were owned by the EOWP." (Second Clarke Decl. ¶10). Therefore, the notion that EOWPs own nothing is simply unfounded and incorrectly "relies on abstract formalisms instead of a practical understanding of what it means to 'own' something ... ." (*See id.* at ¶5 & ¶¶ 7- 10 for a comprehensive analysis of why Sinochart's new "we own nothing" argument is unsupportable). (*See also* Second deLisle Decl. at ¶ 41-48).

On a related point, this "EOWPs own nothing" argument is troublesome because it raises serious questions about Sinochart's good faith when entering into the underlying charter, and in respect to all its contracts. Take, for example, the assignment of the lien on sub-freights. (*See* Ex. A to Verified Complaint, underlying charter party, at Clause 18). The lien on sub-freights is the principal means by which an owner, in a time-charter setting, secures the payment of hire as it enables the owner to collect directly from a sub-charterer if the charterer defaults. Is Sinochart now saying that it misled Plaintiff into believing that Sinochart had an interest in those sub-freights against which it could grant a lien, when in fact that was illusory because Sinochart really never had any interest in those funds, or had any funds for that matter? The whole

position is ludicrous and smacks of a desperate effort to concoct a basis to manufacture immunity where none exists. The argument should be rejected outright.

**B.      Plaintiff is Entitled to a Declaratory Judgment that Enforcement Can be Had Against the Assets of Any EOWP.**

In the alternative, and if Sinochart's argument – that, an EOWP owns nothing as its assets are all the property of the PRC – is accepted, Plaintiff Ocean Line submits that it is entitled to an order from this Court that upon the obtaining of an arbitration award in its favor, Plaintiff is entitled to execute upon any asset of *any* EOWP. 28 U.S.C. §2201(a) (a district court "may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought").

With its new argument, Sinochart has judicially admitted that it is really a shell entity, owns nothing and thus cannot satisfy any judgment rendered against it. The natural result of this extraordinary judicial admission is an admission that the PRC (not Sinochart) is the actual real party in interest with respect to this contract. Therefore, a judgment against Sinochart in connection with this matter is really a judgment against the PRC. To the extent that the assets of all EOWPs are really the assets of the PRC, as the EOWPs can own nothing, Plaintiff should be entitled to execute upon all.

"The statute providing for declaratory judgment meets a real need and should be liberally construed to accomplish the purpose intended, *i.e.* to afford a speedy and inexpensive method of adjudicating legal disputes … and to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." *Beacon Const. Co., Inc. v. Matco Electric Co., Inc.*, 521 F.2d 392 (2d Cir. 1975). In the circumstances of this case, if Sinochart can duck this pre-judgment attachment by use of a

judicial admission that it owns nothing and the PRC owns everything, then come execution day, the assets of all EOWP's should be fair targets. Sinochart (and the PRC) cannot have it both ways.

## POINT III

### VACATUR OF THE ATTACHMENT IS NOT WARRANTED UNDER ANY CIRCUMTANCES, BUT IN THE ALTERNATIVE, AND IF VACATUR IS CONSIDERED, DISCOVERY AND A HEARING ARE WARRANTED.

As demonstrated above and in the accompanying sur-reply declarations, the attachment should be maintained. Sinochart has clearly failed to sustain its burden of proving entitlement to immunity under the FSIA. Indeed, under the record presently before the Court, where the defendant has placed conflicting evidence asto its status and relationship with its parent before the Court, vacatur of the attachment would be inappropriate. To the extent the Court considers vacating the attachment, however, Plaintiff submits that it should be entitled to discovery on the formation, structure, capitalization, and operation of Sinochart and its relationship with Sinotrans before the issues of immunity under the FSIA is determined. *See, e.g., Burnett v. Al Baraka Inv. & Dev. Copr. (In re Terrorist Attacks),* 349 F.Supp.2d 765, 792 (S.D.N.Y. 2005) (parties should have an opportunity for discovery of facts relative to FSIA status) (citing *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 208 (2d Cir. 2003) (instructing district court to permit discovery before granting motion to dismiss based on fact-sensitive, multi-factor test)).

## POINT IV

### SINOCHART'S APPLICATION FOR COUNTERSECURITY IS OVERSTATED.

In its reply, Sinochart admits that, insofar as its request for countersecurity is concerned, the Court has the power to examine its claims to determine whether the asserted counterclaim or

the amount sought is frivolous or not warranted. (*See* Sinochart Reply at 14-15; and Plaintiff's Orig. Memo. at 18-19, and cases discussed therein). With its original opposition papers, Plaintiff submitted the Declaration of Luke Parsons QC (ECF Doc. No. 19), who conclusively illustrated why several components of the Sinochart "counterclaim" are not viable claims under English law (the law governing the underlying dispute) and thus did not provide a legitimate basis for countersecurity. In response, Sinochart has submitted nothing and makes no effort to answer Mr. Parsons' clear points about the unsustainable aspects of its counterclaim. The unsupported argument of Sinochart's U.S. counsel in its reply memorandum is utterly insufficient.

Based upon the foregoing and Plaintiff's original opposition papers, the total sum of countersecurity (assuming the Court determines that an order directing countersecurity is appropriate) should be reduced by those aspects of the claim which are not recoverable under English law, and due consideration should be given to the issue of whether the application should be further reduced to reflect the amount of security actually "given" by Sinochart.

## CONCLUSION

For the reasons set forth above, Defendant Sinochart's Motion to Vacate should be denied. It does not qualify as an instrumentality of the PRC (either as a directly owned entity or as an organ), and it has an interest in the funds which provide a basis upon which they can be restrained under Rule B.[9]

Dated: New York, New York
      January 30, 2008

Respectfully submitted,

Peter J. Gutowski (PG 2200)

---

[9]To the extent a ruling has not been made with respect to Plaintiff's application for an order amending the attachment to include a restraint of freight or hire paid in connection with vessels currently under charter to Sinochart, Plaintiff requests that such an order be issued directing the Clerk to enlarge the process accordingly.

Gina M. Venezia (GV1551)
FREEHILL, HOGAN & MAHAR, LLP
80 Pine Street
New York, New York  10005-1759
Tel: 212 425-1900 / Fax: 212 425-1901
*Attorneys for Plaintiff Ocean Lines*

## CERTIFICATE OF SERVICE

I, PETER J. GUTOWSKI, certify that I am counsel of record for Plaintiff Ocean Line.    On January 30, 2008, the within Sur-Reply Memorandum of Law in Opposition to Sinochart's Motion to Vacate was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Additionally, I served by email a true and correct copy of same upon the following counsel:

> Patrick F. Lennon
> Charles E. Murphy
> LENNON, MURPHY & LENNON, LLC
> The GrayBar Building
> 420 Lexington Ave, Suite 300
> New York, NY  10170
> *Attorneys for Defendant*

Peter J. Gutowski

Dated: January 30, 2008