UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                              Plaintiff,

                                                    **ECF CASE**

        - against –

                                                    **07-CV- 8123 (DC)**

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,                                    **SECOND DECLARATION OF**
                                                    **WEIDONG CHEN**

                              Defendant.
------------------------------------------------------------x

        I, Weidong Chen, affirm the following:

        1.      I am a Chinese national and a partner of Lee & Chen of Suite 703B,

Building A, Jinying Mansion, 1518 Minsheng Road, Shanghai 200135, China. I make

this declaration based upon my own personal knowledge and upon documents that I

have reviewed in the case. This is my second declaration on the subject case. I submit

this declaration as a supplement to my first declaration and in response to the various

declarations submitted by Sinochart, the Defendant in this action.


**Materials Reviewed**

        2.      I have reviewed and considered the following:

                i.   Second Declaration of Song Dihung submitted by Sinochart in
                     support of Motion to Vacate (with exhibits)

                ii.  Declaration of Si Yuzhuo submitted by Sinochart in support of
                     Motion to Vacate (with exhibits)

iii.  Declaration of Wang Baoshu submitted by Sinochart in support of Motion to Vacate (with exhibits)

iv.  Declaration of Jiang Ping submitted by Sinochart in support of Motion to Vacate (with exhibits)

v.  Reply Memorandum of Law in Support of Motion to Vacate Maritime Attachment or in the alternative for Countersecurity filed by Sinochart

vi.  Additional company search documents regarding Sinochart and its parent company China National Foreign Trade Transportation (Group) Corporation (commonly referred to as "Sinotrans") obtained from the People's Republic of China ("PRC") company Registry (known as "SAIC")

**History of Sinochart.**

3.     In view of the additional documents introduced by Sinochart's experts in their declarations, a local lawyer in Beijing was instructed to and did conduct a thorough company search against Sinotrans, Sinochart and Sinotrans Chartering Corporation at both the SAIC and the Beijing company registry (Beijing AIC). That search, however, revealed no documents against the possible Chinese names of Sinotrans Chartering Corporation, despite the local lawyer's efforts. I have had the chance to review more company search documents in relation to Sinochart and Sinotrans, and I am confident that my previous conclusion is correct, i.e. the current Sinochart should properly be considered as a subsidiary of Sinotrans.

4.     One of Sinochart's experts, Mr. Song Dihuang has, in paragraph 6.4 of his Second Declaration, referred to a few government documents and concluded that "Sinochart came into existence and was operating as a State-run enterprise since 1955. This conclusion is incorrect, or at best, misleading. The reasons are:

(a)    Although the name "Sinochart" began being used in around 1955, and was subsequently registered as a separate enterprise (probably in the 1960's), there did not exist a real separate entity under this name. Mr. Song had to admit in his declaration that the relationship between Sinotrans and Sinochart before the 1990's is "one institution with two name boards" (see paragraph 6.2 of his Second Declaration). This relationship has been recognized in numerous documents issued by Sinotrans and the various government authorities. There is no dispute that Sinotrans has been a real entity ever since its formation in 1955, and it must follow that "Sinochart" has been no more than a trade name of Sinotrans in the relevant period of time.

(b)    The conclusion that Sinochart was not a real separate entity before the 1990's is also supported, among others, by the following facts:

    (i)    Sinochart did not have its own employees; "its employees" were those of Sinotrans. This was admitted by Mr. Song in the second sub-paragraph of paragraph 6.4 of his Second Declaration and is also reflected by a comparison of the certificates of business operation of Sinochart and Sinotrans (Exhibit 1).

    (ii)    Sinochart did not have its own office address; "its office address" was that of Sinotrans (Exhibit 1).

    (iii)    Sinochart did not have its own accounting. Although capital of RMB20 million was registered under Sinochart's name,

Sinochart did not keep its own accounting. The earliest Annual Inspection Certificates (containing accounting statistics such as current capital, fixed assets, and turnover etc.) found in the company search of Sinochart, which are for the years of 1985, 1986 and 1987, suggested that all its accounting statistics were same as those of Sinotrans because they were "one institution with one accounting book and two name boards" (Exhibit 2). It is therefore incorrect to say that the capital of Sinotrans and Sinochart were separate (see paragraph 6.5 of Mr. Song's Second Declaration).

(iv)     Sinochart recognized in its own document that it was only a department of Sinotrans. In its application dated 12 July 1997 to the SAIC for exemption of annual inspection for the years of 1988-1993, Sinochart stated that for the relevant period (i.e. 1988-1993) Sinochart "existed in the form of a business department of Sinotrans, not a separate entity" (Exhibit 3).

