UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
OCEAN LINE HOLDINGS LIMITED,

                       Plaintiff,                                  **ECF CASE**

      – against –                                       **07-CV- 8213 (DC)**

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,                              **SECOND DECLARATION OF**
                                                           **JACQUES DELISLE**

                     Defendant.
-----------------------------------------------------------------x

       I, Jacques deLisle, declare as follows:

1. In preparing this declaration, I have reviewed the Declarations of Donald Clarke, Jiang Ping, Si Yuzhuo, Wang Baoshu, the Second Declaration of Song Dihuang (referred to herein as "Song Declaration") the defendant's Reply Memorandum of November 30, 2007 and the Second Declaration by Chen Weidong, as well as the materials that I reviewed in connection with preparing my prior declaration of in this case. My conclusions remain as they were in my prior declaration and more detailed statements of many of the conclusions offered in this declaration can be found in my prior declaration. They are restated briefly here to the extent necessary to answer claims made and points raised by the materials, listed earlier in this paragraph, that I have received since preparing my prior declaration.

**"Ownership" of Sinochart**

2. I have seen nothing to indicate that the structure of the relationship between Sinotrans and Sinochart at the time of the events relevant to this litigation is not as described in my prior declaration (and in the Chen and Clarke declarations). To put the point in the simple terms that would be used to characterize a relationship with this legal structure in U.S. law, Sinochart is a subsidiary of Sinotrans and a subsidiary member of the Sinotrans Group of companies; Sinotrans is itself owned by the Chinese state, one of a relatively small number of large enterprises that are directly under SASAC (an organ of the Chinese government) and with respect to which SASAC exercises the state's ownership rights. There is, thus, a "tiered" structure of ownership with SASAC/the state at the top, Sinotrans in the middle and Sinochart below it.

3. This tiered ownership or parent-subsidiary structure is amply reflected in numerous documents concerning the structure and function of Sinochart, including documents that in the ordinary course would be, and in this case appear to have been, filed with and reviewed or approved by relevant PRC authorities. My prior declaration addresses these in some detail. To restate key points briefly here: A "Reply Concerning Agreement to the Reuse of the Name [Sinochart]" and Sinochart's Articles of Association provide that Sinochart is a "subordinate" company of the Sinotrans head company. An Application for Registration of Formation of an Enterprise Group, submitted to the SAIC (the state entity that issues the business licenses that defendant's experts regard as so highly determinative), characterizes Sinotrans as the "parent" and Sinochart as among the "subsidiaries." Sinochart's Articles of Association and a document registering with state authorities Sinochart's possession of state assets state that Sinotrans is the sole investor in Sinochart and that there is no "state capital" invested in Sinochart. Sinochart's Articles of Association assign many of the ordinary rights of ownership (including payment of the portion of profits not retained by Sinochart) to Sinotrans, not to the state or SASAC. The Articles of Association would have been reviewed and/or approved by state registration and other state authorities. See also *Clarke Declaration* ¶¶ 16-20.

4. This type of structure is commonplace among Chinese enterprises, including "state-owned enterprises," today and many provisions in Chinese law recognize, reflect and authorize this. My prior declaration and the Clarke and Chen declarations go into this in some detail. Contrary to what defendant's experts repeatedly assert or suggest, terms that denote or connote "subsidiary" are commonly—including in formal legal contexts and including in official documents and enterprise documents cited in my prior declaration and other expert declarations in this case—used to describe entities in the position of Sinochart and with the relationship Sinochart bears to Sinotrans, as well as specifically to describe Sinochart and Sinotrans and the relationship between them. See, e.g., *deLisle Declaration* ¶ 41. (Indeed, defendant's own experts concede this. See *Song Declaration* ¶ 21; *Si Declaration* ¶ 32-33.)

5. As my prior declaration explains, the legal arrangements and structures that reflect and underpin this enterprise relationships are fundamental features of China's reformed, market-oriented economy which has been utterly transformed from the planned economy of the high socialist era when property and ownership rights had little significance and distinctions between government and economic functions and between state and enterprise were far weaker, far less important, and far less intelligible in terms of U.S. and other Western or capitalist legal concepts and categories. See also *Clarke Declaration* ¶ 14.

