```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
OCEAN LINE HOLDINGS LIMITED,                :
                                            :
                    Plaintiff,              :      07 Civ. 8123 (DC)
                                            :
        - against -                         :
                                            :
CHINA NATIONAL CHARTERING CORPORATION,      :
                                            :
                    Defendant.              :
                                            :
------------------------------------------------------------X
```

## SUPPLEMENTAL MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO VACATE MARITIME ATTACHMENT
## OR IN THE ALTERNATIVE FOR COUNTERSECURITY

*Of counsel:*

Patrick F. Lennon, Esq.
Anne C. LeVasseur, Esq.
Lennon, Murphy & Lennon, LLC
Attorneys for Defendant
CHINA NATIONAL CHARTERING CORPORATION
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070

TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………….......................................1

ARGUMENT

POINT I

CHINESE LAW IS CLEAR THAT EOWPS AND
THE ASSETS THEY MANAGE ARE STATE-OWNED…………………………...............2

    A. Chinese statutory law is clear that an EOWP and its assets are State-owned .........................2

    B. Defendant operates and manages the State's assets, but does not own them………………..13

    C. Sinotrans supervises Defendant, but does not own it…………….............………………….18

POINT II

PLAINTIFF MISCONSTRUES DEFENDANT'S
"INSTRUMENTALITY" ARGUMENT UNDER THE FSIA ORGAN PRONG………………...23

CONCLUSION………………………………………………………………………….......................25

# **TABLE OF AUTHORITIES**

**Authority**                                                                                           **Page**

*Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989)........................13

*AON Fin. Prods., Inc., v. Societe Generale*, 476 F. 3d 90 (2d Cir. 2007).............................3

*Chicago Acorn v. United States Department. of Hous. and Urban Dev.*,......................................3
2005 U.S. Dist. LEXIS 45970 (N.D. Ill. 2005)

Clarke, *The Independent Director In Chinese Corporate Governance*,........................................13
31 Del. J. Corp. L. 125 (2006)

*CSX Transportation, Inc. v. Georgia State Board of Equalization*,..............................................2
128 S. Ct. 467, 169 L. Ed. 2d 418 (2007)

*Dole v. Patrickson*, 538 U.S. 468 (2003).............................................................................5

*EOTT Energy Operating Ltd. P'Ship v. Winterthur Swiss Ins. Co.*,................................................24
257 F.3d 992 (9th Cir. 2001)

*Farmers-Merchants Bank and Trust Co. v. The CIT Group/Equipment Financing, Inc.*,...........7
888 F.2d 1524 (1989)

Federal Rule of Civil Procedure 44.1........................................................................................3

*Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F. 3d 212 (3rd Cir 2006).....................................3

*Karaha Bodas Co., LLC v. Perusahaan Perambangan Minyak Dan Gas Bumi Negara*,..........14
313 F. 3d 79 (2d Cir. 2002)

*Lee v. Bankers Trust Co*, 166 F. 3d 540 (2d Cir. 1999)...................................................................2

*Marx & Co., Inc. v. The Diners' Club, Inc.*,......................................................................13
550 F.2d 505 (2d Cir. 1976), *cert. denied*, 434 U.S. 861 (1977)

*McLachlan v. New York Life Ins. Co.*,..............................................................................8
2006 U.S. Dist. LEXIS 15499 (E.D. La. April 3, 2006)

*Murphy v. Korea Asset Management Corp.*, 421 F.Supp.2d 627 (2d Cir. 2005)...............23-25

*Pavelic & Leflore v. Marvel Entm't Group*, 493 U.S. 120 (1989)...................................2

*Pitway Corp. v. United States*, 88 F. 3d 501 (7th Cir. 1996)............................................3

*Rubin v. United States,* 449 U.S. 424 (1981)..................................................................2

*Servo Kinetics, Inc. v. Tokyo Precision Instruments, Co., Ltd.,*...........................................3
475 F.3d 783 (6th Cir. 2007)

*Trans Chemical v. China National Machinery Import and Export Corp.,*.......................13
978 F. Supp. 266 (S.D. Tex. 1997)

*United States v. Day,* 418 F.3d 746 (7th Cir. 2005)..........................................................3

