UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
OCEAN LINE HOLDINGS LIMITED,          :
                                       :
                Plaintiff,             :          07 Civ. 8123 (DC)
                                       :
         - against -                   :
                                       :
                                       :
CHINA NATIONAL CHARTERING              :
CORP. a/k/a SINOCHART,                 :
                                       :
                Defendant.             :
------------------------------------------------X

## SECOND DECLARATION OF SI YUZHUO
## IN SUPPORT OF DEFENDANT'S
## MOTION TO VACATE MARITIME ATTACHMENT

I, Si Yuzhuo, declare under penalty of perjury of the laws of the United States of America

as follows:

1. I submitted my first Declaration on the subject case on 30th November, 2007. I now

submit my 2nd Declaration on the subject case.

2. I have read and considered the following documents which are provided to me:

（1）    Plaintiff Ocean Line Holdings' Sur-Reply Memorandum of Law in opposition

        to Defendant Sinochart's Motion to Vacate;

（2）    the Second Declaration of Mr. Donald Clarke;

（3）    the Second Declaration of Mr. Weidong Chen with exhibits;

（4）    the Second Declaration of Mr. Jacques deLisle;

（5）    the Second Declaration of Mr. Peter Gutowski in opposition to Motion to

        Vacate;

- 1 -

（6）    Declaration of Professor Wang Baoshu;

（7）    the Second Declaration of Mr. Song Dihuang with exhibits;

3. I can see that all the Plaintiff's experts agree that the Law of Industrial Enterprises Owned by the Whole People ("EOWP") and the Constitution of the People's Republic of China ("PRC") are the fundamental laws governing the legal relation of EOWPs.   The main difference between the experts of the Plaintiff and the Defendant is how to interpret the provision of the Law of EOWP[1].   Mr. Chen Weidong and Mr Donald Clarke take the view that one cannot read the Law of EOWP on the "face value."   However, the language of the law is clear and unambiguous.   If an enterprise is registered as an EOWP, it is an EOWP under Chinese law. There is no doubt under Chinese law that all the properties of an EOWP belong to the whole people of the People's Republic of China, i.e., the State.   Legally an EOWP cannot be owned by anyone (including another EOWP), other than the State, although the State may delegate some administrative functions to some EOWPs to exercise certain management roles on behalf of the State.   As a Chinese practicing lawyer and a law professor, I can confirm that the Law on EOWP is enforced.   Again, there is no doubt about this.   I note that the Plaintiff has not bothered to obtain a second opinion from a distinguished legal scholar from the People's Republic of China.   With respect to Mr. Clarke and Mr. deLisle, they are not qualified practicing Chinese lawyers and educated in law in the PRC and their opinions are incorrect both in terms of law and practice, as they are based apparently on their opinions as to their respective

---

[1]  In my First Declaration, the Law of EOWP was referred to as the Law of IEOWP.

American views of the "reality" of Chinese law, as opposed to a proper legal interpretation of the law itself as written.

4.    Mr. Chen has produced some documents and attempted to show that the present Sinochart is not the one established by the Chinese Government in 1955.    Mr. Chen's opinion is misleading.    On the contrary, these documents show that it is the Chinese Government up to the Central Government, i.e., the State Council, who exercised the control over the registration of Sinochart as an EWOP and its maintenance of Sinochart's status as a government controlled and formed EOWP.

### *Ownership of Sinochart*

5.    With respect to the ownership of EOWPs, the PRC law is clear.    If an enterprise is an EOWP, the EOWP and all of its assets are owned by the whole people of the PRC, i.e., the State. Any contrary conclusion would be wrong and would be contrary to Chinese law and practice.

6.    In paragraph 25 of his Second Declaration, Mr. Chen states: "I am fully aware of what the laws say about the ownership of an EOWP as I am aware of the description of the economic nature of an EOWP.    What I do not accept is that these provisions ought to be taken on face value."    *See 2nd Chen Declaration paragraph 25.*    It appears that Mr. Chen argues that the express, written provisions of PRC laws should not be literally interpreted, but should be explained and interpreted in other ways.    I cannot understand or accept his reasoning.    The law expressly provides that all properties of an EOWP belong to the whole people, that is the State. There is no room for a different conclusion to be drawn, especially considering that China employs a statute/civil law system.

- 3 -

7.    In paragraph 26 of his Second Declaration, Mr. Chen argues that Article 2 of the Law

of IEOWP confers the right of possession, use and disposition on an EOWP and therefore my

first Declaration is wrong in stating that "the whole people or Chinese government owns the full

ownership of an EOWP."    *See 2nd Chen Declaration paragraph 26.*    Apparently, Mr. Chen's

opinion is misleading again.    In fact, it is well known that under PRC law the functions of

ownership may be separate from the ownership.    For instance, the owner of a property can rent

his property to others and the right of possession and utilization is transferred to the property

leaser, but it does not mean that the owner loses the right of ownership.    Likewise, EOWPs are

conferred the right to operate, manage, possess, use and dispose of their properties in accordance

with the laws of the PRC.    It does not mean that the State loses its right of ownership of the

properties.    The second provision of Article 2 of the Law of IEOWP states: "The property of the

enterprise shall be *owned by the whole people,* and shall be *operated and managed by the*

*enterprise* with the authorization of the state in line with the principle of the separation of

ownership and managerial authority."    The above provision is to separate the ownership from

the management.    This delegation to the EOWP of operation and management functions does

not affect the State's ownership of the EOWP and its property.

