UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OCEAN LINE HOLDINGS LIMITED,

                              Plaintiff,

        - against —

                                                    07-CV- 8123 (DC)

CHINA NATIONAL CHARTERING CORP.
a/k/a SINOCHART,

                              Defendant.

---

### PLAINTIFF OCEAN LINE HOLDINGS' OPPOSITION TO DEFENDANT SINOCHART'S MOTION FOR SECURITY FOR COSTS PURSUANT TO RULE E(2)(B)

Of Counsel:

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Ocean Line Holdings Limited
80 Pine Street
New York, NY  10005
(212) 425-1900   (212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina Venezia (GV 1551)

NYDOCS1/306584.1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY OF ARGUMENT IN OPPOSITION .........................................................1

REPLY ON THE FACTS..................................................................................................2

A.    Plaintiff's Initial Efforts to Obtain Security for its Claims. ...............................3

B.    The Lack of Any Further Transfers Being Restrained Revealed
      that Sinochart was Circumventing the Court's Order of Attachment,
      Prompting Plaintiff's Application for Disclosure................................................4

C.    Sinochart's Security Proposals. ..........................................................................6

LEGAL DISCUSSION.....................................................................................................8

A.    Sinochart's Unclean Hands. ...............................................................................9

B.    The Items for Which Sinochart Seeks Security
      Under Rule E(2)(b) are not "Costs". ...............................................................11

CONCLUSION ...............................................................................................................12

## TABLE OF AUTHORITIES

<u>Cases:</u>

*Greger Leasing Corp. v. Barge PT Potrero*, 2006 AMC 949 (N.D. Cal. 2006) ...................... 8, 11

*Med-Asia Shipping Ltd. v. COSCO Beijing Int'l Freight Co.,* 07-CV-9624 (RMB),
    2008 U.S. Dist. Lexis 30581 (S.D.N.Y. Apr. 2, 2008) ..................................................... 12

*Result Shipping Co. Ltd. v. Ferruzzi Trading USA, Inc.,* 56 F. 3d 394 (2d Cir. 1995) ............. 8, 11

*Rolls Royce Indus. Power (India) v. M/V Fratzis M,*
    1999 U.S. Dist. Lexis 4907 (S.D.N.Y. Apr. 15, 1996) ......................................................... 8

*The Rice Co. v. Express Sea Transport Corp.,* 07-cv-7077,
    2007 U.S. Dist. LEXIS 84300 (S.D.N.Y. Nov. 15, 2007) .................................................... 9

*Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy,* 542 F.Supp. 1302 (W. D. Wa. 1982) ................ 8

<u>Statutes and Rules:</u>

28 U.S.C. § 1920 .................................................................................................................. 11

Supplemental Admiralty Rule E ............................................................................................ 8

## PRELIMINARY STATEMENT

Plaintiff Ocean Line Holdings Limited (hereinafter "Ocean Line" or "Plaintiff") submits this memorandum in opposition to the motion of Defendant China National Chartering Corporation ("Sinochart" or "Defendant") for an order requiring Plaintiff to post security for the alleged costs incurred or to be incurred by Sinochart in connection with its posting of security for Plaintiff's main claim.[1]  For the reasons below, Sinochart's current motion should be denied in its entirety, or in the alternative, limited to those items which properly constitute "costs".

## SUMMARY OF ARGUMENT IN OPPOSITION

As with most issues that require court resolution, there are two sides to every story, and that adage is particularly applicable in this situation.  Far from the bad faith situation described by Sinochart in its moving papers, Plaintiff's conduct in the negotiations for substitute security were reasonable and well-founded.  Truth be told, Sinochart's hasty decision to post bonds for the *full amount* of Plaintiff's claim (when funds equal to only 14% of the claim had been attached) was more the product of Sinochart's concern that the subterfuge that it had visited upon the Court (in manipulating its fund transfers around the order of attachment) would be exposed, than its supposed exasperation of Plaintiff's alleged failure to accept Sinochart's "offer" of substitute security.  Sinochart never offered reasonable and sound alternative security and it should not now be heard to complain (nor should it get security for the costs of its bonds) where the need to post them was due to its desire to shield from the Court its prior manipulative conduct.

