UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

OCEAN LINE HOLDINGS LIMITED,

                                        Plaintiff,

                                                        ECF CASE

        - against -

                                                        07-CV-8212 (DC)

CHINA NATIONAL CHARTERING CORP.
a/k/a/ SINOCHART,                                       DECLARATION OF
                                                        MATTHEW STEPHEN MOORE

                                        Defendant


I, **MATTHEW STEPHEN MOORE** declare as follows:


1.      I am an Assistant Solicitor at the firm of Ince & Co solicitors, in London, and am duly
        authorised to make this witness statement in support of the Plaintiff's response to the
        security for costs motion that has been filed in New York by the Defendant, Sinochart,
        pursuant to Supplemental Rule E(2)(b).  My firm represents the Plaintiff, Ocean Line
        Holdings ("Ocean Line") in London and I have had the day to day conduct of this
        matter on behalf of Ocean Line throughout the duration of the security negotiations,
        under the supervision of a partner in the firm, Mr Ian Chetwood.

2.      I exhibit to this witness statement a bundle of documents MSM.  I confirm that these
        are true copies of the documents that have been exchanged on behalf of Ocean Line in
        this matter. These documents are numbered consecutively and are identified with
        reference to the page numbers.

3.      Reference is made in this witness statement to the Attorney Declaration of Mr Patrick
        Lennon given in support of Sinochart's motion for security for costs pursuant to
        Supplemental Rule E(2)(b) (the "Attorney Declaration").

4.      I have been asked to comment on the Attorney Declaration and in particular to
        comment on Sinochart's suggestions to the effect that there was a refusal by Ocean
        Line to negotiate substitute security in good faith; that Ocean Line attempted to resist
        valid and immediate offers of substitute security specifically in order to disrupt
        Sinochart's business activities; and that Sinochart were forced by Ocean Line's conduct
        to put up surety bonds for US$177 million.

5.      As I will explain in this statement, the Attorney Declaration does not accurately reflect
        the negotiations which were conducted and, with respect, it distorts the true picture.  It
        may be helpful at the outset to note that the Attorney Declaration principally focuses

on exchanges of correspondence between 4 and 11 February 2008. The Court will wish to note, however, that Ocean Line's initial demand for security for its claim was made in February 2007. The exchanges in New York in the short period to which the Attorney Declaration refers, were thus immediately before the bonds were posted - a year later - in March 2008. The events of the preceding twelve months are material to the allegations made in Sinochart's Attorney Declaration and an examination of the events shows the allegations to be ill-founded.

## Introduction

6.   London is a major international forum for the resolution of maritime claims. As a matter of English law, a claimant is permitted to seek security for his best arguable case. The issue of security is ordinarily dealt with prior to, and separately from, the issue of liability.  Where, as here, London arbitration has been agreed as the dispute resolution forum, a claimant will seek security at the beginning of the case, to ensure that when  the London arbitration award is obtained on the merits (which award will take time to be obtained), there is an easy and straightforward means of enforcing that award so that it will not go unsatisfied. This practice of dealing with security in advance of the merits of the claim is not, of course, peculiar to England. From the claimant's perspective, the security needs to be readily and immediately enforceable, so that no reason or excuse can be given by the defendant or by the security provider for not making full payment. The claimant will also be anxious to avoid any necessity to re-litigate the case with the security provider.

7.   In the normal course of events a request will be made by the claimant for security to be provided voluntarily by or on behalf of the defendant.  If suitable security is not forthcoming, the claimant may seek the assistance of the Court in England (which, incidentally, exercises supervisory jurisdiction over London arbitrations) or in any other jurisdiction where assets of the defendant can be found, if that jurisdiction would provide appropriate relief to the claimant. Typical examples of the action that may be taken to obtain security for a maritime claim include an arrest of a ship or other property belonging to the defendant such as bunkers, or the interception of the defendant's funds. The latter means of obtaining security for London arbitrations is commonly sought through a Rule B application in New York.

8.   When a defendant elects to provide security voluntarily in cases where the losses in issue are covered by a reputable P&I liability insurer, such security will very often be offered in the form of a P&I Club Letter of Undertaking ("LOU") or a first class bank guarantee.  P&I insurers who are part of the International Group of P&I Clubs habitually put up their LOU's on behalf of their insureds. The common practice is a single security instrument covering the full amount of the claim, interests and costs. If a bank guarantee is offered, the claimant will be concerned as to the identity and reputation of the bank and the wording of the guarantee that is being suggested.

