UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
OCEAN LINE HOLDINGS LIMITED,                :

             Plaintiff,                :

  - against -

                        :                    07 Civ. 8123 (DC)

CHINA NATIONAL CHARTERING            :
CORPORATION,

             Defendant.                :
------------------------------------------------------X

## CHINA NATIONAL CHARTERING CORPORATION'S
### REPLY MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SECURITY FOR
### COSTS PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(2)(b)

*Of counsel:*

Patrick F. Lennon, Esq.
Nancy R. Peterson, Esq.
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................1

REPLY TO PLAINTIFF'S SUMMARY OF ARGUMENT..................................1

SUPPLEMENTAL FACTS...................................................................3

ARGUMENT.....................................................................................6

      PLAINTIFF'S OBFUSCATION DOES NOT OVERCOME
      SINOCHART'S ENTITLEMENT TO SECURITY FOR ITS COSTS............6

CONCLUSION...................................................................................10

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                     <u>PAGE</u>

A. Coker & Co., Ltd. v. National Shipping Agency Corp.,
1999 U.S. Dist. LEXIS 8131 (E.D. La. 1999)……………………………………...10

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*,
460 F.3d 439 (2d Cir. 2006)……………………………………………………………7

*Centauri Shipping Ltd. v. Western Bulk Carriers KS*,
07 Civ. 4761 (RJS) (S.D.N.Y. May 6, 2008)……………………………………………9

*Fednav Int'l Ltd. v. Sunwoo Merchant Marine Co. Ltd.*,
2007 U.S. Dist. Lexis 79685 (S.D.N.Y. October 18, 2007)……………………...7

*Result Shipping Co. v. Ferruzzi Trading USA*,
56 F.3d 394 (2d Cir. 1995)……………………………………………………………8

*Rolls Royce Indus. Power (India) v. M.V. Fratzis M.*,
1996 U.S. Dist. LEXIS 4907 (S.D.N.Y. Apr. 15, 1996)………………….…….7-9

*The Rice Co. v. Express Sea Transport Corp.*,
2007 U.S. Dist. LEXIS 84300 (S.D.N.Y. 2007)……………………………….…7-8

*Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy*,
542 F.Supp. 1302 (W.D. Wa. 1982)…………………………………….…….7

## STATUTES AND RULES

Fed. R. Civ. P. Adm., Supp. E(2)…………………………………………*passim*

28 U.S.C. § 1920………………………………………………………………..9

## PRELIMINARY STATEMENT

Defendant, China National Chartering Corp. (hereinafter "Sinochart" or "Defendant") submits the within Reply Memorandum of Law in further support of its Motion for Security for Costs pursuant to Supplemental Admiralty Rule E(2)(b) ("Rule E(2)(b)").   For the reasons previously set forth in Sinochart's Memorandum of Law dated May 14, 2008, and for the additional reasons set forth herein, the Motion for Security for Costs should be granted.

## REPLY TO PLAINTIFF'S SUMMARY OF ARGUMENT

There are very few key facts that are relevant to the Court's disposition of Sinochart's motion for security for costs.   Among the most pertinent facts are:

- Prior to the commencement of this action, the Plaintiff demanded security from Sinochart, which Sinochart agreed to provide subject to being provided details of the claim and breakdown of the alleged damages, which Plaintiff refused to provide;

- In this action, Plaintiff obtained an attachment order in the sum of $177,520,838;

- From the time it obtained the attachment order Plaintiff barraged numerous New York banks with service of the process of attachment and succeeded in attaching in excess of $26 million[1] of Sinochart's property interests;

- Sinochart, an instrumentality of the People's Republic of China, moved to vacate the attachment, as its right, and in the alternative sought countersecurity pursuant to Supplemental Admiralty Rule E(6) for its own substantive claims, as is also its right;

- Plaintiff's efforts to attach Sinochart's property disrupted Sinochart's business;

- Plaintiff refused to accept reasonable substitute security in the form of bank guarantees and insurer's letters of undertaking, thus leaving Sinochart with no option but to incur

---

[1]     Plaintiff incorrectly contends that only approximately $24 million of Sinochart's property was attached.  In fact, in excess of $26 million was attached by Plaintiff's counsel's own admission in correspondence with undersigned counsel.