(c)     It is clear that in the period from 1955 to 1993, Sinochart merely existed as a trade name of Sinotrans. Other than its registration at the company registry (which was not consistently maintained) which may have suggested, on its face, certain independent features of Sinochart, the evidence as a whole overwhelmingly leads to the conclusion that Sinochart was not a real and separate entity.

5.    In the nation-wide restructuring of state-owned enterprises campaign starting in 1988, Sinochart, as the "second name" of Sinotrans, was not reserved because according to the registration regulations and the government policy then in force, one entity should not have two names. In May 1992 when the restructuring was completed, Sinotrans wrote to the Ministry of Foreign Trade with copy to SAIC in relation to the status of Sinochart (Exhibit 4). Sinotrans stated in the report that the status of Sinochart was not settled in the restructuring, and in order to clarify this issue, its intention was to establish Sinochart as a separate legal entity that was a subsidiary to Sinotrans with independent management, office premises, and accounting so that Sinochart could become a "real economic entity" as soon as possible.

6.    Apparently, Sinotrans' aforesaid intention was not quickly realized. However, in 1993/1994 Sinotrans was able to establish a subsidiary called Sinotrans Chartering Corporation, which according to Sinochart's own statement, was to "temporarily substitute Sinochart in its foreign business" (Exhibit 3). Actually, in the Ministry of Foreign Trade's reply in relation to the establishment of Sinotrans Chartering Corporation, the English name approved was "China National Chartering Corporation, in short Sinochart" (Exhibit 5), the implication of which is telling.

7.    As mentioned in paragraph 3 above, the local lawyer in Beijing has tried to search the company registration documents of the former Sinotrans Chartering Corporation in Beijing AIC and the SAIC, but he was advised by both company registries that there were no records or file of this entity. According to the information now available (mainly the exhibits attached to Mr. Song's Second Declaration), I understand that:

(a)  Sinotrans Chartering Corporation was formally registered in 1994.

(b)  Its registered capital was RMB5 million, which was wholly injected by Sinotrans.

(c)  Its registered office address was the same as Sinotrans/ Sinochart.

(d)  It was de-registered in 1998.

8.      In or around 1995, Sinotrans Chartering Corporation applied to its parent company Sinotrans to resume the use of the name "Sinochart" (see Exhibit 11 of my first declaration).  Sinotrans then applied to the Ministry of Foreign Trade for approval. The opinion of the Ministry of Foreign Trade was to change the name of Sinotrans Chartering Corporation to Sinochart, but it sought approval from the Administration Office of the State Council (Exhibit 6).

9.      The Administration Office of the State Council sought comments from the SAIC, which was of the opinion, from the point of view of company registration, that despite the fact that Sinochart had conducted no annual inspection since 1991 or had failed to apply for renewal of registration, it had not been de-registered, thus, it was improper to change the name of Sinotrans Chartering Corporation to Sinochart (see Exhibit 5 of Mr Song Dihuang's Second Declaration).

10.     In the meantime, comments had also been sought from the National Economic and Trade Commission (which is one of the ministries under the State Council) which agreed that the use of the name of "Sinochart" should be resumed. It also stated that, given the fact that Sinochart had not been de-registered, in order to keep consistency, Sinochart should be maintained but it "should be altered to a

subsidiary of Sinotrans, and take over the legal positions of Sinotrans Chartering Corporation which should accordingly be de-registered." (Exhibit 7).

11.    In its report to the Deputy Secretary-General of the State Council (Mr. He Chunlin), the Bureau II of Secretariat of the Administration Office of the State Council stated that "in consideration of the fact that Sinochart has not been de-registered, which has established a good commercial reputation, we propose to agree with the suggestion of the National Economic and Trade Commission and the State Administration of Industry and Commerce, i.e. to treat this issue as a left-over issue of the restructuring of enterprises, to retain the name of Sinochart and change it to a subsidiary of Sinotrans, and in the meantime, to deregister Sinotrans Chartering Corporation."    This suggestion was finally approved by the Deputy Secretary-General and other leaders of the State Council at the end of 1996 (Exhibit 8).

12.    Sinotrans Chartering Corporation wrote to the SAIC on 16 November 1996 and requested for conducting the relevant formalities for resuming the use of the name of Sinochart (Exhibit 9). It is of interest to note in this letter that:

(a)    The letter was typed on the letterhead of Sinotrans Chartering Corporation;

(b)    The logo on the letterhead shows the name of "Sinochart"; and

(c)    The stamp of Sinochart was affixed at the end of the letter.