6. Against this, the defendants and their experts make much of: apparent ambiguities and possible inconsistencies in documentation which are not exceptional, suspicious or freighted with the meaning that defendants assign in the relevant Chinese context; formal and largely vestigial legal categories that have little

practical and legal meaning today and do not have today the significance or meaning that defendants (or, perhaps, a literal translation of the terminology) suggests; and long-past and now-irrelevant features of the Chinese legal and enterprise system, and the Sinochart-Sinotrans relationship, from as long as half a century ago.

7. First, the defendant and its experts' declarations point to apparent gaps, ambiguities and inconsistencies in the registration record for entities called Sinochart (or variations on that name). See *Wang Declaration* ¶¶ 18-22; *Song Declaration* ¶ 6; *Si Declaration* ¶¶ 21-24. Many of the specific issues are addressed in the second declarations of Chen Weidong and to a limited extent in my prior declaration. Accordingly, I will not address those in detail here.

8. More generally, it is hardly unusual, surprising or suspicious for records of the type and from the periods at issue here to be characterized by gaps, sloppiness, tardiness and inconsistencies. Bureaus of the Administration of Industry and Commerce not infrequently are unable or unwilling to provide access to the full range of relevant records. There very well could be still more records and documents that would clear up some of the apparent confusion and uncertainty with respect to Sinochart's status at various times. Also, it is not unusual for Chinese enterprises to be slow in following through on formalities of amending enterprise registrations and licenses to reflect lawful changes in business scope and structure, or for regulatory authorities to be similarly slow and sometimes careless. The likelihood of confusion and omission is all the greater where the relevant rules were in flux, as they appear to have been here concerning, among other issues, the permissibility of legally and functionally entangled entities to operate under two names and the permissibility of reuse of a name of an entity of uncertain ongoing status.

9. Notably, one of defendant's own experts concedes the problems with Chinese records, describing the re-registration of Sinotrans and Sinochart in 1984 as necessitated by the destruction of records during the Cultural Revolution. Remarkably, however, the declarant sees this as only a clerical matter and blithely dismisses the possible significance of forty years' time since the original registration and half a decade of reform prior to the date of re-registration (a few years before the adoption of the 1988 Law on Industrial Enterprises Owned by the Whole People ("State-Owned Enterprise Law") but in the context of regulations that had adopted key features of the State-Owned Enterprise Law during the first half-decade of post-Mao reforms.) See *Wang Declaration* ¶ 18.

10. Even if one were to accept the proposition that Sinochart's status underwent the particular twists and turns asserted by defendant's experts (and no others and not those that Chen Weidong describes), I know of no basis for—nor do defendant's experts provide a legal basis for—the claim by defendant's expert that the current Sinochart must be legally the "same" Sinochart—and apparently have in all respects the same legal characteristics as the Sinochart—that existed in 1955, was

initially registered in 1964 and was re-registered as (in the defendants' experts view) a purely pro forma matter around 1984. Particularly opaque is the apparent claim by one or more defendant's experts that the tangled history of registration and deregistration killed off a new Sinochart that had been established in the mid-1990s and also revived the original 1955/1964/198—but subsequently legally defunct—Sinochart, whose business license had lapsed in the early 1990s. From this, defendant and its experts seek to infer that the current Sinochart is somehow an untransformed circa 1955 Sinochart and is thus fused with Sinotrans as a sister, directly state-owned enterprise, and is not the subsidiary of Sinotrans and member of the Sinotrans-headed Sinotrans Group that more recent documents issued by Sinochart, Sinotrans and Chinese authorities indicate that it is. See *Song Declaration* ¶ 6; *Si Declaration* ¶¶ 21-24; cf. *Wang Declaration*; contrast *Chen Declaration* and *Second Chen Declaration*.

11. At the very least, this record provides an extraordinarily weak and inadequate basis for reaching the conclusions about the current status of Sinochart and its relationship to Sinotrans that the defendant and its experts assert. The record is riddled with gaps. Much of the argument is based on documents that request permission or clarification but not the documents that would have responded to such requests, much less the business licenses or other documents (which defendant's experts in other contexts insist are the legally definitive documents) that would have reflected some of the asserted developments and resolutions. As interpreted by the defendant's experts, the record also indicates two lapses in the legal status of the assertedly relevant Sinochart entities, once through the lapsing of a business license in 1991 and once through the cancellation of registration in 1998 as an administrative sanction. (These appear to be terminations, once each, of the two Sinochart entities that defendant's expert identifies.)