*United States v. Ron Pair Enterprises,* 489 U.S. 235 (1989)............................................2

*United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991)................................................13

*USX Corp. v. Adriatic Ins. Co.,* 345 F. 3d 190 (3d Cir. 2003).....................................23-24

## PRELIMINARY STATEMENT

Defendant's motion to vacate the attachment herein was simple and straightforward because the Chinese <u>Law on Industrial Enterprises Owned by the Whole People</u> ("LEOWP") is simple and straightforward. It is remarkable that Plaintiff would submit 60 mostly single-spaced pages of Declarations asserting a variety of specious contentions extraneous to the facts and law in Defendant's motion, and then protest that Defendant's point-for-point disputations of *Plaintiff's* assertions are "new." Should Defendant have ignored Plaintiff's Declarations?

Certainly, Plaintiff cannot be accused of making any new arguments in its Sur-Reply. To the contrary, Plaintiff's Sur-Reply Declarations are entirely repetitious of the allegations in its original opposition. The Sur-Reply Declarations contain no fewer than 29 references to Plaintiff's previous Declarations. In fact, Plaintiff has responded to the discrete points of Defendant's rebuttal by citing or repeating the same prior assertions that Defendant refuted one point at a time. Moreover, in doing so, Plaintiff mischaracterizes Defendant's valid contentions in order to knock down its own straw men.

Ultimately, Plaintiff's tack is to try to argue that the <u>admitted</u> meaning of the words of the Chinese statutes have changed, based on its experts' personal views of current Chinese policy, not upon any changes in applicable legislation. Plaintiff's strategy is nothing more than to generate a profusion of chaff and argue that Defendant has not carried its alleged burden of persuasion about sovereign immunity. We trust the Court's attention will not be deflected by the chaff, but will home in on the truth in the plain words of the LEOWP.

In addition to the fundamental fallacy that the Chinese law does not mean what it says, the other main flaws in Plaintiff's reasoning are:

1. Plaintiff refuses to recognize the all-important distinction in Chinese law between ownership of assets and management of assets. This leads Plaintiff erroneously to argue that the assets managed by an EOWP are owned by the EOWP, and further that the *managerial* relationship between so-called "parent" and "subsidiary" EOWPs is an *ownership* relationship.

2. Plaintiff fails to recognize the distinction between pre-judgment attachment and post-judgment execution under the Foreign Sovereign Immunities Act ("FSIA"). Immunity is not absolute. The FSIA permits execution against a sovereign's assets upon the Court's order after expiry of a reasonable time to pay a judgment. The parties herein agree that the assets an EOWP manages are available to its creditors. It is a government's privilege to stipulate that specified assets will be available to creditors. But that does not mean the government has waived immunity from pre-judgment attachment of its assets, or foregone a reasonable opportunity voluntarily to satisfy a judgment before execution.

## ARGUMENT

### POINT I

### CHINESE LAW IS CLEAR THAT EOWPS AND THE ASSETS THEY MANAGE ARE STATE-OWNED

**A.     Chinese statutory law is clear that an EOWP and its assets are State-owned**

If a statute is clear, evidence purporting to explain it is inadmissible. *Lee v. Bankers Trust Co.*, 166 F. 3d 540, 544 (2d Cir. 1999). "When we find the terms of a statute unambiguous, judicial inquiry is complete." *CSX Transportation, Inc. v. Georgia State Board of Equalization*, 128 S. Ct. 467, 474, 169 L. Ed. 2d 418 (2007); *Rubin v. United States*, 449 U.S. 424, 430 (1981) ("when we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances"); see also *United States v. Ron Pair Enterprises*, 489 U.S. 235, 240 (1989); *Pavelic & Leflore v. Marvel Entm't Group*, 493 U.S. 120, 122 (1989); *United States*

*v. Day*, 418 F.3d 746, 756 (7th Cir. 2005); *Chicago Acorn v. United States Department. of Hous. and Urban Dev.*, 2005 U.S. Dist. LEXIS 45970 at 14 (N.D. Ill. 2005) (holding "[b]ecause the language is clear, the court need not turn to additional tools of statutory interpretation").