8.    In paragraph 7 of Mr. Clarke's Second Declaration, he argues that the opinions of

Professor Wang Baoshu and myself that EOWPs and their assets are owned directly by the State

is based on a formalistic definition of ownership.    *See 2nd Clarke Declaration paragraph 7.*

He also opines that EOWPs are entitled to possess, use or dispose of their assets according to the

PRC laws and this "looks" like ownership.    Mr. Clarke's opinion is in essence the same as Mr.

Chen's.  ***See paragraph 6 above***.   With respect, Mr. Clarke's opinion is wrong.   His obvious mistake shows that Mr. Clarke is not familiar with Chinese laws and regulations, especially Real Right Law of the PRC.   Firstly, like other continental law countries, the PRC adopted the principle of "One Thing, One Right," i.e. there is only one title to one property.   Thus, one title may be owned by a single subject (i.e. a person, an enterprise or an organ or institution) or multi-subjects.   The latter is named "co-ownership" under Chinese laws.[2]   However, even in the circumstances of co-ownership, there is still only one title to one property which is owned by the co-owners jointly or by proportions.   According to the principle of  "One Thing, One Right," given that the ownership of the property is owned by a single subject (or by multi-subjects), it is impossible that other subjects enjoy the ownership of the same property at the same time.   In view of this principle, under the PRC laws, the State-owned assets belong to the whole people (i.e. belong to the State), so it is impossible that any other entity can also enjoy the ownership of the state-owned assets at the same time.   Mr. Clarke argues that the right to possess, use or dispose of assets "looks" like ownership.   Obviously, Mr. Clarke neglects the legal phenomenon that the powers and functions may be separate from the ownership.   In this regard, I have given examples above of renting property to explain this legal phenomenon.   In conclusion, under the principle of "One Thing, One Right" and considering the separation of the ownership and operation, the Stated-owned assets can only be owned by the whole people of the

---

[2]  Article 78 of General Principal of Civil Law of the PRC prescribes, "Property may be owned jointly by two or more citizens. Co-ownership is divided into co-ownership according to share and co-ownership-in-common. Co-owners by share enjoy rights and undertake obligations with regard to property in accordance with the proportion of their respective shares. Owners-in-common enjoy rights and undertake obligations with regard to the property owned in common."

PRC (namely, the State) and any entity or individual (including the enterprise itself) does not enjoy the ownership.    The enterprise only has the right of operation and management.    Their rights of possession, use and disposition of the authorized assets are only in respect of operation and management, and is not equal to ownership under PRC law.    Otherwise, it will be contrary to the principle of "One Thing, One Right."

9.    In paragraph 8 of Mr. Clarke's Second Declaration, he states: "If the physical and financial assets in question are in a realistic sense directly owned by the Chinese state, such assets would not be available to creditors."    *See 2nd Clarke Declaration paragraph 8.*    In my opinion, that is only Mr. Clarke's unfounded worry and imagination.    Moreover, the unfounded worry and imagination indicate that Mr. Clarke is not familiar with Chinese laws and regulations, because there are specific provisions in Chinese laws regarding this issue.    According to the article 48 of General Principles of the Civil Law of the PRC, "An enterprise owned by the whole people, as legal person, shall bear civil liability with the property that the state authorizes it to manage."    Also, Article 2 of Law of IEOWP states: "The enterprise shall obtain the status of a legal person in accordance with law and bear civil liability with the property which the state has authorized it to operate and manage."    That is to say, under Chinese laws, although EOWPs only have the right of operation and management of the assets authorized to them, they are required by the laws to bear civil liabilities with the properties that the State authorizes them to manage.    In other words, in China enterprises cannot defend against creditors based on the argument that the assets are owned by the State.

10.    In paragraph 9 of Mr. Clarke's 2nd Declaration, he states: "According to Sinochart and its experts, Sinochart does not own this property; it belongs instead to the Chinese state.    Yet it is Sinochart, not the Chinese state, that has appeared in court alleging that the attached property is the property of Sinochart and challenging the attachment.    Given that Sinochart does not appear to accept its experts' reasoning, there is no reason for this Court to do so."    *See 2nd Clarke Declaration paragraph 9.*    This point of Mr. Clarke is contrary to Chinese laws and regulations.    Under Chinese laws, it is an obligation of EOWPs to maintain and improve dominance and competitiveness of the State-owned assets.    At the same time, EOWPs have the complete capacity for civil rights and also for civil conduct.    In other words, in China EOWPs shall bear the liabilities for their debts with all the property managed and operated by them.    On the other hand, when their rights and the State-owned assets are infringed, EOWPs may in their own names, protect their rights and the assets from being infringed.    In this case, therefore, under the PRC laws, it is legitimate for Sinochart to challenge the property preservation in court in its own name.    It is not only the result of its obligation of maintenance and improvement of the State-owned assets, but also the result of its relative civil rights.