_____

[1] Sinochart has also filed a separate motion seeking countersecurity pursuant to Rule E(7) for its alleged counterclaim against Plaintiff which is already fully briefed.  This opposition pertains only to Sinochart's recently filed motion for security for costs under Rule E(2)(b).

Security for costs is a remedy available under principles of equity, and Sinochart comes with unclean hands. For this reason, and other reasons outlined more fully in this brief, Sinochart's application should be denied or limited to the items which properly constitute costs.

## REPLY ON THE FACTS

Sinochart's discussion of the "facts" relevant to its motion for costs security is a rather gross distortion of the reality of what transpired in connection with the prior efforts between the parties to reach agreement on substitute security. Packing its presentation with charged language about bad faith and abusive conduct, Sinochart's factual discussion is designed to paint the Plaintiff Ocean Line as some megalomaniac bent on extracting its pound of flesh in the form of formal security which forced Sinochart into the position of having to spend millions to post bonds which were, supposedly, unnecessary. Nothing could be further from the truth.

Plaintiff Ocean Line, like most plaintiffs these days in maritime cases, sought security for its claims against Sinochart (as did Sinochart against its sub-charterer Daichii). Like Sinochart (who obtained $190 million in security in the form of bank security against Daichii), Ocean Line wanted its security to be provided in some similar standard and acceptable format. There was no effort or motivation (for that matter), in putting Sinochart to any extraordinary lengths, and none were exerted. Sinochart's over-the-top presentation carefully omits any discussion of the true motivation behind its purchase of bonds, and any reasonable examination of the exchanges between the parties regarding alternative substitute security reveals that Plaintiff's position throughout was justified and reasonable.

To provide the Court with a complete and accurate picture of the events leading up to Sinochart's posting of the subject bonds, and to accurately set the stage for the Court's evaluation of this application, Plaintiff sets forth below a summary of the relevant facts and also

respectfully directs the Court to the Declaration of Matthew Moore, which contains a more detailed discussion of the events preceding Sinochart's posting of the bonds.[2]

A.    **Plaintiff's Initial Efforts to Obtain Security for its Claims.**

As the Court is aware, this claim involves a breach of the safe berth/port clause in the governing charter party, which breach resulted in the grounding and subsequent total loss of the M/V OCEAN VICTORY in October 2006. The total losses and damages suffered as a consequence of this incident were considerable, and as is customary in maritime actions subject to London arbitration (as is the claim here), Plaintiff desired security for its substantial claims from Sinochart and sought to obtain that security through negotiation. (Moore Decl. ¶¶ 6-13).

In this respect, Plaintiff first requested that Sinochart post security (voluntarily, without resort to litigation), back in February *2007*.[3] At that time, Plaintiff sought a P&I Club Letter of Undertaking ("LOU"), which is the customary form of security provided in maritime disputes. Between February and August 2007, no offer, let alone any indication of interest, was forthcoming from Sinochart that any security would be provided to Plaintiff. (Moore Decl. ¶¶ 13-16).

As a consequence, Plaintiff filed the captioned action in September 2007 seeking an order of attachment in the total sum of $177 million. An order of attachment was issued on September 17, 2007, providing for the following:

---

[2] As the Moore Declaration contains a detailed discussion of the events surrounding Sinochart's posting of the bonds, Plaintiff will not repeat those details herein. Plaintiff however respectfully directs the Court to the Moore Declaration because it describes the history of the negotiations with Sinochart and reveals the fallacy in Sinochart's current position that Plaintiff somehow acted unreasonably in the security discussions.

[3] In its current application, Sinochart focuses only on the security discussions between the parties in February 2008, which was almost one year after Plaintiff first requested security from Sinochart.

seizure of all tangible and intangible property of the Defendant [Sinochart], ...,
including but not limited to any property of the Defendant (hereinafter
"ASSETS"), as may be held, received or transferred in its own name or for its
benefit at, moving through, or within the possession, custody or control of
banking institutions and/or other institutions ...