9.   The larger the amount of the claim, the greater the concern of the claimant to ensure that any proposed security arrangements are as risk free as possible and completely watertight. The wording of the security is obviously vital and among the other issues

that the claimant will wish to consider is to what trouble and expense he may be subjected if, for any reason, the bank were to refuse to make payment once the award or judgment on the merits is obtained. That brings into play, for example, the place of domicile of the bank, whether the award on the merits can be immediately transposed into a judgment against the bank in the country of its domicile and the availability and speed of appropriate remedies in the legal system where the bank might need to be sued to achieve satisfaction of the award, if payment is for any reason resisted. The claimant's natural preference will be for a bank guarantee issued by a bank domiciled in the same place as where the award will be issued, to simplify enforcement. The claimant seeks straightforward and simple arrangements for security to eliminate any scope for prevarication, obstacles or additional costs, so that he can be sure that when the claim succeeds on the merits, he will promptly and definitely be paid.

## Discussions between Sinochart and Ocean Line

10.    The discussions about security in this case were far from straightforward. No attempt has been made in the Attorney Declaration to explain to the Court the full extent or nature of the negotiations which were conducted, and this statement gives further pertinent details of the chronology and extent of the negotiations outside New York, with a view to providing a fuller picture.

11.    A complete message-by-message recital of who said what to whom and when, is unlikely to assist the Court. The key issue in the light of Sinochart's assertions is whether good faith was exercised by Ocean Line - as Ocean Line submits that it was - in relation to the attempts to agree mutually acceptable security.

12.    I need to point out at the outset of any discussion about this topic that a very significant number of the exchanges relating to security were marked 'without prejudice'. The content of a 'without prejudice' message is privileged and cannot be exhibited to the Court. There is therefore a limit to the level of detail which I can give in this statement. It is, however, reasonable and appropriate to note that lengthy and detailed discussions took place between the parties, not simply restricted to exchanges between New York lawyers. By way of illustration, some 70 or so items of correspondence were exchanged; lawyers in New York, London, Hong Kong and Shanghai were engaged in the dialogue; and there was direct contact between the respective P&I Clubs. The Attorney Declaration accepts in passing that there were *"literally months of negotiations"* but fails to mention there were twelve months during which the issue of possible security was in play. Discussions were not restricted to the very limited period which the Attorney Declaration chooses to focus upon. To the extent I am able, without trespassing on the 'without prejudice' nature of the correspondence, an outline of those negotiations and discussions follows.

## February 2007 – August 2007

13.    Ocean Line's claim relates to the grounding of the *Ocean Victory* on 24 October 2006 and its loss. This was a high profile casualty, of which Sinochart were of course fully

aware as time charterers of the ship. Sinochart in turn were looking to the sub-charterer, Daiichi, from whom they in time obtained security in the form of a single bank guarantee.

14.    On 22 February 2007 a request was made for security to Sinochart's P&I liability underwriter, Skuld, in Hong Kong. At that time a P&I Club Letter of Undertaking (LOU) was sought.

15.    Ocean Line established in correspondence that they had a *prima facie* maritime claim. The existence of that claim was tacitly accepted at an early stage by the London solicitors representing Sinochart's insurers, but rather than meet the request for security 'head on', they sought instead to discuss the merits of the claim and to seek disclosure of documents. As described above, issues of security are usually dealt with before the merits and the claimant's right to obtain security is not contingent upon satisfying the defendant that the defendant will be found liable. Here Sinochart's approach was consistent with a defendant who was intent on avoiding putting up security on a voluntary basis. Ocean Line has not had disclosure of the exchanges about security between Sinochart and Daiichi, but it may be that Sinochart was unwilling to contemplate the provision of security to Ocean Line, until such time as it had obtained security for itself from Daiichi.

16.    In the period from February 2007 to August 2007, no offer or indication was given by Sinochart that security would be provided to Ocean Line. Throughout this period, therefore, Ocean Line was unsecured and efforts to persuade Sincohart to provide satisfactory security came to nought.

**September 2007 – November 2007**

17.    In the absence of a proposal for security, the Rule B application was filed by Ocean Line in New York, with the order being granted on 17 September 2007. In the period from 17 September 2007 to 10 November 2007, transfers in the name of Sinochart and China National Chartering Corp. were caught in the amount of US$24,187,283.93. However, after 10 November 2007, no further transfers were caught (save for US$251,653.33 on 13 November and $3,157.90 on 30 November 2007), which was surprising in view of Sinochart's continuing and extensive international chartering operations.

18.    Sinochart did not seek to discuss proposals for providing security until the Rule B application had been granted and until Sinochart's funds were being intercepted as a result. A period of six months had therefore elapsed from February 2007 during which Sinochart made no attempt – in good faith or otherwise – voluntarily to deal with Ocean Line to resolve security issues.