1

the extreme cost of posting surety bonds to alleviate the disruption of its business caused by Plaintiff's wrongful attachment.

Yet, incredibly, in its effort to resist providing Sinochart with security for the costs it incurred in posting the surety bonds[2] to *wholly* secure Plaintiff's claims, Plaintiff injects irrelevant and unsupported allegations (calling the same "facts") in a smear campaign against Sinochart and its representatives. Built on this obfuscation, Plaintiff stoops to the depth of disingenuousness claiming that Sinochart is not entitled to security for its costs on the basis of "unclean hands." Not surprisingly, Plaintiff cites no supporting authority.

Most telling is Plaintiff's reliance in its opposition papers on loose and unsubstantiated suspicion that Sinochart was utilizing "subterfuge" to avoid having further of its funds beyond the $26 million attached up to the time Sinochart posted the bonds. In a classic bootstrapping argument, Plaintiff contends that Sinochart only posted two surety bonds in the total sum of $177 million in order to avoid have the alleged "subterfuge" exposed, despite the fact that Plaintiff is unable to offer any credible evidence to support its allegations. To be kind, the Declarations of Peter Gutowski and Matthew Moore in support of Plaintiff's opposition contain nothing more than idle speculation to prop up of Plaintiff's "subterfuge" theory. It will indeed be a sad day if this Court allows clever attorney rhetoric and conjecture to act as a substitute for proof.

There simply is no connection between Plaintiff's "subterfuge" theory and Sinochart's legitimate desire to free itself from the disruptive impact on its business caused by the wrongful attachment of its property.[3] In any event, as set forth in the accompanying Declarations of Glenn

---

[2]     Similarly, and despite having $177,520,838 of security from Sinochart, Plaintiff has vigorously refused to voluntarily provide Sinochart with countersecurity for its counterclaims despite the near automatic requirement to do so under Supplemental Admiralty Rule E(6). Sinochart's motion for countersecurity has been pending since October 18, 2007. Plaintiff thus has 100% security whereas Sinochart has 0% security.

[3]     Although Plaintiff alleges that by December 2007, Sinochart's EFT transfers "virtually dried up," (*Plaintiff's Memo. of Law at* 4) that is not true. In addition to the funds Plaintiff attached in December, on January 22, 2008, Plaintiff also attached two separate wire transfers involving Sinochart totaling $286,270.82, both in the

Winter and Lianjun Li, Plaintiff's contrived theory is belied by the facts which demonstrate Sinochart's willingness to provide Plaintiff with security since the Plaintiff's first demand nearly eight months prior to the commencement of this action.

Plaintiff's magniloquence has failed entirely to refute the fact that in the weeks leading up to the posting of the surety bonds, Sinochart offered unconditional security in the form of a $127,520,838 Bank of China guarantee and $50 million Skuld P&I Club letter of undertaking. Plaintiff may quibble over the items that comprise Sinochart's costs, but clearly it does not dispute the fact that the posting of the surety bonds was far and away more costly to Sinochart than the costs Sinochart would have incurred had Plaintiff acted reasonably and in good faith by accepting the Bank of China guarantee and Skuld letter of undertaking.

## SUPPLEMENTAL FACTS

Given the "smoke and mirrors" stratagem Plaintiff has employed in its opposition papers, a foreword regarding the facts relevant to this motion is appropriate. Regardless of what may or may not have transpired in the months prior to Sinochart's posting of the surety bonds, the *only* relevant issues are whether (a) Sinochart offered reasonable, less costly substitute security; and (b) whether Plaintiff unreasonably refused to accept such alternative security, thus causing Sinochart to incur the massive expense of posting the surety bonds. In this regard, *all* of the facts as alleged by Plaintiff in its opposition papers will be seen to be either false, misleading or wholly and totally irrelevant to the determination of those issues.