13.    The use of the name of Sinochart was thus resumed. The new business license of Sinochart dated 14 October 1997 indicated that the registered capital of the enterprise was RMB5 million (Exhibit 10). I have little doubt that this capital was the same capital originally registered under the name of Sinotrans Chartering Corporation. It is also noted that the legal representative of Sinochart was Mr. Zhang Jianwei who

was the general manager of Sinotrans Chartering Corporation before he was appointed as the general manager of "Sinochart". (Exhibit 11)

14.      I also found in the company search documents of Sinochart a balance sheet dated 31 December 1997 which bears the stamps of both Sinotrans Chartering Corporation and Sinochart (Exhibit 12). It is extremely unusual to see the stamps of two companies in a balance sheet of a company. The handwritten remarks on the right top of the document explained the situation. It says "it is hereby certified that the former Sinotrans Chartering Corporation was de-registered early in 1998, and its name was changed to Sinochart. Thus, the stamp of Sinochart was affixed to the original sheet."

15.      In summary, the additional documents I have reviewed and discussed above fortify my conclusion that

(a)      The Sinochart created in 1955 was merely a trade name of Sinotrans; it never became a real and separate entity despite its being registered as a separate enterprise;

(b)      The current Sinochart was effectively a successor to Sinotrans Chartering Corporation (though this was not reflected in the registration); and

(c)      The current Sinochart is a subsidiary of Sinotrans.

**Sinochart was Invested by Sinotrans.**

16.      Mr. Song relied on two documents issued by the Ministry of Foreign Trade (see Exhibit 7 of Mr. Song's Second Declaration) as evidence in support of his argument that Sinochart's capital came from the state. This argument is fallacious in



that Mr. Song was confusing the Sinochart created in 1955 which, as discussed, was a mere trade name, with the current Sinochart, which is a subsidiary of Sinotrans.

17.    A closer reading of the second document of the Ministry of Foreign Trade, namely the letter addressed to the SAIC (folio number [83] MOFTEC Yunzi No. 101/1123) reveals that the RMB80 million was the registered capital of the single entity (under the two names Sinotrans and Sinochart). Since the two "enterprises" have single accounting, it would be artificial to argue that the capital belongs to the two enterprises separately. It is misleading for Mr. Song to have used the word "allocated" in describing the distribution of the capital. The expression used in the government document is "within which 60 million is *under the name* of Sinotrans and 20 million is *under the name* of Sinochart" (my emphasis). I believe this expression more correctly reflects the factual situations where the amount of RMB80 million was not actually allocated to the two enterprises separately; I suspect that the distribution was only notional and was probably made for the purpose of the registration.

18.    As I have discussed in my first declaration, the registered capital of the current Sinochart came from Sinotrans. I would like to say a little more on this issue in the light of the additional company search documents I have reviewed this time. As discussed above (at paragraphs 13 and 14), the registered capital of Sinochart in 1997 was RMB5 million. This capital was, I believe, the same capital as that of the former Sinotrans Chartering Corporation. I think there should be no dispute that the capital of Sinotrans Chartering Corporation came from Sinotrans instead of coming directly from the state.



19.    As is indicated by Exhibit 8 of Mr. Song's Second Declaration, namely the Certificate of Registration of Property Rights of State Assets, the current registered capital of Sinochart is RMB23.16 million. According to the recent company research of Sinochart, the balance of RMB18.16 million came from Sinotrans as well. In the Registration Certificate of Enterprise Application for Alteration dated 16 April 1999, it was recorded that the original capital of RMB5 million was altered to RMB23.16 million and that "according to the regulations of the Group Company in relation to internal re-organisation, the former Marine Department 1 was merged with Sinochart. The cash in the amount of RMB18.16 million that was originally appropriated to the Marine Department I should be used as the registered capital of Sinochart." (Exhibit 13)

20.    Based on the above analysis, I conclude that the registered capital of the current Sinochart wholly came from Sinotrans. This conclusion is exactly in line with the provisions of the Articles of Association of Sinochart.

21.    Mr. Song said in paragraph 8 of his Second Declaration that despite the clear provision in the Articles of Association of Sinochart, the registered capital should "legally" be considered as coming from the state and Sinotrans has contributed in on behalf of the state.