12. Moreover, the record is full of apparent doubt and confusion among the relevant governmental actors and Sinotrans about the status of Sinochart. There is in the record much confusion about the status of one or more once-existing entities named Sinochart or something similar. We see key enterprise regulatory agencies of the state themselves expressing perplexity, seeking advice, and suggesting that the matter be treated as a leftover problem or perhaps handled in somewhat innovative or unorthodox ways. There are no documents that resolve such confusion definitively and authoritatively. The defendant's experts themselves do not seem to be able to agree on what happened, with each including a different subset of the tangled history in their accounts of what is necessary to understand the legal character of Sinochart and its relationship to Sinotrans at the time the events relevant to this litigation occurred.

13. In these circumstances, it is unwarranted and unsupported to draw the kind of inferences about the status and nature of Sinochart and Sinotrans that defendants urge, especially in the face of the ample evidence of the legal and functional relationship between Sinotrans and Sinochart, at times relevant to this litigation, that has been set forth in declarations from Clarke, Chen and me.

14. Whatever murkiness or complexity there may, or may not, have been in the transition from the 1950s relationships among the state, Sinotrans and Sinochart and the relationships at the time of the much more recent events relevant to this case, the relationship at the latter time is the "tiered" and parent-subsidiary type structure described in my and other plaintiff's experts' declarations.

15. Second, defendants and their experts make much of the line on Sinochart's business license that states that the "economic nature" of Sinochart is that of an enterprise under the system of ownership by the whole people (with at least two of defendant's experts' declarations asserting that this is the only document of legal significance). They argue that, as such, it cannot be "owned" by Sinotrans, and that the notion of "indirect ownership" that I and other experts for plaintiffs use to describe the character of the relationship between the state and Sinochart has no basis in Chinese law.

16. This position is misleading, at best. As the archaic-sounding language itself suggests, the labels and categories of "economic nature" and "ownership by the whole people" are old terms the legal and practical meaning of which is not what the terms, as translated, might seem to imply, nor what those terms meant at the time of their adoption decades ago in China. The label "ownership by the whole people" now does little more than differentiate the enterprises that bear that label from enterprises that have been reorganized or created under the Company Law (which first went into effect in the early 1990s) or any of several other laws that provide for the creation of various forms of business enterprise. (The Jiang declaration's repeated reference to EOWPs as "non-incorporated" entities is in a key respect misleading, to the extent that it suggests that these entities are similar to unincorporated associations such as partnerships and thus lack legal status analogous to that of incorporated companies. See *Jiang Declaration* ¶¶ 16-20; *Wang Declaration* ¶ 15.) I also note here that defendant's and defendant's experts' repeated contention that plaintiff and its experts assert that Sinochart is governed by the Company Law is incorrect. My declaration clearly does not do so, and I do not read the Chen or Clarke Declarations as doing so either.

17. As noted above and in my prior declaration, this now-hollowed-out meaning of "EOWP" is fully compatible with a widespread practice and a supporting legal framework of enterprises that are "EOWPs" coexisting in tiered structures and parent-subsidiary relationships of the type that I, along with plaintiff's other experts, have described in our declarations.

18. It is misleading to assert that the entry on the business license is the only relevant item of legal significance. See *Jiang Declaration* ¶¶ 26-30; *Wang Declaration* ¶ 24. As my prior declaration and the Clarke and Chen declarations argue, there are many documents that reflect and bear upon the legal status of Sinochart and the relationship between Sinochart and Sinotrans. Many of those point to a "tiered" structure and Sinochart's status as a subsidiary of Sinotrans. More importantly

here, many of them would have been reviewed by the licensing authorities that issued the business license and/or other authorities whose approval would be required before a business registration could be lawfully sought or received.

19. The defendant's and its experts' emphasis on "ownership" is also misleading. The defendant's experts assert that an EOWP cannot "own" another enterprise but asserts that a company organized under the Company Law can. The State-Owned Enterprise Law says nothing specific either way about an EOWP's authority to own another enterprise. The Company Law also does not use "ownership" as its relevant concept for that role. It refers rather to "investors." These could be shareholders. These could also be a sole investor, such as another enterprise. And a sole investor could be the state (acting through, for example, SASAC). (Indeed, under the pre-2005 Company Law a separate subchapter existed specifically to create a clear legal framework for state sole-invested enterprises.)