"Interpretations of foreign law present a question of law." *Servo Kinetics, Inc. v. Tokyo Precision Instruments, Co., Ltd.*, 475 F.3d 783, 790 (6th Cir. 2007); see also *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F. 3d 212, 216 (3rd Cir 2006) ("[de]terminations of the content of foreign law are questions of law"). "[T]rial courts may find and apply foreign law." *AON Fin. Prods., Inc., v. Societe Generale*, 476 F. 3d 90 (2d Cir. 2007); see also Federal Rules of Civil Procedure 44.1 ("[t]he court's determination shall be treated as a ruling on a question of law").

It is therefore the function of this Court to determine, as a question of law, the content of the controlling Chinese statutes applicable to the laws on EOWPs. Because the controlling Chinese statutes are plain and unambiguous, the Court need not look to any additional aids or tools of statutory interpretation.

As demonstrated hereafter, Plaintiff's declarations proffer personal opinions and interpretations of the current intent of the Chinese statutes (not the intent at the time the statutes were drafted). However, expert evidence regarding alleged policy reasons for interpreting an unambiguous foreign statute to mean something other than what it says, or suggesting the plain words are merely a formality, may not be considered. *Pitway Corp. v. United States*, 88 F. 3d 501, 505 (7th Cir. 1996).

There are no exceptional circumstances here which require the Court to look beyond the face of the statutes. Under the relevant statutes, an EOWP has the right to possess, use, manage, and operate property <u>belonging to the State</u> with the authorization of the State. Sinochart, an EOWP, is, as its name suggests, an entity wholly owned by the People's Republic of China

("PRC"), and its assets are State-owned. Accordingly, Sinochart and its assets are immune from any prejudgment attachment in the United States.

> Article 2 of the LEOWP states in relevant part:
>
> An industrial enterprise owned by the whole people (hereinafter referred to as the enterprise) shall be a socialist commodity production and operation unit which shall, in accordance with law, make its own managerial decisions, take full responsibility for its profits and losses and practice independent accounting.
>
> The <u>property of the enterprise shall be owned by the whole people</u>, and shall be <u>operated and managed by the enterprise</u> with the authorization of the state in line with the principle of the <u>separation of ownership and managerial authority</u>. The enterprise shall enjoy the rights to possess, utilize and dispose of, according to law, the property which the state has authorized it to operate and manage.[1]

***See Jiang Decl., Ex. 5.*** Article 6 of the LEOWP states:

> The enterprise must effectively utilize the property which <u>the state has authorized it to operate and manage</u> and realize the multiplication of its assets; the enterprise must, according to law, pay taxes and fees and hand in profits.

***Jiang Decl., Ex. 5.***

Clearly, EOWPs, including so-called subsidiary EOWPs that have been "funded" by so-called parent EOWPs, <u>manage</u> assets (such as the restrained EFTs) that are owned by the State, but do not <u>own</u> such assets. Additionally, the assets managed (not owned) by "parent" EOWPs by definition include the "subsidiary" EOWPs,[2] because the assets of all EOWPs, including "parent" EOWPs, are owned by the State. ***Second Song Decl. ¶¶ 4, 7- 9; First Si Decl. ¶ 29.***

The U. S. Supreme Court made clear that only <u>ownership</u>, not management, counts in

---

[1] Emphasis throughout this brief is added unless otherwise indicated.

[2] As set forth herein, Defendant contends that the "parent/subsidiary" labels Plaintiff attempts to employ relate to management and not ownership. Even assuming *arguendo* that the labels did relate to ownership, the ownership itself rests with the State and not the "parent" EOWP.

determining whether immunity is available. "Majority ownership by a foreign state, not control, is the benchmark of instrumentality status." *Dole v. Patrickson*, 538 U.S. 468, 477 (2003).

Articles 3 and 41 of the 1992 <u>Regulations for the Transformation of the Business System of Industrial Enterprises Owned by the Whole People</u> ("Transformation Regulations") reiterate the foregoing in stating that the purpose of the "transformation" is ". . . To <u>ensure the ownership of the State</u> to the assets of the enterprise, and safeguarding and appreciation of the State Assets" (Art. 3), and "Assets of enterprises are owned by the whole people, <u>namely, owned by the State</u>. . ." (Art. 41). ***Second Song Decl.*** ***¶ 15*** (the first Declaration of Plaintiff's expert, Mr. Chen, pointedly omitted these Articles in his discussion of the 1992 Transformation Regulations. ***See First Chen Decl.*** ***¶ 21*** and excerpts from the Transformation Regulations at Ex. 3 thereto).