11.    In his two Declarations, Mr. Clarke states that an EOWP is not abstractly owned by the Chinese government, but rather must be owned by a particular state institution.    *See 1st Clarke Declaration paragraph 21 and 2nd Clarke Declaration paragraph 20.*    In my opinion, Mr. Clarke's view is only partially correct.    It would be two different concepts who has the ownership and who may exercise the rights (functions) of ownership.    There is no doubt that the State directly and exclusively holds the ownership of State-owned enterprises, while the state

institution does not.   However, the State has to exercise the ownership through a certain state institution.   In China, the State-owned Assets Supervision and Administration Commission ("SASAC") which was established by State Council and local governments at all levels, exercises the right of ownership of some of the State-owned assets on behalf of the State. According to Article 28 of the Supervision and Administration of the State-owned Assets of Enterprises Tentative Regulations,   SASAC may authorize some qualified EOWPs and companies to operate the State-owned assets.  *See I$^{st}$ Si Declaration, Exhibit 4.*   In other words, besides SASAC, EOWPs may be authorized to invest, operate, administer and supervise the State-owned assets of State-owned enterprises in certain circumstances and EOWPs on behalf of the State exercise the right of ownership.   Sinotrans was approved by State Council as one of the institutions to invest as authorized by the State  *See Exhibit 1 annexed hereto, Document of China Securities Regulatory Commission and the State Council Secretariat Document (publicly available at SAIC) and Abstract English translation.*   However, in any case, it is untenable in respect of Mr. Clarkes' opinion that the ownership of Sinochart is not held directly by the State only because the ownership functions are not exercised by any identifiable state institution.

### *The relationship of Sinochart and Sinotrans*

12.   I explain the history of Sinochart below (*see paragraphs 18, etc.)* in this Declaration. The present Sinochart is the continuance of the Sinochart which was established in 1955, and was placed into the Sinotrans Group by an administration order of government of the PRC in 1996.   However, the relationship of Sinotrans Group and Sinochart should not be regarded as a

"parent-subsidiary" relationship under the PRC Company Law.    Therefore, it is incorrect in a strict legal sense to call Sinochart a "subsidiary" of Sinotrans or to claim that it "belongs" to Sinotrans Group in the sense of ownership.    The relationship of Sinotrans and Sinochart Group is an administrative affiliation relating to operation and management. Although the Sinotrans Group was established with Sinotrans as its core enterprise, this can not charge the equal legal status of Sinotrans and Sinochart which are the members of the same group. I will explain this in details in the later part of this Declaration. In any event, the ownership of Sinochart rests solely and exclusively with the whole people, that is the State.

13.    As aforesaid, it is also a result of an administration arrangement of government that Sinochart joined Sinotrans Group in the name of a "zigongsi" (English: "subsidiary") of Sinotrans Group, but that did not divest the State of its ownership of Sinochart or confer on Sinotrans ownership of Sinochart in the legal sense.

### Comments on the Second Declaration of Mr. deLisle

14.    In paragraph 16 of his Second Declaration, Mr. deLisle argues that the terms "economic nature" and "ownership by the whole people" under Chinese Law are old terms and the true meaning of which are not what the terms seem to imply.    *See 2nd deLisle Declaration paragraph 16.*    He also argues that the label "ownership by the whole people" now does little more than differentiate the enterprises that bear that label from enterprises that have been created under the Company Law.    I believe his opinions are contrary to the plain, true meaning and spirit of Chinese law, and are also contrary to the fact and reality of today's China.    In fact, the division of economic nature and the recognition of an EOWP still have great realistic

significance in China nowadays.    They are not only the basis for choosing the applicable laws of enterprises, but also the symbol of the ownership of enterprises.    There is no doubt that the State owns all enterprises whose "economic nature" was registered as EOWP.    The concepts of "economic nature" and "ownership by the whole people" which indicate the ownership of an EOWP have the same realistic and legal significance as in the past.

15. In paragraph 22 of his Second Declaration, Mr. deLisle states that "Chinese law-making and regulatory authorities have not gone back and cleaned up laws and regulations to remove or revise archaic and now misleading terms or to make the legal terminology of a broad, framework law fit more naturally with economic and enterprise practice and the more specific legal frameworks that enable and authorize that practice. . . . Any problems raised by such terminology in the State-Owned Enterprise Law were expected to be short-term and transitional." *See 2nd deLisle Declaration paragraph 22.*    In other words, Mr. deLisle takes the view that provisions of the Law of EOWP should not be used as the legal basis of this case because they are outdated and misleading.    This is an obvious indication that Mr. deLisle is not familiar with Chinese law and the "reality" (his term) of the Chinese legal system.    It is well known that China is a statute/civil law country.    The laws enacted by the appropriate legislation authorities are unassailably valid until they are clearly repealed or replaced by higher or equal level new laws.    In fact, there are still many EOWPs in today's China, and there are still new EOWPs be approved now and then.    Therefore, as the law of applicable to EOWPs, the Law IEOWP is still current, valid and binding, and contrary to Plaintiff's experts' opinions governs EOWPs and is not outdated or near to be outdated.

16.    Mr. deLisle also states in his Second Declaration that whether the assets are State-owned does not address or answer the issue of whether the entity or enterprise is State-owned. *See 2nd deLisle Declaration paragraph 42.* In other words, Mr. deLisle opines that although Sinochart in this case operates with Stated-owned assets, it might not be a Stated-owned enterprise itself. I do not agree with Mr. deLisle suggestion at all. Under Chinese law, an enterprise that operates with assets that are State-owned and whose economic nature is registered as an EWOP can only be an EWOP, i.e., a wholly State-owned enterprise. This kind of enterprise cannot be owned by any other entity in the strict legal sense and neither Mr. deLisle nor any of Plaintiff's other experts offer any valid alternative interpretation.