The order was subsequently served on a variety of banking institutions, and from the get-go,
multiple transfers of hire and/or freight were frozen in connection with Sinochart's on-going
activities as charterer of dozens of vessels operating in worldwide trade. Indeed, in little more
than a month, approximately $24 million in fund transfers moving through New York to or from
Sinochart had been restrained. (Moore Decl. ¶17).

But as quickly as Ocean Line froze the initial $24 million, the Sinochart transfers
virtually dried up. As the matter progressed into November 2007, the number of transfers began
to rapidly decline, and only a single transfer was captured in all of December. By all accounts,
Sinochart had appeared to have gone out of business, but all concerned knew that that was not
true because all of the market reports confirmed that Sinochart had continued to maintain their
numerous charters and indeed had taken on multiple new ships during this very same period of
time. (*See*, generally, discussion in Freehill application in December 2007 for disclosure on how
Sinochart was manipulating its transfers *around* the order of attachment). Sinochart was thus
able to carry on its business free of the attachment, as a consequence of its effort to manipulate
its fund transfers, and Ocean Line managed to capture, as of mid-December, security for only
about 12-14% of its total claim. (*See* Moore Decl. ¶ 17).

**B.    The Lack of Any Further Transfers Being Restrained Revealed that Sinochart was
Circumventing the Court's Order of Attachment, prompting Plaintiff's Application
for Disclosure.**

As outlined above, the sudden disappearance of any dollar transfers to or from Sinochart
was quite surprising because market research had indicated that Sinochart was operating in

excess of fifteen (15) vessels in worldwide trade at the time. This sort of worldwide chartering operation would have required large sums of monies to be transferred to and from Sinochart in order to maintain its trading position as charterer and/or disponent owner. Yet, despite the fact that these charters likely provided for payment in U.S. dollars (as virtually all charters do) and that most transfers of U.S. dollars must, of necessity, pass through the clearinghouse banks in this district, no transfers of any significance were restrained. (*See* Plaintiff's letter application of November 29, 2007; Moore Decl. ¶¶ 23-23).

The only logical explanation for this absence of transfers was that Sinochart was transferring funds for its benefit in a masked form in an effort to circumvent this Court's order of attachment. In masking the way it transferred funds, Sinochart effectively continued with its business as usual, paying and receiving funds in dollars, but cleverly circumventing this Court's order of attachment by moving its funds right under the Court order in another name, thereby escaping detection by the garnishee banks' filter system.[4] By doing so, Sinochart was blatantly and deliberately violating the Court's order which required the restraint of any assets moving through this district "for the benefit of Sinochart."

In light of these developments, Plaintiff applied for an expansion of the order of attachment to include any transfer of funds representing hire in respect to those vessels which were on charter to Sinochart. (*See* Plaintiff's letter application of November 29, 2007). An expansion of the attachment order as requested would have revealed Sinochart's secreting of funds through New York, as any transfers for hire related to the vessels chartered to or from Sinochart would have been captured.

---

[4] As the Court may know, garnishee banks typically place the name of the defendant in an attachment case in the bank's OFAC filter which allows the banks to identify any transfers which are being made to or from the named defendant and which are then subject to an order of attachment.

A hearing was held with the Court on December 19, 2007, during which Plaintiff's application for expansion of the attachment order was addressed. At the conference, the Court directed Sinochart to respond to Plaintiff's inquiry and confirm whether any funds were in fact moving through New York in a manner which would avoid detection by the garnishee banks' filters. Vigorously challenging Plaintiff's right to any disclosure of this information, Defendant Sinochart argued that Plaintiff had no "right" to know how or in what manner Sinochart was moving its funds. The Court opted to deal with the issue one step at a time by indicating that Sinochart's response, if it chose to respond, had to be provided by a date certain in January, noting that if Sinochart chose not to provide that information, that would be answer enough, at which point Plaintiff would be free to renew its motion to expand the order of attachment and the Court would rule on that application.