19.    Rather than offer security in the form a P&I Club LOU or a first class London bank guarantee (i.e. a bank guarantee in the same jurisdiction as the agreed forum for dispute resolution), Sinochart then mounted a challenge to the Rule B, the details of which will be familiar to the Court.

20.    While it was for Sinochart to come forward with any offer for substitute security with an acceptable wording, it was instead Ocean Line who provided a straightforward proposal and wording for security, to be provided by way of a Skuld LOU or first class London or New York bank guarantee, as early as on 2 October 2008 ("MSM 1 – 4").

21.    It emerged in open written correspondence that Sinochart only had liability insurance cover in place for US$ 50 million. This underinsurance is important, not least because from Ocean Line's perspective they would be looking to Sinochart alone for the uninsured portion of the claim, as opposed to Sinochart and their P&I Club for the full extent of Sinochart's liabilities.

**December 2007 – January 2008**

22.    In the absence of the provision of security and on the basis that no substantial funds had been caught by the Rule B attachment since November 2007 , an application was made to the New York Court to expand the original order.  That application was contested by Sinochart and at a hearing in New York on 19 December 2007, before the court ruled on the expansion application,  Sinochart's attorneys were asked by the Court to obtain an answer from their clients to respond to the simple question as to whether Sinochart funds were being routed through New York, other than in the name of Sinochart or China National Chartering Corporation.  Sinochart could not or would not answer this question, despite being asked to do so by the Court. This was answer enough.

23.    Questions regarding the steps Sinochart may have been taking to move funds through New York otherwise than in their own name, remained unanswered by Sinochart. No further funds were being caught, yet Sinochart were reported to be continuing to charter ships, with payments of hire being needed, I believe, in US Dollars and likely payments of sub-charter hire being received from sub-charterers in US Dollars.

24.    Sinochart's approach at this time to the question of providing substitute security is well illustrated by an exchange of correspondence over a 6 day period. These exchanges pre-date the exchanges referred to in the Attorney Declaration and are representative of the exchanges which had gone before in that Sinochart was unable even at this late stage (i.e. 11 months after the first request for security and 4 months after the attachment order was granted) to make a firm, immediate and binding offer of substitute security, which was capable of acceptance by Ocean Line.

25.    In more detail, on 16 January 2008, a proposal was put forward by Sinochart in relation to possible split security, which would be provided in part in China through a Bank of China bank guarantee and in part in Norway through a Club LOU, but was proposed to be subject to a complicated side agreement governed by English law ("MSM 5 - 20"). The proposal was not immediate or binding as it was made on a "subject to contract basis". The suggested side agreement introduced issues unrelated to security.

26.    The reasons why this proposal was unsatisfactory to Ocean Line are summarised in a message from this firm also of 16 January 2008 ("MSM 21 - 24").  These reasons included, among others, the fact that no proposal was made for a single security

instrument but rather for possible split security from two security providers in different jurisdictions, neither of which was located in the forum in which the arbitration is to be held or where the Rule B attachment had been made. Sinochart was thus asking Ocean Line to bear possible risks from having to seek enforcement of the security instruments in two different jurisdictions when, for example, it may have been possible for Sinochart to ask their P&I Club to accept a bank guarantee from the Bank of China and to then post a single LOU in Ocean Line's favour. Alternatively, a single bank guarantee might have been offered to eliminate the risk of Ocean Line having to commence two separate enforcement actions in Norway and China to draw down on the proposed security, if payment was not made voluntarily.

27.    The questions in this firm's message of 16 January 2008 were not answered and I believe that the impression of readiness to provide substitute security that Sinochart was seeking to create was false and misleading.

28.    Instead of responding to the issues which were raised, Sinochart responded with an alternative proposal on 22 January 2008. The proposal differed significantly from the proposal put forward some 6 days before ("MSM 25 - 28").

29.    These discussions were, it should be recalled, conducted in light of an earlier representation to the court made by Sinochart's attorneys on 8 January 2008 that *"security will be posted within a matter of weeks, if not days"*. The backdrop to the discussions was that Sinochart had already decided to post the bonds and, in my submission, what was being said at this time in correspondence was little more than an attempt to lay a paper trail to try to show at a later date that Sinochart had acted reasonably and to bolster a future security for costs application.

30.    Despite failing to address Ocean Line's concerns about the nature and state of the proposals to provide security, Sinochart made a misrepresentation to the Court, when seeking to defer the expansion application. On 11 January 2008 Sinochart said to the Court that *"it appears both sides are on the verge of agreeing substitute security…"*. This was simply not correct and this is demonstrated by the exchanges above.