The ineffectual nature of the allegations set out in the Declaration of Plaintiff's London solicitor, Matthew Moore, is patent given his repetitive use of the English law principal of "without prejudice" communications as both a shield and a sword. On the one hand, Mr. Moore

---

hands of JP Morgan Chase Bank. Another $1,293,889.54 EFT involving Sinochart was attached by Plaintiff at JP Morgan Chase Bank on February 21, 2008. So much for Plaintiff's "subterfuge theory."

3

criticizes Sinochart by insinuation for supposedly failing to "explain to the Court the full extent or nature of the negotiations." *Moore Decl. ¶ 10.* As the Court will recall, on several occasions, Plaintiff's counsel complained bitterly to the Court that Sinochart's counsel had referred to so-called "without prejudice" communications between the parties London solicitors in correspondence to the Court. On the other hand, Mr. Moore himself indicates that he cannot fully advise this Court of the supposed essential facts due to the "without prejudice" principal. *Moore Decl. ¶ 12.* Neither Plaintiff, nor Mr. Moore, can have it both ways.

The key inquiry in this case is *not* whether Plaintiff exercised good faith in the security negotiations. To the contrary, the relevant inquiry is whether Plaintiff unreasonably refused to accept less-expensive, alternative substitute security, which is why, at the end of the analysis, the only relevant facts are those that immediately preceded Sinochart's posting of the surety bond. Sinochart is not required to prove bad faith. The relevant facts establish that Plaintiff refused to accept the substitute security Sinochart offered and, having made that election, must now live with the consequences of having to secure Sinochart for the costs of posting the surety bonds.

Sinochart stands by the facts as set out in the Declaration of Patrick F. Lennon, submitted with Sinochart's moving papers on May 14, 2008. As the Lennon Declaration clearly establishes, during the few weeks prior to Sinochart's posting of the surety bonds, Sinochart made every conceivable effort to reach agreement with Plaintiff on the Bank of China guarantee and the Skuld letter of undertaking. Plaintiff, however, was intent on stonewalling and refused to intelligently negotiate the wording of these securities, or to meet in person, in order to eliminate Plaintiff's "concerns" (real or imagined). In spite of the exceptional efforts Sinochart made to appease Plaintiff at every stage, Plaintiff now has the temerity to blame Sinochart for its own

4

extreme unreasonableness in the security negotiations and, its refusal to accept the unconditional, reasonable and less costly security Sinochart offered as an alternative to the surety bonds.

In the interests of completing the record, the following facts demonstrate that Plaintiff's arguments ring hollow or are simply untrue.

Sinochart's London solicitors explained to Plaintiff's London solicitors, including Matthew Moore, why Sinochart required further information, both with regard to the cause of the incident and with a more detailed breakdown of the quantum of security Plaintiff demanded. *Declaration of Glenn Winter ¶¶ 4-6, Exhibit GDW1, pages 3-8.* Plaintiff's solicitors, however, ignored that request and Sinochart heard nothing further until just prior to the time Plaintiff obtained the Rule B Attachment in September 2007. *Id. ¶¶ 5-6.*

After the Rule B attachment order was issued, it was repeatedly made clear that Sinochart was willing to voluntarily provide security to Plaintiff. *Winter Decl. ¶ 9.* These facts are wholly ignored by Mr. Moore in his Declaration. Moreover, Plaintiff repeatedly refused to accept such security. *Id.* Plaintiff's refusal appears to have been based on relatively minor objections (e.g. drafting and wording) which could have been satisfactorily resolved had Plaintiff and its representatives been acting in good faith. *Id. ¶¶ 12-13.* Sinochart's London solicitors offered to meet with Plaintiff's London solicitors to address their concerns/objections, but they refused to meet. *Id. ¶¶ 13-14, Exhibit GDW1 pages 17-19.*