22.    I fail to see the legal basis for this argument. Although according to the relevant laws (e.g. the Law of IEOWP 1988) before certain major investments are made by an EOWP prior approval from the government authorities should be obtained, I am not convinced that such investment should necessarily be considered as being made on behalf of the state or the whole people.

23.    I think that a more appropriate description of the nature of the investment of Sinotrans in this case or generally of any EOWP is that they make the investment for their own purpose but with statutory permission as provided for in the Law of IEOWP and other relevant laws and regulations. In this regard, Mr. Song's concern that to interpret otherwise would lead to an absurd conclusion or even cause conversion of state assets is totally unnecessary and misplaced.

**Ownership of Sinochart.**

24.    As I understand it, the common view of the various experts appointed by Sinochart in relation to ownership of an EOWP is that every enterprise which is registered as an EOWP is owned by the state or the whole people, and that there is no room to differentiate them in this respect. Their main grounds are, I think, firstly, that the companies' economic nature is registered as an EOWP and that is the end of the story. Secondly, the Law of IEOWP and certain other regulations provide that an EOWP is owned by the state.

25.    I am fully aware of what the laws say about the ownership of an EOWP as I am aware of the description of the economic nature (which is an outdated word seldom used in daily life) of an EOWP. What I do not accept is that these provisions ought to be taken on face value. There are currently more than 100,000 EOWPs. Some of them (currently around 150) are directly invested by the central government (State Council), more are invested by various levels of local governments, and numerous EOWPs are two or more tiers down the corporate trees (as subsidiaries). It seems to me



unrealistic to argue that they are exactly the same as far as ownership is concerned, i.e. they are simply all owned by the state.

26.    Professor Si Yuzhuo argued in paragraph 17 of his Declaration that the whole people or the Chinese government has "full ownership" of an EOWP. Professor Si did not elucidate on the meaning of "full ownership" but I presume that it means the combination of the four rights consisting of ownership, namely the right of possession, use, disposition and benefit. If my understanding of his meaning is correct, I think Professor Si is mistaken because Article 2 of the Law of IEOWP clearly confers the right of possession, use and disposition (with certain restrictions) to an EOWP. In addition, the first paragraph of Article 2 of that Law provides that an EOWP shall "take the full responsibility for its profits and losses", and Article 28 says that "the enterprise shall have the right to budget and use its retained funds in accordance with the provisions of the State Council". I think these provisions can be considered as the grant of the right of benefit.

27.    Professor Wang Baoshu apparently does not agree with me that the majority of the ownership rights have been granted to an EOWP (see paragraph 11 of his Declaration). However, his contention that the ownership of an EOWP is vested with the state is obviously not a sufficient justification for his view. Professor Wang actually contradicts himself when he admits in the subsequent paragraph (paragraph 12) that an EOWP enjoys the right of disposition (albeit limited to certain extent), which he considers to be the core element of ownership. It is to be noted that, according to Article 15 of the Regulations on Transformation of the Business System of Industrial Enterprises Owned by the Whole People, 1992, which was quoted by Professor Wang



in paragraph 12 of his Declaration, an EOWP has a wide range of powers to dispose of its assets by means of lease, mortgage or sale.

28.    When it comes to a subsidiary EOWP, it becomes even more problematical to argue that the state has the full ownership. As I have discussed in my first declaration (see paragraphs 59-61), a subsidiary such as Sinochart shall turn over the profits (after taxation) to its parent enterprise according to a pre-set percentage. Unlike first tier EOWPs, government departments do not receive profits from the subsidiaries directly.

29.    I have not been convinced by the arguments of Sinochart's experts that the state owns Sinochart in the same way as it owns certain other EOWPs (e.g. a central enterprise such as Sinotrans) and my conclusion remains that it will be far more appropriate and realistic to classify Sinochart as a subsidiary with no direct state ownership.

**Other Comments.**

30.    Mr. Song Dihuang argues in paragraph 6.2 of his Second Declaration that I have taken a wrong approach in that I often base my comments on the PRC Company Law. I find it difficult to understand why Mr. Song thinks this. I am aware that the provisions of the Company Law are essentially not relevant in this action and I have not purported to rely on them.

31.    I have also noted that in some of the Sinochart declarations, the relevant experts have tried to put words in my mouth and then make comments on that basis. To take a few examples, I would like to draw the Court's attention to the following:

(a)  In paragraph 25 of his declaration, Professor Si Yuzhuo suggested that my view was that Sinochart was not an EOWP. I did not say so anywhere in my first declaration. I do not deny that Sinochart was registered as an EOWP but consider it is a second tier EOWP subsidiary to Sinotrans; it was invested by Sinotrans rather than directly by the government and that is why Sinochart was not listed in any of the central or local SASAC list. It is also convenient to note that it is certainly unfounded to argue that I shall provide evidence to prove that Sinochart is NOT on any SASAC list. If Sinochart was in fact on a SASAC list, they would have produced it.