20. As discussed in my prior declaration and other declarations by plaintiff's experts, Sinochart's sole "investor" is, relevant documents indicate, Sinotrans. Chinese laws and regulations permit state-owned enterprises to "invest" in other state-owned enterprises. Thus, while it is true that Sinotrans and Sinochart are not organized under and subject to the Company Law, they operate in a legal environment that is closely akin in these relevant respects to the Company Law.

21. The use of the term "ownership" has generated additional confusion in this case in another way. In my declaration and, it appears, in the declarations of plaintiff's other experts, the concept of "indirect ownership" was employed or implied. Defendants and their experts argue that this concept has no basis in Chinese law. Neither I nor, I believe, other of plaintiff's experts suggested or asserted that this is a technical term of Chinese law. It was offered to characterize, in terms accessible to an audience familiar with American law, the legal and practical relationships among the state, Sinotrans and Sinochart, which are principally characterized in Chinese law and in relevant documents as including the relationship of "investor" and "invested" between Sinotrans and Sinochart.

22. It is regrettable that Chinese law-making and regulatory authorities have not gone back and cleaned up laws and regulations to remove or revise archaic and now-misleading terms or to make the legal terminology of a broad, framework law fit more naturally with economic and enterprise practice and the more specific legal frameworks that enable and authorize that practice. It is also not surprising, and therefore not significant, that they have not done so, for several reasons. Any problems raised by such terminology in the State-Owned Enterprise Law were expected to be short-term and transitional. The official agenda was to have all EOWPs reorganize as companies under the Company Law. While many have, many also have not.

23. Amending or enacting legislation—especially framework economic legislation—has often proved very difficult in contemporary China, with the recent examples

of the Property Law and the revised Bankruptcy Law, for example, taking many years to get through China's legislative process. Legislation that includes ideologically loaded terms and concepts—such as bankruptcy (which could transfer initially "state-owned" assets to private creditors) or property (which entailed deciding whether to make formerly state-owned or collectively owned property alienable in fee simple-like terms)—have been especially difficult and costly to alter or adopt. The State-Owned Enterprise Law also includes provisions that easily could place it in this category. Further, China's legislation and constitution contain many vestigial references to "socialism" and state-dominance and control of the economy and the like that are understood not to be legally constraining or significant or to hold the meaning they may once in principle have held. Notions of "sate-owned" or "whole people ownership" are also of this character.

24. Amending potentially problematic legislation also is often not legally or practically necessary. Especially for basic statutes from relatively early in China's Reform Era (a category that includes the State-Owned Enterprise Law), the statute is sufficiently general, sparse and vague that significant reform can be—and has been—pursued, through other, collateral or lesser legal means. Such means that permit the emergence of tiered structures and inter-enterprise investment and so on need not be seen as contradicting provisions of the older, broader legislation. Moreover, any possible or seeming contradiction is unlikely to be addressed or resolved. Chinese courts do not have the authority to review or strike down regulations or laws for non-conformity to higher-level laws such as national legislation. That power of review is vested in the legislature and has never been exercised by China's national legislature. Courts and state organs thus enjoy, and exercise, latitude to uphold and implement more recent, more conventionally market-oriented or capitalist-style laws, regulations and practices.

25. As the foregoing suggests, the defendant's experts' interpretation of the law of EOWP (exclusively or almost exclusively, the State-Owned Enterprise Law) is narrow, narrowly formalistic and incomplete, at best. Such narrow formalism is an unfortunate feature of much Chinese legal, and especially Chinese legal academic, analysis. Such analysis does not engage the broader and relevant questions of the functional relationship among the relevant actors and the allocation of the rights that comprise ownership in a U.S. law sense. It also may be the case that defendants' experts' analyses reflect the understandable and in many respects well-placed dislike for the State-Owned Enterprise Law that is common among proponents of the Company Law in China. I am familiar with some of the work of Jiang Ping and Wang Baoshu. Both are impressive and articulate advocates of Company Law in China and reform of the Company Law to make it more nearly approach Western or capitalist models. Those who so support and favor Company Law and its reform in China typically take very critical or negative readings of the State-Owned Enterprise Law, not surprisingly given that they tend to see it as a throwback to, or a holdover from, a bygone era.