The same principle is repeated yet again in the 1993 <u>Interim Measures on Ascertainment of Property Rights of State-owned Assets and Resolution of Property Right Disputes</u> ("Interim Measures"), at Article 6:

> The People's Republic of China is the sole subject of the ownership right of the state-owned assets. The State Council exercises the ownership right of the state-owned assets on behalf of the State. The State adopts the method of administration of the state-owned assets by different levels and different divisions. The differentiation and variation on the administrative subjects at different levels and divisions is <u>not the separation or transfer of the state-owned property right</u>.

***Third Song Decl., Ex. 1***.

Article 6 of the 1993 <u>Interim Measures</u> makes it clear that the State, not any particular State agency, owns State-owned assets, contrary to Prof. Clarke's statement that "EOWPs are not abstractly owned by 'the Chinese government.'" ***Second Clarke Decl.*** ***¶ 20; see also Third Song Decl.*** ***¶ 9-11; Second Si Decl.*** ***¶ 11***. The State Council is given the <u>exercise</u> (*i.e.* management) of the rights appurtenant to ownership of assets (such as possession, use, and disposition according

- 5 -

to law), which it in turn delegates to other national or local political arms, or, as managerial functions, to an EOWP. The State's right to manage a group of State-owned EOWPs may be delegated to a "core" EOWP in a "group company/subordinate enterprise" administrative arrangement. However, the delegation of those managerial rights is not an assignment of ownership. ***Third Song Decl. ¶¶ 4-8, 11; Second Si Decl. ¶ 12-13; Jiang Decl. ¶ 25.***

The LEOWP and regulations are clear, and Plaintiff's witnesses have acknowledged, that: (1) Defendant is an EOWP; (2) Defendant is owned by the State; and (3) Defendant's assets are owned by the state. Prof. de Lisle's First Declaration says at least half a dozen times that Defendant's assets are "managed and operated" by Defendant, not owned. ***See First de Lisle Decl. ¶¶ 22, 23, 26, 50, 52, 57.***

As Prof. Clarke has admitted: "Whether Sinochart is an EOWP is not in dispute." ***Second Clarke Decl. ¶ 5.*** It is unfathomable on what legal basis he would deride EOWP status as nothing but a "label found on the business license." ***Id. at ¶ 14.*** Prof. de Lisle, as well, can do no better than belittle Defendant's status as an EOWP to a mere "entry" on a business license. ***Second de Lisle Decl. ¶ 18.*** Prof. Jiang explained that the registry administration must examine and approve an application to do business as an EOWP. It is no mere formality to be an EOWP. ***Jiang Decl. ¶¶ 26-29; Second Si Decl. ¶ 14; Wang Decl. ¶¶ 24, 30.***

Mr. Chen wrote at paragraph 31 of his Second Declaration:

> (a) In paragraph 25 of his declaration, Professor Si Yuzhuo suggested that my view was that Sinochart was not an EOWP. <u>I did not say so anywhere in my first declaration. I do not deny that Sinochart was registered as an EOWP</u> . . . .
>
> (b) In paragraph 28 of his declaration, Professor Si again suggested that my view was that Sinochart is not a state-owned enterprise. <u>I do not hold that view either.</u> . . .

***Second Chen Decl. ¶ 31.***

- 6 -

Mr. Chen wrote at paragraph 34 of his Second Declaration:

> I do not deny that, according to the Law of IEOWP (Article 2), <u>the assets of an EOWP are owned by the whole people</u>.