17.    In paragraph 46 of his Second Declaration, Mr. deLisle says, "until constitutional amendments in 2004, the notion that property owned by an enterprise (or any other lawful owner or possessor) was legally protected from state seizure without fair compensation and a public purpose was not a principle of Chinese law generally." *See 2nd deLisle Declaration paragraph 46.* I have to point out here that Mr. deLisle's understanding is incorrect. There are no such provisions in the PRC Constitution as described by Mr. deLisle. The third part of Article 13 of the PRC Constitution is the closest one and prescribes that "the State may, in the public interest and in accordance with law, expropriate or requisition citizens' private properties for its use and make compensation for the citizens' private properties expropriated or requisitioned." It must be noted that the object of this provision is *citizens'* private properties, not the *enterprises'* properties mentioned by Mr. deLisle. The purpose of this provision which clearly limits the conditions of expropriation and requisition for citizens' private properties is to protect individual

ownership so as to avoid transferring citizens' private properties to State ownership casually and without compensation.   Given that the EOWPs are owned by the State, the State may reassign EOWPs or make other appropriate arrangements by administrative orders depending on its needs.   This is the implementation of ownership of the State-owned assets, not the properties transfer and is not involved with compensation.   Therefore, the States' expropriation and requisition of an EOWP's properties is not prohibited for the "deviation" of the purpose and principle of Article 13 of Constitution.

### *About the history of Sinochart*

18. In paragraphs 23 and 24 of my First Declaration, I have given my brief views on the historical developments of Sinochart. *See 1st Si Declaration paragraphs 23 and 24.*   I have reviewed the documents exhibited to the declarations of Mr. Chen Weidong, Mr. Song Dihuang and Ms. Xing Naiqun.   In order to clarify what I see as some misunderstandings, I shall attempt to clarify the history of Sinochart.

19. The Background Information Regarding the Historic Development of Sinochart at Exhibit 4 of Mr. Chen's Second Declaration sets out the history of Sinochart.   In the early 1950's, in order to break the transportation block imposed by the western countries, the Chinese Government set up "China Overseas Transportation Company" and "China Land Transportation Company," which undertook the responsibilities of transporting strategic materials and resources. In April 1955, China Land Transportation Company was restructured to "China National Foreign Trade Transportation Company" ("Sinotrans") and "China Overseas Transportation Company" was restructured to "China National Chartering Corporation" ("Sinochart").   In May 1955, they

were one institution with two named boards, and this is a very different from the concept of merger under the modern Company Law. Perhaps, we may call this as "one person wears two hats." At that time, Sinochart still remained as an independent legal person and carried out its business independently of Sinotrans.   This is the background of "one institution bearing two name boards" for Sinotrans and Sinochart.

20.  In 1964, the Beijing Administration for Industry and Commerce ("Beijing AIC") issued an industry and commerce enterprise business license to Sinochart.   *See 2nd Song Declaration, Exhibit 2.*

21.  On December 23, 1983, considering Sinotrans and Sinochart are "one institution bearing two name boards," the then Ministry of Foreign Trade and Economic Co-operation ("MOFTEC"), which was the co-authority of both Sinotrans and Sinochart, submitted a letter ((83) WaiJingMaoYunZi NO. 101/1123 to the State Administration for Industry and Commerce ("SAIC") and requested for registering the two corporations separately and issuing the business licenses to them respectively.   *See 2nd Song Declaration, Exhibit 7.*   In its report dated June 5, 1984, SAIC described the particular situation of Sinotrans and Sinochart and consented to register them separately.   *See 2nd Song Declaration, Exhibit 3.*   Subsequently, on June 9, 1984, SAIC registered the two corporations separately and issued Business Licenses to them respectively.   *See 2nd Chen Declaration, Exhibit 1.*

22.  On October 3, 1988, the Central Committee of the Communist Party of China, the then and current ruling political party, and State Council co-issued a decision on checking up and rectifying companies. Since then, the Chinese government has been carrying out a company

checking up and rectifying campaign throughout the country. According to: (1) the letter of Sinotrans dated May 8, 1992 to MOFTEC (*see 2nd Chen Declaration, Exhibit 4*); (2) the letter of MOFTEC dated May 24, 1995 to State Council (*see 2nd Song Declaration, Exhibit 6 and 2nd Chen Declaration, Exhibit 6*); and (3) the opinion of SAIC dated June 19, 1995 to State Council, it can be seen that at the beginning of the company checking up and rectifying campaign, the situation in respect of Sinotrans and Sinochart looked like non-compliance with SAIC's requirement that one institution should not use two names.   However, this special situation was created due to the history of then China.   Sinochart had been an independent legal person since its establishment in 1955 and carried on its business independently from Sinotrans.   Moreover, Sinotrans and Sinochart were totally independent in the shipping industry and hence it was not appropriate to simply merger them into one legal entity.   Given that Sinochart had played an important role in the history of China's sea transportation and ship chartering, Sinochart should continue to exist.   Therefore, Sinochart applied to the MOFTEC for the company checking up and rectifying campaign for retaining Sinochart.   But Sinochart not was listed in its finally issued *Written Reply of State Council on the resolution for the abolition, merging, or retaining of the enterprises under MOFTEC* (QingZhengLingShenZi [1990] No. 039), which means it did not give an express opinion on whether Sinochart should remain or be terminated or merged with other corporations.   The reason may be that this situation of Sinochart was unusual and MOFTEC "had not reported it to State Council in consideration of Sinochart's special history." As a result, the issue of Sinochart existed as a left-over question of the company checking-up and

rectification campaign since then.    Therefore, Sinochart was considered as "having been de-registered" and did not carry out annual inspections from 1991 to 1993.