Several weeks passed following the conference, and despite prodding, Sinochart failed and refused to provide any form of a response to the question as to whether, and in what manner, it was secreting its funds through New York to avoid the current attachment. In view of this refusal to respond, Plaintiff renewed its application for expansion of the attachment order. (*See* Plaintiff's letter application to the Court dated January 8, 2008). Shortly thereafter, Sinochart acknowledged that it would not be responding to the question of whether it was transferring assets through New York, and in the same breath, pronounced that it was now (supposedly) willing to post full security to Plaintiff.

C.    **Sinochart's Security Proposals.**

In its current application, Sinochart suggests that it was willing (in 2008) to post full security for Plaintiff's claims, with that security to come in the form of a P&I Club LOU for part of the claim and a bank guarantee from the Bank of China for the balance. Sinochart asserts that

its supposed "proposal" was reasonable, and that Plaintiff's refusal to accept the proposal was somehow in bad faith and there was no justification for refusing such split security which Sinochart claims was "offered" in a manner capable of acceptance. Sinochart's discussion of its "proposal" is lopsided and does not fairly describe the legitimate and reasonable grounds upon which it was not accepted. Indeed and as discussed in greater detail in the Declaration of Matthew Moore, no actual and firm offer was ever really communicated, and the communications appear to have been more designed to create "evidence" for this motion than any legitimate offer of sound substitute security. (Moore Decl. ¶¶24 – 43).

To the extent this topic is treated in detail in the accompanying Moore Declaration, it is not repeated again here. Suffice it to say that there was never any legitimate, sound and reasonable security offered as of the point in time the bonds were tendered and the suggestion that Plaintiff was somehow acting in bad faith by requesting such sound alternative security is unfair and a mischaracterization of the true facts.

Based upon the foregoing, there is simply no truth to the argument that Sinochart was "forced" to post bonds. Bonds are the standard method for alternative security in lieu of cash. But for the fact that Sinochart was desperate to avoid disclosure of the subterfuge that it had been orchestrating, it could have arranged for the alternative security in the reasonable format Plaintiff had requested and the costs incurred (for which Sinochart now seeks security) would not have been incurred.[5] In view of this, Sinochart comes to this Court with unclean hands seeking to secure the costs which it felt compelled to incur so as to avoid scrutiny of its bad conduct. Under principles of equity, which drive any consideration of security for costs, the application should be denied.

---

[5] It also goes without saying that the hastily-arranged bonds avoided the disclosure of Sinochart's bad conduct which might have damaged its credibility before this Court, in particular with reference to some of the factual issues in play in its motion to vacate.

## LEGAL DISCUSSION

Supplemental Admiralty Rule E(2)(b) provides in relevant part as follows:

> The court may...require the plaintiff, defendant, claimant, or other party to give security, or additional security, in such sum as the court shall direct to pay all costs and expenses that shall be awarded against the party by any interlocutory order or by the final judgment, or on appeal by any appellate court.

*See* Supplemental Admiralty Rule E(2)(b). The district court possesses broad discretion in deciding whether to order security for costs pursuant to Rule E(2)(b). *See Result Shipping Co. Ltd. v. Ferruzzi Trading USA, Inc.,* 56 F. 3d 394, 401 (2d Cir. 1995). The court, however, is limited by the Rule to awarding security for "costs" that will be awarded by the court or upon appeal. *See,* e.g., Rule E(2)(b) (referring to "costs ... that shall be awarded"); *Greger Leasing Corp. v. Barge PT Potrero,* 2006 AMC 949, 953 (N.D. Cal. 2006). Further, the cases make clear that the court is to be guided by principles of fairness when exercising its discretion to award security for costs. *See, e.g., Rolls Royce Indus. Power (India) v. M/V Fratzis M,* 1999 U.S. Dist. Lexis 4907 (S.D.N.Y. Apr. 15, 10996); *Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy,* 542 F.Supp. 1302, 1306 (W. D. Wa. 1982) (request for Rule E(2)(b) security governed by same rules as Rule E(7) security which are concerned with "equality").