**February 2008**

31.    On 4 February 2008, Daiichi announced to the Tokyo Stock Exchange that it had provided Sinochart with bank security for US$ 190 million. It is at about this time – the best part of a year since the initial request for security was made - that Sinochart's Attorney Declaration seeks to pick up the story. The Attorney Declaration attempts to paint a picture of an earlier continued willingness on Sinochart's part to make offers of security, which have somehow been unreasonably refused. The first so-called unconditional offer of security identified in the Attorney Declaration is that of 5 February 2008. The timing of the Daiichi announcement and this proposal is quite telling and it strongly reinforces my belief that Sinochart had no intention of making any firm or binding offer of security to Ocean Line in the 12 months before February 2008 and until they had first obtained a single bank guarantee for themselves from Daiichi.

32.    Even so the issues concerning Sinochart's proposals for substitute security, which were never fully resolved prior to the surety bonds being put up and which stood in the way of agreement being reached on substitute security included:

- Such proposals as were made were "subject to contract";

- SAFE approval in China – i.e. whether approval had been obtained for foreign exchange payment from China, should payment under the bank guarantee be required;

- Split security was proposed from two guarantors covering the same claim and spread across two jurisdictions;

- Issues about the authority of the Bank of China signatories was never satisfactorily addressed;

- The stage reached in the Bank of China's internal approval process was never clarified;

- No definite time frame was provided within which any agreed security might be posted;

33.    On 7 March 2008 the surety bonds were put up.

**Response to the points made in the Attorney Declaration**

34.    Sinochart did not make extraordinary efforts to reach agreement. It failed to make a firm, immediate and binding offer to provide substitute security in a form that would be readily enforceable.

35.    The combination of a possible P&I Club LOU issued in Norway, a possible bank guarantee issued in China and a proposed governing side agreement which was subject to the jurisdiction of the English High Court was not equivalent either to surety bonds posted in New York, or the security that Ocean Line would have had in its favour if a single P&I Club LOU or a single first class bank guarantee had been proposed.

36.    The negotiations about possible security were carried out on Ocean Line's side in good faith. This is borne out by the time, trouble and effort taken by Ocean Line, its insurers and lawyers, and the very extensive correspondence that was exchanged.

37.    There was nothing "veiled in the approach" taken by Ocean Line. Ocean Line had no interest in disrupting Sinochart's business. Ocean Line simply wanted to deal with security in accordance with usual practices, have first class and straightforward security from Sinochart and move on to the merits of the claim.

38.    There was no valid and immediate offer of security from Sinochart. The open – but subject to contract - proposal which was eventually made on 16 January 2008 was not capable of acceptance and was not for readily enforceable security. Enforcement (in the

absence of payment) would have necessitated reference to the Court in Norway and the Court in China, and possibly the High Court in London. Rather than answering the questions relating to the proposal, or simplifying it, Sinochart instead put forward a further equally deficient substitute security proposal, before then posting the bonds.

39.    The expansion order was sought by Ocean Line to obtain security for its claim. Questions regarding the steps taken by Sinochart to avoid the original order remain unanswered.

40.    Sinochart was not "forced to put up bonds for $177 million" by Ocean Line's conduct, in circumstances where only $24 million of its funds had been caught ($26,145,153.48 at the time the bonds were posted, owing primarily to the restraint of an additional $1,293,889.54 on 21 February 2008, immediately before the bonds were posted) and no additional monies were being intercepted.    This is unless, of course, Sinochart's arrangements to avoid the impact of the Rule B order, were in themselves causing Sinochart disruption.  Sinochart would not respond to the Court on this issue.

## Summary and conclusion

41.    Sinochart was from the outset reluctant to provide security. No attempt was made to deal with the issue for six months from the request for security until the Rule B application was in place.

42.    Sinochart then prevaricated and made a number of over-complicated and flawed suggestions as to how they might provide substitute security.  No firm, immediate and binding offer was made to provide a P&I Club LOU or first class bank guarantee, in order to deal with security in a simple and clear way.

43.    Sinochart did not act in good faith.  It would not tell the Court whether funds were being transferred by it through New York in relation to its ongoing charter business. It misrepresented the status of the security negotiations to the Court. In seeking to bolster an application for security for costs, it has now failed to provide the Court with a fair and true explanation of the negotiations that were conducted.

44.    I declare under penalty of perjury and the laws of the United States of America pursuant to 28 USC Section 1746 that the foregoing is true and accurate.

Signed:    ------------------------------------------------------------

Matthew Stephen Moore

Date:   12 June 2008