On one point, Mr. Moore's is correct, i.e. the parties' representatives engaged in lengthy discussions in London, Hong Kong and Shanghai. However, it cannot be overstated that negotiating security for a claim of this magnitude is nowhere near as simplistic as Mr. Moore suggests in his Declaration. *Winter Decl. ¶ 10; Declaration of Lianjun Li ¶ 2.* Far from cooperating with Sinochart with regard to providing security prior to the commencement of this

5

action, Plaintiff and its representatives steadfastly ignored Sinochart's requests for further information and a breakdown of Plaintiff's damage claims until a few days before the attachment order was issued in this case. *Winter Decl. ¶ 8; Li Decl. ¶ 3.* Plaintiff ignored or otherwise refused to respond to Sinochart's with regard to: (1) whether Plaintiff would accept a single bank guarantee from Bank of China for the full sums of the security; and (2) whether Plaintiff would accept two guarantees, one from Bank of China for $127,520,838 and another from Skuld for US$ 50,000,000. *Li Decl. ¶ 5.* Thus, it is untrue and a gross misrepresentation for Plaintiff to contend that there was no "indication of interest" that Sinochart was interested in providing security to Plaintiff. *See Plaintiff's Memorandum of Law at 3.*

Finally, in order to avoid the future costs for Sinochart to maintain the surety bonds, Sinochart remains prepared to offer Plaintiff a Bank of China guarantee for $127,520,838 and a Skuld letter of undertaking (for the sum of $50 million) in exchange for the Plaintiff's return/surrender of the surety bonds. *Li Decl. ¶ 9.*

## ARGUMENT

### PLAINTIFF'S OBFUSCATION DOES NOT OVERCOME SINOCHART'S ENTITLEMENT TO SECURITY FOR ITS COSTS

Plaintiff's contrived "subterfuge" theory is a weak attempt to divert the Court's attention from the key issues relevant to resolution of Sinochart's motion for security for costs pursuant to Rule E(2)(b). For this reason, Sinochart will not engage in a response to Plaintiff's accusations at pages 3-7 of its Memorandum of Law dated June 12, 2008. What is important to note is that Plaintiff admits that this Court has broad discretion to order security for costs pursuant to Supplemental Admiralty Rule E(2). *See Plaintiff's Memorandum of Law at 8.* Thus, Plaintiff acknowledges that Sinochart's motion is well founded.

Plaintiff nonetheless contends that in equity Sinochart's motion should be denied because, according to Plaintiff's "subterfuge" theory, Sinochart has "unclean hands." *Plaintiff's Memo. of Law at 8.* Built on this foundation of artifice, Plaintiff distorts the relevant case law. For example, Plaintiff misinterprets the holding in *Rolls Royce Indus. Power (India) v. M.V. Fratzis M.*, 1996 U.S. Dist. LEXIS 4907 (S.D.N.Y. Apr. 15, 1996) as standing for the proposition that the court's discretion should be guided by principles of "fairness." Yet, in his decision in that case, Judge Haight never used the words "equity" or "fairness." Nonetheless, Plaintiff's equity and "unclean hands" arguments are not only factually unfounded but also unsupported by any legal authority whatsoever. Thus, even analyzed under "fairness" or "equity" considerations, Sinochart's motion should be granted. *See Fednav Int'l Ltd. v. Sunwoo Merchant Marine Co. Ltd.*, 2007 U.S. Dist. Lexis 79685 (S.D.N.Y. October 18, 2007).

Plaintiff's reliance on *Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy,* 542 F.Supp. 1302, 1306 (W.D. Wa. 1982) is misplaced because the court in that case denied the defendant's motions for security on the basis that the plaintiff was sufficiently solvent to satisfy any judgments against it. However, the Second Circuit Court of Appeals in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 439 (2d Cir. 2006) rejected the "need for security" line of cases. Here, the simple fact is that Sinochart is entitled to security for the significant costs it has incurred in posting the surety bonds, and that it will continue to incur to maintain them.