(b)  In paragraph 28 of his declaration, Professor Si again suggested that my view was that Sinochart is not a state-owned enterprise. I do not hold that view either. What I said in the relevant paragraphs referred to by Professor Si is that the profits of a second tier EOWP such as Sinochart do not *directly* form a part of the budget of profits made the State in the capacity as owners of enterprises which were funded directly by state-own capital. Rather, only the profits of first tier EOWPs under direct supervision of the SASAC, such as Sinotrans, will be computed in the budget projections.

32.  Two of the Sinochart experts have expressly contended that it is incorrect to describe the relationship between Sinotrans and Sinochart as "parent-subsidiary". See paragraph 24 of Mr. Song's Second Declaration and paragraph 32 of Professor Si's declaration. The ground of Mr. Song appears to be that the concept of "subsidiary" was not provided in the Law of IEOWP (but only in the Company Law), thus an EOWP



cannot be or have a subsidiary. Professor Si was of the view that to call an EOWP a subsidiary of another is only a "matter of convenience or a misuse in a legal sense". I do not think the argument is valid. Their approach is simply to shut their eyes to the reality in which both Sinotrans and Sinochart unanimously treat themselves as such (Exhibits 3, 4 and 5), the government authorities (including the State Council, the highest administrative authority in China) have confirmed such relationship (Exhibits 5, 7, 8 and 9), and the parent-subsidiary relationship between EOWPs has been referred to in numerous government regulations, e.g. Article 24 of the Provisional Regulations of Supervision and Administration of State-owned Assets of Enterprises 2003 (at exhibit 8 of Professor Wang's declaration) which provides that:

> *In respect of major matters of major subsidiaries invested in and established by Funded Enterprises that must be reported by Funded Enterprises to the State-owned assets supervision and administration authority for approval, the procedures for administration thereof shall be formulated by the State-owned assets supervision and administration authority of the State Council separately and reported to the State Council for approval.*

33.    It is also noticeable that in the Certificate of Registry of Enterprise Group issued by SAIC (the company registry) to Sinotrans in 2001, which is indubitably an official document, Sinotrans was described as the "parent company". (Exhibit 14)

34.    Mr. Song discusses the ownership of assets of an EOWP in paragraphs 15 and 16 of his Second Declaration. Similar comments are also found in paragraphs 10 through 15 in Professor Wang Baoshu's Declaration and paragraph 22 of Professor



Jiang Ping's Declaration. I do not deny that, according to the Law of IEOWP (Article 2), the assets of an EOWP are owned by the whole people. However, I do not think that the issue of ownership of assets of an EOWP is as simple as the experts of Sinochart have suggested.

35.    While I recognize that entities formed under the IEOWP regime embrace the general notion that ownership would ultimately vest with the whole of the people, that must be considered in the historical context within which this legislation was originally promulgated and the nature of the socialist system of ownership.    It is important to note that the "operational and managerial" authority and power that an EOWP enjoys under the law has a unique meaning in the context of Chinese law. It is significantly different from what one would understand the meaning of these words in the normal circumstances due to the unusual degree of autonomy granted by the law. According to the Law of IEOWP, among others:

(a)    An EOWP has the right to dispose of the property in its possession according to the statutory provisions (Article 2).

(b)    An EOWP has the right to retain certain profits/ benefits and make use of them in accordance with the provisions of the State Council (Article 28).

(c)    An EOWP is responsible for its own profit and losses (Article 2), connoting that it cannot resort to the government for reimbursement for losses suffered in the course of its operations.

(d)    An EOWP will be sued in its own name for liabilities incurred in the "operation and management" of the property said to be owned by the state (Article 2).



36. Professor Wang states in paragraph 10 of his Declaration that "...any property in an EOWP, in fact belongs to and is 100% owned by the People's Republic of China." Professor Wang draws its conclusion apparently solely on the ground that the law apparently provides so. Professor Wang does not go on to analyze whether it is still the case when one takes into account all the autonomies that an EOWP enjoys under the law.