26. In the end, and whatever may be the policy perspective and preferences of the defendant's experts, their position is ultimately a narrowly formalistic one that amounts to little more than "Sinochart and Sinotrans are enterprises with the 'economic nature' of enterprises 'under the system of ownership by the whole people' and therefore cannot be anything other than 'whole people'-owned and therefore cannot stand in any 'tiered' parent-subsidiary-like or other non-peer relationship to one another." This position places unbearable weight on formalistic labels that linger in one old general framework statute. And it disregards the considerable body of contemporary Chinese law and practice—including elements bearing directly on Sinochart and Sinotrans—that is inconsistent with so simple and rigid and conclusion, but that is consistent with a conclusion that the relationship between Sinochart and Sinotrans is of the parent-subsidiary or "tiered" type.

27. Third, much of the argument from defendants' experts consists of what might be called an "original sin" type of argument. They point to the initial status, in the 1950s, of the progenitors of the current Sinotrans and Sinochart as entities that were relatively not distinguished from one another or from the state. They point also to the state's being the source of the initial capital of both enterprises and some (or perhaps all) of the capital later invested in both Sinotrans and Sinochart. The claim appears to be that no amount of reform and legal change can cleanse Sinochart of the stain that this produced. See *Song Declaration* ¶¶ 7*ff*.

28. One of the defendant's experts goes further still—and abandons the formalism that characterizes defendant's experts' discussion of EOWP status and EOWP ownership rights—in claiming that the investment of all of Sinochart's capital by the enterprise legal person Sinotrans is an empty formality because the capital is really still state capital despite the recategorization as enterprise legal person capital and despite the space, left blank, for invested "state capital" on the form that documents the investment in the current Sinochart. See *Song Declaration* ¶¶ 20, 30; cf *deLisle Declaration* ¶¶ 90-92 .

29. These arguments "prove too much." If this "original sin" thesis were enough to make a PRC enterprise "owned by the state" and entitled to sovereign immunity, then a very large portion of enterprises, including many organized under the Company Law and those with several clear layers of corporate ownership between themselves and the state, would be entitled to sovereign immunity. So too likely would be many enterprise whose capital today comes from other sources, for it is likely that the actual capital held and used by Sinochart—as with many other enterprises that were once state-owned in a much simpler, more direct and complete sense—comes from retained earnings, bank loans, infusions from parent enterprises and other such sources that are not direct, original capital allocations from the state.

**U.S. Courts and Chinese "Tiered" Structures**

30. Courts in the United States have faced, and correctly understood, structures of ownership of "state-owned" enterprises or EOWPs in China that are analogous, and not analogous, to the structure and relationship that links Sinochart and Sinotrans. Three cases are particularly relevant.

31. First, as addressed in greater detail in my prior affidavit, the Sinochart-Sinotrans relationship is very closely parallel to the Nonferrous-Minmetals relationship in *Lehman Bros. v. China National Minerals and Metals Export-Import Co.*[1] In that case, as here, a "parent" enterprise was a large "state-owned" enterprise (an enterprise under the system of ownership by the whole people) and subject to the State-Owned Enterprise Law (Minmetals / Sinotrans). In that case, as here, the second enterprise (Nonferrous / Sinochart) was at relevant times a subsidiary of the parent enterprise, with close and long-standing operational connections to the parent, independent legal person status, and no other owner or investor. In both cases, the second enterprise was a member of an industrial "group" of enterprises that included the first enterprise as the core or parent enterprise of the group. In both cases, the parent and subsidiary enterprises appear to have been much more legally undifferentiated at earlier phases in their long history and to have received initial capital many decades earlier from the state. In both cases, the second enterprise also was classified as a state-owned enterprise / an enterprise under the system of ownership by the whole people and was subject to the State-Owned Enterprise Law.

32. The *Lehman Bros.* court recognized that Minmetals and Nonferrous stood in a "tiered" ownership structure with Minmetals being owned by the state and Nonferrous being a subsidiary of Minmetals. While the *Lehman Bros.* court found that Nonferrous enjoyed sovereign immunity, it did so on the basis that the tiered ownership structure did not deny sovereign immunity to the lower-tier enterprise—a position rejected by this court in *Bank of China v. NBM* and later by the Supreme Court in *Dole Food Co. v. Patrickson*.

33. Second, in *Bank of China v. NBM*, this court denied sovereign immunity to an entity—the Bank of China Hong Kong—that was wholly owned by an entity—the Bank of China—that was itself under direct ownership of the Chinese state. The enterprise structure was formally somewhat different in that case. The Bank of China Hong Kong appears to have been at relevant times a Hong Kong-registered entity (with independent legal person status). As such, it could not have been formally an enterprise under the system of ownership by the whole people. As discussed earlier in this declaration, that is a peculiar term applicable only to

---

[1] As noted in my earlier declaration, I served as the Chinese law expert for Minmetals / Nonferrous during much of that litigation. This service did not include the phase during which sovereign immunity issues were addressed. My work in the case, which included addressing issues of corporate veil-piercing and independent legal person status, involved extensive work on issues of enterprise and ownership structure.