**Second Chen Decl. ¶ 34.**

Plaintiff's American witnesses argue that the language of the statute is no more than an abstract formalism, and the Court should look beyond the law's plain words. ***Second Clarke Decl. ¶¶ 6, 7, 22; Second de Lisle Decl. ¶ 25.*** Prof. de Lisle says the alleged formalism is a "feature of much Chinese legal, and especially Chinese legal academic, analysis" but asks this Court to disregard this (alleged) Chinese tenet of legal analysis and substitute a supposedly broader American rule of construction. ***Second de Lisle Decl. ¶ 25.*** Prof. de Lisle may feel that the supposedly narrow Chinese legal approach is an "unfortunate" feature of Chinese law but it is not for him to dictate to other nations how they should write and interpret their statutes. *Id.*[3]

As Prof. Si points out, China is a civil law country. ***Second Si. Decl. ¶ 15.*** "Historically, the attitude of courts toward statutory materials have differed in common law and civil law systems." *Farmers-Merchants Bank and Trust Co. v. The CIT Group/Equipment Financing, Inc.*, 888 F.2d 1524, 1527 (1989). "[L]egislation is the solemn expression of legislative will." *Id.* "Courts must look first and foremost to the state's primary sources of law, the State's Constitution, codes, and statutes. . . . The primary basis of law for a [civil law system] is legislation, and not, as in the common law, a great body of tradition in the form of prior

---

[3] In the same paragraph, Prof. de Lisle gratuitously claims that Defendant's Chinese experts' published writings show they dislike the LEOWP. We will not engage in an irrelevant factual contest about that. We must, however, point out the obvious: If Prof. de Lisle's statement is true, that demonstrates all the more strongly that the LEOWP means what it says, because that is why, according to de Lisle, Defendants' experts and other authorities supposedly dislike the statute. It is not up to Prof. de Lisle or a U.S. Court, to abrogate a clearly written Chinese statute, and no Chinese scholar purports to do so.

decisions of the courts." *McLachlan v. New York Life Ins. Co.*, 2006 U.S. Dist. LEXIS 15499 at *5 (2006) (E.D. La. April 3, 2006).

"In order for the law to serve the people, it must reflect reality." *Id.* at 375. The reality is that the language contained in the Chinese statutes creating and governing EOWPs is plain and unambiguous, therefore, under the civil law system of government, the plain language of the statute controls this court's analysis.

Statutes are the "reality" in a civil law system, and they control unless and until they are repealed or replaced by other statutes. Yet, Plaintiff's experts have made no such claim. In any event, the "reality" of Chinese law is not derived from Plaintiff's witnesses' views of what the law should be or even of what they think some members of the government think it should be. The "reality" of Chinese law certainly is not based on an American legal point of view.

Several of Plaintiff's witnesses' statements demonstrate that they are asking this Court to disregard what they acknowledge is the plain meaning of the LEOWP:

> Thus, despite decades of substantial economic reform in the post-Mao era[4], political leaders <u>still view it as **critical to maintain the language of state ownership**</u>, and the law in its language has not traditionally made a rigorous distinction between ownership of enterprises as such and ownership of physical assets. . . . As a result, we find that while the law states that EOWPs can possess, use, and sell (and have seized by creditors) certain assets, it is still insisted in some quarters that the word "ownership" must not be applied to those rights. <u>While one can understand the ideological needs of the Chinese legal system, however,</u> **I do not believe that an American court is required to cater to them.** If it looks like ownership, <u>**we**</u> should call it ownership.

***Clarke Second Decl. ¶ 11.***

---

[4] Mao died in 1976 and the "post-Mao reforms" began in 1978 when Deng Xiaoping became China's political leader. The LEOWP was enacted <u>ten years later,</u> in 1988, and the Transformation Regulations were enacted in 1992. Apart from the inadmissibility of Plaintiffs' witnesses' opinions that the meaning of the words of the LEOWP changed with the times, there is no evidence that the times have changed in any relevant respect since 1992.

- 8 -

> I am fully aware of what the laws say about the ownership of an EOWP as I am aware of the description of the economic nature (which is an outdated word seldom used in daily life) of an EOWP. <u>What I do not accept is that these provisions ought to be taken on face value</u>.

*Chen Second Decl.* ¶ 25.

> Professor Wang states in paragraph 10 of his Declaration that ". . . any property in an EOWP, in fact belongs to and is 100% owned by the People's Republic of China." Professor Wang draws its [*sic*] conclusion apparently solely on the ground that <u>the law apparently provides so</u>.

*Chen Second Decl.* ¶ 36.