23.    In 1993, considering the importance of chartering business, Sinotrans submitted an application to MOFTEC for establishing Sinotrans Chartering Corporation (Chinese name: 中外运租船公司，"Sinotrans Chartering") for which MOFTEC gave its approval[3] on October 23, 1993.    *See 2 nd Chen Declaration, Exhibit 5.*    On February 5, 1994, Sinotrans Chartering was registered with Beijing AIC.    The registered capital of the company was RMB 5 million. **See 2nd Song Declaration Exhibit 4.**

24. In about 1995, Sinotrans Chartering applied for changing its name to "Sinochart." Then Sinotrans submitted an application to MOFTEC.    On May 24, 1995, MOFTEC submitted a *Request for Instruction on Naming Sinotrans Chartering Corporation as China National Chartering Corporation* to the General Office of State Council ("GOSC") and proposed to name Sinotrans Chartering as Sinochart.    ***See 2 nd Song Declaration, Exhibit 6 and 2 nd Chen Declaration , Exhibit 6.***    GOSC then passed the aforesaid Request to SAIC.    On June 19, 1995, after investigation, SAIC submitted *Opinions on the Issue Concerning Naming Sinotrans Chartering Corporation as Sinochart* to GOSC.    ***See 2 nd Song Declaration, Exhibit 5.***    The SAIC stated inter alia: "However, Sinochart has neither applied for deregistration nor applied for re-registration or annual inspection since July, 1991.    Therefore, due to the fact that Sinochart has not been deregistered, Sinotrans Chartering cannot be named as Sinochart.    We recommend that MOFTEC list Sinochart as an unresolved and left issue in the checking up and rectifying

---

[3]  In the approval letter, the English translation of Sinotrans Chartering is China National Chartering Corporation ("Sinochart').

companies campaign and apply to China National Economic and Trade Commission ("NETC") for maintaining the company, and then come to us to conduct the re-register procedure after its being approved."

25. Subsequently GOSC passed the aforementioned two documents (i.e., Opinions on the Issue Concerning Renaming Sinotrans Chartering Corporation as Sinochart of SAIC and the Request for Instruction on Renaming Sinotrans Chartering Corporation as China National *Chartering Corporation* of MOFTEC) to NETC for their comments.   Having investigated this matter, NETC proposed resuming the using of the name of China National Chartering Corporation and since Sinotrans Chartering has not been deregistered at the Administration of Industry and Commerce, in order to maintain the continuity in the relationship under the law and recommended to the State Council for retaining the original China National Chartering Corporation and deregistering Sinotrans Chartering."   *See 2nd Chen Declaration, Exhibit 7.*

26. On 28th October 1996, according to the aforesaid advice of SAIC and NETC, Bureau No. 2 of Secretariat of General Office of State Council ("GOSC") made a report to Mr. He Chunlin who was the then Deputy Secretaries-General of State Council and recommended accepting the opinions given by NETC and SAIC.   *See 2nd Chen Declaration, Exhibit 8.*   Mr. He accepted this recommendation.   The then Vice Premier Minister Li Lanqing indorsed this.

27. These documents also clearly show that the Central Government decided that Sinochart should remain its original status.   NETC in their comments expressly stated: "We suggest that in order to maintain the continuity in respect of relationship under the law, State Council retain the original China National Chartering Corporation."   From these documents, it can be seen

clearly that the present Defendant Sinochart is the Sinochart which was established in 1955 by the Chinese Central Government.    Therefore, it is wrong for Mr. Chen to conclude that the current Sinochart is the renamed entity of Sinotrans Chartering.

28. I would like to mention that in some of the referenced documents discussed above, it appears that the Chinese Government ordered that Sinochart became a "zigongsi" (English translation: "subsidiary") of Sinotrans Group.    The administration system of enterprises owned by whole people ("EOWPs") in China is completely different from the western company system (and is different even from the Company Law system in China).    Therefore, in this case, the relationship of Sinotrans Group and Sinochart should not be viewed as a parent-subsidiary relation under the PRC Company Law or from the concept of the mature western corporate legal system. As a matter of fact, the relationship between Sinotrans and Sinochart is actually more like that of a superior and subordinate which is arranged by the State.    It is just the State's description of the relationship in the administrative law sense instead of an affirmance of either the "parent-subsidiary" structure of the Sinotrans Group, or the relation that argued by the Plaintiff and its experts between the group members.    The parlance of "parent-subsidiary" relationship between Sinotrans and Sinochart, therefore, just comes from an administrative arrangement instead of the ownership relationship or share holding and only exists in the Administrative law sense.    The administrative nature of the relationship I describe above is illustrated by the fact that it is possible for the Chinese government at its discretion to order Sinochart to become a "zigongsi" (subsidiary or junior) under another EOWP (other than

Sinotrans) or in the list of SASAC if the Government considers fit in the future, without providing any compensation to Sinotrans.