In the instant case, Sinochart's motion for over $7 million in security for costs[6] should be denied because it has unclean hands and the interests of equity do not warrant granting the relief which Sinochart requests. (*See* Point A below). As an alternative, Sinochart's request should be denied to the extent it seeks security for items which would not constitute taxable costs in the district court or on appeal. (*See* Point B below). Each point is addressed below.

---

[6] Sinochart initially requested over $13 million in security for costs but amended its application by letter of May 29, 2008, to seek $7,250,110.20 as security.

A.    **Sinochart's Unclean Hands.**

As outlined above, Sinochart's motivation for the posting of bonds had nothing whatsoever to do with its purported frustration over Plaintiff's alleged bad faith negotiations. Instead, Sinchart was staring down the barrel of a potential disclosure battle which was going to reveal the extent to which it had taken liberties with its transfers of funds and circumvented this Court's attachment order.  Cognizant of the fact that disclosure of what Sinochart had been doing would have resulted in an expansion of the order of attachment, Sinochart opted to take the path of least resistance and posted bonds far in excess of the sums which had been restrained.  To the extent the need to do so was the product of its own bad conduct, it hardly deserves to be rewarded now for those costs, and its effort to lay the blame for the need to do so at the feet of Plaintiff is shameful.

With respect to the latter, Plaintiff's reluctance to accept Sinochart's *conditional proposal* to post two different forms of security from different security providers in different jurisdictions was entirely appropriate and is not even a reflection of aggressive negotiation, let alone bad faith. Although in a slightly different context, Judge Pauley recognized in *The Rice Co. v. Express Sea Transport Corp.,* 07-cv-7077, 2007 U.S. Dist. LEXIS 84300, at *5-6 (S.D.N.Y. Nov. 15, 2007), that offers of conditional security are not the equivalent to providing valid security under the rules.  In that case, the defendant made an offer to provide a letter of undertaking, which was subject to further negotiation, and made a second offer to provide a conditional bank guarantee. *Id.*  Judge Pauley recognized that because of the uncertainties attendant to the offers of security, the defendant had not shown that the proposed alternative security "would even be equivalent to that afforded by a Rule B attachment." *Id.*

In much the same way, Sinochart's purported "offer" of alternative security (which came only on the eve of a disclosure order about the manner in which Sinochart had been secreting its funds) was not the equivalent to security afforded by Rule B, and despite being characterized or labeled as an offer, always carried with it some element of a condition or further requirement. Further, the complicating factors for enforcement of such a combined form of security (*i.e.* a possible P&I Club LOU issued in Norway, a possible bank guarantee issued in China and a proposed governing side agreement which was subject to the jurisdiction of the English High Court) was hardly the equivalent of the type of security to which Plaintiff was entitled to under Rule B, and asking for alternative security of similar value can hardly be characterized as bad faith.

Moreover, the costs for which Sinochart now seeks security could easily have been avoided if Sinochart posted security in the usual form provided in maritime matters, namely a single P&I Club LOU. In *Result Shipping,* the Second Circuit affirmed the district court's denial of a defendant's application for security for costs. There, the plaintiff had agreed to stipulate to the release of the property if the defendant posted full security in an interest-bearing account that would be available to satisfy any future arbitration award in plaintiff's favor. The district court denied the defendant's request for security for the costs incurred in posting a bond to secure the release of his property, because the defendant could have obtained the release of its attached property without incurring the expenses of posting a substitute bond.

The circumstances of this case are no different than in *Result Shipping.* Here, Plaintiff had attached approximately $24 million, which was considerably less than the $177 million sought. To obtain the release of this property, Defendant only had to post a bond to cover that amount, and did not have to post the entire $177 million. Further, Plaintiff was willing at all

times to accept a Club LOU, which is the typical form of security given in maritime actions. Even if one accepts that the P&I cover through Skuld only reached the level of $50 million, Sinochart could have provided a guarantee (corporate or bank) to Skuld for the difference and a single LOU could have been issued.[7] This would have obviated the need for any bond costs. Thus, Sinochart could have easily avoided the costs for which it now seeks security if it had posted security in the normal and expected form, and but for its bad conduct, it had no reason to post more than what was under attachment if in fact there were no other funds coming through New York and it had not consciously circumvented the court's order.