Next, Plaintiff wrongly contends that the alternative security offered by Sinochart in its efforts to avoid incurring the costs of posting the surety bonds was "conditional." The Declaration of Patrick F. Lennon dated May 14, 2008 and submitted in support of Sinochart's motion belies Plaintiff's unfounded assertion that the security offered was "conditional." The authority it cites in this regard, *The Rice Co. v. Express Sea Transport Corp.*, 2007 U.S. Dist.

LEXIS 84300 (S.D.N.Y. 2007) is totally inapposite. In that case, the Court simply ruled that a

Rule B attachment order could not be vacated based on the defendant's security offers prior to

the commencement of the action. *Id.* at \*5-6. The court did not discuss, much less consider, the

issues presented in this case which are governed by more relevant precedent, e.g. *Result Shipping*

*Co. v. Ferruzzi Trading USA*, 56 F.3d 394, 401 (2d Cir. 1995) and *Rolls Royce Indus. Power*

*(India) v. M.V. Fratzis M.*, 1996 U.S. Dist. LEXIS 4907 (S.D.N.Y. Apr. 15, 1996), neither of

which Plaintiff distinguishes and both of which favor granting Sinochart's motion.

     Given the facts of this case, Plaintiff's attempt to find an exception in the *Result Shipping*

holding is most unapt. Here, in truth, it is indisputable that Sinochart made every conceivable

effort to provide Plaintiff with alternate security less costly than the surety bonds. It is also

indisputable that Plaintiff acted unreasonably by failing and refusing to: (a) indicate to Sinochart

whether it would, in principle, accept certain forms of security Sinochart proposed; and (b)

accept the unconditional security Sinochart offered. Thus, unlike the facts of *Result Shipping*,

where the plaintiff agreed to stipulate to an alternative and less costly form of security (*Result*

*Shipping*, 56 F.3d at 401), here Plaintiff refused to accept any feasible alternative security

arrangements. Thus, under the *Result Shipping* holding, Sinochart's motion should be granted

because the *Ferruzzi* Court clarified that such recoverable costs in this context may include the

premium for bonds obtained to release an attachment. *See Result Shipping,* 56 F.3d at 401.

     Realizing the weakness in its position Plaintiff contends that Sinochart should only have

posted a surety bond up to the amount of its property under attachment at that time, i.e. just in

excess of $26 million. First, the Court should take notice of the fact that during the security

negotiations, Plaintiff *never* suggested that Sinochart should only post a $26 million surety bond,

despite Sinochart having made its intention to seek security for the bond costs in the event it was

8

forced to post surety bonds. Second, Plaintiff's after the fact hypothetical ignores the fact that Sinochart's business was severely interrupted by the Plaintiff's continued service of the attachment order on the New York intermediary banks and eliminated Sinochart's ability to engage in U.S. dollar funds transfers. Had Sinochart posted only a $26 million surety bond, Plaintiff would have continued serving the intermediary banks with the process of attachment seeking to obtain security for the $153,000,000 balance, thus perpetuating the disruption of Sinochart's business and would have led to a repeating situation where Sinochart would be forced to post surety bond after surety bond as Plaintiff continued to attach its funds.[4] This scenario would have only added to the costs Sinochart now claims in respect of the two surety bonds that it posted totaling $177,520,838.