37. In my view, it is highly impractical and amounts to a total disregard of reality for Sinochart's experts to have proposed that an EOWP only has "operational and managerial authority" (in the sense suggested by them) and 100% of the ownership of its property is vested with the state. Despite that an EOWP is provided by the law to be owned by the whole people, if one considers the whole of the law, and examines the rights and autonomies that an EOWP enjoys under the law, he/she will probably be satisfied to conclude that the EOWP owns the property in same or similar way as a private commercial entity does.

38. Mr. Song stated in paragraph 19 of his Second Declaration that "if the Government decides to transfer Sinochart to the Group of another EOWP, it can do so by way of administrative order according to law. Sinotrans is not entitled to request such EOWP to pay Sinotrans." A similar statement is also found in paragraph 33 of Professor Si's declaration. Professor Si asserts that the reason was that "capital contribution (if any) was made by Sinotrans on behalf of the PRC." I think this is an unrealistic hypothesis and is unfounded. I note that Mr. Song has not cited any law to support his view.



39.  According to the Provisional Regulations of Transfer of State-owned Property Rights of Enterprise, 2003 (Exhibit 15), which governs the behavior of the SASACs and state-owned enterprises in the transfer of state-owned property rights (Article 2), any transfer shall follow the procedures provided in the law, e.g. the transfer should be conducted openly through a property rights exchange institution (Article 4) and the price should be appraised by qualified institutions (Article 13), etc. It is important to note that the decision of the transfer of the property rights of a subsidiary enterprise is to be made by the parent enterprise; only if a major transfer of a major subsidiary enterprise is involved, final approval from the Ministry of Finance should be obtained (Article 26).  Furthermore, any transfer should be paid for (Article 20).

40.  I tend to agree that in extremely unusual circumstances, e.g. in case of war or other emergency, the government may order transfer or otherwise dispose of any property rights of a subsidiary by administrative orders, I doubt that the example created by Sinochart's experts will occur in normal circumstances.  In this regard, I would like to draw the Court's attention to Article 9 of the Provisional Regulations of Supervision and Administration of State-owned Assets of Enterprises 2003 (see Exhibit 9 of Professor Wang Baoshu's declaration), which provides that "in case of war, serious natural disasters or other major and emergent situations, the state may, *according to the law,* make an overall appropriation or disposition of state-owned assets of the enterprise." (my emphasis)  Even in such unusual situations, the rule of law shall apply. I even more doubt that such a hypothesis assists Professor Si's conclusion that the reason was that the parent EOWP has invested the subsidiary on behalf of the state.



41.   For the sake of good order, it is to be noted that the 1996 Guidelines referred to by Mr. Song in paragraph 19 of his Second Declaration is in force and Mr. Song is incorrect.

42.   In paragraph 20 of his Second Declaration, Mr. Song refers to the 1996 Guidelines in relation to the change of "state capital" to "state-owned corporate capital" within an enterprise group. To avoid doubt, the relevant article is Article 4(4). I think the true meaning of the provision "the previous state capital of the subsidiary company shall be changed to state-owned corporate capital" is that, with regard to a member enterprise which was originally directly invested by the state, its original capital (which must originally be state capital) should be changed to state-owned corporate capital because the group enterprise has been treated as the parent and investor.

43.   It is important to note here that the "authorised operation" of state-owned enterprises envisaged by the 1996 Guidelines only apply to member enterprises which were originally invested by the state directly rather than those which were originally invested by a group enterprise. Apparently, with regard to member enterprises which were originally invested by the group enterprise, the relationship of "the investor and the invested" and/or "parent-subsidiary" has already existed and there is no need for the state to authorize the group enterprise to operate/manage them. In this regard, reference can be made to Article 1(1) of the 1996 Guidelines and my explanations in paragraphs 89 and 90 of my first declaration.

44.   It is misconceived for Mr. Song to suggest at the end of paragraph 20 of his Second Declaration that the reason why the capital of Sinochart was registered as state-owned corporate capital was the authorisation under the 1996 Guidelines. As I

have discussed in paragraphs 18 and 19 above, the capital of the current Sinochart was *initially* injected by Sinotrans.    The parent-subsidiary relationship between them naturally existed by this investment and any "authorised operation" within the meaning of the 1996 Guidelines would not be required at all.

45.    As to the nature of the "central enterprises" mentioned in paragraph 26 of Mr. Song's Second Declaration, I think there should be no doubt that the 150+ central enterprises (including Sinotrans) listed on the SASAC website (see exhibit 15 of my first declaration) are the only EOWPs in relation to which the SASAC has exercised the right of investor (i.e. the state).    It is correct that SASAC may in some circumstances authorize a state-owned enterprise directly under its supervision to operate, manage and supervise another state-owned enterprise, however it must be pointed out here, for avoidance of doubt, that no evidence suggests that Sinotrans was authorised by the SASAC to operate, manage and supervise Sinochart.