NYDOCS1/298222.1

enterprise entities organized under the laws of the PRC. Despite Hong Kong's reversion to Chinese sovereignty in 1997, its legal system has remained separate and such PRC legal concepts have not been extended to Hong Kong.

34. Nonetheless, key attributes of the relationship between the Bank of China and the Bank of China Hong Kong appear to have been functionally highly similar to the relationship between Sinotrans and Sinochart. Like Sinotrans, Bank of China appears to have been (and was found by the court to be) an entity wholly owned by the Chinese state or an entity of the Chinese state. Like Sinochart, Bank of China Hong Kong appears to have been an independent legal person whose single investor was that parent entity (Bank of China, like Sinotrans). Even if that were not the precise relationship between the Bank of China and the Bank of China Hong Kong, many Chinese state-owned enterprise with the status and position of Sinotrans (or Bank of China or Minmetals) do stand in such relationships to overseas (a term which, for these purposes, includes Hong Kong) wholly owned subsidiaries. Indeed, as noted in my prior declaration, the Sinotrans Group appears to have such subsidiaries.

35. Moreover, this court in *Bank of China* drew a contrast between the relationship between the Bank of China and the Bank of China Hong Kong, on one hand, and the relationship between Bank of China and Bank of China branches doing business in other non-PRC jurisdictions, on the other hand. The court found those other branches to be unincorporated "branches" of the Bank of China Head Office in Beijing. It appears, therefore, that they were not independent enterprise legal persons under any legal system. And they could not have been such under Chinese law. They are thus fundamentally unlike Sinochart and their enjoyment of sovereign immunity is therefore not relevant to Sinochart.

36. Provincial branches in China of the Bank of China or other state-owned banks might be regarded as in a position similar to the unincorporated non-Hong Kong branches of the Bank of China and thus not entitled to sovereign immunity in part because they are not independent enterprise legal persons and therefore cannot exist in the sort of parent-subsidiary or "tiered" structure that characterizes Minmetals and Nonferrous or Sinotrans and Sinochart. Given the independent litigation authority and corporate structure of provincial level "branches" of the major state-owned banks in China, that conclusion is debatable under Chinese law and, at least, a good deal closer than the typical American legal meaning of a "branch bank" (as I understand it) would suggest.

37. Whatever one's conclusion about that issue, compared to the relationship between a Chinese state-owned bank and a provincial branch of such a bank, the relationship between Sinotrans and Sinochart is much more clearly a "tiered" structure akin to that between Bank of China and Bank of Chin Hong Kong in *Bank of China* or Minmetals and Nonferrous in *Lehman Bros.* Among other vital distinctions, the provincial "branches" of the major state-owned Chinese banks generally are not independent legal persons, unlike Sinochart and Nonferrous.

38. Third, *Trans Chemical Ltd.* v. *China National Machinery Import and Export Corp.*, on which defendants extensively rely, involved a very different set of circumstances from those presented in this case and in other analogous cases. As my prior declaration explains, *Trans Chemical* involved a Chinese entity with no semblance of a tiered ownership structure. At best, the enterprise in question stood in a relationship to the state akin to the relationship between Sinotrans and the state, not the relationship between Sinochart and the state. Moreover, the factual circumstances were a good deal less like those in the present case than even this characterization suggests. The relevant events occurred at a much earlier stage in China's economic and legal reforms when the relationships between the state and enterprises in which it had an ownership or ownership-like interest generally were less well defined and much less similar to the now-common structures that can be appropriately analyzed in terms of parent-subsidiary or "tiered" ownership arrangements. I also concur in the analysis of the *Trans Chemical* decision set forth in Professor Clarke's declaration.