> . . . . defendants and their experts make much of . . . formal and largely vestigial legal categories that have little practical and legal meaning <u>today</u> and do not have today the significance that defendants (or, perhaps, <u>a literal translation of the terminology</u>) suggest . . . .

*De Lisle Second Decl.* ¶ 6.

> As the archaic-sounding language itself suggests, the labels and categories of "economic nature" and "ownership by the whole people" are old terms the legal and practical <u>meaning of which is not what the terms as translated might seem to imply</u>, <u>nor what those terms meant at the time of their adoption</u> decades ago in China.

*De Lisle Second Decl.* ¶ 15.

In sum, it is Mr. Chen's view that a legal opinion should not be based on what the statute states on its face. It is Prof. de Lisle's view that the English translation, although not challenged, does not mean what it says, nor what it <u>admittedly</u> meant when the statute was written! And it is Prof. Clarke's humble view that an American Court should disregard the plain words of Chinese laws that were enacted 10 and 14 years into reform, express the "critical language of state ownership," and meet the "ideological needs of the Chinese legal system." Instead, America

should impose its occidental perspective (or Clarke's perspective) upon the State of China. Clearly, those personal opinions are inadmissible in construing the plain words of the statute.

It should not be surprising that the western-infused perspective of Plaintiff's two American law professors, Clarke and de Lisle, differs from the point of view of Defendant's three Chinese law professors, Si, Jiang, and Wang, who have been scholars of Chinese law contemporaneously with its development since before the 1988 enactment of the LEOWP. Defendant's status as an EOWP and its appurtenant attributes are matters of Chinese, not American, law and perspective. The arguments of Plaintiff's Chinese lawyer, Mr. Chen, are exercises in advocacy, not objective expert opinion.

Plaintiff's witnesses' arguments contain their own defeat, because they admit the LEOWP meant what it said when it was written and that the authorities in contemporary China hold that the statute still means what it always meant. As quoted above, Prof. Clarke acknowledges that "political leaders still view it as critical to <u>maintain</u> the language of state ownership. . . ." ***Second Clarke Decl. ¶ 11.*** In other words, the language of State ownership meant what it said when the LEOWP was written, and contemporary political leaders consider it is important to retain that meaning, not change the interpretation of the unchanged words. This directly contradicts Prof. de Lisle's intimation that it is only due to a slow moving legislative bureaucracy that the statute has not been revised. ***Second de Lisle Decl. ¶¶ 22-23.***

Prof. de Lisle, like Prof. Clarke, also acknowledges that the LEOWP once meant exactly what Defendant contends it still means, and that many Chinese authorities agree with Defendant's witnesses that it still means what it always did. As quoted above, de Lisle wrote that the meaning of the LEOWP: "is not what the terms as translated might seem to imply, nor

what those terms <u>meant at the time of their adoption</u>." ***Second de Lisle Decl. ¶ 15***. In his First Declaration, Prof. de Lisle wrote:

> ¶ 65. In this rapidly evolving and now profoundly transformed context, the meaning of "ownership by the whole people" (like "collective ownership") has been fundamentally <u>altered</u>. . . . That Soviet-style structure initially gave way to one of state "departments in charge" that often combined regulatory, some asset ownership, enterprise ownership and sometimes management functions over "their" enterprises. (The shadow of that interim world <u>still hangs on – in my view excessively</u> . . .)"
>
> ¶ 66. An enterprise's formal classification as under the system of "ownership by the whole people" simply <u>does not retain the robust notion of "state ownership" that it once may have had</u> now that China has undertaken decades of legal reforms . . .
>
> ¶ 75. . . . . In ordinary Chinese descriptions, the term "state-owned" (guoying) that <u>once would have applied to both enterprises</u> would no longer be applied to Sinochart, though it might to Sinotrans, even though both are enterprises "under the system of ownership by the whole people."
>
> ¶ 76. Under the circumstances of enterprise ownership and enterprise structure in contemporary China described above, "ownership by the whole people" thus does not mean <u>what it would appear to suggest</u>.