29. In paragraph 4 of Mr. Chen's Second Declaration, he states: "It is clear that in the period from 1955 to 1993, Sinochart merely existed as a trade name of Sinotrans … Sinochart was not a real and separate entity." *See 2nd Chen Declaration paragraph 4.*    I summarize his reasons as follows: (i) some evidence has shown that the relationship of Sinotrans and Sinochart is "one institution with two name boards."    Since there is no dispute that Sinotrans has been a real entity, it must follow that Sinochart can not be a real entity at the same time; (ii) Sinochart did not have its own employees; its employees were those of Sinotrans; (iii) Sinochart did not have its own office address; its office address was that of Sinotrans; (iv) although the capital of RMB20 million was registered under Sinochart's name, Sinochart did not have its independent financial account.    As a result, the funds of Sinotrans and Sinochart were not separate; (v) Sinochart recognized in its own document that it was only a department of Sinotrans from 1988-1993.    *See Second Chen Declaration paragraph 4.*

30. In my view, Mr. Chen's opinion is incorrect.    I set out my comments as below:

(a) Article 37 of General Principles of the Civil Law of the PRC states: "A legal person shall have the following qualifications: (1) establishment in accordance with the law; (2) possession of the necessary property or funds; (3) possession of its own name, organization and premises; and (4) ability to independently assume civil liability."    There is no doubt that Sinochart is an independent legal person if it meets all the above four requirements, and vice versa.

(b) In this case, Sinochart was established by the Chinese Government. The registration form submitted by Sinochart to SAIC clearly shows that the "authority of approval and its Reference" of Sinochart is "Ministry of Foreign Trade (55) Yunmidaizi No.79." *See 2nd Song Declaration, Exhibit 1.* Sinochart was established upon the government approval and therefore the first requirement is met.

(c) Sinochart had a registered capital of RMB 20 Million at the beginning of its establishment and this was provided by the Chinese Government. Therefore, I opine that Sinochart has also fulfilled the second requirement (i.e., it must possess the necessary property or funds). I do not agree with Mr. Chen's opinion that the registered capital of Sinotrans and Sinochart are not separate because of their sharing the same accounting book. It is true that Sinotrans and Sinochart might share the same accounting system but this was due to the peculiar historic background of then China but this does not mean that Sinochart and Sinotrans would not assume its civil liability separately. In any event, whether the financial accounting is independent is a different matter from whether the registered capital is independent. The latter is decided at the time of establishment of the enterprises, while the former was in respect of the operation of the enterprises after their establishment. The latter cannot affect the former. In another words, the fact that Sinotrans and Sinochart shared the same accounting system did not mean the registered capitals and the funds of Sinochart and Sinotrans could not exist independently. It did not affect Sinochart's independent registered capital and assets.

(d) Sinotrans and Sinochart shared the same employees and used the same premises. However, it does not mean that Sinochart did not have its own organization. There is no doubt

-.19 -

that Sinochart has its own name (i.e., "China National Chartering Corporation").    From all of the above, I take the view that Sinochart at that time had its own name, organization and office address.    The third requirement is thus also satisfied.

(e) Sinochart is a well known name in China.    Sinochart has been running its business for many years and it has always been exercising its civil rights and assuming civil liabilities in its own name externally.    So I take the view that Sinochart also fulfills the fourth requirement.

(f) In conclusion, I take the view that Sinochart meets all the four requirements of legal person in accordance with Chinese laws.    There is no doubt that Sinochart is an independent legal person and entity. "One institution bearing two name boards" or "one person wears two hats" is obviously due to the peculiar historic background of China.    However, it does not affect the status of Sinochart as independent legal person under PRC law, nor its present status as an independent entity from Sinotrans that is wholly and completely owned by State.

31.  In addition, in paragraph 4 (b) (iv) of Mr. Chen's Second Declaration, he mentions that: "In its application dated 12 July 1997 to the SAIC for exemption of annual inspection for the years of 1988-1993, Sinochart stated that for the relevant period (i.e. 1988-1993) Sinochart 'existed in the form of a business department of Sinotrans, not a separate entity'" *See 2nd Chen Declaration, Exhibit 3.*.    From all the documents I have reviewed, I can draw a conclusion on the factual background that in 1988, when the checking up and rectifying companies campaign was conducted, MOFTEC did not apply to the State Council for retaining Sinochart as a company and this made the relevant government departments and the parties concerned including Sinochart misbelieving that Sinochart had been deregistered.    But in fact, Sinochart

has never been deregistered, which was clearly indicated in the relevant documents of SAIC. Moreover, as an EOWP, Sinochart has no right to merge or terminate or change its economic nature by itself. Therefore, one cannot draw the conclusion that Sinochart was deregistered simply from a reference in Sinochart's its report. You have to look into the relevant laws.

32. In paragraph 14 of Mr. Chen's Second Declaration, he states that a balance sheet of Sinotrans Chartering was also stamped with Sinochart's seal. He also cited the handwritten remark on the right top of the document, i.e., "it is hereby certified that the former Sinotrans Chartering was de-registered early in 1998, and its name was changed to Sinochart. Thus, the stamp of Sinochart was affixed to the original sheet." *See 2nd Chen Declaration paragraph 14.* I do not know who wrote this on this document. In any event, this statement was incorrect given that Sinotrans Chartering had been deregistered.