Under the circumstances, it is clear that equity dictates that Sinochart's current motion be denied in its entirety.

**B.    The Items for Which Sinochart Seeks Security Under Rule E(2)(b) are not "Costs".**

Rule E(2)(b) allows for security to cover the "costs" that might be awarded by the court or upon appeal at the conclusion of the case. *See, e.g.,* Rule E(2)(b); *Greger Leasing Corp.,* 2006 AMC at 953. Those costs are, in turn, set forth by statute in 28 U.S.C. §1920.[8] Additionally, the Second Circuit has recognized that Rule E(2)(b) security may include the "premium for bonds obtained to release an attachment." *Result Shipping,* 56 F.3d at 401.

---

[7] While the provision of security by a Club is discretionary, Clubs routinely post LOUs for members for non-covered claims where the member arranges to provide the Club with countersecurity.

[8] 28 §1920 provides, as follows:

> A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5)Docket fees under §1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services under §1828 of this title.

Sinochart's current application goes well beyond the items of cost which might be recoverable at the conclusion of the case and the premium on the bonds obtained as alternative security. Sinochart's application, in fact, includes (i) interest on the bond premium for three years ($639,075.02), (ii) charges imposed by the Bank of China for providing collateral to the bonding company ($1,147,687.54); and (iii) interest on the Bank of China charges for three years ($137,722.50). Yet, there is no authority and Sinochart has pointed to none which would authorize the inclusion of interest on the bond premium, the cost of collateral required by the bonding company, or interest on those charges, in the calculation of the costs covered by Rule E(2)(b). To the extent neither the interest sought nor the bank charges reflect taxable costs, they may not serve as the basis for awarding security under Rule E(2)(b). *See, e.g., Med-Asia Shipping Ltd. v. COSCO Beijing Int'l Freight Co.,* 07-CV-9624 (RMB), 2008 U.S. Dist. Lexis 30581 (S.D.N.Y. Apr. 2, 2008) (noting that attorney's fees are not the type of costs for which security is to be provided under Rule E(2) because the prevailing party may not recover attorney's fees from the loser, absent statutory or contractual provisions to the contrary). Thus, even if the Court were to find that Sinochart is entitled to any security under Rule E(2)(b) (which it is not, as discussed above), that security should be limited only to the cost of the bonds ($5,325,625.14).

## CONCLUSION

For the reasons set forth above, Defendant Sinochart's motion for security for the costs it incurred in posting the bonds to secure Plaintiff's claims should be denied in its entirety. Sinochart posted the bonds not because of any unreasonable actions of Plaintiff, as alleged, but rather to avoid having its deliberate effort to circumvent the Court's order of attachment

NYDOCS1/306584.1

12

exposed. An award of security under Rule E(2)(b) is simply not warranted in the circumstances of this case.[9]

Dated: New York, New York
      June 12, 2008

                    Respectfully submitted,
                    FREEHILL HOGAN & MAHAR LLP


                     /s/ Peter J. Gutowski
                    Peter J. Gutowski (PG 2200)
                    Gina M. Venezia (GV1551)
                    FREEHILL, HOGAN & MAHAR, LLP
                    80 Pine Street
                    New York, New York  10005-1759
                    Tel: 212 425-1900 / Fax: 212 425-1901
                    *Attorneys for Plaintiff Ocean Lines*

---

[9] In the alternative, any award of costs security should include only consideration of the premium paid on the bonds posted by Sinochart. The interest on this bond cost, the bank charges associated with the Bank of China providing collateral to secure the bonding companies, and the interest on these charges are not recoverable "costs".

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all attorneys of record. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice of Electronic Filing.

**VIA CM/ECF:**

> Patrick F. Lennon
> Charles E. Murphy
> LENNON, MURPHY & LENNON, LLC
> The GrayBar Building
> 420 Lexington Ave, Suite 300
> New York, NY 10170
> *Attorneys for Defendant*

> _/s/ Peter J. Gutowski_
> Peter J. Gutowski

Dated: June 12, 2008