The ultimate question is whether Sinochart incurred costs in posting the surety bonds. Indisputably, Sinochart has incurred and will incur during the pendency of this action $7,250,110.20 of costs associated with posting and maintaining the surety bonds. Apparently, Plaintiff does not dispute these figures. Thus, at the conclusion of the case, Sinochart is entitled to recover these costs. Plaintiff's contention that certain aspects of the costs Sinochart has incurred are not "recoverable" costs under Rule E(2)(b) and 28 U.S.C. § 1920 is wrong. As Judge Haight explained in *Rolls* "the expense incurred by defendant in obtaining the letter of credit is an additional expense which is properly the subject of an order for the giving of security for costs under Supplemental Rule E(2) (b)." *Rolls Royce*, 1996 U.S. Dist. LEXIS 4907 at *4. The situation in this case is no different. Thus, the Court should grant Sinochart's motion to ensure it will be made whole if it prevails in defeating Plaintiff's claims, as it fully expects.

Other authority also supports Sinochart's motion. For example, in *Centauri Shipping Ltd. v. Western Bulk Carriers KS*, 07 Civ. 4761 (RJS) (S.D.N.Y. May 6,

---

[4]    *See footnote 2, supra.*

9

2008)(copy attached) the court ordered the plaintiff, whose attachment had previously been vacated, to post a supersedeas bond during the appeals process to secure the defendant for _all_ of its costs and expenses, including bond premium, interest, costs of collateral, etc., associated with posting and maintaining the surety bonds to secure the plaintiff's claims (in the identical manner Sinochart followed here).

In a slightly different context, the court in *A. Coker & Co., Ltd. v. National Shipping Agency Corp.*, 1999 U.S. Dist. LEXIS 8131 (E.D. La. 1999) ordered the plaintiff to post a bond in excess of the amount of the plaintiff's attachment. Relying on Rule E(2)(b) the court ordered the plaintiff to post the bond for "costs associated" with the attachment of bunker fuel on a vessel, stating that "Rule E(2)(b) provides the Court with the authority to order [plaintiff] to post a bond. *Id.* at *5-6. The costs involved in that case related to lost charter hire, bunker fuel, pilotage, launch service and agency fees arising from the attachment of the bunker fuel. *Id.* at *8-9. Thus, Plaintiff's contention that the costs Sinochart claims are not recoverable under Rule E(2)(b) is incorrect.

### CONCLUSION

Having elected to attach Sinochart's funds and then having chosen to reject the alternative security Sinochart offered, Plaintiff must abide the consequences of being required, in fairness and equity, to provide security to Sinochart for the costs of having to post surety bonds in the total amount of $177,520,838.00 in order to lift disruptive effects to its business caused by the attachment. Thus, for all of the foregoing reasons, and those set forth in Sinochart's main Memorandum of Law, Plaintiff should be ordered to secure Sinochart in the sum of $7,250,110.20,[5] in the form of cash or bond, within ten

---

[5]     *See undersigned counsel's May 29, 2008 letter to the Court explaining the basis for the reduction in the amount of security Sinochart claims in this motion.*

10

(10) calendar days following issuance of an Order from this Court compelling Plaintiff to

provide such security.  Should Plaintiff fail to provide such security then Plaintiff's

attachment over Sinochart's property should be vacated and this action dismissed.

Dated: July 3, 2008
       New York, NY

                              The Defendant,
                              CHINA NATIONAL CHARTERING CORPORATION

                          By: _____
                              Patrick F. Lennon
                              Nancy R. Peterson
                              LENNON, MURPHY & LENNON, LLC
                              The Gray Bar Building
                              420 Lexington Ave., Suite 300
                              New York, NY 10170
                              (212) 490-6050 - phone
                              (212) 490-6070 - facsimile
                              pfl@lenmur.com
                              nrp@lenmur.com

## **AFFIRMATION OF SERVICE**

I hereby certify that on July 3, 2008, a copy of the foregoing Reply Memorandum of Law was filed electronically and made available to all counsel of record and pro se parties. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____

Patrick F. Lennon

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/6/08

CENTAURI SHIPPING LTD.,

Plaintiff,

-v-

No. 07 Civ. 4761 (RJS)
ORDER

WESTERN BULK CARRIERS KS, WESTERN
BULK CARRIERS AS, and WESTERN BULK, AS,

Defendants.