**Whether Sinochart is an Organ.**

46.    I understand that this issue will turn on an analysis of the factors outlined by the Second Circuit in its decision in Filler v. Hanvit and that those factors include:

> (1)    whether the foreign state created the entity for a national purpose;
>
> (2)    whether the foreign state actively supervises the entity;
>
> (3)    whether the foreign state requires the hiring of public employees and pays their salaries;
>
> (4)    whether the entity holds exclusive rights to some right in the [foreign] country; and
>
> (5)    how the entity is treated under foreign state law.

47.  As set forth in my first declaration and as supplemented in this second declaration, I have carefully considered the formation, structure, operation, and supervision of Sinochart, and it is my opinion that Sinochart does not satisfy the above reference factors.   The reasons for this follow as do my comments in response to the points raised by Sinochart on this issue.

48.  Sinochart was not formed by statute or presidential decree or the like.  It was formed according to the procedures provided for in the relevant government regulations governing the registration of enterprises, and upon the actions taken by Sinotrans.

49.  The business scope of Sinochart is clearly set out in its Business License (see exhibit 3 of Professor Si Yuzhuo's declaration) and Article 8 of its Articles of Association, which have the identical wording that reads:

> "To accept instructions to charter in/out ships, to engage in ship sale and purchase and to arrange for ship repairs as the agent; to carry out ship operation and management and relevant cargo transportation, and to provide services in relation to international shipping information and consultation."

As can be seen from the above, Sinochart was not established for the purpose of chartering ships and perform related activities *"in relation to Sinotrans' activities"* as alleged in the first paragraph of page 11 of the Reply Memorandum of Law submitted by Sinochart's counsel.   Sinochart is, as its parent Sinotrans, an independent commercial entity and has been acting as such in the shipping market.



50.    Sinochart was apparently not formed to perform government functions. In this regard, the Court's attention is drawn to paragraph 6 of the Declaration of Mr. Xing Nai Qun, the manager of the legal department of Sinochart, which reads as follows:

> "Sinochart is engaged in the shipping industry as agents, charterers, managers and operators of ocean going vessels and other functions relate to the industry generally"

51.    As I have discussed above, the Sinochart's experts are mistaken when they state that the current Sinochart originated in 1955. It is also incorrect to say that the registered capital of the current Sinochart came from the state. I think I have made clear in the discussions above that Sinochart's capital was entirely infused by Sinotrans.

52.    It is further to be noted that before the 1990's, Sinochart and Sinotrans were "one entity bearing two names" and they shared the same employees. The situations, however, entirely changed when the current Sinochart effectively succeeded Sinotrans Chartering Corporation (albeit not being officially reflected in company registration) in or around 1997, when Sinochart became a real independent entity with its own employees who are hired in the same manner as any other private commercial entity.

53.    It is noted that the top management of Sinochart is appointed by Sinotrans. (Exhibit 16).    In comparison, the directors of Sinotrans are appointed by the government (SASAC) (Exhibit 17).

54.    I also note that one factor in deciding whether an entity is an "organ" of a foreign state is whether the foreign state requires the hiring of public employees and pays their salaries. Whilst I assume that "public employee" is a term under US law and



do not propose to analyze in details for the purpose of this declaration whether there exists a similar concept in China, I can confirm that the employees of Sinochart are hired and fired by Sinochart but not the Chinese government or any department thereof and the salaries of Sinochart's employees are paid by Sinochart but not from the State Treasury.

55.    As a subsidiary of Sinotrans, the operations of Sinochart are subject to the supervision of Sinotrans.  It is important to note that unlike Sinotrans which was under the direct supervision of SASAC, the operations of Sinochart are, in all material respects, not subject to the direct supervision of the SASAC.

56.    Sinochart, like any other EOWPs, enjoys no privilege in legal or administrative proceedings within China.  It bears civil obligation and assumes civil liability as a private commercial entity does.  Its assets are subject to attachment (either prior or subsequent to judgment) like those of any other private entities.  It can sue and be sued like any other entity in China before any court.

57.    I hope the above comments will be helpful to the Court in its determination.  I would be happy to provide further comment or amplification on any of the discussion above should the Court wish, and I am honored to have been able to submit this to the Court.