**"State Organ" Issues and Sinochart**

39. Defendants also argue that Sinochart is an "instrumentality" of the Chinese state under the "organ" prong of the test. Based on the entities at issue in the cases defendants cite and the meaning of "state instrumentality" in the relevant aspects of U.S. foreign sovereign immunities law, as I understand them, "organ" would not appear to include Sinochart. In all of the materials and information that I have reviewed concerning Sinochart and Sinotrans, I have found no indication that Sinochart is analogous to: TANS (the entity at issue in *Vivas* v. *Boeing*) which provided Air Force One-like services and troop transport and served other public purposes, was financially "inseparable" from the government, enjoyed "little operational or financial autonomy," and had as its key employees state-paid state employees (i.e., pilots in the national air force), *Vivas* v. *Boeing Co.* 2007 WL 2409742 (N.D. Ill Aug. 21, 2007); or Petroleo (the entity owned by a state-owned entity that was at issue in *RSM* v. *PDVSA*) which the court described as "an instrument of the [state's] oil policy," subject to legal requirements that its activities be "undertaken for the public welfare and social interest," and obliged to "follow in detail the policies, guidelines and direction" of the government thus "makings its activities public in nature," *RSM* v. *PDVSA*, 338 F.Supp. 2d 1208 (D. Colo. 2004). The current characteristics of Sinochart are not consistent with such a characterization. Although subject to a variety of obligations not to transgress public or state interests and subject to the laws and policies of the state, Sinochart legally enjoys considerably greater autonomy and is charged with activities and functions that are primarily commercial and market-responsive in nature.

40. There are many entities in China that might fit the relevant definition of the "organ" version of "state instrumentality." These might include, for example, SASAC. They might have included entities such as the original Sinotrans / Sinochart of the 1950s. The characteristics of Sinochart at the time of the events

relevant to this litigation, however, are not analogous to those of entities that have been found to be organs in the cases relied upon by defendants. Moreover, if entities with the characteristics of Sinochart at the time of events relevant to this litigation were considered to be "organs" of the Chinese state entitled to sovereign immunity, it is likely that the vast majority of substantial enterprises in China that are at all likely to appear as parties in U.S. litigation also would be organs of the Chinese state—a conclusion that would extend near-blanket sovereign immunity to the state-linked enterprises that still predominate in China's external economic relations and that have not so routinely been accorded sovereign immunity in U.S. courts.

**Property / Asset "Ownership"**

41. Defendants and their experts emphasize the "state-owned" character of the assets with which Sinochart operates its business. See *Jiang Declaration* ¶¶ 19-25; *Wang Declaration* ¶¶ 6-15; *Song Declaration* ¶¶ 12-16; *Si Declaration* ¶¶ 29ff. This issue too is addressed in considerable detail in my prior declaration. Here, I will only raise a few key points that bear on arguments from defendants and their experts.

42. First, as my prior declaration explains, arguments that the assets are "state-owned" do not address or engage the critical issue of whether the entity or enterprise is state-owned. (For examples of the apparent confusion of these two concepts or the belief that asset ownership is decisive and enterprise ownership or investor identity is irrelevant, see *Wang Declaration* ¶ 23; *Song Declaration* ¶¶ 12-16, 29; *Si Declaration* ¶ 29.) As my prior declaration addresses, it is possible in Chinese law, as under other legal systems, for an enterprise to be formally and functionally a separate legal entity that operates with assets that it does not itself own. So too, such operation with assets owned by another does not mean that the enterprise is owned by the entity that owns the assets. Here, Chinese law and legal terminology are illustrative. The questions of whether an enterprise is "under the system of ownership by the whole people," of whether a particular group of assets that an enterprise uses are "state-owned," and of who comprises the enterprise's "investor(s)" (and are thus, in a functional sense, its "owner(s)") are, unremarkably, three distinct questions the answer to one of which does not, without more, always dictate a particular answer to the others. Defendant's experts, in the end, do not—and cannot—claim differently.

43. Second, relevant Chinese law and practice are clear that many, indeed most, of the attributes of ownership over "state-owned assets" are indeed vested with the enterprise (including where the enterprise is an EOWP). These include rights of possession, use and disposition, as defendant's experts mostly recognize. Defendant and its experts emphasize the limits to the enterprise's ownership powers, but these are less remarkable than they may seem. See *Wang Declaration* ¶¶ 12-15; cf. *Song Declaration* ¶¶ 29-30 and *Si Declaration* ¶¶ 26-17 (asserting that EOWPs enjoy no aspect of ownership rights). Although the State-Owned

Enterprise Law framework, again, uses archaically socialist language, many of the limits it imposes (and that are relied upon by defendant's experts) are, as my prior declaration discusses in greater detail, little more than proscriptions against waste, impositions of fiduciary duty-like obligations on enterprise management, and requirements that any disposition of property conform to law, and so on.