***First de Lisle Decl. ¶¶ 65-66, 75-76***.

Thus, Prof. de Lisle acknowledges the plain meaning and original intent of the LEOWP on its face. He argues, however, that the self-same words should nevertheless be construed otherwise in light of alleged policy changes, notwithstanding that the statute itself has not been amended. Moreover, he acknowledges the precept of "State ownership" <u>subsists</u>, but, in his opinion, either "excessively" (*id.* ¶ 65) or "not robustly" (*id.* ¶ 66). "Excessive" and "not robust" are contradictory terms, but either way de Lisle acknowledges that State ownership persists. It cannot be wished away. de Lisle's acknowledgment that State ownership continues today was put even more strongly by Clarke, who wrote that Chinese political leaders consider it "critical."

- 11 -

Prof. de Lisle acknowledges that the LEOWP was enacted for the very purpose of accomplishing the very same policy that he simultaneously argues mandates a change in the interpretation of the unmodified statute: "to make firm-level entities responsible for their own successes and failures, and free to respond to market incentives." ***First de Lisle Decl. ¶¶ 51-52***.

Thus, the LEOWP and its regulations were enacted to remove bureaucratic State ministries from the <u>management</u> of an EOWP's business, <u>without</u> a transfer of ownership of assets to the EOWP. Prof. de Lisle cites no facts whatsoever to support his argument that EOWP-<u>ownership</u> of assets would effectuate the State's policy better than EOWP-<u>management</u> of assets, or that the Chinese government has come to believe so since 1988. On the contrary, the statements of Plaintiff's own witnesses establish that the Chinese government continues to hold State-ownership of EOWPs and their managed assets to be critical.

Productive business management is cultivated in the LEOWP by focusing management in a (State-owned) business entity instead of a State bureaucracy, and is also fostered by the prospect of the punishment that can be meted out to managers for causing losses of State-owned assets. ***First de Lisle Decl. ¶¶ 26, 57***.

It is rather surprising that Profs. Clarke and de Lisle would refer to "EOWP" and "economic nature" as out-dated, archaic, and vestigial expressions (***Clarke Second Decl. ¶ 25; Second de Lisle Decl. ¶¶ 6, 16, 23***), because Clarke's first Declaration cited a <u>2007</u> government document titled: "How to Handle Registration of Enterprises Owned by the Whole People and Collectively-Owned Enterprises." ***First Clarke Decl. ¶ 14, n. 4***. Clearly, "owned by the whole people" and "EOWP" are very much current and economically meaningful concepts. ***Third Song Decl. ¶ 19; Second Si Decl. ¶¶ 14-15***.

We don't know when Prof. Clarke thinks "EOWP" became out-dated, or when an EOWP's "economic nature" became nothing but a label on a business license, but clearly he made no such suggestion to the Court when he testified in *Trans Chemical v. China National Machinery Import and Export Corp.*, 978 F. Supp. 266 (S.D. Tex. 1997). Nor did Prof. Clarke think EOWP was outdated or a label on a business license as recently as 2006, when he wrote:

> This does not mean that state ownership of enterprises is on the way out. The government has explicitly declared its firm commitment to retaining control over enterprises in several sectors: national security-related industries, natural monopolies, sectors providing important goods and services to the public, and important enterprises in pillar industries and the high-technology sector.

Clarke, *The Independent Director In Chinese Corporate Governance*, 31 Del. J. Corp. L. 125, fn. 78 (2006). His testimony in *Trans Chemical* was entirely consistent with the opinions offered in this case by Sinochart's experts. Particularly apt is his testimony that: "The Industrial Enterprises Law seeks to encourage <u>management</u> autonomy, while at the same time <u>maintaining state ownership</u> of enterprise assets. It does so by separating ownership rights from operation and management rights." *Trans Chemical*, 978 F. Supp. at 284.

As far as de Lisle's and Clarke's discussions of <u>American</u> judicial decisions are concerned, it should go virtually without saying that these are not admissible. It is fundamental that a lawyer-expert witness may not testify to legal conclusions, which is exclusively the province of the Court. *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991); *Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1976), *cert. denied*, 434 U.S. 861 (1977).

**B.**     **<u>Defendant operates and manages the State's assets, but does not own them</u>**

Contrary to Plaintiff's characterization (Sur-Reply Mem. at 9), State-ownership of the assets Defendant manages is not a "fall-back" or "either/or" argument. FSIA § 1609 protects