### *About the Source of Sinochart's Registered Capital*

33. In respect of the source of the registered capital of Sinochart, Mr. Chen in paragraph 13 and paragraphs 16-23 of his Second Declaration argues that: (i) the capital of RMB 20 million of former Sinochart was only nominal and did not reflect the factual situation; (ii) the registered capital of Sinochart in its Business License (for the year of 1997) is RMB 5 million. *See 2nd Chen Declaration paragraphs 13, 16-23.* Mr. Chen opines that this capital was the same capital as that of the former Sinotrans Chartering and there was no dispute that the capital of Sinotrans Chartering came from Sinotrans instead of coming directly from the state; (iii)The current registered capital of Sinochart is RMB 23.16 million as appearing on the current Registration Certificate. Not only the aforesaid RMB 5 million, all the capital of RMB 23.16

million was vested by Sinotrans because the other RMB 18.16 million came from former Marine Department I of Sinotrans. *See 2nd Chen Declaration paragraphs 13, 16-23.*

34. For the first issue mentioned above, Mr. Chen appears to be assuming that the registered capital of Sinochart is only a "nominal registered capital" without any evidence in support. I believe that this is a pure imagination. A "nominal registered capital," would mean that Sinochart did not possess any assets. But Sinochart has conducted its operation of business externally for many years. If it has only nominal registered capital, it could not conduct its operation of business for so many years.

35. As to the second issue, I take the view that this is also a Mr. Chen's imagination without evidence in support. According to Chinese laws, many other circumstances may also lead to the changing of the registered capital of enterprises.

36. In respect of the third issue, in my view, we have to take the historic background into consideration. In the 1990s, there was a campaign of grouping enterprises into different core enterprises in China. A relatively bigger enterprise is regarded as the core enterprise. The purpose is to set up an enterprises group in order to utilize the advantages of big scale of the group and realize the distribution of resources and human resources scientifically. In 1993, China National Foreign Trade Transportation Group ("Sinotrans Group") was established with Sinotrans (i.e. China National Foreign Trade (Group) Corporation) as the core enterprise and Sinochart joined Sinotrans Group as its member. *See 1st Chen Declaration, Exhibits 16 and 18.* I note that there is an English translation error at Exhibit 16 to Mr. Chen's First Declaration. Where he uses the term "parent enterprise" it should be translated to "core enterprise" in the

Notice of Approval.    As mentioned above, the fact that Sinochart became a "member" of Sinotrans Group was a result of an administration order and was not based on any ownership relationship between Sinotrans and Sinochart.    In 1997, Sinotrans was chosen to be one of the 120 pilot enterprise groups.    Subsequently, a restructuring and reorganization of companies was carried out.    The previous Marine Department I of Sinotrans was recomposed into Sinochart. This was a result of an administrative arrangement.    The reorganization of the State-owned companies/assets under the administrative orders is different from a merger under the PRC Company Law context.    Therefore, the relationship of Sinotrans Group and Sinochart is different from the relationship of a holding company and its controlled company or the relationship between parent company and subsidiary under the PRC Company Law.    Therefore, I have no hesitation to conclude that the present Sinochart is the same one which was established by the Chinese Government in 1955.    Although Sinochart is a member enterprise of the Sinotrans Group, Sinochart like Sinotrans is an EOWP directly owned by the State.    The arrangement did not create the result that the State was divested of its ownership of Sinochart or that Sinochart became subject to ownership of Sinotrans in the context of the Company Law. The Chinese Government was and is entitled to put Sinochart into another group or in the list of SASAC at its sole discretion in accordance with the PRC Law of EOWP.    I note that all the experts engaged by the Plaintiff agree that they have no intention to apply the PRC Company Law into the structure of Sinotrans and Sinochart.    Hence, the same conclusion should be reached.

I declare under penalty of perjury of the laws of the United States that the foregoing is

true and correct to my knowledge of Chinese law.

Executed on    14 March , 2008 in Dalian, China.

Si Yuzhuo

# EXHIBIT  1

# Document of China Securities Regulatory Commission and the State Council Secretariat Document (publicly available at SAIC) and Abstract English translation

# Document of the China Securities Regulatory Commission

Zheng Jian Fa [2002] No.69

Issuer: Zhou Xiaochuan
Co-Issuer: Jiang Qiangui

## Request for Instructions on Relevant Issues Concerning the Oversea Listing of Sinotrans after Reconstruction

State Council,

China National Foreign Trade Transportation (Group) Company (hereinafter referred to as the "Sinotrans") has submitted the "Request for Instruction on the Reconstruction and Reform of Sinotrans and the Establishment of the Joint-stock Company Limited" ([2002] Yun Shangshi No. 1605/0370) to the China Securities Regulatory Commission. We now report to you as follows the relevant situation together with our opinions and further request for your instruction.

...

After study, we recommend that:

I.      agree to the reconstruction plan of Sinotrans;

II.     approve that the joint-stock company limited to be established by Sinotrans may use the word "China" within its name, i.e. "Sinotrans Ltd", and that all its subordinate companies shall use "Sinotrans" within their names;

III.    approve Sinotrans to be an "institution to invest as authorized by the State";

IV.     approve that Sinotrans may reduce its holding of state shares by 10% within 3 years from establishment of the joint-stock company limited.

Please instruct on whether the above is appropriate.