RICHARD J. SULLIVAN, District Judge:

Plaintiff Centauri Shipping Ltd. ("Centauri") commenced the above-entitled action on June 5, 2007, seeking, *inter alia*, a writ of attachment pursuant to Rule B of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims. On that date, the Honorable Kenneth M. Karas, District Judge, signed an order permitting plaintiff to attach assets of defendants Western Bulk Carriers KS, Western Bulk Carriers AS, and Western Bulk AS, in the amount of $15,350,796.00 (hereinafter, "the attachment order").[1] (*See* Order dated June 5, 2007.) Subsequently, by order dated September 12, 2007, the Court vacated the attachment order (hereinafter, "the *vacatur*"). (*See* Order dated Sept. 12, 2007; *see also* Sept. 7, 2007 Tr.) On October 12, 2007, the Court denied plaintiff's motion for a stay of the *vacatur* pending appeal but ordered a temporary stay of the *vacatur* pending resolution of plaintiff's application to the Court of Appeals (hereinafter, the "Stay Order"). (*See* Order dated Oct. 12, 2007.) Moreover, because the Court denied plaintiff's motion for a stay of the *vacatur*, it did not resolve defendants' request seeking, in the event that a stay was entered, the issuance of a *supersedeas* bond.

---

[1] The case was reassigned to the undersigned on September 4, 2007.

On January 30, 2008, the Court of Appeals for the Second Circuit granted plaintiff's application to stay the *vacatur* pending appeal, and directed defendants to submit an application for a *supersedeas* bond to this Court. (*See* Jan. 30, 2008 Order at 2.)[2] By letters dated, respectively, February 20 and February 29, 2008, the parties submitted letter briefs to this Court regarding the amount of a *supersedeas* bond. On April 8, 2008, the Court heard oral argument regarding this issue. Thereafter, the parties each submitted supplemental letter briefs to the Court.

At oral argument regarding this issue, plaintiff's counsel stated that his client had previously "offered to provide a bond in the amount of the cost [to defendants] to maintain the surety bond. So [plaintiff is] obviously standing by that representation." (Apr. 8 Tr. at 9.) In its April 18 letter brief, plaintiff concedes that the cost to defendants of maintaining the surety bond is $312,753. (Pl.'s Apr. 18 Ltr. at 2 & n.1.)

Nevertheless, in its April 18 letter, plaintiff asserted for the first time that it "has a fundamental issue with the bond premium and associated cost[s]" to defendants of maintaining the surety bond. (*Id.*) Specifically, plaintiff argues that, in June 2007, defendants "could have" avoided the costs of the surety bond by obtaining a "bank guarantee or letter of credit" in lieu of the surety bond. (*Id.* at 2-3.) According to plaintiff, on June 11, 2007, plaintiff suggested to defendants that they obtain a bank guarantee, but defendants rejected that suggestion on the ground that they did "not have a bank in London or New York for such purposes." (*Id.* at 2 (quoting Defs.' June 11, 2007 Ltr.).) Plaintiff now — for the first time since the parties raised the issue of a *supersedeas* bond with the undersigned in September 2007 — "takes exception" to

---

[2] The Second Circuit noted that defendant was required to make such an application to this Court, in the first instance, pursuant to Rule 8(a)(1)(B) of the Federal Rules of Appellate Procedure, which provides that "A party must ordinarily move first in the district court for . . . approval of a supersedeas bond . . . ."