I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.


Executed on 30 January, 2008 at Shanghai, PRC


NYDOCS1/298068.1

Weidong Chen

Declaration of Weidong CHEN

# Exhibit 1

# 营业证书

工商企业证字第01170号

兹证明 中国对外贸易运输总公司（营业执照）

已于一九八〇年六月九日登记注册

为 之（企证字01170号 ），具有法人资

格。

注册资本：人民币陆仟万元

经营范围：

办理各种进出口物资的运输，

仓储业务。

董　事　长：
副董事长：
总　经　理：刘福锦　宋寥道　陆永仁　王启芳
副总经理：
企业地址：北京市西城区武定侯
电话：895631 　　　　　　　　 传 28067 TRANS CN
　　　　　　　　　　　　　　　 真 22153 TRANS CN

分支机构：在全国二十八省、市、自治区设有分公司（供运输处）

营业执照有效期至一九九九年六月八日

中华人民共和国国家工商行政管理局

中华人民共和国国家工商行政管理局

局　长

一九八七年六月十日

本证书有效期至一九九九年六月八日

00066

# 营业证书

工商企业证字第01171号

兹证明 中国租船公司

已于一九八四年六月廿七日登记注册（营业执照

为企业注字01171号），具有法人资

格。

注册资本：人民币贰佰万元

经营范围：

报办国内外承租船只业务，办理

对外租船、洽办租船业务。

有效期至：

1991年6月30日

董 事 长：

总 经 理：王 健

副总经理：刘福麟 吴季玮 陈恭仁 王厚贤

企业地址：北京市西郊翠微山

电话：890551  电传：22265 TRANS CN
                    22153 TRANS CN

分支机构：在全国各主要沿海港口租船办事处

营业执照有效期自一九八五年六月廿八日

有效期延至：一九九○年十二月卅一日

中华人民共和国国家工商行政管理局

局 长 ［签名］

一九八五年六月廿八日

登记机关：

一九九○年十二月卅一日

本证书有效期至一九九一年六月三十日

003333

## Certificate of Business Operation

Gong Shang Qi Zheng Jin Zi No. 01170

THIS IS TO CERTIFY that China National Foreign Trade Transportation Corporation was registered on 9 June 1984 (Business License No.: Gong Shang Qi Jin Zi No. 01170) and is a legal person.

Registered Capital: RMB60,000,000

Business Scope: Transportation and storage of all kinds of imported and exported products

Chairman of the Board of Directors:

Vice-chairman of the Board of Directors:

General Manager: Ping Jian

Deputy General Manager: Liu Fulin, Wu Bingze, Lu Zhongren, Wang Houxian

Office address: Er Li Gou, Xi Jiao, Beijing

Telephone:                    890931
Telefax:                        22867 TRANS CN
                                     22153 TRANS CN

Branches: Branches and representative offices located in 28 provinces, cities and autonomous regions in China (except for Tibet), main coastal ports and frontier stations.

The business license is valid until 8 June 1989.

State Administration of Industry and Commerce of the People's Republic of China (Stamped)

President: Ren Zhongjin (Signed)

10 June [illegible] 1987

This certificate is valid until 8 June 1989.

8-66-7011.00 169622

## Certificate of Business Operation

Chairman of the Board of Directors:

Gong Shang Qi Zheng Jin Zi No. 01171)

Vice-chairman of the Board of Directors:

THIS IS TO CERTIFY that China National Chartering Corporation was registered on 9 June 1984 (Business License No.: Gong Shang Qi Jin Zi No. 01171) and is a legal person.

General Manager Ping Jian

Deputy General Manager, Liu Fulin, Wu Bingze, Lu Zhongren, Wang Houxian

Registered Capital: RMB20,000,000

Office Address: Er Li Gou, Xi Jiao, Beijing

Business Scope: Chartering business and cargo space booking business as per instructions of domestic and foreign entities.

Telephone:    890931
Telefax:      22265 TRANS CN
              22153 TRANS CN

Branches: Chartering offices located at all main coastal ports of China

The business license is valid until 8 June 1989.
The term of validity is extended to 31 December 1989.
The term of validity is extended to 30 September 1990.
The term of validity is extended to 31 December 1990.

The term of validity is extended to 31 December 1991.

State Administration of Industry and Commerce of the People's Republic of China (Stamped)

President Ren Zhongjin (Signed)

10 June [illegible] 1987

This certificate is valid until 8 June 1989.

6 06 7011 00 189622

2