44. Defendant's expert overdraws the distinction between the state's role, with respect to enterprise property, as "owner" (shareholder or investor) in a company under the Company Law and under the State-Owned Enterprise Law. See *Jiang Declaration* ¶¶ 19*ff*; *Wang Declaration* ¶¶ 12-13. Under the Company Law, investors / shareholders—which are the state or a state organ in a state solely-invested enterprise—do have authority over certain major decisions affecting the assets of the company, much as the state authorities do with respect to state-owned assets assigned to an EOWP. Under the State-Owned Enterprise Law, an EOWP does have extensive authority over the disposition (as well as possession and use) of the assets operated by the enterprise and the obligation, similar to that of a company under the Company Law, to bear civil liability with the assets held by the enterprise. These points too are addresses more completely in my prior declaration.

45. Defendant's experts particularly emphasize the ostensible lack of a specific assignment of the "right to profit" from state-owned assets to an EOWP. See *Jiang Declaration* ¶¶ 24-25; *Song Declaration* ¶ 29. This too overstates the contrast. The State-Owned Enterprise Law itself and many other legal and policy reforms that preceded and accompanied it radically restructured the relationship between the state and "state-owned enterprises." These changes included those that granted enterprises the right to retain a portion of their profits, remitting only a portion to the state, and those that replaced the system of profit remission with a system that imposed taxes on the profits earned (and increasingly retained, net of taxes) by enterprises, including EOWPs. Some of these changes are specifically—if briefly—reflected in the State-Owned Enterprise Law itself. See *State-Owned Enterprise Law*, arts. 6, 28. Moreover, Sinochart's Articles of Association indicate, and ordinary parent-subsidiary type relations dictate, that Sinochart's profits go to its investor, Sinotrans (except to the extent that they are retained by Sinochart or are paid as taxes owed to state fiscal authorities).

46. Defendant's expert also asserts that the state may reassign state-owned assets held by an EOWP and do so without compensation. See *Song Declaration* ¶ 19; *Si Declaration* ¶ 33. In some respects, this is an unremarkable power for assets owned by an entity outside an enterprise (with reassignment ordinarily being an attribute of ownership and compensation governed by the terms of the assignment of rights). Moreover, defendant's experts do not provide instances of the legal authority to which they refer or examples of its use. It is, therefore, hard to evaluate the nature of their claim. Finally, until constitutional amendments in 2004, the notion that property owned by an enterprise (or any other lawful owner or possessor) was legally protected from state seizure without fair compensation

and a public purpose was not a principle of Chinese law generally. (And, like constitutional provisions in China generally, this provisions is seen as largely—and perhaps completely—dependent on implementing legislation.)

47. Third, the notion that operation with primarily or exclusively state-owned assets makes an enterprise "owned by the state" also is an argument that "proves too much." As my prior declaration explains, by this logic, many many PRC enterprises—including foreign-invested joint ventures and foreign-owned (or Chinese-owned) real estate and property development companies—could be deemed "owned by the state." My prior declaration also addresses this issue in greater detail.

48. Fourth, the notion that operation with primarily or exclusively state-owned assets makes an enterprise "owned by the state" and entitled to sovereign immunity is inconsistent with the positions taken by Chinese state-owned enterprises and the Chinese state in legal proceedings and legal analyses at home and abroad. My prior declaration addresses this issue in greater detail.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.

_____
Jacques deLisle

Dated: January 30, 2008

and a public purpose was not a principle of Chinese law generally. (And, like constitutional provisions in China generally, this provisions is seen as largely—and perhaps completely—dependent on implementing legislation.)

47. Third, the notion that operation with primarily or exclusively state-owned assets makes an enterprise "owned by the state" also is an argument that "proves too much." As my prior declaration explains, by this logic, many many PRC enterprises—including foreign-invested joint ventures and foreign-owned (or Chinese-owned) real estate and property development companies—could be deemed "owned by the state." My prior declaration also addresses this issue in greater detail.

48. Fourth, the notion that operation with primarily or exclusively state-owned assets makes an enterprise "owned by the state" and entitled to sovereign immunity is inconsistent with the positions taken by Chinese state-owned enterprises and the Chinese state in legal proceedings and legal analyses at home and abroad. My prior declaration addresses this issue in greater detail.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. §1746 that the foregoing is true and accurate.

*[signature]*
Jacques deLisle

Dated: January 30, 2008