September 29th, 2002

(Seal of China Securities
Regulatory Commission affixed)

## the State Council Secretariat, Document Subject to Approval

| | |
|---|---|
| Approvals and Instructions of the Leaders | Please may Comrade Ma Kai submit to leaders of the State Council for their instructions.<br><br>Recommending approval, please may Comrade You Quan submit it to Comrade JiaBao for instruction.<br><br>                         Ma Kai, October 10th<br><br>Comrade Rongji (circled as approved on October 16th), Lanqing (circled as approved on October 15th), Bangguo (circled as approved on October 15th), Wu Yi (circled as approved on October 14th), Zhongyu (circled as approved on October 14th), please instruct.<br><br>                         Wen Jiabao, October 10th<br>                (Seal of Sinotrans Company affixed) |
| Headline of the Document and its Source | "Request for Instructions on Relevant Issues Concerning the Oversea Listing of Sinotrans after Reconstruction" from the China Securities Regulatory Commission<br>(Zheng Jian Fa [2002] No.69 ) |

Ref: Ban 2336                                        Tel: 63096760

Person in Charge: Zheng Yaodong, Office 1, Bureau 2        Person Responsible: Cao Yu

# 中国证券监督管理委员会文件

证监发[2002]69 号

签发人：周小川

会签人：蒋黔贵

## 关于中外运集团重组后境外上市有关问题的请示

国务院：

　　中国对外贸易运输（集团）总公司（以下简称"中外运集团"）向证监会报送了《关于中国对外贸易运输（集团）总公司重组改制设立股份有限公司的请示》（[2002]运上市字 1605/0370 号）。现将有关情况和我们的意见报告并请示如下：

　　一、重组上市方案

　　为深化企业改革，建立现代企业制度和比较完善的治理结构，适应我国加入世界贸易组织后的新形势，加快实现企业发展目标，提高核心竞争力，中外运集团拟在重组设立中国外运股份有限公

— 1 —

*73*

司（以下简称"股份公司"）后发行境外上市外资股（H 股）。中外运集团重组涉及的资产包括在北京、上海、天津、江苏、浙江、广东等地的子公司，以及全资拥有的中外运国际联运代理公司、中国船务代理公司两家全国性专业子公司；此外，中外运集团在中外运空运发展股份有限公司（A 股上市公司）的股权也将注入股份公司。

经初步测算，拟注入股份公司的总资产约 68 亿元，净资产约 23 亿元，2001 年营业收入 92.49 亿元，净利润 5.11 亿元。股份公司拟在境外发行 25% 至 35% 的新股（以发行后的股本计算），筹资规模约 3 至 6 亿美元，募集资金主要用于建设与改造物流中心、产品开发、改进信息技术系统、根据业务需要并购国内物流企业、建立国际网络等。

二、重组及境外上市涉及的主要问题

（一）股份公司的名称。股份公司名称拟使用"中国外运股份有限公司"。为突出中国外运的品牌，中外运集团拟在其下属公司名称中统一冠以"中国外运"字样。

（二）明确为国家授权投资的机构。中外运集团是 120 家大型试点企业集团之一，资产规模较大，经营业绩较好，具备国家授权投资机构的基本条件。明确中外运集团为国家授权投资的机构，符合国有企业改革的精神，也便于其办理国有土地处置等必要手续。

（三）根据国家有关政策，境外上市公司的国有股东需在公

— 2 —



# 国务院办公厅呈批文件专用单

| 领导同志批示 | 请马凯同志核报国务院领导同志批示<br><br>*（领导同志手写批示）* |
| --- | --- |
| 来文单位与文件标题 | 证监会《关于中外运集团重组后境外上市有关问题的请示》<br>（证监发[2002]69号） |

| 文 号 | 办 2336 | 联系电话 | 63096760 |
| --- | --- | --- | --- |
| 承办人 | 二局一处  郑耀东 | 负责人 | 曾宇 |

74

司境外发行股票时，按融资额的 10%减持国有股，出售收入上缴全国社会保障基金。由于股份公司设立至境外发行股票时间未满三年，需报国务院特别批准。

三、意见和建议

中外运集团已将重组方案另行上报国家经贸委，国家经贸委已就方案征求了国家计委、财政部、国土资源部、交通部、外经贸部、海关总署、税务总局和工商总局的意见。各部门对中外运集团重组改制后到境外上市均无不同意见。对中外运集团提出的涉及各部门职责范围的支持性政策，有关部门有的已同意并明确答复中外运集团，有的需在股份公司设立后履行相关程序。

工商总局提出，中外运集团拟在设立股份公司时以股权出资，不符合《公司法》的规定。外经贸部认为，在严格审核条件、避免企业股权重复出资的前提下，经有关部门协商，可选择一些大型国企进行以股权出资方式完成企业重组的试点。我们研究认为，《公司法》对股权出资未作出禁止性或限制性规定，大型国企重组改制阶段以股权出资已有成功的先例（如中石化），基于此，中外运集团在设立股份公司时以股权出资可予以批准。此外，中外运集团原拟多出售 10%的国有股权，用于解决非上市部分持续发展和人员分流的问题，财政部对此提出异议；中外运集团已根据财政部的意见调整了方案，根据国家规定，按融资额的 10%减持国有股。

经研究，我们建议：

—3—

75

（一）同意中外运集团改制重组方案。

（二）批准中外运集团改制设立的股份公司名称中冠以"中国"字样，即中国外运股份有限公司，其下属公司名称中统一冠以"中国外运"字样。

（三）批准中外运集团为国家授权投资的机构。

（四）批准中外运集团在股份公司设立未满三年时，按筹资额的 10%减持国有股。

妥否，请批示。





（联系人：竺煜　电话：88061275）

主题词：公司　股份制　上市　请示

抄送：国家经贸委

| 证监会办公厅 | 2002 年 9 月 20 日印发 |
| --- | --- |
| 打字：冯伟　　　　校对：竺煜 | 共印 30 份 |

— 4 —