2

defendants' refusal to obtain a bank guarantee in lieu of a surety bond, and asserts, *inter alia*, that "a number of banks in New York," including defendants' own bank, "will issue letters of credit," which are purportedly "equivalent to bank guarantees."[3]  (*Id.*)

The Court rejects plaintiff's arguments that the amount of the *supersedeas* bond should be reduced based on defendants' purported failure to obtain a specific form of alternative security in June 2007.  Although plaintiff now "takes exception" to defendants' failure to obtain a bank guarantee in June 2007, plaintiff did not make these exceptions known to the Court at *any* point prior to plaintiff's April 18, 2008 letter, notwithstanding the fact that plaintiff's counsel has appeared for several conferences before the Court to discuss this issue and has submitted multiple letters and briefs to this Court, as well as the Court of Appeals (*see* Defs.' Apr. 18, 2008 Ltr., Ex. 3), that specifically address the issue of the *supersedeas* bond.  To the contrary, throughout the course of this action, plaintiff has consistently indicated that the amount of the *supersedeas* bond should equal "the amount of money it would cost [defendants] to maintain the surety bond during the course of the appeal" in this action.  (Sept. 28 Tr. at 16-17; *see* Pl.'s Feb. 29, 2008 Ltr. at 2; Apr. 8 Tr. at 9;.)

Moreover, even if plaintiff had diligently pursued this line of argument, the Court finds that plaintiff has failed to present *any* statute or authority, or any persuasive equitable argument, in support of its position that defendants were obliged to obtain security in precisely the form desired by plaintiff, or that defendants' failure to do so in June 2007 requires this Court to now reduce the amount of the *supersedeas* bond that should be posted by plaintiff pending appeal.

---

[3] In response, defendants maintain that (1) New York banks do not issue bank guarantees, and do not indicate a view as to whether "letters of credit" — which are apparently distinct from bank guarantees — may be obtained from New York banks; and (2) they declined plaintiff's suggestion in June 2007 to obtain a bank guarantee for a number of reasons, including, *inter alia*, their concern that doing so would "have further exposed [defendants'] property to potential maritime attachment by other creditors" seeking to attach funds in this District.  (Defs.' Apr. 18, 2008 Ltr. at 2-3.)

Rule 62(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.[4]

Under Rule 62(c), "a *supersedeas* bond provides compensation for those injuries which can be said to be the 'natural and proximate result of the stay.'" *Moore v. Townsend*, 577 F.2d 424, 427 (7th Cir. 1978) (quoting *Weiner v. 222 East Chestnut Corp.*, 303 F.2d 630, 634 (7th Cir. 1962)).

In this case, given that the very purpose of the bond under Rule 62(c) is "to preserve the status quo pending [the] appeal . . . ," *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Eastern Air Lines, Inc.*, 847 F.2d 1014, 1018 (2d Cir. 1988), the Court finds that it would be inappropriate, at this time, to set the bond amount on the basis of plaintiff's dissatisfaction with surety arrangements that have been in place since June 2007. Rather, it is clear that the "injuries . . . result[ing]" from the stay in this case are the defendants' costs of maintaining the June 2007 surety bond — costs that would not exist but for the stay obtained by plaintiff — during the course of the appeal. *See Moore*, 577 F.2d at 427. Accordingly, the Court directs plaintiff to post a *supersedeas* bond in the amount of $312,753 in order to cover the costs to defendants of maintaining the surety bond in this action pending appeal.[5] Specifically, the

---

[4] Although plaintiff initially sought a stay under Rule 62(d), the parties now agree that the stay should be construed as one issued pursuant to Rule 62(c). (*See* Stay Order at 3-4.)

[5] It is undisputed that this amount is the cost to defendants of maintaining the surety bond through December 2008. (*See* Defs.' Apr. 18, 2008 Ltr., Ex. 1; Pl.'s Apr. 18, 2008 Ltr at 2 n.1.) In the event that it appears that plaintiff's appeal will not be resolved by December 31, 2008, the parties should apply to this Court for a modification of the amount of the *supersedeas* bond.

4

Court finds that such security is "necessary" under Rule 62(c) to "preserve the status quo pending [the] appeal" of this action. *Int'l Ass'n of Machinists*, 847 F.2d at 1018.

SO ORDERED.

Dated:        New York, New York
             May _5_, 2008

                                    _____
                                    RICHARD J. SULLIVAN
                                    UNITED STATES DISTRICT JUDGE

5